Brittany A. Stillwell
info@brittstillwell.com
1055 W 7th Street, 33rd Floor
Los Angeles, California 90017
Tel: 702-907-1908
Fax: (213) 513-5102
PLAINTIFF APPEARING IN PRO PER

**F I L E D**
CLERK, U.S. DISTRICT COURT

08/31/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ram_____ DEPUTY
Fee Paid

## U.S. DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRITTANY A. STILLWELL**, *an individua*l | Case No.  2:21-cv-07040-AB-PDx |
| Plaintiff,<br>v. | **COMPLAINT FOR:** |
| **FASHION NOVA, LLC**, *a California Limited Liability Company*; **NIXON PEABODY LLP**, *a New York Limited Liability Partnership*; **INTRIVO DIAGNOSTICS, INC**, *a Delaware Corporation*; **FN LOGISTICS, LLC**, *a Delaware Limited Liability Company*; **RICHARD D. SAGHIAN**, *an individual*; **ERICA A. MEIERHANS**, *an individual*; **STACI J. RIORDAN**, *an individual*; **REEVE BENARON**, *an individual*; **DANIEL R. MARKEL**, *an individual*; and **DOES 1 THROUGH 10**<br><br>Defendants. | ***1)*** **FORCED LABOR,** *(18 U.S.C. § 1589(a)(2), 18 U.S.C. § 1595);*<br>***2)*** **FORCED LABOR,** *(18 U.S.C. § 1589(a)(3), 18 U.S.C. § 1595);*<br>***3)*** **FORCED LABOR,** (*18 U.S.C. § 1589(b), 18 U.S.C. § 1595);*<br>***4)*** **CALIFORNIA TRAFFICKING VICTIMS' PROTECTION ACT,** *(Ca. Civil Code Section 52.5);*<br>**5)** **PROMISSORY FRAUD - INTENTIONAL MISREPRESENTATION;**<br>**6)** **PROMISSORY FRAUD - NEGLIGENT MISREPRESENTATION;**<br>**7)** **BREACH OF ORAL** |

CONTRACT – OHN
CONSULTANCY
AGREEMENT;
8)     BREACH OF ORAL
CONTRACT – COVID-19
CONSULTANCY
AGREEMENT;
9)     BREACH OF
FIDUCIARY DUTY;
10)    CIVIL RICO, *(18 U.S.C. §
1962(c))*, **Predicate Act:
HONEST SERVICES FRAUD**, *(18 U.S.C. § 1346)*;
11)    **CIVIL RICO,** *(18 U.S.C. §
1962(c))*, **Predicate Act:
NATIONAL STOLEN
PROPERTY ACT,** *(18 U.S.C. §
2314*);
12)    **CIVIL RICO,** *(18 U.S.C. §
1962(c))*, **Predicate Act: WIRE
FRAUD,** *(18 U.S.C. § 1343);*
13)    **PROFESSIONAL
NEGLIGENCE;**
14)    **INTENTIONAL
INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE;**
15)    **NEGLIGENT
INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE;**
16)    **INTENTIONAL
INFLICTION OF EMOTIONAL
DISTRESS;**
17)    **NEGLIGENT
INFLICTION OF EMOTIONAL
DISTRESS;**
18)    **REQUEST FOR
DECLARATORY RELIEF:**

COMPLAINT

**California Pharmacy Law, as Applied to Compliance Firm;**
**19) REQUEST FOR DECLARATORY RELIEF: California Pharmacy Law, as Applied to Intrivo Diagnostics, Inc.;**
**20) REQUEST FOR DECLARATORY RELIEF: Stillwell's State of Residency and Domicile;**
**21) DECLARATORY JUDGMENT: Subject Matter Jurisdiction Lacking in *FNL vs Compliance Firm*, (*28 U.S.C. § 2201*);**
**22) DECLARATORY JUDGMENT: PREP Act Immunity Applicable to Stillwell and Compliance Firm, (*28 U.S.C. § 2201*);**
**23) DECLARATORY JUDGMENT: Attorney Misconduct, (*28 U.S.C. § 2201*); and**
**24) REQUEST FOR DECLARATORY RELIEF: Attorney Misconduct**

Plaintiff BRITTANY STILLWELL alleges as follows:

## I.   INTRODUCTION

1.   This quasi-whistleblower action arises from the racketeering activities and conspiracies perpetrated against Plaintiff, Brittany A. Stillwell, ("Stillwell"), by the Defendants.

2.      While working for Fashion Nova, Plaintiff obtained firsthand knowledge of Fashion Nova's criminal conduct, such as Fashion Nova's ongoing worker compensation fraud, payroll tax evasion, and its exploitation of undocumented workers.

3.      In addition to working for Fashion Nova, Plaintiff's company, The Compliance Firm LLC, ("Compliance Firm") leased employees to Fashion Nova and was eventually hired to provide COVID-19 testing to Fashion Nova's nearly 10,000 employees, contractors, and vendors.

4.      From July 2020 to January 2021, at the height of the COVID-19 pandemic, Compliance Firm recruited over 400 employees who worked at Fashion Nova's Santa Fe Springs warehouse and distribution center.

5.      In a reckless disregard for human life, Fashion Nova knowingly under-reported and intentionally concealed *hundreds* of positive COVID-19 cases from employees, contractors, and vendors, including multiple COVID-19 outbreaks at its Santa Fe Springs warehouse in November 2020 and December 2020.

6.      Fashion Nova refused to cooperate with Compliance Firm in an investigation of a COVID-19 related death that was linked to Fashion Nova's December 2020 COVID-19 outbreak and threatened Plaintiff for pursuing an investigation of the COVID-19 related death.

7.     Fashion Nova intentionally failed to inform employees, contractors, and vendors when they were exposed or close contacts of COVID-19 positive persons. Fashion Nova executives feared employees would stop coming to work if they knew the actual number of positive COVID-19 cases.

8.     Fashion Nova encouraged and knowingly allowed symptomatic *and* COVID-19 positive employees to work, citing staffing shortages for this rationale. Fashion Nova's reprehensible actions exposed *thousands* of its nearly 10,000 employees to COVID-19.

9.     Plaintiff made multiple complaints to Fashion Nova executives and other government agencies regarding the unlawful conduct described herein.

10.    Fashion Nova was concerned that any negative COVID-19 related press or lawsuits would deter investors and adversely affect Fashion Nova's sales and profits.

11.    To silence Plaintiff and to shield itself from COVID-19 related litigation, Fashion Nova asked Stillwell to sign a backdated non-disclosure agreement, ("NDA"), which contained an arbitration agreement, and an agreement to indemnify Fashion Nova against future COVID-19 related litigation. The NDA would have been binding for Stillwell *and* Compliance Firm.

12.     After Stillwell refused to sign the NDA, Fashion Nova threatened to leverage its "connections" and social media "clout" to "destroy" and "bankrupt" Stillwell and her businesses. Fashion Nova further threatened it had the means to make Plaintiff "disappear" if she ever pursued or participated in any legal claims against Fashion Nova.

13.     In January 2021, Fashion Nova owed Compliance Firm over $500,000.00 and refused to pay unless Stillwell signed the NDA. After Stillwell refused to sign to the NDA, Fashion Nova terminated all its contracts with Stillwell and Compliance Firm then refused to pay its outstanding balances and unpaid invoices.

14.     In January 2021, Fashion Nova enlisted the help of the Defendants, including several Nixon Peabody attorneys, and began a barrage of harassment, threats, conspiracies, and schemes to harm and intimidate Stillwell.

15.     In March 2021, the Defendants conspired to defraud Compliance Firm out of more than $500,000.00 in relation to Fashion Nova's purchase of 12,800 CareStart Antigen COVID-19 Tests, ("CSA Tests").  The nearly 13,000 CSA Tests had a shelf life of six (6) months and expired in April 2021.

16.     Fashion Nova purchased the CSA Tests in November 2020 to provide onsite COVID-19 testing to its 10,000 employees. However, Fashion Nova

delayed its COVID-19 testing efforts due to fear of revealing its November 2020 and December 2020 COVID-19 outbreaks.

17. In March 2021, Fashion Nova, Intrivo Diagnostics, and Nixon Peabody conspired to re-label and resale over 8,000 *expired* and adulterated CSA Tests, which are currently being sold and used at clinics, schools, and workplaces throughout the country.

18. The expired CSA Tests can yield *false* negative results and cause COVID-19 positive persons to unknowingly transmit the COVID-19 virus. Using the expired CSA Tests can lead to widespread COVID-19 infections and outbreaks, thereby causing a public health disaster.

19. On April 15, 2021, Stillwell sent Fashion Nova a second demand for payment of its outstanding balances and unpaid invoices. The next day, Fashion Nova sued Compliance Firm[1] in federal court for over $600,000.00. The frivolous lawsuit, filed by Nixon Peabody, accuses Compliance Firm of "misrepresenting itself as a qualified medical services provider and charging Fashion Nova over $600,000 for workforce testing services that were never provided."

---

[1] FN LOGISTICS, LLC v. THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and DOES 1 though 10, Case No. 2:21-cv-03312-GW-MAR, ("**FNL Complaint**").

20.     Nixon Peabody, Fashion Nova, and Intrivo Diagnostics contrived fictious allegations, falsified documents, offered perjured testimony, destroyed evidence, and concealed material facts to prevent Compliance Firm from defending the frivolous FNL Complaint.

21.     In June 2021, former Fashion Nova employees informed Plaintiff of Fashion Nova's conspiracies against Stillwell and Compliance Firm. The former employees offered evidence and testimony that proved Fashion Nova, Nixon Peabody, and Intrivo Diagnostics conspired to defraud money and property from Stillwell and Compliance Firm.

22.     After learning that Compliance Firm obtained exculpatory evidence, Nixon Peabody filed a request for Entry of Default, instead of a Motion to Dismiss the frivolous FNL Complaint, to further injure Stillwell and Compliance Firm.

23.     Fashion Nova's frivolous lawsuit cost Compliance Firm and Stillwell over $10,000,000 after clients canceled COVID-19 testing contracts amidst the false allegations of fraud.

24.     The Defendants' relentless harassment, threats, and conspiracies to defraud Stillwell and Compliance Firm are ongoing and continue to cause irreparable financial, emotional, and physical harm to Stillwell.

25.     After enduring Fashion Nova's malicious and oppressive conduct for over a year, the stress inflicted upon Stillwell exacerbated her rare heart condition and nearly cost Plaintiff her life. In a race against time, Plaintiff files this suit before this Court, potentially on her deathbed, unsure if she'll live to see justice served.

26.     In the event of Plaintiff's untimely demise, Stillwell's Will provides that her Estate retain counsel to continue litigating this suit. In the interim, Plaintiff anticipates retaining counsel prior to discovery.

27.     After discovery in this matter, Stillwell and Compliance Firm intend to file a police report with Los Angeles Police Department to formally pursue criminal charges for the conduct alleged herein.

28.     The Defendants' deplorable conduct alleged herein remains a threat to public safety and public health. Plaintiff's Complaint should remain unsealed in the interest of justice for other victims that were harmed by the conduct alleged herein.

## II.     PARTIES

29.     Plaintiff, Brittany A. Stillwell, ("Stillwell,") is an individual residing in Los Angeles County, California. Stillwell has been a resident of California at all relevant times, including on April 16, 2021, when Nixon Peabody filed the FNL Complaint falsely alleging Stillwell to be a resident

of Nevada, so it could claim diversity jurisdiction. Stillwell owns The Compliance Firm LLC and its six wholly owned subsidiaries.

30.    <u>Defendant, Fashion Nova, LLC</u>, ("FN"), is a California limited liability company with its headquarters at 2801 E 46th Street, Vernon, California 90058. On December 31, 2020, Fashion Nova, Inc. converted from a California corporation to Fashion Nova, LLC, a California limited liability company.

31.    Upon information and belief, Fashion Nova, LLC has three members: Nova 21, LLC, FN Logistics, LLC and Fashion Nova Holdings, LLC.

　　(a) Nova 21, LLC is a California limited liability company with its business address in Berkeley, California

　　(b) Upon information and belief, Nova 21, LLC has two members, Fashion Nova, LLC and FN Logistics, LLC.

32.    <u>FN Logistics, LLC</u> ("FNL") is a Delaware limited liability corporation with its headquarters at 2801 E 46th Street, Vernon, California 90058.

33.    Upon information and belief, FN Logistics, LLC has three members: Fashion Nova, LLC; Nova 21, LLC; and Fashion Nova Holdings, LLC.

　　(a) Fashion Nova Holdings LLC is a Delaware limited liability company, with its headquarters at 2801 E 46th Street, Vernon, California 90058.

1.  Upon information and belief, Fashion Nova Holdings, LLC has four members: Fashion Nova, LLC; FN Logistics, LLC; Nova Fashion, Inc., and Richard D. Saghian, an individual.

2.  Nova Fashion, Inc. is a California stock company with its headquarters at 2801 E 46th Street, Vernon, California 90058.

34.    Defendant, Richard D. Saghian, ("Saghian") is an individual residing in Los Angeles County, California.

35.    Upon information and belief, Saghian is the founder and CEO of Fashion Nova, LLC and all of its subsidiaries, including FN Logistics, LLC; Nova Fashion, Inc; Fashion Nova Holdings, LLC; UFF LLC, and Fashion Nova F21 Acquisition, LLC.

36.    Defendant, Erica A. Meierhans, ("Meierhans") is an individual residing in Los Angeles County, California. Meierhans is an attorney licensed in California and the General Counsel and Chief Compliance Officer at Fashion Nova LLC and its subsidiaries.

37.    Defendant Nixon Peabody LLP, ("Nixon Peabody") is a New York limited liability partnership with its headquarters at 53 State Street, Boston, Massachusetts 02109.

(a) Nixon Peabody conducts business in California from an office located at 300 S Grand Avenue #4100, Los Angeles, California 90071.

38. Defendant, Staci J. Riordan, ("Riordan") is an individual residing in Los Angeles County, California. Riordan is an attorney licensed in California and is a partner at Nixon Peabody LLP. Riordan is also the CEO and president of Samicah Corporation, Inc. ("Samicah"), where Riordan provides legal services. Samicah conducts business in California from Nixon Peabody's Los Angeles office, located at 300 S Grand Avenue #4100, Los Angeles, California 9007.1

39. Defendant Intrivo Diagnostics, Inc ("Intrivo") is a Delaware corporation with its headquarters located at 65 Clyde Road, Somerset, New Jersey 08873.

(a) Intrivo Diagnostics, Inc. is **not** a registered or qualified business in California but conducts business in California out of an office located at 2021 Santa Monica Blvd #11, Santa Monica, CA 90404.

40. Defendant, Reeve Benaron, ("Benaron") is an individual residing in Los Angeles County, California. Benaron is a Co-owner and the CEO of Intrivo Diagnostics, Inc.

41.     Defendant, Daniel R. Markel, ("Markel") is an individual residing in Los Angeles County, California. Markel is a Co-owner of Intrivo Diagnostics, Inc.

42.     Does 1 through 10, ("Doe Defendants"); Plaintiff Stillwell is ignorant of the true names and capacities—whether individual, corporate, partnership, association, or otherwise—of defendant Does 1 through 10 ("Doe Defendants"), inclusive, and therefore sues said parties by their fictitious names.  Stillwell is informed and believes, and thereupon alleges, that each of the fictitiously named Doe Defendants is responsible in some manner for the injuries and damages alleged by Stillwell in this Complaint.  Stillwell will seek leave of the Court to amend this Complaint to show the true names and capacities of the fictitiously named Doe Defendants when such names have been ascertained.

43.     Plaintiff Stillwell is informed and believes, and thereupon alleges that, at all relevant times, FN, FNL, Intrivo, Nixon Peabody, Saghian, Benaron, Markel, Meierhans, Riordan, and the Doe Defendants, and each of them, were the principal, agent, servant, employee, vendor, or in some other legal relationship to the others, whereby legal liability is imputed from one party to the others.

44.     At all relevant times, FN, FNL, Intrivo, Nixon Peabody, Saghian, Benaron, Markel, Meierhans, Riordan, and the Doe Defendants were acting

within the course and scope of their agency, servant, or employment

relationship.

## III.   JURISDICTION AND VENUE

45.   There are two sources of subject matter jurisdiction in this Court:

(a) Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction because the parties' citizenship is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

(b) Pursuant to Title 28 U.S.C. § 1331, this Court has subject matter jurisdiction because this matter involves questions, issues and/or claims arising under federal law.

46.   Defendants Intrivo and Nixon Peabody are diverse parties. Intrivo is incorporated in Delaware and maintains its headquarters in New Jersey. Nixon Peabody is incorporated in New York and maintains its headquarters in Massachusetts.  The amount in controversy exceeds $75,000 as to each defendant.

47.   This matter involves questions, issues and/or claims arising under:

(a) federal racketeering laws codified at 18 U.S.C. § 1961 et seq.

(b) The Public Readiness and Emergency Preparedness Act, ("PREP Act") codified at 42 U.S.C. 247d-6d and 42 U.S.C. 247d-6e); and

COMPLAINT
- 14 -

(c)  Declaratory Relief, codified at 28 U.S.C. §§ 2201-2202.

48.     This Court has personal jurisdiction over all Defendants because each Defendant had, and continues to have, contacts with California that are continuous, systematic, purposeful, and the specific claims in the lawsuit arise from those particular contacts.

49.     Pursuant to 18 U.S.C. § 1596(a), this Court has extra-territorial jurisdiction over Plaintiff's claims arising under 18 U.S.C. § 1589.

50.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's related state law claims.

51.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Los Angeles County, which is in this Court's judicial district.

52.     Venue is also proper in this Court 28 U.S.C. § 1391(d), because Defendants FN, FNL, Nixon Peabody, and Intrivo transact business in Los Angeles County. Venue is also proper in this Court 28 U.S.C. § 1391(b), because Defendants Saghian, Benaron, Markel, Meierhans, and Riordan all reside and work in Los Angeles County, which is in this Court's judicial district.

## IV.     FACTUAL BACKGROUND

53.     Plaintiff, Stillwell owns The Compliance Firm LLC, ("Compliance Firm") and its wholly owned subsidiaries, including Compliant Care Staffing, KovidPass, Salveo Medical Supply, and Inventotech.

54.     Stillwell is an employee of Compliance Firm, and also acts as an agent of Compliance Firm and its subsidiaries. Stillwell also works as a sole proprietor when consulting for certain clients.

55.      Through its 100 percent wholly owned subsidiaries, Compliance Firm provides temporary staffing solutions, business consultancy, telehealth services, health informatics and affordable COVID-19 testing that cost as low as $35.00 per person

56.     In California, Compliance Firm does business as Compliant Care Staffing, ("CCS").

## A.     VALID AND ENFORCEABLE AGREEMENTS

### 1.     OHN AGREEMENT

57.     In June 2020, Compliance Firm and FNL entered into a valid and enforceable Nurse Staffing Agreement ("OHN Agreement") under which Compliance Firm staffed Occupational Health Nurses to provide non-clinical services at FNL's warehouse, located at 12588 Florence Ave., Santa Fe Springs, California, 90670.

### 2.     LEASING AGREEMENT

58.     In July 2020, Compliance Firm entered into a valid and enforceable Employee Leasing Agreement ("Leasing Agreement") with FN and FNL. Under the Leasing Agreement, Compliance Firm recruited and leased employees ("Leased Employees") who worked at FN and FNL's various warehouses.

59.     Under the Leasing Agreement, Compliance Firm charged a 30% markup on hourly labor rate, in exchange for: indemnification for employment lawsuits, reimbursement for all payroll expenses and payroll taxes. FN and FNL agreed to cover the leased Compliance Firm employees under FN's Comp West worker compensation policy ending in 3123. Compliance Firm also charged FN a 20% conversion fee for all Leased Employees who were not converted to FN's payroll within 90 days.

60.     Compliance Firm recruited and leased FN and FNL Occupational Health Nurses, Onsite Managers, Warehouse Associates, Yard Goat Drivers, Cherry Pickers, and Maintenance Technicians and electricians.

61.     On or about October 1, 2020, Compliance Firm demanded a $100,000.00 deposit ("Leasing Agreement Payroll Deposit") to help alleviate the financial burden of FN and FNL's chronically delayed payments to cover the Leased Employees' payroll expenses.

62.     On or about October 20, 2020, FN and FNL paid Compliance Firm a $100,000.00 Leasing Agreement Payroll Deposit, in consideration of the Leasing Agreement, to be applied toward payroll expenses for the Leased Employees.

63.     In January 2021, FN refused to honor the Leasing Agreement; According to Meierhans, the Leasing Agreement did not include the payment of payroll taxes. Meierhans stated Compliance Firm was supposed to withhold payroll taxes in a separate account and use those funds towards FN and FNL's outstanding balances.

64.     At the request of Meierhans, FN refused to honor the Leasing Agreement, including Leasing Agreement's indemnification clause and reimbursement for payroll taxes that Compliance Firm paid on behalf of FN and FNL.

65.     Further, Meierhans demanded Compliance Firm reimburse FN for a $100,000.00 deposit that Compliance Firm applied toward FNL's 3rd Quarter 2020 payroll taxes and payroll expenses.

66.     From July 2020 to January 2021, FN and FNL placed over 150 employees on Compliance Firm's payroll to avoid accurately reporting payroll and to evade employer taxes.

67.     Stillwell entered the Leasing Agreement on behalf of Compliance Firm. At the time the agreement was made, Stillwell was unaware of FN's scheme to evade taxes.

### 3.     RECRUITING AGREEMENT

68.     In August 2020, Compliance Firm entered into a valid and enforceable Recruiting Agreement ("Recruiting Agreement") with FN and FNL to recruit employees for FN and FNL.

69.     Under the Recruiting Agreement, Compliance Firm provided direct hire employee recruitment. Compliance Firm was paid 20% of the direct hire's base salary after ninety (90) days of employment.

### 4.     OHN CONSULTANCY AGREEMENT

70.     In September 2020, Stillwell and FN entered into a valid and enforceable Consultancy Agreement ("OHN Consultancy Agreement"), after an Occupational Health Nurse ("OHN") alleged that Fashion Nova was "committing work comp fraud."

71.     Under the OHN Consultancy Agreement, Stillwell was asked to review FN's worker compensation claims and processes to determine why the OHN suspected fraud.

72.     Stillwell was also asked to assist FN in developing its occupational health clinic and in-house drug screening program. Parties agreed that Stillwell would be paid $175 per hour and work no more than twenty hours per *month*.

73.     In November 2020, Lori Ott, ("Ott") Fashion Nova's Director of Human Resources, revoked Stillwell's access to company files after Stillwell discovered discrepancies in Fashion Nova's COVID-19 reporting. Stillwell was asked to cease her OHN Consultancy to assist FN with its COVID-19 testing endeavors for Cal/OSHA Emergency Temporary Standards ("Cal/OSHA ETS") compliance.

### 5.     COVID-19 CONSULTANCY AGREEMENT

74.     On November 20, 2020, Stillwell and FN entered into a second valid and enforceable consultancy agreement ("COVID-19 Consultancy Agreement"), where Stillwell was asked to consult on FN's Injury and Illness Prevention Program ("IIPP"), Emergency Disaster Plan, and assist Fashion Nova with onsite COVID-19 testing.

75.     Stillwell and FN entered into a second consultancy agreement ("COVID-19 Consultancy Agreement"). Under the COVID-19 Consultancy

Agreement, Parties agreed that Stillwell would be compensated $175 per hour and work no more than 20 hours each *week*[2] as a consultant for FN.

## 6.   <u>JOINT VENTURE</u>

76.     On November 25, 2020, Compliance Firm and FN entered into a valid and enforceable, Joint Venture ("Joint Venture"), where Compliance Firm and FN agreed to build a COVID-19 laboratory at Fashion Nova's Santa Fe Springs Warehouse, located at 12588 Florence Avenue, Santa Fe Springs, California 90670.

77.     Under the Joint Venture, FN asked Compliance Firm to obtain the CLIA certificate, recruit, and train laboratory staff, and purchase medical and non-medical supplies.

78.      Under the Joint Venture, Compliance Firm was to obtain approval from FN prior to major purchases. All expenses and costs related to the lab were to be paid by FN on NET 15 payment terms.

79.     All policies and documents were to be signed off by FN's legal department, who consulted with Nixon Peabody's Health Care Compliance practice.

---

[2] Stillwell was previously working as OHN consultant no more than 20 hours each *month*.

80.     FN and FNL paid nearly $400,000 to cover the costs of COVID-19

tests, in consideration of the Joint Venture agreement.

81.     The OHN Agreement, OHN Consultancy Agreement, Leasing

Agreement, Recruiting Agreement, COVID-19 Consultancy Agreement, and

Joint Venture were all six separate valid and enforceable agreements.

**B.**     **WORKER COMPENSATION FRAUD**

**1.**     **MISCLASSIFICATION OF WORKERS**

82.  In September 2020, Stillwell was asked to review Fashion Nova's

Comp West work compensation policy number ending in 3123, along

with open claims and prior claim history to determine ways FN could

decrease its

Experience Modification Rate, ("XMod") to obtain lower premiums.

83.     At the time, Fashion Nova had thirty-nine (39) open claims and eleven

(11) of the claims involved litigation.

84.     While reviewing the documents Stillwell discovered that Fashion

Nova intentionally misclassified all its warehouse employees under class code

8008, the class code for apparel retail workers.

85.     On or about September 30, 2020, Stillwell informed Ott that the

classification Code 8008 did not apply to workers at FN's warehouse, because

applies to *retail* stores engaged in the sale of clothing, shoes, linens, and fabrics.

86.     Over 80 percent (80%) of the workers at Fashion Nova's Santa Fe Springs warehouse worked with conveyors, operated Powered Industrial Trucks, and or worked as freight handlers, who pack or handle merchandise at FN's shipping or receiving docks.

87.     Stillwell provided Ott with the following chart to show how the misclassification affected the difference in Advisory Pure Premium Rates:

| ADVISORY PURE PREMIUM RATES | | | |
|---|---|---|---|
| CLASS CODE | DESCRIPTION | CURRENT RATE | EFFECTIVE 01/01/2021 |
| 8008 | retail store | $2.29 | $2.23 |
| 7360 | freight handler | $5.58 | $5.33 |
| 8292 | gen warehouse | $8.14 | $7.73 |

88.     Stillwell informed Ott that the employee misclassification caused Fashion Nova to be *undercharged* by nearly three hundred percent (300 %).

89.     Ott informed Stillwell that the classifications have been the same since 2018 and were not the cause of Fashion Nova's high XMod.

### 2.     UNDERREPORTING PAYROLL

90.     On or about September 3, 2020, an employee from Fashion Nova's finance department brought over $40,000 in cash to Fashion Nova's Santa Fe Springs warehouse. The cash was given to Ott to pay warehouse associates.

91.    In December 2020, FN paid over $100,000.00 to employees in cash to incentivize attendance during the COVID-19 pandemic. The cash payments were not reported on FN or FNL's payroll.

92.    FN pays its undocumented workers in cash.

93.    FN paid cash benefits to certain workers who tested positive for COVID-19 instead of reporting these cases to its workers compensation carrier, Comp West.

94.    FN paid cash to employees covered by the Leasing Agreement and refused to confirm the cash payment amounts with Compliance Firm, who processed payroll for the Leased Employees, which resulted in an under-reported payroll.

95.    Since 2019, Meierhans has overseen reporting payroll and classifications to FN's worker compensation carrier, Comp West.

96.    Meierhans intentionally underreported FN's payroll and misclassified employees to Comp West in 2019, 2020 and in January 2021 to obtain lower premiums.

97.    From 2019 to 2021, Meierhans intentionally omitted the payroll of nearly 5,000 employees and misclassified over 8,000 employees to obtain lower worker compensation premiums for FN.

### 3.    NON-REPORTING WORKPLACE INJURIES

98. In June 2020, Cindy Spurgeon ("Spurgeon") FN's Director of Loss Prevention, Safety and Security and Ernesto Hernandez ("Hernandez") FN's Safety Manager oversaw Fashion Nova's Injury and Illness Prevention Program ("IIPP"), which included oversight of Fashion Nova's OHN Program.

99. In July 2020, Spurgeon and Hernandez told Compliance Firm to hire George Villarreal ("Villarreal") as FN's OHN Manager.

100. Compliance Firm disagreed with the decision because Villarreal was not the most qualified candidate.

101. Spurgeon threatened to terminate the OHN Agreement and refused to interview or consider other candidates until Villarreal was hired. Compliance Firm reluctantly hired Villarreal for FN in July 2020.

102. In August 2020, Compliance Firm hired a second OHN, Kathy, to work at Fashion Nova.

103. In September 2020, Stillwell was informed by OHN Kathy that she suspected Fashion Nova and Villarreal were committing worker compensation fraud. Stillwell informed Ott and Meierhans, who then asked Stillwell to investigate the allegations.

104.   After reviewing internal documents, Stillwell learned that Fashion Nova failed to report over 300 worker compensation claims from January 2020 to January 2021.

105.   On or about September 1, 2019, FN began sending injured workers to Health First Clinic in Santa Fe Springs for work related injuries.

106.   FN kept paper documentation and files for the injured workers put did not report the injuries to its insurance carrier and did not record the recordable injuries in its Cal/OSHA Form 300.

107.   FN paid Health First Clinic for the treatment of injured workers. Workers with "serious" injuries were paid in amounts varying from $500.00 to $5,000.00 in exchange for signed waivers releasing FN from liability.

108.   According to employee files, workers without "serious" injuries but had threatened to sue, were also offered waivers and their claims were sometimes submitted to Comp West with the Loss Date omitted.

109.   On or about August 2020, Fashion Nova had over 180 work compensation claims that were reported three or more days after the injuries occurred. Forty-seven (47) of those claims that were submitted over twenty-eight (28) days after the injury occurred, and eighty-eight (88) claims that were submitted without a Loss Date.

110.   On or about September 2020, Stillwell provided Ott and Meierhans a detailed report of her findings in the work compensation fraud allegations. The employee files were confiscated by Ott and given to Meierhans for further investigation.

111.   On or about September 8, 2020, OHN Kathy resigned due to fears of being associated with FN's worker compensation schemes.

112.   In September 2020, Compliance Firm informed FN that it was planning to terminate and report Villarreal to the California Board of Nursing, due to his involvement with FN's work compensation schemes, and for providing care to patients that was beyond his scope of practice.

113.   FN threatened to terminate all Compliance Firm agreements and sue Compliance Firm for breach of contract, negligence, and fraud if Villarreal was terminated or reported to the Board of Nursing.

114.   According to Meierhans, Villarreal signed a non-disclosure agreement with FN and the non-disclosure agreement prevented Villarreal from participating in Compliance Firm's internal investigations about FN.

115.   On or about September 30, 2020, Hernandez informed Stillwell that Fashion Nova signed a medical oversight agreement with Dr. Ronald Crowell, MD, and Health First Clinic, ("Health First Agreement").

116.   According to Hernandez, Villarreal's "orders" would come from Dr. Crowell and that would eliminate any work comp fraud concerns.

117.   The Health First Agreement states in part:

"Fashion Nova has hired Occupational Health Nurses (OHNs) to provide on-site first aid services to their employees.  They wish to retain Health First Medical Group, their Workers Comp medical clinic, to provide Medical Director services in support of their on-site program."

"The Fashion Nova OHNs will keep a log of all visits with an appropriate medical record.  This log will be reviewed by the Medical Director on a monthly basis for quality control and conformity to State regulations."

"The Medical Director shall be Ronald Crowell, M.D.  He is available by cell: 562-882-3575.  Should he not be immediately available for any reason, the OHN shall call Health First and speak with the Provider on duty. Dr. Crowell will work with the OHNs to approve an OTC formulary, including elastic wraps and hot and cold packs, eye washes, etc. Dr. Crowell will also work with the OHNs to develop standardized protocols for First Aid care."

118.   Villarreal was given a Fashion Nova employee badge and email, George.Villarreal@fashionnova.com. Villarreal reported FN's positive COVID-19 cases to Los Angeles County Public Health Department, ("LACPHD") and to FN's worker compensation carrier.

119.   Villarreal continued working for FN despite Compliance Firm's objections, until his resignation on December 16, 2020.

**4.   FN USED DRUG SCREENING TO DETER EMPLOYEES FROM MAKING WORKER COMPENSATION CLAIMS**

120.   On or about October 5, 2020, FN asked Stillwell and Compliance Firm to assist with developing FN's in-house Department of Transportation ("DOT") compliant drug testing program.

121.   FN had over twenty (20) DOT drivers who required quarterly drug testing.

122.   FN also required pre-employment drug screening as well as drug testing when employees were involved in workplace accidents.

123.   The proposed in-house drug screening program also included a reasonable suspicion policy and reasonable suspicion training for FN's managers, supervisors, and FN Security Department.

124.   FN and Compliance Firm agreed that the proposed in-house drug screening program would save FN over $120,00.00 annually.

125.   FN's budget for the program was $35,000.00.

126.   Compliance Firm spent $31,750.00 developing FN's Drug Screening program. Compliance Firm purchased the drug screening equipment and supplies as requested by FN. Compliance Firm also hired and trained specimen collectors to assist with the screenings.

127.   On or about November 5, 2020, Hernandez informed Compliance Firm that FN could not use drug screening equipment because the drug screen results were reported electronically. According to Hernandez, FN wanted a *manual* drug testing solution.

128.   FN agreed to reimburse Compliance Firm $31,750 .00 for expenses related to the drug testing program.

129.   On or about, December 1, 2020, Stillwell was investigating allegations of a COVID-19 outbreak at FN's Santa Fe Springs warehouse. During the investigation, Stillwell discovered that FN was using drug screening to deter employees from filing worker compensation claims.

130.   FN required certain employees to complete drug screening to file a worker compensation claim. Employees were threatened with termination if the drug screens were positive.

131.   According to records Stillwell found in the OHN office, two employees threatened to sue Fashion Nova, because they "believed their drug

screen result were fake." The two employees were told by FN that they were being terminated because their drug tests were positive. The two employees completed drug testing at a clinic and the results were negative. The matter was escalated to FN's legal department and "settled."

132.    Over thirty (30) employees who reported COVID-19 symptoms and or exposures to FN opted to quit instead of being drug tested.

### 5.    NON-REPORTING OF COVID-19 CASES: NOVEMBER 2020

133.    Each week, beginning in September 2020, FN emailed and posted a weekly COVID-19 associate letter, ("COVID-19 Associate Letter") that informed employee, contractors, and vendors of positive COVID-19 cases at the Santa Fe Springs warehouse.

134.    The COVID-19 Associate Letter included the last date the infected employee worked, and the department the infected employee worked in.

135.    On or about November 19, 2020, Stillwell informed Ott that the weekly COVID-19 Associate Letter omitted over twenty (20) confirmed positive cases.

136.    According to the COVID-19 Associate Letter, dated November 19, 2020, there were only four (4) confirmed COVID-19 cases.

137.    During the month of November 2020, Fashion Nova was informed of over ninety-four (94) positive cases, but only reported a total of twenty-three

(23) positive COVID-19 cases in the four weekly COVID-19 Associate Letters that were distributed in November 2020.

138.   True and correct copies of the four November 2020 COVID-19 Associate Letters dated:  November 5, 2020, November 12, 2020, November 19, 2020, and November 26, 2020 are attached in Exhibit A and incorporated by reference.

139.   FN and FNL intentionally concealed positive COVID-19 rates to deter employees and vendors from getting tested, and to avoid decreased productivity caused by COVID-19 related staffing shortages.

**6.    FN USED UNDOCUMENTED WORKERS TO SUPPLEMENT STAFFING AT WAREHOUSE**

140.   There was a labor shortage at FN's Santa Fe Spring warehouse from September 2020 to January 2021 due to the COVID-19 pandemic.

141.   FN and FNL supplemented staffing at the Santa Fe Springs Warehouse with over five hundred (500) undocumented workers from September 2020 to January 2021.

142.   Many of the workers also reported working a second job, as garment workers or warehouse associates at different warehouses located in the Inland Empire.

143.   FN and FNL were aware of the undocumented workers and allowed them to work because they were "least likely to be absent" from work.

144.   FN and FNL's undocumented workers were more likely to work despite having COVID-19 symptoms and despite being COVID-19 positive.

145.   Stillwell and Ott were also aware of at least one of the staffing agencies that hired over 100 undocumented workers that worked at the Santa Fe Springs warehouse.

146.   On or about November 20, 2020, Ott revoked Stillwell's access to company files after Stillwell discovered and complained about discrepancies in Fashion Nova's COVID-19 reporting.

## C.   COVID-19 SCHEMES

## 1.   COVID-19 CONSULTANCY

147.   On or about November 20, 2020, Ott and Meierhans asked Stillwell to assist with obtaining pricing for COVID-19 tests and pricing for COVID-19 testing services for approximately 4,000 employees. According to Meierhans, Fashion Nova had approximately 10,000 employees and roughly 4,000 employees would need to be tested twice each week.

148.   Stillwell provided Ott and Meierhans with pricing from several vendors that offered turnkey COVID-19 testing solutions. Ott and Meierhans

ultimately decided it was cheaper for FN's OHNs to administer COVID-19 testing onsite.

### 2.   CONSPIRACY TO CIRCUMVENT EUA BY OBTAINING A PHARMACY LICENSE

149.   On or about November 23, 2020, Meierhans informed Stillwell that FN wanted to purchase COVID-19 testing kits as a *pharmacy*. According to Meierhans, a pharmacy was not required to report tests results because pharmacies are not licensed CLIA[3] laboratories.

150.   Meierhans consulted Nixon Peabody's Health Law Practice for guidance on Cal/OSHA's ETS compliance. According to Meierhans and Nixon Peabody, California's Pharmacy Law governed "*teaching and research laboratories*" and these laboratories were *not* required to report COVID-19 results.

151.   Stillwell, Meierhans and Jill Gordon, ("Gordon") a health law attorney and Nixon Peabody Partner, all agreed that *research and teaching* laboratories were governed by California's Pharmacy Law; and clinical laboratories that performed *diagnostic* testing were governed by California Department of Public Health (CDPH) and CLIA.

---

[3] "CLIA" is the acronym for the Clinical Laboratory Improvement Amendments of 1988.

152.   By creating a teaching or research laboratory, FN believed it would not be required to report COVID-19 test results to LACPHD because teaching and research laboratories do not provide *diagnostic* testing.

153.   Stillwell explained to FN that the FDA's Emergency Use Authorization, ("EUA"), required the *diagnostic* tests to be administered by CLIA licensed labs and reporting was mandated by the CARES Act.

154.   On or about November 23, 2020, Stillwell informed Meierhans and Ott that Compliance Firm was declining to obtain a pharmacy license on FN's behalf. Stillwell believed a pharmacy license was an unlawful circumvention of the intended purposed of the emergency use authorization for COVID-19 testing.

### 3.       JOINT VENTURE COVID-19 TESTING

155.   On or about November 24, 2020, Compliance Firm and FN, agreed to build an on-site COVID-19 testing lab as a joint venture to provide COVID-19 testing until June 17, 2021, which was the original expiration date of the Cal/OHSA ETS standards.

156.   FN agreed to pay for COVID-19 testing for all employees, vendors, contractors, and visitors who may have been exposed to COVID-19 at the Santa Fe Springs warehouse. Compliance Firm recruited and leased hundreds of employees that worked at FN's Santa Fe Springs warehouse.

157.   Compliance Firm entered the Joint Venture in good faith and to ensure the safety of the Leased Employees.

158.   The Joint Venture enabled FN to provide COVID-19 testing for less than $50.00 per person, per test, which, according to FN was over "**59% cheaper than comparable vendors**."

159.   The Joint Venture would have saved FN approximately $460,000.00 per month for employee COVID-19 testing, based on comparable testing rates.

160.   Stillwell entered the Joint Venture on behalf of Compliance Firm in good faith.

161.   Stillwell believed FN and Compliance Firm were creating a waived-CLIA licensed, *diagnostic* laboratory to comply with the COVID-19 testing requirements set forth in the Cal/OSHA ETS.

162.   For the California laboratory licensing application, Meierhans and Nixon Peabody recommended that Compliance Firm be listed as the laboratory's 'owner' because the Compliance Firm would be eligible for "PREP Act immunity." FN also agreed to indemnify Compliance Firm in exchange for Compliance Firm being listed as the laboratory's owner.

### 4.   <u>PURCHASE OF 12,800 CARESTART ANTIGEN TESTS</u>

163.   On or about November 25, 2020, Meierhans asked Stillwell to purchase 12,800 CareStart Antigen Tests ("CSA Tests").   According to Meierhans, 12,800 CSA Tests would last "about a month."

164.   The CSA Tests costs $28.00 each and were non-refundable.

165.   The CSA Tests were purchased from a distributor in Minnesota, and **not** from Intrivo Diagnostics.

166.   Compliance Firm offered to store the CSA Tests until the lab was ready to use the CSA Tests. FN declined and demanded that the CSA Tests be delivered and stored at its Santa Fe Springs Warehouse.

167.   Stillwell informed FN that the CSA Tests needed to be stored securely, in a temperature-controlled facility and according to the manufacturer's instructions.

168.   Since the 12,800 CSA Tests costs nearly $400,000.00, Stillwell offered to reduce the Joint Venture agreement to writing as reassurance, FN declined.

169.   In lieu of a written agreement, FN agreed to pay one hundred percent (100%) of the CSA Tests upfront to show good faith in the oral agreement to create the Joint Venture with Compliance Firm.

170.   On or about November 25, 2020, FN paid Compliance Firm $392,448.00 for the 12,800 CSA Tests.

171.   At the time of the CSA Test purchase, FN owed Compliance Firm over $250,000.00 for staffing services that were unrelated to COVID-19 testing.

172.   The invoice for the CSA Tests was accompanied by an Emergency Use Purchase Agreement ("EUA Purchase Agreement"), pursuant to the oral Joint Venture agreement.

173.   The EUA Purchase Agreement explicitly states:

"Due to the nature of these tests, once these tests are shipped, they will NOT BE REFUNDABLE OR EXCHANGEABLE for any reason."

"The Purchaser agrees to indemnify, defend and hold harmless Company and its officers, directors, employees, agents, representatives, successors and assigns from any and all claims, demands, losses, liabilities, judgements, awards and costs (including attorney's fees) arising out of or relating to the breach of this Agreement by the Purchaser, or any person affiliated with the Purchaser."

174.   A true and correct copy of the CSA Tests invoice and EUA Purchase Agreement are attached in Exhibit B and incorporated by reference.

175.   Upon information and belief, Meierhans countersigned the EUA Purchase Agreement on behalf of FN.

COMPLAINT

176.     FN never provided Compliance Firm with a counter-signed copy of the EUA Purchase Agreement.

177.     On or about December 9, 2020, the 12,800 CSA Tests were shipped directly from the distributor and delivered to FN's Santa Fe Springs Warehouse. Stillwell and Ian Dill ("Dill"), Fashion Nova's Director of Safety, counted the tests to confirm all 12,800 CSA Tests were present.

178.     Stillwell and Dill confirmed that 12, 800 Care Start Antigen Tests were present. The CSA Tests were all from lot number "CH20L03" and all had an expiration date of "APR 2021"

### 5.     COVID-19 OUTBREAK:  NOVEMBER 21, 2020

179.     Between September 2020 and January 2021, over thirty Leased Employees worked in FN's Facilities Department.

180.     Approximately 60-80% of the Facilities Department workers were Leased Employees.

181.     All COVID-19 results for workers at the Santa Fe Springs warehouse were reported to FN's Human Resource Department, ("FNHR"). FNHR then passed the results and employee information on to the OHN. The OHN was responsible for reporting the results to LACPHD.

182.    On or about November 1, 2020, Meierhans instructed Ott to conceal positive cases and close contacts involving the Leased Employees, to prevent Stillwell and Compliance Firm from complaining.

183.    On or about November 21, 2020, FNHR was aware of five (5) positive COVID-19 cases in their Facilities Department.

184.    FNHR only informed the OHN of three of the five positive COVID-19 cases. The remaining two cases were Leased Employees.

185.    Under the Leasing Agreement, FN and FNL agreed to inform Compliance Firm of any injuries related to the Leased Employees.

186.    FN and FNL also agreed to participate in any investigations regarding the Leased Employees.

187.    FN and FNL did not inform Compliance Firm of the positive cases or the close contacts for the Leased Employees.

188.    FN and FNL intentionally omitted the positive cases in the Facilities Department from the COVID-19 Associate Letter dated November 26, 2020, which is attached in Exhibit A.

189.    Upon information and belief, FN intentionally concealed the outbreaks and positive cases from Compliance Firm and paid Leased Employees two weeks of pay in cash. FN and FNL refused to disclose the

names of leased employees who were paid cash benefits. These cash payments were not reported on FN, FNL or Compliance Firm's payroll.

## 6.   COVID-19 OUTBREAK: NOVEMBER 27, 2020

190.    On November 27, 2020, FNHR was aware of six (6) positive COVID-19 cases in their Facilities Department.

191.    On November 27, 2020, at 5:56PM, Jade Arreola, ("Arreola"), an FNHR employee, emailed the OHN about three (3) positive COVID-19 cases in the Facilities Department and concealed the remaining three (3) positive cases involving the Leased Employees.

192.    On November 27, 2020, at 6:02PM, Kim Herrera ("Herrera") FNHR's Senior Business Partner, forwarded Arreola's email to Ott and Felix Felder, ("Felder"), FN's Senior Director of Operations, and stating "FYI Plus 3 Compliance care Facilities associates."

193.    Below are screenshots of Arreola and Herrera's November 27th emails:

From: **Jade Arreola**
<jade.arreola@fashionnova.com>
Date: Fri, Nov 27, 2020 at 5:56 PM
Subject: COVID positive and contacts
To: George Villarreal
<george.villarreal@fashionnova.com>, Ernesto
Hernandez
<ernesto.hernandez@fashionnova.com>,
Kimberly Herrera
<kim.herrera@fashionnova.com>, Alma Padilla
<alma.padilla@fashionnova.com>

Hi George and Ernesto,

Here is the info for positive cases ~~█████~~
~~█████~~ and ~~██████████████~~ and
contacts.

From: Kimberly Herrera
<kim.herrera@fashionnova.com>
**Sent:** Friday, November 27, 2020 6:02 PM
**To:** Lori Ott <lori.ott@fashionnova.com>
**Cc:** Felix Felder <felix.felder@fashionnova.com>
**Subject:** Fwd: COVID positive and contacts

FYI

Plus 3 Compliance care Facilities associates.

Kimberly Herrera | Senior HR Business Partner

Human Resources

FASHION**NOVA**

194. On November 28, 2020, Herrera and Ott conspired with Compliance Firm onsite manager Heather Salazar, ("Salazar") to conceal information regarding the Leased Employees and their COVID-19 exposures.

195. Salazar used unapproved methods to communicate, divert and prevent the Leased Employees from reporting symptoms and COVID-19 results to Compliance Firm's Employee's Health Department per Compliance Firm's protocol.

196. FNHR never provided Stillwell or Compliance Firm with the names of the COVID-19 positive Leased Employees, or the names of their close contacts.

197.     FN and FNL never informed Stillwell or Compliance Firm about the positive COVID-19 cases in the Facilities Department and intentionally omitted the cases from the COVID-19 Associate Letter dated December 3, 2020.

198.     A true and correct copy of the COVID-19 Associate Letter dated December 3, 2020, is attached in Exhibit C, and incorporated by reference.

### 7.     COVID-19 OUTBREAK: DECEMBER 4, 2020 & $100K BONUS SWEEPSTAKES

199.     On December 3, 2020, 12:36 AM, FNHR sent the following email to employees and staffing partners:

"Team! Good news:  We have a large backlog of orders to ship and we need everyone to attend all scheduled shifts over the next 7 - 10 days. Therefore, we are announcing our first ever $100,000 bonus sweepstakes! Each person that works all of their next 6 scheduled shifts (overtime days included) will be entered into the $100,000 giveaway."

200.     On December 3, 2020, Stillwell complained to Dill and FNHR that the $100,000 Sweepstakes would incentivize employees to report to work, despite having COVID-19 symptoms.

201.    Stillwell also complained that FNHR continued to withhold information about cash payments that were made to Compliance Firm's Leased employees.

202.    On December 4, 2020, a symptomatic employee came to work and exposed over twenty (20) other workers at Fashion Nova's Santa Fe Springs warehouse.

203.    On December 4, 2020, Ott emailed the following to FN managers and staffing partners:

"We are continuing to have issues with associates who are awaiting COVID-19 testing results entering the building. Unfortunately for us the number of times they get those results while on shift are increasing. We had an issue last night with an associate awaiting testing results, who had tested because another employer told him too. I'm assuming they told him for a reason. He still came into the building and worked for hours, and then received notification of a positive test. After sharing his positive results with multiple associates and supervisors, he left the building."

204.    FN and FNL continued with the $100,000 Sweepstakes despite the number of increased positive cases and symptomatic employees reporting to work.

205.    FN and FNL knew that cash incentives and attendance bonuses incentivized symptomatic and COVID-19 positive employees to attend work, but disregarded employees' safety to keep up with the demands of Fashion Nova's holiday shoppers.

206.    Less than a week after the $100,000 Sweepstakes began, over **sixty (60)** employees at the Santa Fe Springs warehouse became infected with COVID-19.

207.    In the weekly COVD Associate Letter dated December 9, 2020, FN stated "there were only twenty-eight confirmed COVID-19 positive cases since last week's associate notification letter, posted on 12/03/20"

208.    FN intentionally under-reported the positive cases and continued to incentivize and encourage "perfect attendance" despite its known correlation to increased COVID-19 infections.

209.    A true and correct copy of the COVID-19 Associate Letter dated December 9, 2020, is attached in Exhibit D, and incorporated by reference.

210.    On or about December 9, 2020, Stillwell complained to FN that the COVID-19 Letter dated December 9, 2020, was "about 40 cases off" from

the number that was previously discussed. Ott stated that FN was only required to report positive cases from "actual Fashion Nova employees" and did not have to disclose positive cases from agency employees, contractors, or vendors.

211.    Agencies provided 60-70 percent of the labor at FN's Santa Fe Springs warehouse. FN and FNL knew that excluding positive COVID-19 infections reported by contractors, vendors and staffing agencies was negligently misleading. The omitted disclosures prevented close contacts from being informed of COVID-19 exposures from the *thousands* of contractors, vendors and staffing agencies, which largely staffed the Santa Fe Springs warehouse.

212.    Stillwell, Ott, Meierhans, FNHR, FN and FNL all understood that Cal-OSHA ETS required Fashion Nova to report *all* positive COVID-19 cases at the worksite, as Stillwell and Nixon Peabody thoroughly briefed FN's executives about its COVID-19 reporting requirements at the local, state, and federal levels.

### 8.    COVID-19 OUTBREAK: DECEMBER 15, 2020

213.    On or about December 15, 2020, less than two weeks after the $100,000 Sweepstakes, FNHR was informed of over sixty (60) positive COVID-19 cases.

214.     On or about December 16, 2020, Herrera and Salazar were informed of that six (6) FN Facilities Department employees tested positive for COVID-19. Two of the six infected workers were leased Compliance Firm employees, who also worked in the Facilities Department.

215.     FN's preliminary contact tracing revealed that over two hundred (200) workers were close contacts.

216.     OHN Villarreal resigned after close of business on December 16, 2020.

217.     On December 18, 2020, FN instructed Salazar to terminate seventeen (17) Leased Employees who worked in the Facilities Department.

218.     Seven (7) of the Leased Employees reported having COVID-19 symptoms less than five days *prior* to termination. Three of the terminated employees tested positive less than five days *after* termination.

219.     One employee tested positive on December 16, 2020, two days prior to termination.

220.     FN, FNL and Salazar did not inform the Leased Employees of their COVID-19 exposure.

221.     FN, FNL and Salazar did not inform Compliance Firm of the COVID-19 exposures.

222.     FN and FNL also omitted the positive cases in the Facilities Department from the weekly COVID-19 Associate Letter dated December 17, 2020.

223.     A true and correct copy of the COVID-19 Associate Letter dated December 17, 2020, is attached in Exhibit E, and incorporated by reference.

224.     After multiple requests, FN continued, and continues to refuse to provide Compliance Firm with the names of over twenty-five (25) Leased Employees that were exposed to COVID-19 while working in the Facilities Department from September 2020 through January 2021.

## 9.     STATEMENTS FROM FORMER FASHIONNOVA EMPLOYEE

225.     On or about June 25, 2021, a former FN employee, @Jasminaakinnz, tweeted the following about her experience working at FN's Santa Fe Springs Warehouse:

> "I was formerly a lead at FN is SFS. These allegations are true. Employees did contract COVID-19, and the employees were not informed. Their reason for not informing employees was so that the employees won't panic or leave work in the middle of a shift. When COVID-19 first outbreak someone had the virus and employees were informed but everyone panicked and left. So in order to prevent that

they kept everything hushed. There was even an occasion where I had to train a new employee, and on that first day she found out she had COVID-19.

She informed me and I then informed a lead. Once she left I asked if I was safe. I mean I was just exposed to someone with COVID-19 so I was worried for myself. They just told me I was fine to work the rest of the shift and asked if I told anyone about the situation.

I said no and they basically told me to keep it that way… that's just my own story during COVID-19. I sympathize for the FN employees who contracted COVID-19, fell very ill, and unfortunately passed away.. I wish I spoke up before, but many other employees tried to and got no where. So I felt powerless"

226.     In response to a TMZ tweet about FN and Saghian, @Jasminaakinnz wrote: "Use to work at the Fashion Nova warehouse and every time he came he was so disrespectful and hateful to EVERYONE. Wouldn't be surprised if someone had it out for him."

227.     Below are screen shots of the tweeted messages described in the preceding paragraphs:

**TMZ** ✔ @TMZ · 6/25/21

#UPDATE: Fashion Nova CEO Targeted in Hollywood Hills Shooting That Left One Dead



tmz.com
Fashion Nova CEO Targeted in Hollywood Hills Shooting, One Dead

💬 54        1,139       🤍 1,274       ↥

 **Jasminaakinnz** @Jasminaaki... · 6/25/21  ···
Use to work at the Fashion Nova warehouse and every time he came he was so disrespectful and hateful to EVERYONE. Wouldn't be surprised if someone had it out for him. 🙄

💬 6        84       ❤️ 955       ↥

**Mya Angela** @myathegawd · 6/25/21  ···
Omg what was it like working there?

💬 4       🔁       🤍 70       ↥

← **Tweet**

 **Jasminaakinnz**
@Jasminaakinnz                      ···

Replying to @brittstillwell @myathegawd and @TMZ

I was formerly a lead at FN is SFS. These allegations are true. Employees did contract COVID-19, and the employees were not informed. Their reason for not informing employees was so that the employees won't panic or leave work in the middle of a shift. When COVID first …

4:26 PM · 6/25/21 · Twitter for iPhone

**10** Retweets  **82** Likes

COMPLAINT
- 50 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28


**Tweet**

**Jasminaakinnz**
@Jasminaakinnz

Replying to @brittstillwell @myathegawd and @TMZ

..outbroke someone had the virus and employees were informed but everyone panicked and left. So I'm order to prevent that they kept everything hushed. There was even an occasion where I had to train a new employee, and on that first day she found out she had covid. She informed..

4:29 PM · 6/25/21 · Twitter for iPhone

**Jasminaakinnz**
@Jasminaakinnz

Replying to @brittstillwell @myathegawd and @TMZ

...me and I then informed a lead. Once she left I asked if I was safe. I mean I was just exposed to someone with covid so I was worried for myself. They just told me I was fine to work the rest of the shift and asked if I told anyone about the situation. I said no  and they...

4:31 PM · 6/25/21 · Twitter for iPhone


**Jasminaakinnz**
@Jasminaakinnz

Replying to @brittstillwell @myathegawd and @TMZ

..basically told me to keep it that way… that's just my own story during covid. I sympathize for the FN employees who contracted covid, fell very ill, and unfortunately passed away.. I wish I spoke up before, but many other employees tried to and got no where. So I felt powerles

4:35 PM · 6/25/21 · Twitter for iPhone

2 Retweets  6 Likes


**Britt** 🔒 @brittstillwell · 6/25/21
Replying to @Jasminaakinnz @myathegawd and @TMZ

I totally understand the powerlessness feeling. FN harassed and fired employees who complained abt the exposures. As a vendor, I felt their wrath too

There will likely be a class action lawsuit and hopefully a criminal investigations into FashionNova's COVID-19 scandal.

### 10.   NON-DISCLOSURE AGREEMENT, ARBITRATION AGREEMENT AND INDEMNIFICATION AGREEMENT

228.     On or about December 28, 2020, FN asked Stillwell to sign a back dated non-disclosure agreement ("NDA") and an indemnification agreement, in exchange for FN reducing all oral agreements between FN and Compliance Firm to writing.

229.     The indemnification agreement required Compliance Firm to indemnify FN against any lawsuits involving FN and Compliance Firm.

230.     The NDA contained an arbitration agreement that would have bound Stillwell and Compliance Firm to arbitration. The NDA also barred Stillwell from participating or initiating investigations and lawsuits involving FN.

231.     Stillwell refused to sign the NDA and indemnification agreement. Stillwell never signed an arbitration agreement.

### 11.     FN / FNL SCHEME TO DEFRAUD VENDORS

232.     On or about December 28, 2020, FN owed Compliance Firm over $250,000.00 in unpaid invoices, for services Compliance Firm provided to FN. Per an employee in FN's Finance Department, FN was planning to withhold at least $10,000,000.00 (ten million dollars) in vendor payment until January, or February 2021.

233.    The 'Timely Payment' clause in the OHN Agreement, explicitly states in part:

> "Client also agrees to pay Agency all reasonable costs and expenses of collection, including attorneys' fees, collection agency fees and all related costs. If Client is past due on any undisputed invoice by 45 days or more, Client shall, upon Agency's request, promptly provide its financial statements (including its balance sheet, income statement and statement of cash flows) for its most recent completed fiscal year and for all interim period since such fiscal year (collectively "Client Financial Statements") to Agency."

234.    After learning of FN's plans to withhold over $10,000,000.00 in vendor payments, Compliance Firm requested FN to provide its financial statements, pursuant to the Timely Payment clause in the OHN Agreement.

235.    FN provided Compliance Firm with its consolidated Financial Statements from years ended December 31, 2019, and 2018.   FN also provided FNL's Financial Statements for year ended December 31, 2019.

236.    A true and correct copy of Fashion Nova's Financial Statement for years ended December 31, 2019, and 2018, is attached in Exhibit F, and incorporated by reference.

237.    A true and correct copy of FN Logistics Financial Statement for year ended December 31, 2019, is attached in Exhibit G, and incorporated by reference.

### 12.    ONSITE COVID-19 TESTING AT CCS AT FNL

238.    The joint venture COVID-19 testing lab at FN was named *CCS at FNL*, which was a combination of Compliant Care Staffing, a subsidiary of Compliance Firm, and Fashion Nova Logistics.

239.    CCS at FNL was the name chosen to denote the joint venture between Compliance Firm and Fashion Nova.

240.    CCS at FNL is also the laboratory name the appeared on the California Laboratory License and CLIA certificate, which were provided to FN.

241.    The address listed on the CLIA and lab licenses was 12588 Florence Avenue, Santa Fe Springs, California 90670, which is the address of FN's Santa Fe Springs warehouse.

242.    From December 1, 2020, to January 6, 2021, FN made over ten (10) material changes to intentionally cause costly delays with onsite testing.

243.    The changes required Compliance Firm to rehire three different groups of laboratory staff because FN drastically changed the time and manner for onsite testing with less than a few days' notice.

244.    On December 9, 2020, Stillwell sent an email, ("December 9th Email), to FN, FNL leadership and FN stakeholders with a high level overview of task delegation for each department. Meierhans was included on the email.

245.    FNL also references and mischaracterizes the December 9th Email in paragraphs numbered 32-34 of the FNL Complaint

246.    On December 9, 2020, Meierhans, FN and FNL were performing according to the terms of the Joint Venture. All expenses and material changes were agreed to in advance by FN. In the December 9th Email Stillwell wrote:

"The Hi Team,

I wanted to provide a high level overview of the COVID-19 testing process in hopes of being able to delegate tasks so that we can stay on track to begin testing on 12/27/2020. The project will take the collaboration of Safety, HR, legal, IT and facilities to pull off. After reading the update below, my hope is that task delegation will become more clear. Once FN delegates tasks, I can assign a point of contact to streamline communication between the TCF/CCS consultants and FN.

OVERVIEW

Onsite testing can be divided into two parts: collection and testing. Below is a high level overview of collection – (collection is client

dependent and based largely on FN's preferences and policies / testing SOP's are the responsibility of the lab director and lab supervisor)"

247.    A true and correct copy of the December 9th Email is attached in Exhibit H, and incorporated by reference.

248.    On or about December 14, 2020, without informing Compliance Firm, FN leased two large mobile offices to be used as laboratories.  The mobile offices did not contain a water source.

249.    Compliance Firm consultants and FN maintenance workers had to redesign the mobile offices so they could be used as laboratories.

250.    Initially, Compliance Firm and FN agreed upon the use of tents, which were much less expensive.

251.    The mobile offices were located inside of FN's trucking yard, behind security gates and not accessible to the public. FN's Facilities Department hardwired the offices with electricity, which prevented the offices from being moved.

252.    FN placed one mobile office near the north and south ends of the trucking yard.

253.    Both mobile offices were equipped with continuous security monitoring that could be viewed remotely by anyone with the login

credentials. FN's Facilities and IT Departments installed the security cameras.

254.     Below are pictures of the two mobile offices that were leased by FN:



255.    On January 3, 2021, Stillwell informed FN that twelve (12) employees at work reported having COVID-19 symptoms. FN acknowledged Stillwell's remarks but took no action.

256.    On or about January 3, 2021, Stillwell assisted the laboratory supervisor with training sixteen (16) new lab staff.   Twenty (20) CSA Tests were used for training purposes.

257.    On January 4, 2021, Dill informed Stillwell that FN CEO, Saghian, wanted his relatives to get tested on January 5, 2021. Stillwell refused because the laboratory was not properly open, and testing required a prescription.

258.    Dill informed Stillwell that if she refused to perform testing on January 5, 2021, then FN would cancel all Compliance Firm contracts, sue her for breach of contracts, then report Stillwell and Compliance Firm for illegally performing COVID-19 testing on January 3, 2021.

259.    FN threatened to use video footage, obtained from the laboratory during Compliance Firm's staff training on January 3, 2021, as proof of Stillwell and Compliance Firm's illegal COVID-19 testing.

260.    According to Dill, Meierhans and Ott were considering other vendors for COVID-19 testing because they did not trust Stillwell, who they believed anonymously reported FN to the LACPHD.

261.    Dill agreed to delete the lab footage from January 3, 2021, and "push hard" for Meierhans and Ott to use Compliance Firm for testing, in exchange for Stillwell performing testing for Saghian's relatives on January 5, 2021.

262.    Stillwell was unaware that FN was considering other vendors for COVID-19 testing because Compliance Firm and FN had an existing Joint Venture agreement in place.

263.    On January 5, 2021, Stillwell verbally agreed under duress to perform COVID-19 testing.

TEXT MESSAGES BETWEEN DILL AND STILLWELL – 01/02/2021

264.   Stillwell worked around the clock to meet FN and FNL's unreasonable demands and last minute changes.

265.   On Saturday, January 2, 2021, at 10:43am, Dill texted Stillwell and asked "Can we remove the pregnancy question, please?" Stillwell informed Dill that the LA County Health Department's instructions states "do not change the template" for reporting COVID-19 cases.

266.   On Saturday, January 2, 2021, at 3:08pm, Stillwell texted Dill to ask whether FN wanted to provide PCR testing to confirm positive COVID-19 results. Dill responded "No. Just recommend. But I'll discuss with the team"

267.   On Saturday, January 2, 2021, Stillwell asked Dill "Can you please send me the finalized copy of the SOP's for Dr. Hinton to sign off on. We still don't have this." Dill emailed Stillwell the document, however, FN's SOP's were missing the policies and procedures for COVID-19 testing.

268.   In responses to FN not completing the SOPs as they previously agreed, Dill texted Stillwell "need to update Monday or Tuesday; unless Steve can help." Stillwell and Compliance Firm previously provided FN with twenty (20) hours of complimentary consulting services to help meet FN's everchanging deadlines.

269.    On Saturday, January 2, 2021, Dill texted Stillwell, "If Steve can quickly adjust the SOP accordingly, that would be helpful and billable. Monday and Tuesday is going to be crazy for me"

270.    On Saturday, January 2, 2021, Stillwell texted Dill:

"any delays can attributed to the lack of communication internally. That's not a YOU or Safety problem. That's just the culture of FN. so I'm sure everyone understands that we're doing the best given how little support we had."

"After testing is set up and running smoothly, it would be nice to have a joint debriefing on what could've been done better etc. The lack of communication and delays also came with a cost. The overall cost of testing is still <$45 but there were last minute expenses such as re-hiring an entire staff bc the Hours of operation changed"

271.    Below are screen shots of the text messages described preceding paragraph:



TEXT MESSAGES BETWEEN DILL AND STILLWELL – 01/03/2021

272.     On January 3, 2021, FN and FNL were still making last minute

changes to the COVID-19 testing process and testing schedule.

273.     On Sunday, January 3, 2021, at approximately 2:17pm, Stillwell

texted Dill:

"In short, our Medical Director and Lab Director haven't signed off on anything- largely because things were still changing as late as Thursday"

"Our testing SOPs have literally been redesigned to accommodate the end of shift testing. My recruiting team worked through the holiday to find replacement employees after the testing schedule changed. We are doing our best, but time was definitely wasted bc all stakeholders weren't part of the planning and implementation process"

"Tomorrow I'll be onsite to configure printers and help Matt with training our new lab techs. Steve is very aware of the things that need to be addressed before our directors sign off - so you're in good hands."

"The testing process has changed so before I leave SFS i def want to show you, Steve and Matt"

274.    Below are screen shots of the text messages described preceding paragraph:





In short, our Medical Director and Lab Director haven't signed off on anything- largely because things were still changing as late as Thursday

Our testing SOPs have literally been redesigned to accommodate the end of shift testing. My recruiting team worked through the holiday to find replacement employees after the testing schedule changed. We are doing our best, but time was definitely wasted bc all stakeholders weren't part of the planning and implementation process

Understood

Tomorrow I'll be onsite to configure printers and help Matt with training our new lab techs. Steve is very aware of the things that need to be addressed before our directors sign off - so you're in good hands.

The testing process has changed so before I leave SFS i def want to show you, Steve and Matt

COMPLAINT

275.     On Sunday, January 3, 2021, at approximately 4:06pm, Stillwell informed Dill that twelve (12) employees were experiencing signs and symptoms of COVID-19. Stillwell also created a Google Sheet that updated automatically with employee responses to COVID-19 screening questions. Dill and FNHR were given access to the Google Sheet and, were informed in real-time of when employees or vendors were positive or had symptoms of COVID-19.

276.     Below are screen shots of the text messages described in the preceding paragraph:



TEXT MESSAGES BETWEEN DILL AND STILLWELL – 01/04/2021

277.    On January 4, 2021, Compliance Firm's Employee Health Specialists refused to continue working with FN and FNL after experiencing multiple incidents of unprofessionalism and disrespect from Ott and several other FNHR employees.   Stillwell informed Dill via text and via phone at approximately 2:50pm on January 4, 2021.

278.    On January 4, 2021, at approximately 5:00pm, Stillwell began to feel lightheaded and ill. Stillwell had been forced to work over twenty-four hours straight, to meet FN and FNL's January 5th testing date.

279.    On January 4, 2021, at 5:34pm the following text messages were sent between Stillwell and Dill:

Stillwell: "I've been up for over 24hrs. After the impromptu training I'm go have to go home. I actually may Uber to a hotel bc I'm not sure if it's safe for me to drive"

Dill: Ok. What can I do?

Dill: Can we at least test leadership tomorrow, North/Florence, at 3PM?  The Owner's niece needs to get tested.

Stillwell: Is she here now?

Dill: No. Tomorrow.

Stillwell: I think I'm gonna go to urgent care

Dill: Shit. Wait.

Stillwell: I feel light headed and I think it's bc I'm extremely dehydrated

Dill: I'm on my way

Stillwell: Is there a blood pressure cuff in the OHN room?"

280.    On January 4, 2021, at 8:48pm the following text messages were sent between Stillwell and Dill:

Stillwell: "Thanks Ian for looking out for me earlier. I appreciate that. Tomorrow I'll sign off on Abbott's master agreement. And when FN is ready, I'll transition you all to the $5/test. And if things can't work out with Lori, then I'll make sure the exit strategy includes a plan to ensure that your testing costs stay low.

Dill: Most appreciated Britt. Please get some rest."

281.    Below are screen shots of the January 4, 2021, text messages described in the preceding paragraphs:



TEXT MESSAGES BETWEEN DILL AND STILLWELL – 01/05/2021

282.    On January 5, 2021, at approximately 10:00am, Stillwell texted Dill:

"I was gonna ask if we could cut the camera in the lab where we'll be

testing. But I forgot Matt will be there. Remember, we are just doing

dry runs. I don't want Matt knowing much about the testing bc he'll

mention it to Dr. Xie."

283. Dill and FN previously threatened to use training video footage as proof of Stillwell and Compliance Firm's illegal COVID-19 testing. Stillwell was afraid that Dill and FN would use footage from the January 5, 2021, testing to blackmail and extort Stillwell. Stillwell also did not want the other lab staff or Compliance Firm employees involved, as she wanted to protect them from potentially being blackmailed or extorted by FN and FNL.

284. Stillwell also informed Dill about two shipments of PPE that were being delivered to FN's Santa Fe Springs warehouse.

285. On January 5, 2021, at approximately 8:37pm, Stillwell texted Dill and asked if COVID-19 testing for the night shift could be postponed until FN secured the propane heaters and light. Dill responded that FN ordered lights and night shift testing could be paused until Monday (January 11, 2021) or whenever the heaters arrived.

286. Stillwell also informed Dill "Tonight I'll be back onsite around 930p and staying until 1 or 2am to help with the IT stuff" FN's IT department was originally supposed to spearhead the electronic medical records ("EMR") system for the COVID-19 lab. However, at the last minute, on or about December 24, 2020, Dill informed Stillwell that Compliance Firm would need to build or secure an EMR system for the COIVD-19 testing lab.

287. On January 5, 2021, at approximately 10:33pm, Dill texted Stillwell:

"What can I do to satisfy Dr. Scott to sign off and test the 20 associates tomorrow? Dr. Scott is only waiting for the Surveillance?

I'm driving to the office to complete any requirements to have Dr. Scott sign off. Just confirming Dr. Scott needs the Surveillance and/or MD referenced in the procedures. Please confirm and I'll make it happen now. "

288.    On January 5, 2021, onsite COVID-19 testing at FN was delayed because FN and FNL had not completed many of their delegated tasks. FN and FNL's disorganization and lack of communication led to Stillwell and other Compliance Firm employees working around the clock to meet FN's last-minute testing deadlines.

289.    At night, there was not ample lighting outside of the onsite testing COVID-19 lab, this prevented Compliance Firm from being able to complete COVID-19 testing for the night shift. There was also no heating source and the temperatures dropped as low as 55 degrees outside where the lab staff were relegated to wait.

290.    On January 5, 2021, FN and FNL had not provided the materials or services as previously agreed in the Joint Venture agreement. FN and FNL's nonperformance led to many testing delays.

291.     Below are screen shots of the January 5, 2021, text messages described in the preceding paragraphs:





## 13.   COVID-19 TESTING PERFORMED UNDER DURESS

292.   Stillwell is a registered nurse, licensed in California, and feared disciplinary action if FN made false reports about her to the California Board of Nursing or California Department of Public Health.

293.   On January 5, 2021, Dill kept his word and emailed Meierhans at 6:54AM:

"I recommend we move forward with Compliant Care Staffing. Compliant Care's weekly pricing, including test and staffing is 59% *less* than their comparable vendor providing the same service.

Although staffing hourly rates are nearly the same, the price gap is the per test ($28 vs $90) costs"

294.    Around 8:00am on January 5, 2021, Stillwell informed Dill that she didn't feel comfortable performing COVID-19 testing, and she felt that FN was trying to entrap her. Dill informed Meierhans.

295.    On January 5, 2021, at 9:34AM, Meierhans emailed Dill the following:

"I assume if we wanted to change staffing agencies, we could do so relatively easily and would still be able to keep the lab and the tests we paid for, correct?  Essentially, I am trying to determine what we own versus what Compliant Care "owns" so we are flexible and not wholly tied to one company"

296.    On January 5, 2021, at 9:40AM, Dill replied to Meierhans "We own the tests and lab.  CCS is providing CLIA lab license, staffing and MD (standing orders, liability, etc.); which any other provider is able to do."

297.    Below are screenshots from the communications between Meierhans and Dill on January 5, 2021. In an email to Meierhans, Dill states "We

would need to provide a testing site (canopy set up in the yard) and lab/office to process results"[4]

On Tue, Jan 5, 2021 at 6:54 AM Ian Dill <ian.dill@fashionnova.com> wrote:
Hi Erica -

Our overall test cost per associate (test+staff+lab) is $41.17.
- Test Cost per Associate = $28
- Staff Cost per Associate = $12.5 ($50/hr. divided by 15 minutes)
- Lab Cost per Associate = $0.67 ($32K total for 6 month rental)

We own the tests and lab. CCS is providing CLIA lab license, staffing and MD (standing orders, liability, etc.); which any other provider is able to do.

Ian Dill | Director, Loss Prevention & Safety

FASHION**NOVA**

I recommend we move forward with Compliant Care to provide Rapid Antigen COVID-19 tests onsite. Compliant Care's weekly pricing, including test and staffing, is 59% less than their comparable vendor providing the same service. Although staffing hourly rates are nearly the same, the price gap is the per test ($28 vs. $90) costs.

We would need to provide a testing site (canopy set up in the yard) and lab/office to process results.

I assume if we wanted to change staffing agencies, we could do so relatively easily and would still be able to keep the lab and the tests we paid for, correct? Essentially, I am trying to determine what we own versus what Compliant Care "owns" so we are flexible and not wholly tied to one company (as I understand Compliant Care gave notice and then "withdrew" it recently, I want to make sure we have a plan in place in the event something like this were to happen again or in the event we found a better option).

Thanks,
Erica Meierhans | General Counsel and Chief Compliance Officer

FASHION**NOVA**

---

[4] In the FNL Complaint, FNL falsely accuses Compliance Firm of using FN's money to build Compliance Firm's own COVID-19 testing lab. The complaint also falsely alleges that FNL was expecting a "turnkey" solution and Compliance Firm failed to disclose cheaper alternatives.

298. At approximately 9:45AM on January 5, 2021, Dill informed Stillwell that FN had other vendors lined up and would terminate all Compliance Firm contracts if Stillwell did not perform COVID-19 testing.

299. On January 5, 2021, Stillwell performed COVID-19 testing, under duress, on twenty (20) people, including Saghian's relatives.

<u>TEXT MESSAGES BETWEEN DILL AND STILLWELL – 01/06/2021</u>

300. On January 6, 2021, at 3:37am, Stillwell texted Dill, "I Update the google sheet with the names. Emails sent with results." Dill replied "THANKFUL"

301. On January 6, 2021, at 4:49am, Stillwell texted Dill: "There was a lot of condensation last night - that can't be good for the computers outside. It will be a matter of time before the moisture causes damage" At 5:56AM Dill replied "Will address"

302. On January 6, 2021, at 11:31am, Stillwell texted Dill, "Hi Ian. We can't test today. Dr. Xie was able to see the inside of the lab and isn't ok with it. Today the testers will complete their training."

**14.    FN TERMINATION OF COMPLIANCE FIRM AGREEMENTS**

303. On January 6, 2021, at approximately 10:30AM, Stillwell informed FN that over **forty-five** (45) employees at work reported having COVID-19

symptoms. Of those employees, over five employees reported testing positive for COVID-19 less than a week prior.

304.    Stillwell provided FN with the names and contacts of the employees. FNHR Department also always had access to this information, and in real time.

305.    On January 6, 2021, approximately 11:30AM, Stillwell informed FN that she would not be conducting any more testing until the lab was properly functioning. Later that day, Meierhans emailed Stillwell a Notice of Termination for the OHN and Recruitment Staffing Agreements.

306.    FN never cited a reason for the termination in the letter. However, Paragraph 7 of the FNL Complaint falsely cites "many weeks of mismanagement and delays, and just two days of inefficient testing and incredibly expensive testing services" as the reason for FN and FNL's decision to terminate Compliance Firm's contracts. However, FNL, FN and Meierhans knew that Compliance Firm's testing was 59% cheaper than its closet competitor. FNL, FN and Meierhans also knew the delays in testing were caused by FN and FNL, not Compliance Firm.

307.    A true and correct copy of FN's Notice of Termination letter is attached in Exhibit I, and incorporated by reference.

308.    From December 31, 2020 – January 22, 2021, FN did not send or post COVID-19 Associate Letters to inform workers of positive COVID-19 cases, despite one day notification rule that became effective on January 1, 2021.

309.    FN was aware that many workers could have been exposed or positive, but intentionally refrained from testing to conceal the revelation of more positive cases.

310.    On or about January 16, 2021, Stillwell emailed Meierhans about an alleged COVID-19 related death:

"Hi Erica,

A group of former employees who worked in the picking and facilities departments are alleging they were exposed to COVID-1919 at FN and not informed. Of this group, some allege they didn't receive their 2week COVID-19 pay, while other employees did receive pay. One of the former employees believes he contracted COVID-19 at FN and unknowingly infected a relative, who subsequently died. Mixed in with those complaints were also so complaints about racial discrimination.

Part of my internal investigation includes fact gathering, so I can better understand CCS' position. Further, I was at SFS during the times of the outbreaks and if these allegations are true, then I was exposed and never informed.

I raised my concerns with your team several times in December via email, text and in person - I was never given a response. Instead, I was met with hostility and retaliation. When employees make allegations such as these, I have to investigate. I'm not being accusatory or difficult.

During the times in question November 2020/ December 2020, no facilities employees were ever listed on the employee notification letters. As you know, I was consulting on the OHN and COVID-19 testing sites during this time. I know for a fact that some of the facilities leadership was out with COVID-19, yet this was never reflected on the employee notification letter. I asked about this info being omitted and was told that HR decided to only include non-supervisory staff in the letters. This is a grossly inaccurate

representation, especially considering that the omitted classes of employees interact with non-supervisory staff."

311.   Meierhans, FN, and FNL refused to cooperate with Compliance Firm's investigation into the November 2020 and December 2020 COVID-19 outbreaks.

### 15.   <u>FN AND FNL REFUSED TO PAY EMPLOYER TAXES FOR LEASED EMPLOYEES</u>

312.   Under the Leased Employees agreement, FN agreed to reimburse Compliance Firm for all payroll expenses, including employer taxes, that Compliance Firm paid on behalf of FN and FNL.

313.   Compliance Firm was initially provided FN's EIN 86-XXX5549 and told that employer taxes for the Leased Employees would be billed to FN's tax account. Later FNHR informed Compliance Firm that the Leased Employees would be billed to FNL's employer tax account.

314.   FNHR provided Compliance Firm with FNL's EIN, 83-XXX6139 and FNL California EDD account number, 1XX-X9705.

315.   Compliance Firm uses ADP for payroll processing and accounting for employer taxes.

316.   On or about November 1, 2020, Stillwell informed Ott that Compliance Firm switched ADP platforms and needed an executed Third-

Party Payer Arrangement ("TPPA") since FNL was the Common Law Employer and IRC Section 3401(d)(1) employer for the Leased Employees.

317.    Ott informed Stillwell that a TPPA was unnecessary because the terms of the Leased Employee Agreement address the matter. Stillwell reminded Ott that she still needed to sign the Leased Employee Agreement. Ott informed Stillwell that Meierhans would be signing the agreement.

318.    Stillwell reminded Ott that ADP usually provides quarterly tax statements one month after the quarter ends, however, since Compliance Firm switched payroll platforms in the middle of fourth quarter, there might be some delays with Compliance Firm's Form 941 for 4th Quarter 2020. Ott replied, "ok, let me know when you know."

319.    On or about January 28, 2021, ADP provided Compliance Firm with its Form 941 for 2020. Compliance Firm paid $103,876.31 in employer taxes for the Leased Employees.

320.    On or about January 31, 2021, ADP provided Compliance Firm with its California Quarterly Contribution Return and Report of Wages for 4th Quarter 2020. Compliance Firm paid $8,472.25 in employer taxes for the Leased Employees.

321.    FNL owes Compliance Firm a total of $112,348.56 for employer taxes that Compliance Firm paid on behalf of FNL in 4th Quarter 2020.

**16.** **FASHION NOVA REFUSAL TO PAY FOR SERVICES PROVIDED BY COMPLIANCE FIRM / INVOICE DISPUTES**

322.    On February 4, 2021, Meierhans informed Stillwell that FN was not paying Stillwell or Compliance Firm for any fees or expenses related to the COVID-19 lab or testing because there was no *written* contract in place. Stillwell had previously refused to sign an NDA and indemnity agreement, so FN and FNL refused to reduce the oral agreements to writing and refused to sign written agreements that Stillwell had reduced to writing.

323.    Meierhans refused to pay for Invoices #1038, 1040, 1043, 1045, despite these Invoices being previously approved. Meierhans did not dispute Invoice 1033 during the meeting.

324.    On or about February 11, 2021, Stillwell sent Meierhans copies of emails and text messages that proved the oral agreements existed between FN and Compliance Firm. Stillwell also provided an in-depth explanation for each line items on the invoices Meierhans refused to pay. Meierhans and FN continued to refuse payment because Stillwell refused to sign the NDA.

325.    Meierhans, a licensed attorney in California, represented FN, FNL and its subsidiaries in the negotiation of the oral agreements with Compliance Firm and Stillwell. Meierhans was also involved in material decisions regarding the COVID-19 lab and testing.

326.    There were no disputes about the terms of any of the oral agreements. Stillwell refused to sign the NDA because the NDA prohibited Stillwell and Compliance Firm from participating in civil or criminal investigations against FN and FNL. The NDA and arbitration clause were not discussed until after all the oral agreements were made.

327.    The written indemnification agreement, that was buried in the NDA was materially different than what Stillwell and FN agreed to orally. In the oral agreement, FN and agreed to indemnify Compliance Firm. In the proposed *written* indemnification agreement, Meierhans wanted unilateral indemnification.

328.    Fashion Nova's general counsel has never been involved with the discussion of invoice disputes. It was not a FN's policy or practice for the general counsel to investigate approved and undisputed invoices.

329.    Any invoice disputes would have been initiated and discussed at the department level, as department heads are required to approve or dispute invoices.

330.    The invoices that Meierhans disputed had already been approved by the respective department heads.

331.    The department heads responsible for signing off never questioned or disputed invoices submitted by Compliance Firm.

332.  Meierhans contrived the alleged invoice disputes in furtherance of schemes to defraud Stillwell and Compliance Firm.

### 17.   FN ONSITE TESTING WITH RAPID NOW

333.  FN terminated over 2,000 temp staff in early January 2021 before they began COVID-19 testing with Rapid Now.

334.  On or about January 27, 2021, Fashion Nova entered into an agreement with Rapid Now to provide onsite testing at FN's Santa Fe Spring warehouse.

335.  Prior to entering into an agreement with Rapid Now, FN solicited at least four other vendors to perform onsite testing at its Santa Fe Springs warehouse, using the CSA Tests. According to the agreement, Fashion Nova would *"provide 13,000 CareStart antigen tests to be used by Rapid Now for testing."*

336.  Paragraph 6 of the FNL Complaint, FNL states it was "not authorized to lawfully possess, warehouse, store, sell, broker, distribute, or provide logistics services for the CSA Test"

337.  Rapid Now's testing services were over forty percent (40%) more expensive than the Compliance Firm.

338.  Meierhans signed the Rapid Now agreement on behalf of FN.

339.     A true and correct redacted copy of the Rapid Now testing agreement is attached in Exhibit J and incorporated by reference. Rapid Now's banking and financial information have been redacted from the document.

340.     Defendants concealed FN's use of over 4,500 CSA Tests from Compliance Firm and Stillwell.

341.     Stillwell became aware of the Rapid Now testing services and FN's use of the CSA Tests on or about June 2021.

### 18.     CSA TESTS FRAUD

342.     On February 26, 2021, Compliance Firm sent FN a demand letter in the amount of $114, 321.37 for unpaid invoice that were over 90 days late.

343.     A true and correct copy of Compliance Firm's Demand Letter is attached in Exhibit K and incorporated by reference.

344.     After receiving the demand letter, Riordan emailed Stillwell a letter informing Stillwell that Nixon Peabody was representing FN Logistics, Inc.

345.     The letter dated February 26, 2021, stated in part:

"FNL learned that CCS left approximately 13,000 CareStart COVID-19 Antigen tests at FNL's warehouse, which is considered a "dangerous device" under the law, and which is CCS's responsibility as a licensed California laboratory. Given these are the property and legal responsibility of CCS, please contact me at your earliest

convenience to arrange for your taking possession and picking them up."

346.    A true and correct copy of Riordan's Letter dated, February 26, 2021, is attached in Exhibit L and incorporated by reference.

347.    February 26, 2021 was the first time Stillwell and Compliance Firm were asked to retrieve the CSA Tests from FN and FNL.

348.    On the following dates Stillwell informed Riordan and the Nixon Peabody attorneys that the CSA Tests were non-refundable.

(a) February 26, 2021,

(b) March 3, 2021,

(c) March 16, 2021,

(d) March 23, 2021, and

(e) April 3, 2021.

349.    Stillwell also offered to assist FN and FNL with donating the CSA Tests, which were close to expiring in April 2021.

350.    Several Nixon Peabody lawyers and employees were copied on the February 26, 2021, email containing Riordan's letter.

351.    The "approximately 13,000" CSA Tests referenced in Riordan's February letter were set to expire all in roughly thirty days. The CSA Tests all had expiration dates of April 2021.

352.    At the time of Riordan's February letter, Riordan was aware that FN had used nearly 5,000 of the CSA Tests. However, Riordan continued to conceal this material fact from Compliance Firm and Stillwell.

353.    Stillwell responded to all persons on Riordan's February email and asked for clarification on how Compliance Firm became the owners of the CSA Tests. No one replied.

354.    On March 12, 2021, Riordan emailed Stillwell a second letter stating: "the CSA Tests are considered "dangerous devices" – pursuant to California Business & Professions Code § 4022 – which can only be handled, stored, warehoused, distributed, or shipped by authorized parties, pursuant to California pharmacy law."

355.    The letter also stated that Compliance Firm was "required by law to maintain possession of those tests."

356.    A true and correct copy of Riordan's Letter dated, March 12, 2021, is attached in Exhibit M and incorporated by reference.

357.    Stillwell offered to assist with donating the CSA Tests and repeatedly asked for clarification about the ownership of the CSA Tests. Stillwell provided Riordan and Nixon Peabody with emails and screenshots of

messages showing FN believed and understood that the CSA Tests and lab belonged to FN.

358.     Paragraph 33 of the FNL Complaint, Meierhans and Riordan misrepresented Compliance Firm's ownership of the lab by using the following sentence out of context: "*CCS at FNL is wholly owned by The Compliance Firm.*" This sentence was part of an email, which Meierhans was part of, discussing Compliance Firm being listed as the lab owner on the CLIA application and lab registration, as all parties had previously agreed.

359.     Stillwell provided Riordan and Brian with copies of emails and communications that showed Meierhans was kept abreast and involved with everything regarding the COVID-19 lab and testing. Riordan was aware that FN relied on Nixon Peabody's guidance regarding the legal implications and licensing for the lab.

360.     Stillwell called Riordan several times and never received a call, text or email reply from Riordan or anyone at Nixon Peabody.

361.     The 'Invoicing' clause in the OHN Agreement, explicitly states in part:

> Invoicing. Any and all invoice corrections, pay corrections, debit memos and/or time slip corrections that are submitted to Agency ninety (90) days after the date of an applicable invoice, shall be

considered invalid by Agency. Agency will not accept any corrected billing after such 90-day period**"**

362.    After over ninety (90) days, Nixon Peabody never provided Stillwell or Compliance Firm with the basis for FNL's alleged invoice disputes, which remain undisputed and unpaid. Per Meierhans, the oral agreements are invalid because they were not reduced to writings.

363.    On March 22, 2021, Aaron Brian ("Brian"), an attorney at Nixon Peabody, emailed Stillwell and stated the California Board of Pharmacy ("BOP") instructed him to call the waste pickup to collect the CSA Tests. The email further stated that Brian contacted the manufacturer, Access Bio, who agreed to pick up the tests as a courtesy.

364.    A true and correct copy of Brian's email dated, March 22, 2021, is attached in Exhibit N and incorporated by reference.

365.    On or about March 22, 2021, Stillwell emailed Access Bio, Intrivo and Nixon Peabody to inform them that the CSA Tests are the subject of pending litigation. In the email Stillwell confirmed there should be 12,760 CSA Tests present at FN's facility.

366.    Twenty (20) CSA Tests were used by Compliance Firm staff for training purposes, and twenty (20) CSA Tests were used for COVID-19 testing at FN on January 5, 2021.

367.     Stillwell also asked Nixon Peabody and Intrivo to confirm the number of CSA Tests present and the disposition of the CSA Tests.

368.     On or about March 22, 2021, Meierhans informed Dill that Reeve Benaron and several of his colleagues were picking up the CSA Tests on March 24, 2021. Dill then emailed the FN Security team and informed them that "Reeve Benaron would be picking up approximately 8,320 CSA Tests on March 24, 2021." Meierhans was blind carbon copied on the email, that was sent to at least seven FN employees.

369.     On or about March 23, 2021, Stillwell spoke with Andrew Holmes ("Holmes"), Intrivo's general counsel. During the call Holmes stated that Intrivo was "only the marketing and branding for Access Bio." Holmes confirmed that Intrivo does not sell or manufacture the CSA Tests.

370.     Holmes also denied Intrivo's involvement with retrieval of the CSA Tests and stated that "Intrivo had no duty or obligation to interfere" with FN and Compliance Firm's dispute over the tests.

371.     Holmes further confirmed that no one from Intrivo would be picking up the CSA Tests from FN's warehouse.

372.     The following day, on or about March 24, 2021, Benaron and Markel picked up 8,320 CSA Tests from FN's Santa Fe Springs warehouse and

transported them to FN's Vernon warehouse where the expiring CSA Tests were re-labeled to be sold.

373.     Benaron and Markel also took possession of over $25,700.00 worth of personal protective equipment, ("PPE"), testing and medical supplies that belonged to Compliance Firm.

374.     Compliance Firm purchased six (6) months of PPE and other testing supplies to be used by laboratory staff for onsite COVID-19 testing.

375.     FN refused to allow Compliance Firm to retrieve its medical supplies because Compliance Firm refused to take possession of the CSA Tests.

376.     In January 2021, after FN terminated all agreements, Compliance Firm offered to endorse the CSA Tests to FN's new provider or laboratory vendor.

377.     Compliance Firm also left the CLIA and laboratory license in place until the CSA Tests could properly be endorsed to a licensed provider.

378.     FN never responded to Compliance Firm's multiple offers to assist with the proper disposition of the CSA Tests.

## 19 .     INVOICE DISPUTES

379.     Invoices numbered 1033, 1038, 1040, 1043, and 1045 ("Disputed Invoices") were invoices for services that Compliance Firm provided to FN and FNL pursuant to the Joint Venture agreement.

380.     FN, FNL, Meierhans used the Disputed Invoices as pretext for defrauding Stillwell and Compliance Firm.

381.     Below is a chart containing the approval date and approver of the alleged Disputed Invoices:

| INVOICE # | AMOUNT | DATE APPROVED | APPROVED BY | INVOICE PAID? |
|---|---|---|---|---|
| 1033 | $392,448.00 | 12/03/2020 | ERICA MEIERHANS, FN GEN COUNSEL, RYAN KANESHIRO, FN CFO, JULIA GARCIA | YES |
| 1038 | $95,201.15 | 12/22/2020 | IAN DILL & FELIX FELDER | NO |
| 1040 | $18,419.47 | 03/26/2021 | IAN DILL & TIFFANY SMITH | NO |
| 1043 | $63,522.50 | 01/15/2021 | IAN DILL & FELIX FELDER | PARTIAL |
| 1045 | $26,000.00 | 03/26/2021 | IAN DILL & TIFFANY SMITH | NO |
| TOTAL AMOUNT FOR INVOICES: 1033, 1038, 1040, 1043 & 1045 = **$595,591.12** | | | | |

382.     Below are screenshots of emails from Coupa Supplier Portal ("Coupa"). Coupa is a cloud based electronic invoicing portal used by FN and FNL for vendor invoicing and payments. The emails and screenshots show that Invoices #1033, #1038, #1040 and #1045 were approved in Coupa.

383.     Invoice #1043 was approved orally on January 15, 2021, by Dill and

Felder.

COMPLAINT

384.     On or about January 15, 2021, Felder instructed Stillwell to "zero out any deposits" by applying the unused deposits towards outstanding invoices. Stillwell applied $34,352.00 towards invoice 1043, which left a balance of $29,170.50 for invoice 1043.

385.     A true and correct copy of Invoice 1043 is attached in Exhibit O and incorporated by reference.

386.     The total amount of the Disputed Invoices is $595, 591.12, which is approximately the same amount that FNL sought in its complaint against Compliance Firm.

### 20.     INTRIVO SOLD EXPIRED CSA TESTS ON AMAZON.COM

387.     On March 4, 2021, Intrivo issued a press release stating in part:

"Intrivo, a Los Angeles-based digital health company presently focused on high-quality testing solutions for COVID-19, today announced that it will offer COVID-19 rapid antigen tests on Amazon Business in the U.S."

"Intrivo gives faster, easier access to accurate, point-of-care COVID-19 antigen tests, now available on Amazon Business."

"Working with Amazon Business to distribute our antigen tests in their online store is a major milestone for our company," said Reeve Benaron, Founder, Chairman and CEO of Intrivo."

"Intrivo's work with Amazon Business is the latest in the testing provider's efforts to expand distribution to more customers in need."

388.  On or about March 4, 2021, Intrivo listed the CSA Tests on Amazon.com for resale.  According to Intrivo's Amazon.com listing, the CSA Tests were first made available on March 24, 2021.

389.  The CSA Tests are listed under Amazon Standard Identification Number ("ASIN") B09123GSVT. An Amazon Standard Identification Number is a 10-character alphanumeric unique identifier assigned by Amazon.com and its partners for product identification within the Amazon organization. The European Article Number ("EAN") is 0860006191634, and the Unique Product Code ("UPC") for the expired CSA Tests is 860006191634.

390.  The Amazon listing of the expired CSA Tests can be found at https://www.amazon.com/CareStart-COVID-19-Antigen-Test-Point/dp/B08ZY5YMMF

391.  Intrivo is selling the CSA Tests at the following rates:

(a) Option 1: 640 CSA Tests for $8,320.00, which is $13.00 per test

(b) Option 2: 12,800 CSA Tests for $160,000.00, which is $12.50 per test

    (i) According to Intrivo's listing, Option 2 is currently unavailable

392.    Screenshots of Intrivo's Amazon listing for the CSA Tests are provided below:



CareStart COVID-19 Antigen Test: Rapid, Sensitive Point-of Care Test to detect Active SARS-CoV-2 Infection in 10 Minutes - EUA Authorized and CLIA-Waived for Lower Nasal Collection (640 Tests)
Brand: CARESTART

Item Package Quantity: 640

| 640 | 12800 |
|---|---|
| 1 option from $8,320.00 | 1 option from $160,000.00 |

- CONVENIENT & MOBILE: All-in-one package including anterior nares (lower nasal) collection swabs. Each kit includes up to 20 antigen tests—there is no additional training or expensive instruments needed. At any point of care (POC) environment with a CLIA certificate of waiver, the test can be administered with meaningful, easily read results in as little as 10 minutes and requires no analyzer to generate results. Each order includes 32 kits (20 tests in each kit) for a total of 640 tests.
- HIGH CAPACITY USA PRODUCTION: All of our EUA authorized tests are manufactured in our state-of-the-art manufacturing facility in New Jersey. With a capacity to manufacture millions of tests per month, we are ready to meet continually growing testing needs in this country.
- PEACE OF MIND: Helps provide critical answers about active infections to patients and healthcare workers alike, aiding in a confident return to normalcy.
- QUALITY YOU CAN TRUST: Highly specific (100%) and sensitive (87.2%) tests detect SARS-CoV-2 nucleocapsid protein via a lateral flow assay using lower nasal swabs. Access Bio has an 18-year track record of engineering and manufacturing superior-quality diagnostic kits for malaria, dengue, influenza, HIV and other infectious diseases.
- This test has been authorized by the FDA under an EUA for use by authorized laboratories and at the Point of Care (POC) by medical professionals operating under a CLIA Certificate of Waiver, Certificate of Compliance, or Certificate of Accreditation.

Roll over image to zoom in

## Customer questions & answers



Q  Have a question? Search for answers

▲
0
votes
▼

**Question:**  When will the 128,000 quantity be back in stock? and why is this kit currently unavailable? sold out? is this product selling well n has good quality?

**Answer:**  Hi, thank you for your inquiry. We can sell you 128,000 tests and have it available immediately. The product is the best quality in the market and is quite popular. Please let me know if you have any other questions or if we can expect an order to be placed soon. Thank you!
By Intrivo Diagnostics SELLER  on May 12, 2021

**Product details**

Item Package Quantity:640

**Date First Available : March 24, 2021**

**Manufacturer : Access Bio**

**ASIN : B09123GSVT**

393.     Benaron and Markel and relabeled the expiring CSA Tests with the intention of introducing the adulterated medical devices into commerce.

394.     The original lot number appearing on the CSA Tests was 'Lot CH20L03' and the original expiration date was 'APR 2021'

395.     In Brian's email to Stillwell dated, March 22, 2021, (incorporated as Exhibit N), Brian stated "*If I do not hear from you, or if CCS elects not to pick up the tests by March 24, 2021, FNL will have no choice but to allow Access Bio to collect them.*"

396.     FN was supposed to dispose of the CSA Tests, *not* resale them with Intrivo.

397.     Intrivo is also *not* a licensed pharmacy or laboratory in the State of California.

**21.     INTRIVO CREATED FAKE FDA LETTERS TO EXTEND SHELFLIFE OF EXPIRED CSA TESTS**

398.    The CSA Tests are assigned Emergency Use Authorization ("EUA") Number EUA202625 by the FDA.

399.    According to Brian's email to Stillwell on March 22, 2021, Nixon Peabody "notified the California Pharmacy Board and Access Bio, the manufacturer of the CareStart Antigen Tests, that a significant number of unused test kits remain at the FNL warehouse. The Pharmacy Board recommended that we contact waste disposal to pick up the test kits, since CCS has refused to do so."

400.    The California Board of Pharmacy, ("BOP") instructed Nixon Peabody, FN and FNL to dispose of the expired CSA Tests. Instead of disposal, Nixon Peabody, FN, FNL and Intrivo conspired to relabel and sell the expired CSA Tests.

401.    According to the allegations in the FNL Complaint, it was unlawful for Intrivo to store, distribute, sell, or dispose of the CSA Tests, because Intrivo did not, and does not have a BOP license.

402.    On April 12, 2021, the FDA issued an official letter ("FDA's April 12th EUA Letter") amending and revising the CSA Tests' emergency use.

"On April 1, 2021, you requested to amend your EUA. Based on that request, and having concluded that revising the February 1, 2021, EUA is appropriate to protect the public health or safety under section

COMPLAINT

564(g)(2)(C) of the Act (21 U.S.C. § 360bbb-3(g)(2)(C)), FDA is reissuing the February 1, 2021, letter in its entirety with revisions incorporated.5 Pursuant to section 564 of the Act and the Scope of Authorization (Section II) and Conditions of Authorization (Section IV) of this reissued letter, your product6 is now authorized for use consistent with the indication described above."

403.    A true and correct copy of the FDA's April 12th EUA Letter for CSA Tests is attached in Exhibit P and incorporated by reference.

404.    Access Bio also updated its website to reflect the revised EUA on April 12, 2021. Access Bio website states:

"For Serial Screening of asymptomatic individuals. The serial screening indication is only applied to products manufactured by Access Bio Inc. after April 12, 2021. The product batches listed in the Official Notification Letter (click to see) should not be marketed or used for POC serial screening purposes."

405.    On April 19, 2021, Access Bio issued a Letter of Notification ("Access Bio April 19th Letter of Notification") based on the FDA's April 12th EUA Letter. Attachment A of the Access Bio April 19th Letter of Notification states "**NOTE:** The following product batches in the table

below should **not** be used for POC serial screening purposes." The CSA

Tests are from batch CH20L03. Batch CH20L03 appears in column 1, row 9

of Attachment A.

406.   The CSA Tests should not be used for POC serial screening purposes,

however, Intrivo continues to market and sell the expired CSA Tests for

POC serial screening purposes, despite the FDA's stating otherwise.

407.   A true and correct copy of the Access Bio April 19th Letter of

Notification for CSA Tests is attached in Exhibit Q and incorporated by

reference.

408.   On or about July 19, 2021, Intrivo updated its Amazon listing of the

CSA Tests to include "EUA Amendment(s)" The attached pdf includes a

letter from Access Bio, dated July 19, 2021and reads "**Title: *CareStart*^TM**

**COVID-19 ANTIGEN SHELF-LIFE EXTENSION NOTIFICATION,**"

("Access Bio July 19th Shelf-life Extension Letter")

The Access Bio July 19th Shelf-life Extension Letter states:

"This letter is to inform you regarding the extension of the shelf-life

expiration date of the Access Bio, Inc. *CareStart*TM COVID-19

ANTIGEN test. As a part of the EUA requirement, the US Food and

Drug Administration (FDA) requested Access Bio, Inc. to indicate

shelf life of the product based on the real-time stability data.

To comply with the requirement, Access Bio, Inc. submitted the real-time stability data on July 15th, 2021, and the FDA granted **twelve (12) months of shelf-life at 1–30°C for the *CareStart*TM COVID-19 ANTIGEN test as of July 16th, 2021.**

**Attachment A** lists the lot numbers of *CareStart*TM COVID-19 ANTIGEN products labeled with six (6). These products' shelf-life will now be extended to twelve (12) months.

409.   According to the Access Bio July 19th Shelf-life Extension Letter, the CSA Tests, which originally expired "APR 2021" now expire on "NOV 2021"

410.   A true and correct copy of the Access Bio July 19th Shelf-life Extension Letter for CSA Tests is attached in Exhibit R and incorporated by reference.

411.   The Access Bio July 19th Shelf-life Extension Letter did not include a link to the official FDA EUA letter because the FDA did **not** issue a twelve (12) month shelf-life for the CSA Tests.

412.   Access Bio July 19th Shelf-life Extension Letter did **not** apply to the CSA Tests, as the CSA Tests had expired nearly *three* (3) months prior to the issuance of the Shelf-life Extension Letter.  FN and FNL improperly

stored the CSA Tests in its warehouses were temperatures often exceeded 30° and according to Brian's email dated, March 22, 2021, and incorporated as Exhibit N, FN and FNL were instructed by the California Board of Pharmacy to contact waste disposal so the CSA Tests could be *destroyed,* **not** relabeled, and re-sold by Intrivo.

413.    Nixon Peabody attorneys, along with Benaron, Markel, Intrivo and the Doe Defendants created the Access Bio July 19th Shelf-life Extension Letter after Stillwell tweeted about Intrivo selling expired CSA Tests on Amazon.

414.    The Access Bio July 19th Shelf-life Extension Letter was issued nearly three months *after* the CSA Tests expired. The CSA Tests should have been discarded or returned to the manufacturer, Access Bio. Intrivo is *not* a reverse logistics carrier and was not authorized to retrieve the nearly expired CSA Tests in March 2021.

415.    FN and FNL did not store the CSA in a temperature-controlled building. The CSA Tests were stored at FNL's Santa Fe Springs warehouse near electrical equipment, where the temperatures often exceeded 30 degrees Celsius.

416.    According to Access Bio, the CSA Tests should have been stored in temperatures of 1 degree to 30 degrees Celsius (1° to 30° C).

417.    The expired CSA Tests are still being sold online at Amazon an internationally on U-buy.com.tw. The U-buy CSA Tests listing can be accessed at https://www.u-buy.com.tw/en/product/2BK5QBDY-carestart-COVID-19-antigen-test-rapid-sensitive-point-of-care-test-to-detect-active-sars-cov-2-infec

418.    Screenshots of Intrivo's U-buy listing for the CSA Tests are provided below:



419.    Intrivo sells and markets the CSA Tests on the following sites:

(a) www.Intrivo.com

(b) www.CareStart.com

(c) www.Accessbiodiagnostics.net

420.    The website for Access Bio that is listed in the CSA Instructions for Use is www.accessbio.net

421.    The CSA Tests lists the addresses and website for Access Bio, Inc. and Intrivo Diagnostics, Inc. Access Bio's website on the CSA Tests is www.accessbio.net and the address is "65 Clyde Road, Suite A, Somerset, NJ 08873." Intrivo's website is listed as www.intrivo.com and the address is "2021 Santa Monica, CA 90404"

422.    Images from each side of the CSA Tests appear below:





423.    The CSA Tests were **not** purchased from Intrivo. Stillwell contacted Intrivo in December 2020 to purchase CareStart antigen tests as was referred to NDC Distributors to purchase the tests.

424.    In December 2020, Stillwell was informed by an Intrivo employee that Intrivo was not a manufacturer or distributer of the CareStart antigen tests. The employee further stated that Intrivo was only in charge of marketing and advertising the CareStart antigen tests.

425.    Intrivo is not listed on the FDA's website for registered facilities, or distributors. Intrivo does not have a CLIA license. Intrivo is also *not* licensed to sale or export the CSA Tests to foreign countries.

426.    The CSA Tests were manufactured by Access Bio.

427.    Plaintiff is unaware if Access Bio participated or assisted with the selling of expired CSA Tests, as this information and evidence is with the Defendants and can be discovered. If Access Bio participated in schemes to defraud Stillwell, then Plaintiff will amend Complaint to add Access Bio as a defendant.

### 22.    PURE BLUE HEALTH OFFERS COVID-19 TESTING WITH EXPIRED CSA TESTS

428.    Markel and Benaron own Pure Blue Health, Inc., (PBH), a Nebraska corporation, that was recently incorporated on May 14, 2021.

429.     According to its website, https://purebluehealth.com/home/#about-us "Pure Blue Health is an organization of nationally recognized innovators, technology experts, doctors and medical professionals" that offers reliable and effective COVID-19 testing and solutions, infectious disease solutions, warehousing and logistics, distribution and fulfillment and account management and customer service.

430.     Markel and Benaron used the expired CSA Tests to provide diagnostic COVID-19 testing services in California, Texas, and Nevada. PBH is not licensed to do business or provide laboratory testing services in California, Texas, or Nevada.

431.     Pure Blue Health does not have CLIA license. Intrivo does not have CLIA license.

432.      Pure Blue Health is not a registered FDA facility or FDA registered distributor.

433.     The expired and adulterated CSA Tests are still being sold on Amazon and still being used by PBH to provide COVID-19 testing.

### 23.    **FN LOGISTICS, LLC v. THE COMPLIANCE FIRM, LLC d/b/a COMPLIANT CARE STAFFING LAWSUIT**

434.    On April 15, 2021, at 12:38pm Stillwell emailed Nixon Peabody partners Staci Riordan, Aaron Brian, and Jill Gordon regarding the alleged invoice disputes. Stillwell's April 15th email stated:

"Hello Staci and Aaron,

It's been over **60 days** since your client 'disputed' invoices totaling over $114,000. To date, Your client has not provided a basis or explanation for the disputes; Your client has not participated nor attempted any amicable resolutions or discussions to resolve any disputes; Your client has not paid the outstanding invoices.

If your client does not remit payment for all outstanding balances by 5:00pm PST on April 21, 2021, then we will proceed with legal action. Kind Regards"

435.    Riordan and Brian never responded to Stillwell and the next day, April 16, 2021, Riordan filed the FNL Complaint in federal court seeking $600,000, which was approximate total cost of the Disputed Invoices.

436.    A true and correct copy of the FNL Compliant, and is attached in Exhibit S and incorporated by reference.

437.    Although FN Logistics, Inc. was *still* registered in California, FN sued Compliance Firm under a newly registered company, FN Logistics, LLC,

("FNL"). Meierhans registered FN Logistics, LLC in California on April 13, 2021, just *three* days the FNL Complaint was filed.

438.     Meierhans, Riordan, and Nixon Peabody knew Stillwell lived in Los Angeles, California, but misstated this face to create diversity jurisdiction to file the suit in federal court.

439.     Meierhans, Riordan, and Nixon Peabody devised a scheme to first file the FNL Complaint in federal court, then remove the suit to state court, in a scheme to subject Compliance Firm and Stillwell to incur unnecessary legal fees defending the frivolous case.

440.     The FNL Complaint falsely alleges that Compliance Firm illegally sold FNL 12,800 CareStart Antigen COVID-19 tests, ("CSA Tests").

441.      The FNL Complaint also falsely alleges that "Compliance Firm misappropriated FNL's funds to build a COVID-19 testing lab for Compliance Firm's own commercial use." The alleged misappropriated funds were a reference to Compliance Firm's payment of FN's 3rd Quarter 2020 payroll taxes, in which Compliance Firm used a portion of a $100,000.00 deposit toward the payment of the Leased Employee payroll taxes, pursuant to the Leasing Agreement.

442.     However, according to FNL's Application for Default Judgment, which has *not* been filed, the alleged misappropriated funds at issue relate to

the Disputed Invoices, which were agreed upon and *approved* services that were provided to FN and FNL pursuant to the Joint Venture.

443. FNL's Complaint is riddled with many other false allegations to intentionally paint Compliance Firm and Stillwell in false light and in furtherance of the Defendants' schemes to defraud Stillwell and Compliance Firm.

444. FNL and their attorneys, Nixon Peabody, knew the Compliance Firm was *not* required to obtain a pharmacy license to administer the CSA Tests.

445. Nixon Peabody advised FN, FNL and Compliance Firm on the Cal/OSHA ETS regulations and knew that the CSA Tests did not fall under the jurisdiction of the California Board of Pharmacy "BOP", because the tests were being used for *diagnostic purposes* in a diagnostic laboratory.

446. Paragraph 28 of the FNL Complaint states, "The CSA Tests are considered "dangerous devices" and are also regulated by California pharmacy law. *See* Cal. Health & Saf. Code §§ 4022, 4160 – 4169.1"

447. California pharmacy law, ("CA Pharmacy Law") is codified in Business and Professions Code 4000 *et seq.* and California Code of Regulations, Title 16, Section 1700 *et seq.*

448. According to CA Pharmacy Law, "laboratory" is defined as:

"a research, teaching, or testing laboratory not engaged in the dispensing or furnishing of drugs or devices but using dangerous drugs or dangerous devices for scientific or teaching purposes. Every laboratory shall maintain an established place of business and keep purchase records. Every laboratory shall be subject to the jurisdiction of the board.

*See* Cal. Health & Saf. Code § 4031.

449. The Joint Venture laboratory, *CCS at FNL*, was a *diagnostic* laboratory **not** a research, teaching, or testing laboratory. The Joint Venture laboratory was **not** governed by CA Pharmacy Law.

450. Further, the Joint Venture laboratory's purchase and use of the CSA Tests were also exempt from CA Pharmacy law pursuant to Title 16, Section 1714.5, <u>Dangerous Drugs and Devices Exempt from the Provisions of Chapter 9, Division 2 of the Business and Professions Code</u>. *See* 16 CCR § 1714.5.

451. On April 5, 2021, an employee from CDPH Laboratory Field Services, ("LFS") confirmed that LFS "**provides regulatory oversight for the licensed laboratories and tests that are conducted for the purpose of clinical diagnosis.**" The email was sent to Riordan and the Nixon Peabody attorneys.

452.    Below is a screenshot of the LFS email that we sent to Stillwell on

April 5, 2021:

> On Apr 5, 2021, at 12:23 PM, Wilson, Gilberto@CDPH <Gilberto.Wilson@cdph.ca.gov> wrote:
>
> Hello Britt,
>
> Thank you for submitting your complaint to the Laboratory Field Services Branch.  This branch provides regulatory oversight for licensed laboratories and tests that are conducted for the purpose of clinical diagnosis.  To reach the District Attorney's office, please contact your local county's Office of the District Attorney.  Thank you again for contacting Laboratory Field Services.
>
> Regards,
>
> **Gilberto Wilson**
> Associate Governmental Program Analyst
> CDPH Laboratory Field Services
> Gilberto.Wilson@cdph.ca.gov

453.    The FNL Complaint alleges the sale of the CSA Tests was unlawful

because Compliance Firm lacked a BOP license.

454.    The BOP has jurisdiction over research laboratories and CDPH has

jurisdiction over diagnostic laboratories. FN, FNL, Meierhans, Riordan and

Nixon Peabody were aware of LFS's jurisdiction for the CSA Tests, as the

COMPLAINT
- 110 -

BOP pharmacy license was discussed in November 2020, as described herein.

455.   Nixon Peabody attorneys devised the scheme and knowingly assisted FN, FNL and Intrivo in concealing the use and disposition of the CSA Tests, that are at issue in the FNL Complaint.

456.   Nixon Peabody attorneys fraudulently concealed FN and FNL's use of nearly 5,000 CSA Tests with Rapid Now, as described herein. Paragraph 43 of the FNL Complaint states, "It was illegal for FNL to possess, store, warehouse, or distribute the COVID-19 tests."

457.   Nixon Peabody, Riordan, FN, FNL, Meierhans, Intrivo, Benaron, and Markel knowingly, intentionally, and fraudulently concealed Intrivo's possession and ownership of 8,320 CSA Tests, after assisting Intrivo with taking possession of 8,320 CSA Tests in March 2021.

458.   A Wholesaler License is required before any firm or organization may distribute, broker, or transact the sale or return of dangerous drugs or dangerous devices in California. A Wholesaler License is also required of customs brokers who sell for resale or negotiate for distribution any dangerous drug or device included in section 4022 of the Business and Professions Code. A wholesaler permit is also required for reverse distributors who arrange for the destruction of outdated or damaged

dangerous drugs or devices. *See* Cal. Health & Saf. Code §§ 4022, 4160 – 4169.1"

459.     CA Pharmacy Law defines "*Reverse distributor*" as "every person who acts as an agent for pharmacies, drug wholesalers, third-party logistics providers, manufacturers, and other entities by receiving, inventorying, warehousing, and managing the disposition of <u>outdated or nonsaleable</u> dangerous drugs or **dangerous devices**." *See* Cal. Health & Saf. Code § 4040.5

460.     CA Pharmacy Law defines "*Reverse third-party logistics provider*" as "an entity that processes or manages the disposition of an outdated or nonsaleable dangerous drug or **dangerous device** on behalf of a manufacturer, wholesaler, or dispenser of the dangerous drug or dangerous device, <u>but does not take ownership</u> of the dangerous drug or **dangerous device** nor have the responsibility to direct its sale or disposition." *See* Cal. Health & Saf. Code § 4044.5

461.     Intrivo, *not* Compliance Firm, was required to have a BOP license to "possess, warehouse, store, sell, broker, distribute or provide logistics services" for the CSA Tests. The "dangerous devices" that are regulated by CA Pharmacy Law was applicable to Intrivo's possession of the CSA Tests, *not* Compliance Firm. *See* Cal. Health & Saf. Code §§ 4022, 4160 – 4169.1

462.    The Nixon Peabody attorneys also knew that Intrivo was *not* a licensed "Reverse distributor," or "Reverse third-party logistics provider" by the California Board of Pharmacy, as required by CA Pharmacy Law.

463.    The Nixon Peabody attorneys knew that Intrivo was *not* a licensed facility, manufacturer, or reverse distributor by the FDA.

464.    The Nixon Peabody attorneys knew Intrivo was *not* a registered or qualified business in the state of California.

465.    According to Nixon Peabody and FNL's application of CA Pharmacy Law in Paragraph 42 of the FNL Complaint, it would have been *illegal* for Intrivo, an unlicensed company, to "possess, warehouse, store, sell, broker, distribute or provide logistics services" for the CSA Tests.

466.    Nixon Peabody attorneys knew the FNL Complaint was being used for improper purpose, contained false allegations and untenable claims that lacked evidentiary support.  Despite knowing these things, Nixon Peabody attorneys *still* filed the FNL Complaint, in violation of Cal. Civil Code Section 128.7(b)(1)-(3), which states:

> "By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading, petition, written notice of motion, or other similar paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief,

formed after an inquiry reasonable under the circumstances, all of the following conditions are met:

(1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

(2) The claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

(3) The allegations and other factual contentions have evidentiary support or, if specifically, so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

467.    On May 7, 2021, Compliance Firm emailed, faxed, and called Nixon Peabody to ask for an extension while waiting to retain counsel. Nixon Peabody did not reply.

468.    In June 2021, Meierhans, Saghian, FN, FNL, Riordan, Intrivo, Benaron, Markel and Nixon Peabody became aware that Stillwell and Compliance Firm obtained exculpatory evidence that disclosed the schemes to defraud.

469.     June 14, 2021, to prevent Compliance Firm from offering the exculpatory evidence against FNL, Nixon Peabody and Riordan filed a filed a Request for Default Entry to further prevent Compliance Firm form defending the case.

470.     A true and correct copy of FNL's Requests for Default Entry is attached in Exhibit T and incorporated by reference.

471.     On July 15, 2021, the Clerk entered Default against Compliance Firm.

472.     On August 9, 2021, Stillwell and Compliance Firm were served with FNL's Application for Default Judgement by Clerk, ("FNL Default Judgement") The document was dated July 14, 2021, and intentionally mailed to the incorrect address listed in Redding, California.

473.     The FNL Default Judgement includes the declaration of Brittania Allison ("Allison") an accounts payable manager and FNL. Allison's declaration falsely states that "The per unit amount that FNL paid for the Testing Kits was **$31.16.**" Allison's Declaration also states that Exhibit A, Exhibit B and Exhibit C of the FNL Default Judgement are true and correct copies.

474.     Exhibit A of the FNL Default Judgement contains a falsified receipt for the CSA Tests that contains the unredacted banking accounting number and routing number for Compliance Firm's banking account. Riordan and

Nixon Peabody knew that any documents filed in federal court would be made available to the public. Riordan and Nixon Peabody intentionally exposed Compliance Firm's banking information to harm Compliance Firm and Stillwell. Further, the invoice states the CSA Tests costs $28.00 per test and *non-refundable*.

475.     Exhibit B of the FNL Default Judgement contains a receipt for the CSA Tests that states in part,

"On March 26, 2021, Reeve Benaron of Intrivo Diagnostics, picked up 8,320 unused CareStart COVID-19 Antigen Testing Kits manufactured by Access Bio, Inc. from the Fashion Nova Logistics warehouse located at 12588 Florence Avenue, Santa Fe Springs, California."

476.     Exhibit C of the FNL Default Judgement contains three invoices numbered #1038, #1040 and #1045. These invoices are *not* true and correct copies of the invoices as alleged in Allison's declaration.

477.     Invoices #1033, #1038, #1040 and #1045 were previously approved and undisputed.

(a) Invoice #1033 was approved on 12/03/2020 by Erica Meierhans, Esq., Ryan Kaneshiro, CFO, and Julia Garcia.

(b) Invoice #1038 was approved on 12/22/2020 by Ian Dill and Felix Felder.

(c) Invoice #1040 was approved on 03/26/2021 by Ian Dill and Tiffany Smith.

(d) Invoice #1043 was approved on 01/15/2021 by Ian Dill and Felix Felder.

(e) Invoice #1045 was approved on 03/26/2021 by Ian Dill and Tiffany Smith.

478.    Allison's Declaration in support of the FNL Default Judgement was signed by Allison under penalty of perjury.

479.    Allison offered perjured statements in furtherance of schemes to defraud Stillwell and Compliance Firm.

480.    Saghian, Meierhans, FN, FNL, Riordan, and Nixon Peabody knew Allison's statements were false and would be considered perjured testimony. Despite knowing this, Riordan and Nixon Peabody still included Allison's perjured Declaration in support of the FNL Default Judgement.

481.    The FNL Default Judgement, dated July 14, 2021, and received on, August 9, 2021, is the first time Compliance Firm and Stillwell became aware of the actual number of CSA Tests FN and FNL used with Rapid Now.

482.     Riordan, Meierhans, FN, FNL, Intrivo, and Nixon Peabody knew that Compliance Firm had FDA Establishment Registration and Device Listing for a COVID-19 antigen test, multiple CLIA licenses, and that Compliance Firm could store CSA Tests.

483.     Further, Nixon Peabody, Riordan and Brian demanded Compliance Firm retrieve the CSA Tests multiple times because Nixon Peabody, Riordan, and Brian, *knew* that Compliance Firm *could* legally store, hold, sell, and use the CSA Tests.

484.     Compliance Firm's FDA Owner/Operator Number is 10079567. Below is a screenshot of Compliance Firm's FDA Establishment Registration and Device Listing.



485.     FNL's Application for Default Judgement includes a proposed Default Judgement order against Compliance Firm in the amount of $363,260.35.

486.     FNL's Application for Default Judgement includes a Certificate of Service by Mail which states that on July 14, 2021, Heidi Gutierrez ("Gutierrez") mailed a "true and correct copy" of the Application for Default Judgment by Clerk and Proposed Judgement to the following address:

> The Compliance Firm LLC d/b/a
> Compliant Care Staffing
> Authorized Agent
> 1267 Willis Street, Ste. 200
> Redding, CA 96001

487.     Gutierrez intentionally mailed FNL's Application for Default Judgement to the incorrect address. Compliance Firm's registered agent, Northwest Registered Agent, Inc. ("Northwest"), is listed on California's Secretary of State website.

488.     Northwest's address is listed on its most recent 1505 Certificate is: 2108 N St. STE N, Sacramento, California 95816-5712.

489.     Gutierrez is a Practice Assistant at Nixon Peabody's Boston Headquarters, and her work address is listed as: 100 Summer St, Boston, Massachusetts, 02110.

490.     Gutierrez signed the Certificate of Service under penalty of perjury.

491.     Gutierrez was also copied on emails from Nixon Peabody to Stillwell and on emails from Stillwell to Nixon Peabody.

492.     Gutierrez was aware and knowingly participated in the schemes to defraud Stillwell and Compliance Firm.

493.     On or about August 10, 2021, Stillwell asked Compliance Firm's registered agent to confirm the date of delivery for FNL's Application for Default Judgment by Clerk and Proposed Judgement.

494.     On August 12, 2021, Northwest Registered Agent emailed Stillwell the following:

"To whom it may concern:

Northwest Registered Agent, Inc. is the listed registered agent for THE COMPLIANCE FIRM LLC in the State of California.

On August 4, 2021, Northwest Registered Agent, Inc. received Service of Process document in the matter of FN LOGISTICS, LLC v. THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and DOES 1 though 10, Case No. 2:21-cv-03312-GW-MAR. The Service of Process document was received via standard mail and a copy of the same has been included with this letter.

On August 9, 2021, the document was reviewed, approved, and then immediately uploaded to our client's account. This Service of Process is the only document regarding this matter which we have received on behalf of our client since the Summons in a Civil Action received on April 19, 2021.

The Service of Process document is dated July 14, 2021, and was mailed to Northwest Registered Agent, Inc. at 1267 Willis Street, Ste. 200, Redding, CA 96001. However, that address is no longer associated with Northwest Registered Agent, Inc.

On or about May 18, 2021, Northwest Registered Agent, Inc. filed a Statement of Information and 1505 Certificate, with the California Secretary of State, to update our address from the aforementioned Redding address to the correct address at 2108 N St., Ste. N, Sacramento, CA 95816.

As such, the Service of Process was initially sent to the incorrect address before being forwarded to our current address, causing a delay in receipt."

495.    A copy of FNL's Application for Default Judgment and Proposed Judgement, ("FNL Default Judgment") dated, July 14, 2021, was attached to Northwest's letter to Stillwell. Stillwell redacted the banking account and

routing information that appears at the bottom of Invoice 1033, on page 7 of FNL's Application for Default Judgment.  from the document.

496.    Federal Rules of Civil Procedure, ("FRCP"), Rule 5.2 Privacy Protection For Filings Made with the Court explicitly states that a financial-account number may include only "the last four digits of the financial account number" *See* F.R.Civ.P 5.2 (a)(4).

497.    Local Rule 5.2-1 states "It is the responsibility of the filer to ensure full compliance with the redaction requirements of Federal Rules of Civil Procedure 5.2" *See* L.R. 5.2-1

498.    Nixon Peabody filed the FNL Default Judgment on July 14, 2021, with Compliance Firm's *full* routing and *full* banking account information. Intentionally to further harm Compliance Firm and Stillwell.

499.    A redacted copy of Northwest's August 12, 2021, letter and the accompanying attachment, FN's Request for Default Entry against Compliance Firm, is attached in Exhibit U and incorporated by reference.

500.    On July 15, 2021, a Default Judgment in the amount of $363,260.35 was entered against Compliance Firm.

501.    A true and correct copy of FNL's Default Judgment is attached in Exhibit V and incorporated by reference.

502.    At the time of filing the FNL Complaint, Riordan and Nixon Peabody

knew and had evidence of the following material facts:

(a) FN and FNL *legally* purchased 12,800 nonrefundable CSA Tests in

November 2020 to be used by the Joint Venture to provide onsite

COVID-19 testing to FN and FNL's "nearly 10,000 employees."

(b) The 12,800 nonrefundable CSA Tests expired in April 2021.

(c) FN and FNL used 40 CSA Tests with Compliance Firm.

(d) FN and FNL used 4,440 CSA Tests with Rapid Now Tests.

(e) FN and FNL gave 8, 320 CSA Tests to Intrivo.

(f) The Disputed Invoices were pretextual and falsely disputed by

Meierhans in furtherance of schemes to defraud Compliance Firm

and Stillwell.

(g) The Disputed Invoices were previously approved by FN and FNL

for services provided by Compliance Firm pursuant to the Joint

Venture Agreement.

(h) FN and FNL owed Compliance Firm and Stillwell over

$500,000.00.

503.    FNL's Requests for Default Entry contains a Declaration from

Riordan that states in part

> "I am partner at Nixon Peabody LLP, attorneys of record for Plaintiff FN LOGISTICS, LLC. I am licensed to practice law in Federal and State court in California. I have personal knowledge of the following facts and if called as a witness, could and would competently testify thereto under oath."

504.   Riordan's Declaration in support of FNL's Requests for Default Entry was signed by Riordan under penalty of perjury.

505.   Riordan, and Nixon Peabody knew Riordan's statements were false and would be considered perjured testimony. Despite knowing this, Riordan and Nixon Peabody still included Riordan's perjured Declaration in support of FNL's Requests for Default Entry.

506.   The FNL Default Judgement contains a Declaration from Riordan that states in part

> "I am partner at Nixon Peabody LLP, attorneys of record for Plaintiff FN LOGISTICS, LLC. I am licensed to practice law in Federal and State court in California. I have personal knowledge of the following facts and if called as a witness, could and would competently testify thereto under oath."

507.   Riordan's Declaration in support of the FNL Default Judgement was signed by Riordan under penalty of perjury.

508.     Riordan offered perjured statements in furtherance of schemes to defraud Stillwell and Compliance Firm.

509.     Riordan, and Nixon Peabody knew Riordan's statements were false and would be considered perjured testimony. Despite knowing this, Riordan and Nixon Peabody still included Riordan's perjured Declaration in support of the FNL Default Judgement.

510.     Nixon Peabody, Riordan, FNL and FN intentionally made false and perjured statements in furtherance of schemes to defraud and harm the reputation of Compliance Firm and Stillwell.

511.     Nixon Peabody, FNL, FN, Riordan, Meierhans and Saghian suborned perjured statements in furtherance of schemes to defraud and harm the reputation of Compliance Firm and Stillwell.

512.     Eleven (11) of the thirteen (13) causes of action in the FNL Complaint are related to the alleged unlawful sale of CSA Tests. The remaining two causes of action are related to the Disputed Invoices, which were disputed as pretext to defraud Compliance Firm and Stillwell.

513.     According to FN's Notice of Interested Parties that was filed with the FN Complaint, FN and FNL believed Stillwell to be the sole member and owner of Compliance Firm. Defendants intended for Compliance Firm *and* Stillwell to be harmed by their actions.

514.    The FNL Compliant was terminated on July 15, 2021, Compliance firm had thirty (30) days to appeal, which meant Compliance Firm's appeal was due by August 14, 2021. However, service not proper under FRCP (5) as FNL's Application for Default Judgment was mailed to wrong address, which was a fundamental defect in service. Nixon Peabody knew Compliance Firm's correct address but nevertheless sent mail to a different address.

515.    *Compliance Firm did not receive DF judgment until August 9, 2021, because Nixon Peabody knowingly and intentionally mailed* FNL's Application for Default Judgment *to the incorrect address;* Compliance Firm and Stillwell became informed of Default Judgment and on August 9, 2021.

516.    Compliance Firm and Stillwell became informed of termination of suit on and on August 22, 2021, when Stillwell accessed the California Central District Court's Electronic Court Filings (ECF) System, ("Pacer"), to retrieve copies of documents that were filed in the FNL Complaint.

517.    A true and correct copy of the FNL Complaint docket is attached and incorporated as Exhibit W.

518.    The Central District Court of California did ***not*** have subject matter jurisdiction over the matter because there was no diversity (FNL and Nixon

Peabody falsely alleged Stillwell, a California resident, to be a resident of Nevada.

519.    Compliance Firm is unable to appear in the matter due to the financial hardships caused by FNL, Nixon Peabody.

### 24.    NIXON PEABODY ATTORNEYS BLOCKED EMAILS FROM COMPLIANCE FIRM

520.    On April 20, 2021, Stillwell emailed Riordan and Nixon Peabody to inform them that she was a resident of California, *not* Nevada.

521.    The next day, on or about April 21, 2021, Nixon Peabody instituted a domain-wide block against emails originating from Compliance Firm's domain, thecompliancefirm.com, thereby blocking Stillwell or any employees from Compliance Firm from sending emails to any attorneys or employees at Nixon Peabody.

522.    Compliance Firm's Legal department can be reached at legal@thecompliancefirm.com. Attorneys representing Compliance Firm, correspond using Compliance Firm domain email addresses.

523.    Stillwell copied the Compliance Firm's legal department on communications to Nixon Peabody. Nixon Peabody attorneys were provided the contact information for Compliance Firm's legal department but never attempted correspondence.

524.     Three Nixon Peabody attorneys are representing FNL in *FN Logistics, LLC v. The Compliance Firm, LLC.* Compliance Firm has asked Nixon Peabody several times to unblock emails from Compliance Firm – Nixon Peabody refuses.

525.     Nixon Peabody attorneys refused to investigate FNL's allegations and also refused to participate in mediation to amicably resolve any alleged dispute FNL might have had against Compliance Firm.

526.     Below are screenshots from blocked emails, dated May 9, 2021, that were sent from Compliance Firm to several attorneys at Nixon Peabody, including two partners and the three attorneys that are representing FNL in its suit against Compliance Firm:



COMPLAINT
- 128 -





## 25.   **PREP ACT IMMUNITY**

527.   To encourage the expeditious development and deployment of medical countermeasures during a public health emergency, the Public Readiness and Emergency Preparedness Act ("PREP Act") authorizes the Secretary of Health and Human Services (HHS) to limit legal liability for losses relating to the administration of medical countermeasures such as diagnostics, treatments, and vaccines.

528.     In a declaration effective February 4, 2020 ("HHS Declaration"), the Secretary of HHS (the Secretary) invoked the PREP Act and declared Coronavirus Disease 2019 (COVID-19) to be a public health emergency warranting liability protections for covered countermeasures.

529.     Under the HHS Declaration and its amendments, covered persons are generally immune from legal liability (i.e., they cannot be sued for money damages in court) for losses relating to the administration or use of covered countermeasures against COVID-19. The sole exception to PREP Act immunity is for death or serious physical injury caused by "willful misconduct."

530.     The PREP Act preempts and displaces state law to alter the usual liability rules or immunize certain individuals from liability.

531.     In the PREP Act, Congress made the judgment that, in the context of a public health emergency, immunizing certain persons and entities from liability was necessary to ensure that potentially life-saving countermeasures will be efficiently developed, deployed, and administered.

532.     At all relevant times, Stillwell was, and is, a covered person under the PREP Act engaged in the recommended activities for covered countermeasures.

533.     Stillwell's involvement with Fashion Nova's CSA Tests and joint venture COVID-19 lab, were recommended activities, for the type of covered countermeasures, that the PREP Act's liability protections intended to cover.

534.     At all relevant times, Compliance Firm was, and is, a covered person under the PREP Act engaged in the recommended activities for covered countermeasures.

535.     Compliance Firm's involvement with Fashion Nova's CSA Tests and joint venture COVID-19 lab, were recommended activities, for the type of covered countermeasures, that the PREP Act's liability protections intended to cover.

536.     Compliance Firm's actions in relation to COVID-19 testing were not willful misconduct.

537.     Stillwell's actions in relation to COVID-19 testing were not willful misconduct.

## 26.     <u>BREACH OF FIDUCIARY DUTY</u>

538.     Stillwell provided healthcare consultancy services to FN and FNL. Compliance Firm provided COVID-19 testing solutions to FN and FNL in compliance with the Cal/OSHA COVID-19 emergency temporary standards. ("Cal/OSHA ETS")

539.    The Joint Venture and Leasing Agreement created a fiduciary duty between:

(a) Compliance Firm and Saghian,

(b) Compliance Firm and Meierhans,

(c) Compliance Firm and FN,

(d) Compliance Firm and FNL,

(e) Compliance Firm and Riordan,

(f) Compliance Firm and Nixon Peabody,

(g) Stillwell and Saghian,

(h) Stillwell and Meierhans,

(i) Stillwell and FN,

(j) Stillwell and FNL,

(k) Stillwell and Riordan, and

(l) Stillwell and Nixon Peabody.

540.    The COVID-19 Consultancy Agreement and OHN Consultancy Agreement created a fiduciary duty between:

(a) Compliance Firm and Saghian,

(b) Compliance Firm and Meierhans,

(c) Compliance Firm and FN,

(d) Compliance Firm and FNL,

(e) Compliance Firm and Riordan,

(f) Compliance Firm and Nixon Peabody,

(g) Stillwell and Saghian,

(h) Stillwell and Meierhans,

(i) Stillwell and FN,

(j) Stillwell and FNL,

(k) Stillwell and Riordan, and

(l) Stillwell and Nixon Peabody.

541.   Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody were aware that Stillwell was not a licensed attorney and Compliance Firm is not in the business of providing legal services.

542.   Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody were aware that Stillwell had no experience or expertise with the Cal/OSHA ETS standards, as these standards were new when they became effective on November 30, 2020.

543.   Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody were aware that Stillwell and Compliance Firm's COVID-19 testing experience was limited to the COVID-19 pandemic, which was declared a national emergency by Proclamation 9994 on March 13, 2020.

544.    Meierhans, a licensed attorney in California, and general counsel for FN and FNL, consulted Nixon Peabody law firm to provide legal and expert healthcare consulting and services in connection with the Joint Venture COVID-19 testing lab, and compliance with the Cal/OSHA ETS.

545.    Nixon Peabody has a Health Care practice and purports to be experts in health care law.

546.    Meierhans, Riordan and Nixon Peabody knew or should've known that Stillwell and Compliance Firm were the intended third-party beneficiaries of Riordan and Nixon Peabody's legal advice to FN, FNL, Saghian, and Meierhans.

547.    Meierhans, Riordan and Nixon Peabody knowingly undertook the responsibility to act on behalf of and for the benefit of the Joint Venture in providing COVID-19 testing services.

548.    Meierhans, Riordan, and Nixon Peabody did not disaffirm Stillwell's reliance. Meierhans dissuaded Stillwell from seeking independent legal advice and assured Stillwell that Nixon Peabody were experts and FN would not pass off the costs of Nixon Peabody's health care consultancy to Stillwell or Compliance Firm.

549.    Stillwell and Compliance Firm reasonably relied upon Meierhans, Riordan and Nixon Peabody's integrity to give honest legal advice and

recommendations so that the Joint Venture could provide "COVID-19 testing to FN and FNL's "roughly 10,000 warehouse employees."

550.     Stillwell and Compliance Firm reasonably relied upon FN and FNL to act honestly and in good faith and to honor all oral and written agreements.

551.     Meierhans, Riordan, Nixon Peabody, the non-defendant Nixon Peabody attorneys, and the John Doe Nixon Peabody attorneys are licensed attorneys in California.

552.     Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody owed fiduciary duties to Stillwell and Compliance Firm.

553.     Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody acted in their own financial self-interests and breached their fiduciary duties to Stillwell and Compliance Firm by:

> (a) devising and participating in multiple schemes to conceal material facts about Intrivo, FNL and FN's use of the CSA Tests;
>
> (b) Falsely alleging that Compliance Firm illegally sold FN and FNL the CSA Tests, despite Stillwell and Compliance Firm's acting pursuant to their reasonable reliance on Meierhans' and Nixon Peabody' legal advice regarding the procurement and use of the CSA Tests;
>
> (c) Filing the frivolous FNL Complaint and falsely alleging:

"Compliance Firm acted in its own financial self-interest in building a COVID-19 testing lab, from scratch and which it would own outright, instead of recommending or even offering to FNL the option of contracting with a previously established, fully licensed, COVID-19 testing company that could provide services almost immediately to FNL and without need for any secondary consulting work by Compliance Firm."

554.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody continue to make these false misrepresentations despite having evidentiary support that states otherwise.

555.    On January 5, 2020, one day before FN and FNL terminated all agreements between Stillwell and Compliance Firm, Dill emailed Meierhans:

"I recommend we move forward with Compliant Care Staffing. Compliant Care's weekly pricing, including test and staffing is 59% less than their comparable vendor providing the same service."

556.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody Defendants knew the allegations in the FNL Complaint were false and were

only made to defraud Stillwell and Compliance Firm of money and services that Stillwell and Compliance Firm provided to FN and FNL.

557.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody devised and participated in schemes to repackage, relabel, and re-sell over 8,000 expired CSA Tests with the help of Defendants Intrivo, Benaron and Markel.

558.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody devised and participated in schemes to steal and re-sell over $20,000 worth of medical supplies and PPE that belonged to Compliance Firm

559.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody devised and participated in schemes to disaffirm valid and enforceable oral contracts between FN and Stillwell, FNL and Stillwell, FN and Compliance Firm and FNL and Compliance Firm.

560.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody intended to avail Stillwell and Compliance Firm to litigation costs and expenses related to defending lawsuits that FN and FNL previously agreed to indemnify Stillwell and Compliance Firm against.

561.    Saghian, Meierhans, Riordan, FN, FNL and Nixon Peabody devised and participated in schemes to defraud Compliance Firm and Stillwell out of monies owed for services that Stillwell and Compliance Firm provided FN and FNL pursuant to valid and enforceable oral agreements.

562.     Nixon Peabody, who represented FNL in the FNL Complaint, blocked all emails originating from Compliance Firm's domain, including emails from Stillwell and attorneys representing Compliance Firm. Stillwell called and faxed Nixon Peabody's Los Angeles office and Nixon Peabody's Boston Headquarters to  ask for the block to remove since the parties were in litigation. Nixon Peabody refused and continues to block emails from Stillwell and Compliance Firm.

563.     Nixon Peabody also breached its fiduciary duty to Stillwell and Compliance Firm by:

(a) Falsely misrepresenting material facts to a Federal Court and intentionally misstating the law, in the FNL Complaint, by alleging that California's Pharmacy Law required Compliance Firm to obtain a pharmacy permit in order provide COVID-19 testing pursuant to the Cal/OSHA ETS standards;

(b) Concealing Intrivo, FN and FNL's use of the CSA Tests;

(c) Destruction of evidence relating to the COVID-19 testing lab;

(d) and by filing a lawsuit against Compliance Firm for improper purposes;

(e) Aiding and abetting FN and FNL's scheme to fraudulently obtain services from Stillwell and Compliance Firm;

(f) Devising and participating schemes to defraud Stillwell and Compliance Firm for payment of services that Stillwell and Compliance Firm provided FN and FNL in good faith per their valid and enforceable oral agreements;

(g) Aiding and abetting FN and FNL's scheme to defraud Stillwell and Compliance Firm for payment of services that Stillwell and Compliance Firm provided FN and FNL in good faith per their oral agreements;

(h) Accepting bribes, kickbacks, and quid pro quo for participation in schemes to defraud Stillwell and Compliance Firm of FN and FNL honest services;

(i) Filing an Entry for Default Judgement to prevent Compliance Firm from defending itself, while continuously concealing and destroying evidence Compliance Firm needed to defend itself against the false allegations;

(j) Filing an Application for Default Judgement to prevent Compliance Firm from defending itself, while continuously concealing and destroying evidence Compliance Firm needed to defend itself against the false allegations.

564.    Meierhans, Saghian, FN and FNL would not have been able to defraud Stillwell and Compliance Firm without the assistance of Intrivo, Riordan and Nixon Peabody, where were each indispensable participants in the schemes to defraud Stillwell and Compliance Firm.

### D.    EMPLOYEE COMPLAINTS

### 1.    LEASED EMPLOYEE LAWSUITS

565.    On or about May 8, 2021, FN and Compliance Firm were co-defendants and co-employers in an employment law hearing before the California Labor Commissioner.

566.    Compliance Firm terminated the employee on December 12, 2021, after not reporting to work for over a week. FN was informed of the termination.

567.    Unbeknown to Compliance Firm, FN permitted the employee to work until December 17, 2020, when the employee informed FNHR that he was experiencing COVID-19 symptoms.

568.    The employee filed a complaint against Compliance Firm and FN for wrongful termination and wage theft allegations. All the employee's allegations were the result of actions and conduct of FN, not Compliance Firm.

569.     FN refused to indemnify Compliance Firm as previously agreed. FN also concealed evidence and testimony from Compliance Firm.

570.     During the hearing, FN provided false information to the Commission about the employee. FN told the Commissioner that they had no records of the employee working.

571.      Compliance Firm had to retain legal representation to defend itself against the employee's allegations, because FN refused to honor its indemnification agreement.

572.     Compliance Firm has been threatened with multiple lawsuits from former leased FN employees. In each instance, the allegations are based on the actions and conduct of FN employees. Compliance Firm was merely the payroll processor and recruiter for the leased FN employees.

573.     Fashion Nova obtained workers' compensation coverage for all the leased employees, pursuant to California Labor Code Section 3602(d).

574.     Fashion Nova was and is the common law employer and the employer pursuant to IRC Section 3401(d)(1) of the leased employees.

## 2.      RACIAL DISCRIMINATION

575.     By September 30, 2020, Compliance Firm's leased employees raised over twenty (20) complaints about racial discrimination at FN's Santa Fe Springs warehouse.

576.     Whenever Ott questioned the legitimacy of the Leased Employees' complaints, Stillwell confirmed that she had also felt like she had been treated differently than other vendors and other contractors because of her race.

577.     Stillwell informed Ott that her agency is referred to as the "black agency" and that her employees are easily targeted because they are African American and because they were required to wear bright orange lanyards which identified them as workers from Compliant Care Staffing.

### 3.     ADA DISCRIMINATION

578.     On or about September 18, 2020, Stillwell was berated by a senior manager for allowing her agency to hire a cherry picker / forklift driver who had a physical disability.

579.     Stillwell advocated that FN's treatment of the employee violated the Americans with Disabilities Act ("ADA"). Stillwell never yelled or became disrespectful although the manager cursed yelled and berated Stillwell in front of other FN employees.

580.     After the meeting, the manager requested that Compliance Firm's contract be terminated. Compliant care had spent many hours on recruiting for these positions.

581.     Stillwell complained that FN's action was retaliatory, Stillwell was merely a whistle blower and had done nothing wrong. Compliance Firm was allowed to continue providing services to FN, but no longer allowed to recruit or hire employees for that department – despite there being a huge need in shortage for cherry pickers.

582.     On or about November 17, 2020, FNHR demanded the medical records of an African American Leased Employee, because the employee walked with a cane.

583.     FNHR attempted to obtain the employee's medical records *without* the employee's permission. Stillwell was informed that the employee was harassed about his cane and told that he could not walk throughout the warehouse with his cane. Stillwell raised the issue with FNHR and provided the employee with a foldable cane that allowed the employee to safely walk around the warehouse.

584.     FNHR denied the allegations. However, an onsite manager emailed Stillwell on November 17, 2020, to document the incident, stating "I feel it's safer for me to email these back and forth conversations with FNL's HR because I'm not comfortable with the way they mishandled the information I gave them." A screen shot of the email appears below.

From  Hector Rodriguez
      hector.rodriguez@compliantcarestaffing.com

To    Britt Stillwell   britt@thecompliancefirm.com

Date  Nov 17, 2020, 11:38 AM

🔒    Standard encryption (TLS)
      Learn more

Good morning Britt,
   I'm emailing you just to clarify the protocol I was referring to while talking to Christine was about sending her the documents for ████████ medical records, as you instructed me I referred FNL's HR to contact you on that matter. I also sent them the email stating that ████████ found out (on his day of) he was exposed to someone with Covid and that he responsibly never came back in. I have no idea what they've said about what I said to them but what I'm telling now is exactly how these conversations went. Moving forward I feel that it's safer for me to email these back and forth conversations with FNL's HR because I'm not comfortable with the way they mishandle the information I give them.
Regards,

Hector Rodriguez | *Onsite Manager*

✚ **Compliant Care Staffing**

1055 West 7th Street, 33rd Floor
Los Angeles, CA  90017
ph. 213-282-9905 / 213-800-4572 (direct)
fax. 213-513-5102



## 4.    <u>Meal Break Violations</u>

585.    FNL refused to pay overtime and refused to reimburse Compliance Firm for meal awards, because Compliance Firm refused to make Signing a meal waiver form a compulsory requirement.

586.     When employees refuse to sign the meal break waiver, FNL would intentionally assign the employee to a later break, to purposely cause the employee to take their breaks *after* the fifth hour. Stillwell found this to be retaliatory and refused to issue disciplinary actions for employees who could not take their lunch prior to the fifth hour.

587.     Sometimes overtime at FNL was compulsory and often told to employees only after they arrived at work. Many employees reported being forced to work because they were threatened with termination if they did not stay for forced overtime.

588.     Stillwell and Compliance Firm were unaware of the forced overtime, because Salazar would change the employees timesheets per FNHR's request.

589.     Stillwell and Compliance Firm were unaware that FNHR and Salazar were intentionally removing overtime hours from employees' timesheets.

590.     Stillwell became aware of this problem when lawyers threaten litigation for this occurrence happening to over *eight* different employees.

591.     FN forced employees to take hour lunches because this was a combination of all of their brakes.

592.     For shifts that began at 5:00AM, FN and FNL required employees to take their hours lunch break as early as 9 AM, often leaving employees with no breaks from 10:00 AM until 5:00 PM, which is 7 hours.

593.     FN and FNL coerced and misled employees into signing meal break waivers by offering paid 30-minute breaks to employees who signed the meal waivers and forcing an *unpaid* 30-minute meal break for all employees who did not sign a meal waiver. This practice punished employees who did not sign a waiver and it was misleading for employees who did sign the meal waiver, because the additional *paid* 30-minute break was never offered.

594.     FN and FNL used false promises to fraudulently induced employees to sign the meal break waivers. A third meal break is not listed or available per FN and FNL's meal and break schedule. Also, many employees complained that they were *not* allowed to take the required third break.

595.     FNL's meal and break schedule was required to be posted throughout the warehouse, and states: "When working 10+ hour shifts associates must take the required 3rd rest break *(paid)* **AND** a 2nd 30-Minute Meal Break *(unpaid)* unless they have signed a written meal break waiver. "

### 5.     **HEAT ILLNESS**

596.     FN and FNL's warehouses do not have central air-conditioning and on the top floors of the warehouse the temperatures often exceeded ninety

COMPLAINT
- 146 -

degrees Fahrenheit (90°F) or thirty-two degrees Celsius (32°C). FN and FNL's warehouse workers often had to walk up three levels in the heat.

597.    FN and FNL used manual versus digital and centralized thermometers intentionally to remain ignorant of the actual temperature.

598.    FN and FNL kept multiple paper records of their temperature recordings. The falsified records were maintained in the event of a Cal/OSHA visit.

599.    FN underreported, and at times did not record, the high number of heat exhaustion illnesses. Stillwell discovered these discrepancies and reported to Ott and anonymously to Cal/OSHA.

600.    Cal/OSHA's recordkeeping regulations require employers to record certain occupational heat-related events such as heat illness and heat stroke.

## 6.    HARASSMENT BY DIRECTOR OF FNHR

601.    Ott, the director of FNHR and a stakeholder in the COVID-19 testing endeavors at FN and FNL, refused to work with and communicate with Stillwell. Ott also made up rumors about Stillwell and created hurdles to sabotage Stillwell success.

602.    On or about September 7, 2020, Ott told FN and FNL executives that Stillwell was trying to organize employees at FN and FNL and recommended terminating Compliance Firm and Stillwell's contracts.

Stillwell argued with FNHR that it was illegal to retaliate against employees for trying to unionize and Ott responded Stillwell was "delusional" for believing NLRB protections applied her.

603.    Ott would often demand deliverables and once Stillwell provided the deliverables, Ott would "change her mind" and would refuse to pay Stillwell because there was no written contract, despite FN, FNL refusing to sign any written agreements with Stillwell.

604.    At all times FN and FNL were in arrears and owed money to Compliance Firm because Ott refused to approve Compliance Firm's invoices out of spite. Compliance Firm's approval process had to be changed because Ott would intentionally cause delays to prevent the payment of Compliance Firm invoices.

605.    FN and FNL *under* paid invoices and at times I didn't pay invoices at all. FN and FNL also refused to pay late fees despite agreements to do so.

606.    Ott knew that FN and FNL owed Compliance Firm money and often use that to coerce and threaten Stillwell to comply with her unreasonable demands.

607.    On or about October 5, 2020, Ott and Meierhans asked Stillwell to refrain from sending emails about employee complaints. Ott complained that the "tone" of Stillwell's emails is offensive and discussing employee

complaints in person or over the phone were best to avoid miscommunication.

608.     On or about November 30, 2020, Ott informed Stillwell that she was prohibited from communicating and escalating issues to certain FN and FNL executives. Stillwell was also told to stop sending emails about certain matters because the emails created a "discoverable paper trail."

609.     Stillwell informed Ott that she was obligated to investigate complaints and allegations that were escalated to her. Stillwell further explained to Ott that without emails, there would be no proof that Stillwell or Compliance Firm investigated employee complaints, which Stillwell argued was an unmitigated liability.

**7.     OTT'S HARASSMENT OF STILLWELL**

610.     In August 2020 after Stillwell reported the sexual harassment of a Leased Employee. Ott accused Stillwell of hiring attractive women to solicit attention from male managers and supervisors.

611.     Ott informed Stillwell that she was aware Stillwell's past attempts to "sue wealthy men based on allegations of sex trafficking" and wanted to assure Stillwell that those "antics would that work at Fashion Nova."

612.     Ott then showed Stillwell an article which detailed Stillwell's sex trafficking experience, as well as links to court documents pertaining to the incident.

613.     The article titled, "**Lawyer Who Tried Suing Turtleboy Is Accused of Raping This Drugged Client And Squatting In A Mansion Of A Dead Client That Doesn't Own,**" ("Turtleboy Article"), also includes an image of Stillwell drugged and bound in rope against her will.   The Turtleboy Article can be accessed at https://turtleboysports.com/laywer-who-tried-suing-turtleboy-is-accused-of-raping-this-drugged-client-and-squatting-in-a-mansion-of-a-dead-client-that-he-doesnt-own/

614.     Below is a screenshot of the Turtleboy Article:



615.     Ott accused Stillwell of trying to use Fashion Nova to "rebrand" herself from being more than what she was. According to Ott, "the article says you're a prostitute."

616.     Ott continued to berate Stillwell by asking offensive questions such as: "Why aren't you on Facebook? Where are your social media accounts? Why is it that no one can find anything about you other than your stint as a prostitute?"

617.     Stillwell cried and became emotional then explained to Ott that she was qualified and had the credentials she purported to have. Stillwell also explained to Ott that she had previously worked abroad for a foreign military and for security reasons did not maintain much of an online or social media presence.

618.     Stillwell offered to work ten (10) hours complementary each month to prove herself and to win Ott's trust and respect. Stillwell's efforts were exploited as Stillwell was forced to work more than sixty (60) hours per month for FN and FNL.  Stillwell was never compensated for her services because Ott and Meierhans conspired to disaffirm oral agreements between FN/FNL and Stillwell for payment of her services.

619.     Stillwell and Ott discussed the Turtleboy Article in confidence. Stillwell was unaware that Ott recorded the conversation.

620.     Ott told Stillwell that she would be willing to forget about Stillwell's "prostitution" if Stillwell could forget about Hernandez's indiscretions.

621.     On different occasions Ott mocked Stillwell by making remarks to Stillwell about "working for free," and stating "I thought working for free with your thing" when Stillwell and Ott discussed Stillwell's compensation. Ott once told Stillwell that she was "shocked" that Stillwell "expected it to be compensated for anything" and told Stillwell to be "thankful" that Ott allowed her to continue providing services for FN.

622.     In January 2021, Ott created fake Twitter accounts pretending to be Stillwell and made posts that were disparaging to Fashion Nova. Ott then shared the Twitter posts internally and accused Stillwell of making disparaging remarks about Fashion Nova.

623.     In May 2021, Stillwell created a Twitter account with the handle @brittstillwell out of fear that Ott and FN would damage Stillwell's reputation in the absence of Stillwell's online presence.

624.     Ott was hypercritical of Stillwell's work, despite refusing to work with Stillwell directly. Stillwell countered Ott's criticism by pointing out the positive feedback Stillwell received from FN and FNL employees who work directly with Stillwell. Stillwell raised concerns about Ott's mistreatment to Dill and Felder.

625.    Dill told Stillwell that Ott and Meierhans believed Stillwell exchanged sexual favors in return for positive work recommendations and referrals, because only the male employees at Fashion Nova appeared to like Stillwell.

626.    On three separate occasions Ott and other FN employees were caught making disparaging comments and remarks about Stillwell to FN, FNL, and Compliance Firm vendors.

627.    On one occasion, after Ott made disparaging remarks about Stillwell to a vendor, the vendor called Stillwell and threatened to cancel a contract that Stillwell entered on behalf of FN and FNL.

628.    Stillwell repeatedly complained about this behavior to Dill and Felder.

629.    Stillwell, Dill and Felder are all African American. Ott, who is Caucasian, would often refer to Stillwell as Dill and Felder's 'girl,' which was slang for 'homegirl.' The term 'homegirl' is used among urban African American to describe a female acquaintance from one's neighborhood or town.

630.    Ott often referred to Stillwell as 'girl' in executive meetings and in front of FN and FNL employees.

631.    On or about November 27, 2020, Stillwell complained to Ott about the COVID-19 outbreak and how FNHR mishandled the situation and underreported the COVID-19 results.

632.     On or about November 28, 2020, Dill and Felder addressed Stillwell's complaints with Ott. Ott accused Dill and Felder of taking up for their 'girl' and choosing their 'girl' over their FN team.

633.     On or about December 9, 2020, Ott stated that if Stillwell ever spoke to her again, the a physical altercation would likely ensue.  Stillwell was 'forbidden' from emailing or talking directly to Ott, because its "sets her off," despite Ott being a key stakeholder in the OHN program and the onsite COVD-19 testing endeavors.

634.     On or about November 30, 2020, Christine Seta ("Seta") told Stillwell that she can no longer escalate issues to Ott, Felder, or Meierhans and that all communication to FN's executive team would need to go through Dill or Seta, effectively preventing Stillwell from raising complaints to FN and FNL's executive teams. Stillwell was effectively silenced and forced to endure harassment.

635.     To prevent miscommunication and delays, Stillwell continued to include Ott, Felder, and Meierhans on emails about the COVID-19 Joint Venture.

636.     In December 2020, Ott, Felder, and Meierhans stopped responding to Stillwell's emails and relayed messages about COVID-19 testing via Dill or in person.

## 8.   DECEMBER 31st DISPUTE WITH OTT

637.     On or about December 31, 2020, during a Zoom meeting with approximately forty (40) FN and FNL vendors, Ott discussed the FN and FNL COVID-19 testing plan. Ott informed the group that Compliance Firm would be sending COVID-19 tests results to FNHR and to the staffing agencies.

638.     According to Ott, FNHR and the staffing agencies would then be responsible for informing employees of any positive results. This was the first time that Stillwell or Compliance Firm became aware of FNHR's decision to change how tests results were disseminated.

639.     Once Ott finished speaking, Stillwell, who spearheaded the Joint Venture, clarified that COVID-19 tests results would be provided to FNHR and the employees, per the HIPAA consent. Stillwell also stated that Compliance Firm could not force or mandate employees to further disclose their results without first obtaining the employee's consent.

640.     Stillwell further explained that Compliance Firm would need to execute Business Associate Agreements, ("BAA") with each agency before sharing protected Health Information, ("PHI") with the agencies.     While Stillwell was still speaking, Ott rudely interrupted and berated Stillwell in front of the other vendors.

641.    After the meeting Stillwell emailed Ott, her concerns about FNHR's use and disclosure of employee medical records without a consent.

642.    Ott replied to Stillwell "I will always send us to double check legal compliance regardless of anyone's opinion. Do I need to find another provider?" Dill, Felder and Meierhans were also copied on Ott's email.

643.    Below is a screenshot of Ott's email that we sent to Stillwell on December 31, 2020:



644.    The FNL Complaint alleges Compliance Firm breached its fiduciary duties, however, despite Stillwell or Compliance Firm's recommendations, all decisions pertaining to the Joint Venture and COVID-19 testing lab were

COMPLAINT
- 156 -

ultimately made by FNHR and FN's legal department, which consulted with Nixon Peabody's Health Law practice.

645.    On December 31, 2020, at approximately 1:00PM, Stillwell texted Dill to complain about Ott's constant disrespect. Stillwell included a screenshot of Ott's December 31st email and informed Dill, "Lori cannot continue to disrespect me." Stillwell then texted Dill, "I'm ending the contract. I'll send my 30 notice today"

646.    On December 31, 2020, at approximately 1:15PM Dill called Stillwell and pleaded with her to not end her contract. Dill reprimanded Stillwell for speaking to Ott during the Zoom call and for emailing Ott after the Zoom call, as Stillwell had previously been instructed not to communicate with Ott.

647.    Dill told Stillwell if she terminated her contract, then the ramifications would adversely affect the Leased Employees and laboratory staff, who were hired under the Joint Venture Agreement. Dill warned that FN would not pay the December Invoices and would sue Stillwell and Compliance Firm for breach of contract if Stillwell "quit the team."

648.    Stillwell complained to Dill about the mistreatment and disrespect she's been forced to endure and complained that Ott and Meierhans unprofessional conduct always went unchecked. Dill reminded Stillwell that

she was no longer supposed to communicate with Meierhans and Ott directly, and if Stillwell utilized Dill to communicate with Meierhans and Ott, then "things would run smoothly." Stillwell was still not convinced that her relationship with FN could be salvaged.

649.    Dill then warned Stillwell to consider how her decision would adversely impact Compliance Firm employees. Dill reminded Stillwell that he and Meierhans were good friends, as the two previously worked together at BCBG.

650.    Finally, Dill told Stillwell, if she stayed on the team to "see things through" then he'd make sure the the December Invoices were paid in January.

651.    Stillwell rescinded her resignation on December 31, 2020, and at approximately 2:30PM Stillwell texted Dill,

> "Thanks again for being a listening ear. I simply lack the tools in my tool box to deal with people like Lori. And thanks for talking me off a ledge. Although ending the contract is right for ME, it's not right for the other stakeholders, so thank you"

652.    Below are screen shots of the December 31, 2020, text messages described in the preceding paragraphs:



653.    On December 31, 2020, at approximately 6:00PM Ott began to email a list of last-minute demands for Stillwell to complete.   At approximately 6:15PM Stillwell texted Dill, "I just saw Lori's email and wont' respond" because although Ott and Meierhans were allowed to contact and demand things from Stillwell, Stillwell was not allowed to reply.

654.    On December 31, 2020, at approximately 9:15PM, Ott and Meierhans continued making last-minute demands for Stillwell to revise an Authorization for Release of Protected Health Information, ("PHI Release").

COMPLAINT
- 159 -

655.     Nearly a week prior, Stillwell recommended the appropriate language to appear in the PHI Release, but Meierhans dismissed Stillwell's recommendations stating, "I only take advice from counsel, and I don't speak to nonlawyers" implying that Stillwell was not qualified to give recommendations to Meierhans, because Stillwell was not a licensed attorney.

656.     Stillwell has a juris doctorate and concentration in Health Law and over ten (10) years of relevant experience. Stillwell had previously worked as a health law consultant to hospitals, hospital systems, domestic and foreign governments.

657.     Meierhans and Ott often made unwarranted and unsubstantiated remarks about Stillwell's capabilities and would always refer to outside counsel for health law matters. When outside counsel arrived at the same conclusions as Stillwell, Meierhans and Ott would refuse to acknowledge or apologize to Stillwell. Meierhans and Ott continued to disrespect and insulted Stillwell, which forced Stillwell to stop making suggestions.

658.     In response to Meierhans and Ott's demand for Stillwell to revise the PHI Release on December 31, 2020, Stillwell texted Dill "I honestly started to create and add this, but specifically didn't bc I didn't want Lori & Erica

giving me a hard time about suggesting anything legal on behalf of FN lol I would've never heard the end of that"

659.     Below are screen shots of the December 31, 2020, text messages described in the preceding paragraphs:



660.     On the evening of December 31, 2020, Meierhans and Ott continued making last minute changes and last-minute demands for Stillwell, which forced Stillwell to spend New Years' Eve working. Stillwell was never

compensated for her time, despite going over and beyond to meet Meierhans and Ott's unreasonable demands and deadlines.

### 9. RETALIATION AFTER DECEMBER 31st DISPUTE W/ OTT

661. By December 29, 2020, Invoices numbered 1034, 1035, 1036, 1038 and 1039, ("December Invoices"), had been approved by Dill and were approved to pay in Coupa.

662. On December 29, 2020, Dill texted Stillwell, "Can you send me a list of outstanding invoice numbers/$ to be paid? I need to follow up this afternoon." Stillwell replied with the list of outstanding invoices and stated, "They're all approved to pay in Coupa, they just haven't been paid."

663. Below are screenshots of texts between Dill and Stillwell:



664. On or about January 1, 2021, After Stillwell and Ott's disagreement on December 31, 2020, Stillwell was asked again to sign the NDA and indemnity agreement. Stillwell refused and Meierhans instructed FN finance employees not to pay the December Invoices.

665. Stillwell became aware of FN and FNL's scheme to withhold $10,000,000.00. However, on December 31, 2020, Dill promised Stillwell that the December Invoices would be paid, if Stillwell rescinded her thirty-day termination notice.

666. Stillwell rescinded her thirty-day termination notice in reliance on Dill's promise that the December Invoices would be paid in January. Paragraph 36 of the FNL Complaint misstates Stillwell's resignation and reefers to resignation as "erratic behavior."

667. Ott and Meierhans often mocked Stillwell when she complained about their disrespect and mistreatment. Stillwell was always depicted as being "whiny" "difficult to work worth," "angry," and "rude" whenever she complained about mistreatment.

668. On January 15, 2021, FN's deposit balances were applied towards FN and FNL's outstanding invoices, as instructed by Felder.

669. At the time this Complaint was filed, the December Invoices, Disputed Invoices and 4th Quarter 2020 payroll taxes for the Leased

COMPLAINT

Employees remain unpaid. FNL and FN owe Compliance Firm $370,753.55 for the December Invoices, Disputed Invoices and 4th Quarter 2020 payroll taxes, plus late fees, interests, and attorney fees to collect payment.

## 10.   HEATHER SALAZAR CONSPIRED WITH FN AND FNL

670.    Salazar worked at FN's warehouse as an onsite manager for Compliance Firm's leased employees, and as a liaison with FNHR.

671.    Salazar was responsible for addressing HR and payroll concerns for the leased employees who worked at the warehouse.

672.    Compliance Firm was unaware that Salazar was conspiring with FN until after Salazar's separation from the company in December 2020.

673.    From February 2021 to May 2021 Compliance Firm was threatened with multiple lawsuits from former leased employees who worked at Fashion Nova from August 2020 to January 2021.

674.    While investigating allegations from former employees, Compliance Firm discovered that Salazar deleted and destroyed employee records and communications related to the COVID-19 outbreaks at Fashion Nova.

675.    Compliance Firm was able to recover some communications and text messages between Salazar and employees and Salazar and FN. However, Compliance Firm is unable to determine exactly how many records were destroyed by Salazar.

676.     Salazar currently works in FNHR and has refused to participate in any investigations regarding her participation or knowledge of the COVID-19 outbreaks at FN and FNL's Santa Fe Springs warehouse.

677.     Upon information and belief, on or about January 1, 2021, Salazar was offered Fashion Nova gift cards and employment in FNHR in exchange for her agreement to provide perjured testimony pertaining to the allegations described herein.

## 11.   EMPLOYEE COMPLAINTS MADE TO FNHR:

678.     In addition to the allegations described herein, Stillwell emailed Ott about serious discrimination, retaliation, and safety complaints that were escalated to Stillwell.   Stillwell raised over twenty complaints before Meierhans and Ott told Stillwell to stop *emailing* Ott.

679.     On or about July 20, 2020, Stillwell complained about FN and FNL's discriminatory hiring practices disparate treatment of an Asian applicant. FN and FNL refused to consider occupations health nursing applicants that were not fluent in Spanish, which resulted in FN and FNL only considering Hispanic applicants. Over 300 qualified candidates applied for the position and less than 1% of applicants met FN and FNL's requirements.

680.     On or about July 22, 2020, Stillwell complained about FN and FNL's refusal to compensate Compliance Firm for paid meal awards. Stillwell also raised employee concerns about lack of breaks.

681.     On or about August 19, 2020, Stillwell refused to force the Leased Employees to sign FN's Meal Waiver and complained that signing the waiver should be voluntary, not compulsory.

682.     On or about August 25, 2020, a semi-trailer truck pulled off with an employee still inside of the trailer. Stillwell raised safety concerns about FN and FNL's lack of training program and skills assessments for its drivers.

683.     On or about August 26, 2020, Stillwell complained about inappropriate communication and sexual harassment of female employees by male managers and supervisors. At the time, a married FN manager had impregnated two subordinates, who were all still working at FN's Santa Fe Springs Warehouse.

684.     On or about August 27, 2020, Stillwell complained about the retaliation and harassment of a female employee. The employee had recently complained about inappropriate communication from her male supervisor. The female employee resigned less than a month later.

685.     On or about August 28, 2020, Stillwell complained about FN and FNL's discriminatory ADA practices. An employee who identified as

Pacific Islander had a physical disability that did not prevent him from operating a forklift. The employee had previously worked in a similar capacity for over ten years, with his disability. The employee was not allowed to demonstrate is ability to safely complete the functions of the job. FN and FNL refused to accommodate the employee and placed the employee in a lower paying, and more physically demanding position. The employee eventually resigned.

686.    On or about August 28, 2020, Stillwell complained about FN and FNL's improper training and discriminatory assessments for its forklift drivers and cherry pickers. Stillwell also informed FN and FNL of their Cal/OSHA violations in addition to many safety concerns involving FN and FNL's use of powered industrial trucks ("PIT").

687.    On or about August 31, 2020, Stillwell complained that FN and FNL had not addressed the Cal/OSHA safety concerns, and the improper training led to an accident involving a PIT. FN and FNL retaliated by no longer allowing Compliance Firm to recruit employees who operate PIT.

688.    On or about September 2, 2020, Stillwell raised concerns about the OHNs acting beyond their scope of practice. Stillwell also informed FN and FNL about allegations of workers compensation fraud.

689.     On or about September 5, 2020, Stillwell complained that FN and FNL managers were demanding the OHNs to provide care that was beyond their scopes of practice. Stillwell informed FN and FNL that nurses cannot prescribe medications or dispense medications without a physician's order. Stillwell also informed FN and FNL that nurses cannot diagnose illnesses or prescribe treatment plans to injured workers.

690.     On or about September 7, 2020, a Yard Goat Driver ("YGD") backed into a dock door. After investigating the incident, Stillwell complained about FN and FNL's lack of safety precautions in their trucking yard. Several of dock doors lacked bumpers. FN and vendor drivers frequently failed to chock trailers; there was no posted speed limited in the trucking yard, which resulted in several trucking accidents. FN and FNL did not have any managers or supervisors who were qualified to assess the skills of the yard goat drivers. FN and FNL allowed managers and supervisors to park in the yard, which was a huge safety concern due to the large number of semi-trucks entering and exiting the yard.

691.     On or about September 8, 2020, an OHN resigned after FNHR failed to address multiple complaints of harassment and retaliation; The OHN was harassed after reporting that FN and FNL were committing work compensation fraud, illegally administering medications, treating employees

without consent, violating HIPAA, and harassing employees who complained about workplace injuries.

692.     On or about September 10, 2020, several African American YGD complained about the hostile working environment. The African American drivers complained that FN and FNL managers and supervisors frequently disrespected the drivers. After the drivers complained about the treatment, they were forced to load and unload trucks, which was not part of their job descriptions.  FNHR did not address the complaints.

693.     On or about September 11, 2020, Stillwell complained that FN and FNL lacked a Department of Transportation ("DOT") compliant training program. Stillwell raised safety concerns that the YGD's complaints about the maintenance and safety of the trucks were ignored. At the time, FN and FNL had over twenty truck drivers, but no Yard Supervisor and no manager competent enough to understand the severity of the YGD complaints. FN and FNL hired YGD for the first time in July 2020.

694.     On or about September 16, 2020, the African American YGD complained that discrimination and harassment worsened and was not addressed. The YGD's threatened to quit, one eventually resigned because of the harassment and discrimination. Stillwell raised these concerns with FNHR and informed Ott that other African American employees working at

the warehouse made similar complaints. Stillwell explained that she had personally been harassed and heard two Hispanic security guards jokingly refer to Compliant Care Staffing as the "Black agency." Ott dismissed Stillwell's complaints, stating the security guards were likely referring to the color of the agency's lanyards. Compliance Firm's Leased Employees wore orange and blue lanyards – not black lanyards.

695.   On or about September 28, 2020, Stillwell raised employee concerns about the lack of parking at the Santa Fe Springs warehouse. Employees complained that they had to arrive sometimes as early as 4:00AM to be on time for their 5:00am shifts. One morning Stillwell drove to the warehouse and arrived at approximately 4:15AM and there was no available parking. Stillwell complained that it was not fair for FN and FNL to issue attendance points for tardy employees because FN failed to secure the additional parking ahead of Peak Season.

696.   On or about September 28, 2020, Stillwell also raised employee wage concerns, many of FN and FNL's Santa Fe Springs workers were making $13.00 - $14.00 per hour. On July 1, 2020, the Los Angeles County minimum wage increased to $15.00 per hour. FN and FNL did not increase wages to $15.00 per hour until January 1, 2021, six months after the Los Angeles County Minimum Wage Ordinance went into effect.

697.    On or about September 28, 2020, Stillwell informed Ott that FNL was breaching its 2019 California Competes Tax Credit (CCTC) Agreement by paying employees less than $15.00 per hour. Ott informed Stillwell that the temporary warehouse workers were paid $13.00 per hour by their staffing agencies, which are located outside of Los Angeles County. Ott stated once the employees are converted to FNL's payroll, the employees make $14.00 per hour, which is appropriate because, according to Ott, Santa Fe Springs is located in unincorporated Los Angeles County.

698.    On or about September 29, 2020, an African American Leased Employee complained that FN Security harassed him for using his phone while he was on break in the break area. FN Security made the employee end his call with a dying family member and told the employee that no phones were allowed in the building, even on breaks, which was untrue. The employee explained that his significant other was in the hospital dying of cancer and when the employee went on break, he noticed a missed call from the hospital. The employee told FN Security that he waited until his break to check his phone. FN Security maintained that the employee still needed to exit the building to talk on his phone.

699.    On or about September 30, 2020, Ott and FN threatened to terminate all Compliance Firm Contracts after Stillwell complained about FN's

COMPLAINT
- 171 -

security team's harassment of two Leased Employees. The employees were falsely accused of smoking weed after FN's security team recorded the two employees smoking tobacco in their car, on their lunch breaks. Despite there being no reasonable suspicion, FNHR required the employees to submit to drug testing or be terminated. The employees resigned and threatened to sue FN. Ott informed Stillwell that FN was planning to terminate all agreements with Compliance Firm on October 5, 2020, when Meierhans returned from vacation.

700.    On or about October 1, 2020, two African American drivers complained about racial discrimination, harassment, and hostile work environment. The African American drivers were told to drive the non-DOT yard trucks to get gas whenever the truck ran out of gas. Hernandez had previously told Stillwell that twice a week FN arranged for onsite gasoline refills from a third-party vendor. The drivers reported that the vendor stopped refills and the several times each week, the trucks ran out of gas. The YGDs complained that they were not DOT certified and the yard truck was also not DOT certified to be driven outside of FN's trucking yard. According to African American employees, FN was "testing" them to see if they were "loyal" enough to keep. The drivers complained that they felt forced to break the law, to keep their jobs. The African American drivers

also reported that only the African American drivers were forced to drive the yard truck to get gas.

701.    On October 3, 2020, Stillwell filed a complaint with the EEOC (inquiry #480-2021-0039) after receiving over twenty separate complaints about harassment, discrimination, and retaliation at FN's Santa Fe Springs warehouse that were never addressed by FNHR.

### 12.    REPORTS TO GOVERNMENT AGENCIES:

702.    Stillwell also reported conduct alleged herein to the following local, state, and federal government agencies:

   a.  Los Angeles County District Attorney's Office

   b.  California Attorney General's Office

   c.  Federal Bureau of Investigation ("FBI")

   d.  FBI Los Angeles Field Office

   e.  Immigration and Customs Enforcement ("ICE")

   f.  California Department of Industrial Relations

   g.  California Department of Industrial Relations Division of Occupational Safety and Health ("Cal/OSHA")

   h.  California's Labor Commissioner's Office

   i.  California's Governor's Office of Business and Economic Development

j.   Whittier Police Department

k.   California Laboratory Field Sciences ("LFS")

l.   California Department of Public Health ("CDPH")

m. United States Department of Justice ("DOJ")

n.   National Center for Disaster Fraud Hotline

o.   Los Angeles County Public Health Department ("LACPDH")

p.   Equal Employment Opportunity Commission ("EEOC")

(i) On August 18, 2020, the EEOC issued Stillwell a Right to Sue letter because Stillwell was not considered an employee as defined by Federal discrimination laws.

(ii) A true and correct copy of Stillwell's Right to Sue letter from the EEOC is attached and incorporated as Exhibit X.

703.    Upon information and belief, FN and FNL were contacted by government investigators and provided false information to refute allegations.

704.    FN and FNL use forced arbitration agreements and NDAs to prevent, threaten and intimidate employees, vendors, and contractors from participating in government or agency investigations.

705.   Stillwell was accused of breaching her fiduciary duty for any complaints she made against FN and FNL. Stillwell was threatened with litigation for using information obtained from working for FN and FNL.

706.   Stillwell is not protected by any federal whistleblower protections and lack of protections that are typically afforded to employees under federal law, such as federal laws that prohibit retaliation for complaints against discrimination, fraud, and unsafe workplace conditions.

707.   Stillwell is in a unique position, as an employee of a company she owns wholly, Stillwell cannot bring employment actions under state or federal laws, as she would've essentially been suing herself.

708.   The lack of protection from any federal retaliation laws, allowed Fashion Nova to retaliate against Stillwell repeatedly and without recourse.

709.   After discovery in this matter concludes, Stillwell and Compliance Firm intend to pursue criminal charges against the Defendants for the conduct alleged herein.

### E.   INJURIES TO STILLWELL'S BUSINESS OR PROPERTY

#### 1.   REPUTATIONAL HARM

710.   FN, FNL used threats of financial and reputational harm to coerce Stillwell.

711.     After the frivolous FNL Complaint was filed, former clients of Stillwell and Compliance Firm emailed and texted screenshots of several articles in which Compliance Firm was accused of fraud, including an article from Law.com, and also an article posted ChamberLitigation.com.

712.     The Law.com article stated,

> "Warehouse operator FN Logistics sued Compliant Care Staffing Friday in California Central District Court for alleged fraud and breach-of-contract in connection with COVID-19 testing. The suit, filed by Nixon Peabody, accuses Compliant Care of misrepresenting itself as a qualified medical services provider and charging FN over $600,000 for workforce testing services that were never provided. Counsel have not yet appeared for the defendant. The case is 2:21-cv-03312, FN Logistics, LLC v. The Compliance Firm LLC d/b/a Compliant Care Staffing et al."

713.     The Law.com article can be accessed online at the following web address: https://www.law.com/radar/card/fn-logistics-llc-v-the-compliance-firm-llc-d-b-a-compliant-care-staffing-et-al-39858196-0/

714.     Below is a screenshot of the Law.com article:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    715.    The ChamberLitigation.com article stated,

20    **"California Company Sued for Charging Over $600,000 for Just**

21
22    **40 COVID-19 Tests**.

23    Overview: FN Logistics, LLC sued The Compliance Firm LLC in

24
25    California federal court, alleging that it provided COVID-19 tests to

26    only 40 individuals despite receiving $600,000.

27
28

**The Complaint:** FN Logistics sought to offer COVID-19 tests to its warehouse employees and retained The Compliance Firm to handle the testing.  Instead of providing services quickly, the complaint alleges that The Compliance Firm went through a time-consuming and expensive process of building COVID-19 testing infrastructure from scratch, passing all costs on to FN Logistics, and ultimately charged over $600,000 to perform just 40 tests.  FN Logistics asserts several state-law claims related to its contract."

716.     The ChamberLitigation.com article also contains a link to the FNL Complaint.  The ChamberLitigation.com can be accessed online at the following web address: https://www.chamberlitigation.com/RoundUp57

717.     Below is a screenshot of the ChamberLitigation.com article:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

🔒 chamberlitigation.com

**4. California Company Sued for Charging Over $600,000 for Just 40 COVID-19 Tests.**

**Overview:** FN Logistics, LLC sued The Compliance Firm LLC in California federal court, alleging that it provided COVID-19 tests to only 40 individuals despite receiving $600,000.

**The Complaint:** FN Logistics sought to offer COVID-19 tests to its warehouse employees and retained The Compliance Firm to handle the testing.  Instead of providing services quickly, the complaint alleges that The Compliance Firm went through a time-consuming and expensive process of building COVID-19 testing infrastructure from scratch, passing all costs on to FN Logistics, and ultimately charged over $600,000 to perform just 40 tests.  FN Logistics asserts several state-law claims related to its contract.

**Our Take:** Although we do not know the truth of the allegations asserted here, we have recounted several cases on this blog of individuals and businesses having taken advantage of the pandemic to enrich themselves through fraudulent or dubious activity related to COVID-19 testing.  Because COVID-19 testing and vaccination regimes will

COMPLAINT
- 179 -

718.    Stillwell's reputation and the reputation of Compliance Firm has been harmed indefinitely due to each of the Defendants' intentional destruction of her and Compliance Firm's reputations.

719.    Compliance Firm is a federal contractor, a vendor with the State of California, a Los Angeles Country vendor, and a vendor with the city of Los Angeles. Accusations of fraud affect the cost of Compliance Firm's business insurance premiums and can make Compliance Firm ineligible for certain government grants and contracting opportunities.

720.    Accusations of fraud and moral turpitude as alleged in the FNL Complaint can prevent Stillwell's ability to practice law and nursing.

721.    The FNL Complaint harmed the Compliance Firm and its subsidiaries, as well as Stillwell's ability to earn a livelihood as an attorney a registered nurse.

722.    Saghian, Meierhans, FN, FNL, Nixon Peabody, and Riordan intentionally tried to destroy Stillwell's ability to earn a living as an entrepreneur, small business owner, attorney, and register nurse.

723.    Saghian, Meierhans, FN, FNL, Nixon Peabody, and Riordan intentionally tried to destroy Stillwell's life to suppress her testimony and

any potential legal matters arising out of the complaints and allegations alleged herein.

## 2.   INJURY TO STILLWELL'S BUSINESS OR PROPERTY

724.   Plaintiff Stillwell is a "person" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

725.   Plaintiff Stillwell is a "person" within the meaning of 18 U.S.C. § 1964(c), which states:

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."

726.   Compliance Firm and each of its subsidiaries is a "person" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

727.   Stillwell has business and property interests in her one hundred percent (100 %) ownership of Compliance Firm and its subsidiaries.

728.   Stillwell has a business and property interests for Compliance Firm's accounts receivable and the accounts receivable for Compliance Firm's subsidiaries.

729.   Stillwell has business and property interests in her one hundred percent (100 %) ownership of KovidPass.

730.   Stillwell is an employee of Compliance Firm and has a business interest in her salary from Compliance Firm.

731.   Stillwell's base annual salary is $750,000.00 + bonuses.

732.   Stillwell's bonuses are ten percent (10%) of Compliance Firm's annual revenue, plus 10% of revenue generated by Compliance Firm's wholly owned subsidiaries.

733.   Stillwell has property interest in her salary from Compliance Firm.

734.   In January 2021, Stillwell loaned Compliance Firm $350,000.00 that pay operational costs, legal fees and settlements related to employment law cases, that FN and FNL refused to indemnify Compliance Firm against.

735.    Stillwell loaned Compliance Firm $350,000.00 in reliance on FN and FNL's promises to pay for the services Stillwell and Compliance Firm provided to FN and FNL.

736.    Compliance Firm is unable to repay to Stillwell the $350,000.00 loan, as a direct result and proximate cause of the Defendants' unlawful conduct described herein.

737.    Compliance Firm has also been unable to pay Stillwell's salary and bonuses from 2020.

738.    As a direct and proximate result of the Defendants' conducts alleged herein, Compliance Firm's inability to pay Stillwell's base monthly salary of $62,500.00 ($750,000.00/year), has caused Stillwell to be unable to pay for personal living expenses, and business expense, such as employee salaries and operational costs of Compliance Firm's subsidiaries.

739.    Further, Stillwell personally guaranteed all of Compliance Firm's lines of credit. When Compliance Firm was unable to pay creditors, Stillwell's personal credit score was adversely affected. Stillwell's personal credit score has dropped over 200 points since April 2021.

740.    With Stillwell's now poor personal credit score, Stillwell has been unable to secure business loans to cover Compliance Firm's operational costs. Stillwell has also been unable to secure personal lines of credit to

cover her living expenses, including medical care and medical expenses that were caused by the emotional harm the Defendants' inflicted upon Stillwell.

741.    Compliance Firm entered the following valid and enforceable twelve (12) month service contracts at the request of, and on behalf of FN and FNL pursuant to the Joint Venture:

(a) ECS Laboratory Staffing;

(b) Lighthouse Lab Consulting;

(c) Abbott Laboratories, for COVID-19 diagnostic and medical devices;

(d) WorkCare, for occupational health services; and

(e) Verizon for internet and telecommunications for the Joint Venture.

742.    Compliance Firm would not have entered into the services agreements but for FN and FNL's promise to reimburse Compliance Firm and but for Compliance Firm's reliance on FN and FNL's promise to perform under the Joint Venture.

743.    Pursuant to the Joint Venture agreement, FN and FNL owe Compliance Firm $1,570,800.45 for monies that Compliance Firm paid on behalf of FN and FNL pursuant to the Joint Venture.

744.     Stillwell and Compliance Firm entered the aforementioned valid and enforceable twelve (12) month service contracts at the request of, approval of, and on behalf of FN and FNL.

745.     Compliance Firm would not have entered into the services agreements but for FN and FNL's promise to reimburse Compliance Firm and but for Compliance Firm's reliance on FN and FNL's promise to perform.

746.     Pursuant to the OHN Consulting Agreement, FN and FNL owe Compliance Firm $87,500.75 for monies that Compliance Firm paid on behalf of FN and FNL pursuant to the OHN Agreement.

747.     In December 2020, Stillwell invested $200,000.00 in KovidPass and had to stop in March 2021 due to lack of funds and cancelled client contracts. KovidPass clients cancelled contracts due to the false allegations in the FNL Complaint.

748.     Stillwell and Compliance Firm lost $10,000,000.00 in testing contracts after clients cancelled citing FNL complaint and its allegations of fraud.

749.     Compliance Firm purchased $1,120,300.00 worth of testing supplies and equipment for Joint Venture and other testing contracts that it can no longer use because clients cancelled contacts, citing the of the FNL Complaint.

750.     Compliance Firm had to destroy $65,888.00 worth of expired COVID-19 tests and testing supplies that were purchased for testing contacts.

751.     Compliance Firm and its subsidiaries were expected to have revenues in excess of $50,000,000.00 for fiscal year 2021, which began on January 1, 2021, and ends on December 31, 2021.

752.     But for the Defendants' conduct, clients would not have cancelled COVID-19 testing contracts for fraud and incompetence for "not being qualified" to perform workplace testing.

753.     Testing clients have replaced Compliance Firm with other vendors, thereby making the COVID-19 contracts unavailable to Compliance Firm.

754.     But for the Defendants' conduct, clients would not have cancelled KovidPass contracts for fraud. KovidPass clients have replaced Compliance Firm with other vendors, thereby making the contracts unavailable to Compliance Firm.

755.     Stillwell was the intended third-party beneficiary of the Joint Venture agreement.

756.     Stillwell's expected 2021 salary, with her bonus, was expected to be $5,750,000.00.

757.    Stillwell spent 659 hours working on filing this Complaint in pro per. Based on Stillwell's annual base pay of $750,000.00 Stillwell's hourly rate is $360.58 per hour.

758.    Defendants' conduct alleged herein deprived Compliance Firm out of an identifiable and specific and ascertainable amount of money in the sum of $3,194,489.20 for monies Compliance Firm paid on behalf of FN and FNL pursuant to the OHN Consulting Agreement, COVID-19 Consulting Agreement, and Joint Venture.

759.    Defendants' conduct alleged herein deprived Compliance Firm out of an identifiable and specific and ascertainable amount of money in the sum of $370,753.55 for the December Invoices, Disputed Invoices and 4th Quarter 2020 payroll taxes, plus late fees, interests, and attorney fees to collect payment.

760.    Defendants' conduct alleged herein deprived Compliance Firm out of a total of $3,565,242.75, an identifiable and specific and ascertainable amount of money.

### 3.    DEPRIVATION OF HONEST SERVICES

761.    The Defendants' conduct described herein Compliance Firm and Stillwell of honest services.

762.     The Defendants' conduct described herein deprived Compliance Firm of $10,000,000.00 of honest services from COVID-19 testing clients, that Compliance Firm reasonably relied upon receiving.

763.     The Defendants' conduct described herein deprived Compliance Firm of $40,000,000.00 of honest services from KovidPass clients, that Compliance Firm reasonably relied upon receiving.

764.     The Defendants' conduct described herein deprived Stillwell of $550,000.00 of honest services from Compliance Firm in monies that Stillwell loaned Compliance Firm, as described herein. Stillwell reasonably relied on Compliance Firm's repayment.

765.     The Defendants' conduct described herein deprived Stillwell of $5,750,000.00 of honest services from Compliance Firm for Stillwell's 2021 total expected salary. Stillwell reasonably relied on Compliance Firm's payment of her 2021 salary.

## F.     **ATTORNEY MISCONDUCT**

766.     Cal. Civil Code Section 128.5(2) defines "frivolous" as totally and completely without merit or for the sole purpose of harassing an opposing party. The FNL Complaint was a frivolous lawsuit,

767.     FN, FNL, Saghian, Meierhans, Riordan, and Nixon Peabody abused the legal process by filing the FNL Complaint to harass, intimidate, and defraud Stillwell and Compliance Firm.

768.     FN, FNL, Saghian, Meierhans, Riordan, and Nixon Peabody filed the FNL Complaint to defraud Stillwell and Compliance Firm.

769.     FN, FNL, Saghian, Meierhans, Riordan, and Nixon Peabody filed the FNL Complaint to intimidate and prevent Stillwell's complaints and testimony about:

    (a) FN and FNL's forced labor of employees, vendors and contractors,

    (b) FN and FNL's exploitation of undocumented workers,

    (c) FN and FNL's COVID-19 outbreaks at its warehouses,

    (d) FN and FNL's payroll tax evasion, and

    (e) FN and FNL's discriminatory employment practices,

all of which Stillwell has firsthand knowledge and capable of competently testifying against.

770.     The Rules of Professional Conduct of the State Bar of California, ("CA Rules of Profession Conduct") Rule 4.1 Truthfulness in Statements to Others, states:

    "In the course of representing a client a lawyer shall not knowingly:

    (a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Business and Professions Code section 6068"

771.    Meierhans, Riordan and Nixon Peabody knowingly made false statements of fact and law to Stillwell, Compliance Firm and to the California Central District Federal Court. Disclosure was necessary to avoid assisting a criminal or fraudulent act by a client.

772.    Meierhans, Riordan and Nixon Peabody knew the disclosures were necessary to avoid assisting a criminal or fraudulent act by a client. The disclosure of material facts and statements by Meierhans, Riordan and Nixon Peabody would not have been prohibited by Business and Professions Code Section 6068.

773.    Meierhans, Riordan and Nixon Peabody knowingly and intentionally did not comply with Rule 4.1 of the California Rules of Profession Conduct by knowingly concealing and destroying evidence and failing to disclose material facts to Stillwell and Compliance Firm.

774.    On May 7, 2021, Stillwell emailed Intrivo's General Counsel, Andrew B. Holmes ("Holmes"),

"Intrivo converted approximately 8,500 CSA Tests and concealed that FashionNova used the remaining 12,500 CSA Tests, that are currently at issue in a case pending in Federal Court.

Intrivo knew CCS was being sued for the costs of the 12,800 CSA Tests (approx. $400k) and did not disclose that over half of the CSA Tests were taken by Intrivo.

If Intrivo believed the tests belonged to FashionNova – then Intrivo still had a duty to disclose information pertaining to the tests. Ethically, Andrew, you and the Nixon Peabody attorneys had a duty to disclose.

I informed you of the litigation between CCS and FashionNova- and you still continued to conceal information – in furtherance of the fraud perpetrated against CCS.

The Nixon Peabody attorneys blocked all emails from my domain and have refused to answer any calls or questions about the tests.

CCS' Answer is due Monday, May 10, 2021. The information about the tests are material to CCS' defense of the allegations. Please provide the requested information prior to Monday, May 10th. I've asked for this information several times previously."

775.    Holmes responded to Stillwell's email,

"Ms. Stillwell –

At this time, we can't be of any assistance to you. I suggest you direct

your requests for information to counsel for Fashion Nova."

776.    Below are screenshots of Stillwell's email to Holmes and Holmes'

response to Stillwell's email sent on May 7, 2021:

On May 7, 2021, at 6:32 PM, Britt Stillwell <britt@thecompliancefirm.com> wrote:

Hi Andrew,

In March 2021, Intrivo, your client and/or employer removed approximately 8,500 CSA Tests, worth over $238,000, from FashionNova's warehouse because FashionNova told you the tests belong to CCS. Your company removed CCS' property and did not return the property to CCS.

Intrivo nor FashionNova had the authorization from CCS, nor the authority of law, to seize the CSA Tests. If you believed the tests belonged to CCS, then why weren't they returned to CCS?

**RICO predicate act:** Intrivo converted approximately 8,500 CSA Tests and concealed that FashionNova used the remaining 12,500 CSA Tests, that are currently at issue in a case pending in Federal Court.

Intrivo knew that CCS was being sued for the costs of the 12,800 CSA Tests (approx $400k) and did not disclose that over half of the CSA Tests were taken by Intrivo.

IF Intrivo believed the tests belonged to FashionNova- then Intrivo still had a duty to disclose information pertaining to the tests. Ethically, Andrew, you and the Nixon Peabody attorneys had a duty to disclose.

I informed you of the litigation between CCS and FashionNova - and you still continued to conceal information- in furtherance of the fraud perpetrated against CCS.

The Nixon Peabody attorneys blocked all emails from my domain and have refused to answer any calls or questions about the tests.

CCS' Answer is due Monday, May 10, 2021. The information about the tests are material to CCS' defense of the allegations. Please provide the requested information prior to Monday, May 10th. I've asked for this

Ms. Stillwell –

At this time, we can't be of any assistance to you.

I suggest you direct your requests for information to counsel for Fashion Nova.

Andrew B. Holmes

General Counsel

Intrivo Diagnostics

2021 Santa Monica Blvd. #11

Santa Monica, CA 90404

Tel: (310) 415-0267

Email: abholmes@intrivo.com

www.intrivo.com



**From:** Britt Stillwell <britt@thecompliancefirm.com>
**Sent:** Friday, May 7, 2021 5:33 PM
**To:** Andrew Holmes <abholmes@intrivo.com>
**Cc:** Anthony Horgan <ahorgan@intrivo.com>; Brian, Aaron <abrian@nixonpeabody.com>; Gordon, Jill <jgordon@nixonpeabody.com>; Gutierrez, Heidi <hgutierrez@nixonpeabody.com>; Hparikh@nixonpeabody.com; Intrivo Diagnostics <info@intrivo.com>; Jack Sahagian <jsahagian@intrivo.com>; Matt Held <mheld@intrivo.com>; Riordan, Staci Jennifer <sriordan@nixonpeabody.com>; dannah.bosi@thecompliancefirm.com
**Subject:** Re: Conspiracy & Wire Fraud - CareStart Antigen Tests

777.     FNL, Riordan and Nixon Peabody knowingly lied about Stillwell's residency to assert diversity for federal jurisdiction.

778.     Meierhans, Riordan, Saghian, FNL and Nixon Peabody wanted to file the FNL Complaint in federal court for more exposure and to cause Stillwell and Compliance greater harm. All claims in the FNL Complaint were State claims.

779.     Saghian also wanted to sue Compliance Firm under FNL instead of FN so that Fashion Nova could be shielded FashionNova from negative press.

780.     FNL, Riordan and Nixon also filed the FNL Complaint  in federal court to intentionally cause Compliance Firm and Stillwell to incur excessive legal fees defending the suit. Defendants planned to refile the case in State court if Compliance Firm was successful with a Motion to Dismiss the FNL Complaint.

781.     FNL, Riordan and Nixon Peabody filed FNL's Entry of Default to prevent Compliance Firm from using recently acquired, exculpatory evidence to defend itself against FNL's false allegations.

782.     FNL did not serve Compliance Firm with the FNL Entry of Default and Application for Default Judgment until thirty (30) days after filing the documents in court. FNL, Riordan and Nixon Peabody knowingly and

intentionally served Compliance Firm at the wrong address to intentionally cause delays and prevent Compliance Firm from appealing the Default Judgement.

783.    FNL, Riordan and Nixon Peabody knowingly and intentionally disclosed Compliance Firm's full banking account information in Exhibit A of FNL's Application for Default Judgment.

784.    Exhibit A of the FNL Application for Default Judgement contains a falsified receipt for the CSA Tests that contains the full and unredacted banking accounting number and routing number for Compliance Firm's banking account. Riordan, FNL and Nixon Peabody knowingly and intentionally disclosed Compliance Firm's banking information to cause financial harm to Stillwell and Compliance Firm. Compliance Firm was forced to place a block on its checking account to prevent further fraudulent transactions.

785.    FRCP Rule 12 states,

"(f) Motion to Strike. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." *See* F.R.Civ.P 12(f).

786.    Riordan, Nixon Peabody, Saghian, Meierhans and FNL devised schemes to enforce the default judgment against Compliance Firm to further harm Stillwell and Compliance Firm. This threat of financial harm is ongoing as of August 31, 2021, the date this Complaint was filed.

787.    Since diversity jurisdiction did not exists in the FNL Complaint, subject matter jurisdiction for this Court was lacking.

788.    Pursuant to F.R.Civ.P 12(f), this Court may act on its own to strike FNL's Application for Default Judgment and FNL's Request for Entry of Default against Compliance Firm in the FNL Complaint.

789.    Due to financial hardship caused by each of Defendants, Compliance Firm is currently unable to hire legal representation to defend itself against the FNL Complaint as well as the leased employee lawsuits.

790.    L.R. 5.2-1 provides for attorney discipline for the attorney misconduct described herein.

791.    L.R. 83-3.1.3 Possible Disciplinary Penalties states:

"An order imposing discipline under this Rule may consist of any of the following:

(a) disbarment,

(b) suspension not to exceed three years,

(c) public or private reproval,

(d) monetary penalties (which may include an order to pay the costs of the proceedings), and/or

(e) acceptance of resignation"

## G.    EMOTIONAL DISTRESS

792.    Stillwell and Compliance Firm have struggled to find representation due to smaller law firms fearing retribution by fighting Nixon Peabody due to Nixon Peabody's "government connections" and "influence." Stillwell was told by several firms and lawyers, if she could overcome a 12(b) motion to dismiss, then she'd have no trouble finding legal representation for Compliance Firm or for herself.

793.    Since she was unable to attain legal representation, Stillwell was forced to draft the Complaint in *Pro per* to avenge herself and Compliance Firm's reputations.

794.    Stillwell experienced post-traumatic stress disorder ("PTSD") symptoms while drafting this complaint as Plaintiff was forced to re-live the traumatic experiences described herein.

795.    In September 2020, Stillwell had to resume taking medications to manager her Attention Deficit Hyperactivity Disorder, ("ADHD").

796.    Stillwell had previously been able to manage her ADHD without medications since 2015. However, the stress inflicted upon Stillwell while working for FN and FNL caused Stillwell so much distress that she was forced to resume taking medications for her ADHD, after over five (5) years of managing her ADHD non-Pharmacologically.

797.    The stress caused by the Defendants also caused Stillwell's blood pressure to become critically elevated, which ultimately caused Stillwell to sustain a spontaneous coronary artery dissection ("SCAD"), which is life threatening and can result in sudden cardiac arrest and death.

798.    Stillwell had no previous history of high blood pressure and had never needed medications to manager her stress or blood pressure.

799.    The emotional distress caused by the Defendants' actions were exacerbated by the ongoing COVID-19 pandemic, which had already placed Stillwell under a heightened level of stress.

800.    While drafting this Complaint, Stillwell frequently broke out in hives and had panic attacks that required Stillwell to medicate with antihistamines and medications that made Stillwell drowsy and often limited her cognitive ability to fully function at work.

801.    Stillwell's dangerously elevated blood pressure continues to exacerbate Stillwell's SCAD, which has significantly decreased Stillwell's life expectancy and quality of life.

802.    There are currently no available surgical interventions available to Stillwell for the treatment of her SCAD. Stillwell frequently uses 'bedrest' and frequent rest to allow her heart and SCAD to heal.

803.    Due to decreased cardiac output, Stillwell is chronically fatigued and struggles to carry out daily tasks such as cooking, cleaning, and work. Stillwell is currently able to sit out of bed for approximately two to four hours before needing to lay down due to exhaustion and her heart's decreased functioning.

804.    Stillwell, a licensed nurse in California is currently unable to physically meet the demands of bedside nursing due to chronic fatigue and exhaustion, Stillwell is also unable to work from home full-time as she requires frequent breaks from her chronic fatigue and exhaustion.

805.    It can be months, if ever, before Stillwell's cardiac functioning is optimal for Stillwell to return to her previous quality of life.

806.    Stillwell currently requires cardiac care and in-home assistance to help with her activities of daily living ("ADLs").

807.     Stillwell was hospitalized multiple times die cardiac related complications. Most recently, Stillwell was hospitalized around the same time as her father, which prevented her from being with her father during his finals days, due to her own dire health status, that was directly caused by Defendants' conduct described herein.

808.     Stillwell's heart condition remains fragile, and as a result, Stillwell is unable to fly home to attend her father's funeral on September 2, 2021.

## H.     **PUNITIVE DAMAGES**

809.      The conduct of Saghian, Meierhans, FN, FNL, Riordan, Benaron, Markel, and Intrivo described above is outrageous. The Defendants' conduct demonstrates a reckless disregard for human life and a conscious disregard for public safety.

810.     The acts and omissions described above were willful and performed with actual or implied malice.

811.     Punitive and exemplary damages are therefore appropriate and should be imposed in this instance.

## I.     **RICO ENTERPRISE #1 – FASHION NOVA ENTERPRISE ("FNE")**

812.     <u>Enterprise Members:</u> Fashion Nova Enterprise, ("FNE"), is an "enterprise" within the meaning of 18 U.S.C. §1961(4) whose members are:

(a) Fashion Nova, LLC, ("FN"),

(b) Fashion Nova Holdings, LLC, ("FNH"),

(c) 2801 EAST 46TH STREET, LLC, ("2801-LLC"),

(d) 1360 EAST 17TH STREET, LLC, ("1360-LLC"),

(e) SAM MARCEL COSMETICS, INC, ("SMC"),

(f) FN LOGISTICS, LLC, ("FNL"),

(g) UFF, LLC, ("UFF"), and

(h) FN EXPRESS, INC, ("FNX")

813.    Each member of FNE are "persons" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

### 1.    FNE 2020 REORGANIZATION / RESTRUCTURE OF FN SUBSIDIARIES, AFFILIATES, & SHELL COMPANIES

814.    In December 2020, FNE reorganized FN's subsidiaries, affiliate companies, foreign branches, and shell companies in furtherance of fraudulent schemes that were, and are, intended to defraud FNE's customers, employees, vendors, creditors, and investors.

815.    Fashion Nova, LLC, ("FN"), a successor entity that assumed its ownership interests, rights, benefits, duties, and legal obligations from it its predecessor corporation, Fashion Nova, Inc.

(a) Fashion Nova, Inc was incorporated in California on March 15, 2006, and converted to Fashion Nova, LLC on December 31, 2020.

(b) FN is a controlling and indispensable member of FNE.

816.   Fashion Nova Holdings, LLC, ("FNH") FN's parent company, and a successor entity that assumed FN's ownership interests, rights, benefits, duties, and legal obligations from it its predecessor corporation, 1360 EAST 17TH STREET, LLC on or about December 15, 2020.

(a) On January 20, 2015, Fashion Nova Holdings, LLC was incorporated in California.

(b) On October 03, 2018, Fashion Nova Holdings, LLC's name was changed to 1360 EAST 17TH STREET, LLC.

(c) On December 15, 2020, Fashion Nova Holdings, LLC was incorporated in Delaware.

1.   On or about December 15, 2020, 1360 EAST 17TH STREET, LLC transferred FN's ownership interests, rights, benefits, duties, and legal obligations to Fashion Nova Holdings, LLC, a Delaware company.

(d) FNH is a controlling and indispensable member of FNE.

817.    <u>2801 EAST 46TH STREET, LLC</u>, ("2801-LLC"), a subsidiary of FN and California company that was incorporated on December 3, 2015. 2801-LLC is a controlling and indispensable member of FNE.

818.    <u>1360 EAST 17TH STREET, LLC</u>, ("1360-LLC"), the former parent company of FN from January 20, 2015, until on or about, December 15, 2020, when the company became, and remains, a current subsidiary of FN. 1360-LLC is a controlling and indispensable member of FNE.

819.    <u>SAM MARCEL COSMETICS, INC</u>, ("SMC") an affiliate company of FN and a California corporation incorporated on January 20, 2016. SMC is a controlling and indispensable member of FNE.

820.    <u>FN LOGISTICS, LLC</u>, ("FNL"), an affiliate company of FN and a Delaware company originally incorporated on June 18, 2018, as FN Logistics, Inc.

(a) On December 30, 2020, FN Logistics, Inc, converted to FN Logistics, LLC in Delaware.

(b) On April 13, 2021, FN Logistics LLC was registered in California as a foreign, limited liability company.

(c) On April 22, 2021, FN Logistics, Inc. surrendered its foreign qualified corporation status in California.

(d) FNL is a controlling and indispensable member of FNE.

821.     UFF, LLC, ("UFF"), a shell company of FN, and a Delaware company incorporated on February 29, 2019. UFF is a controlling and indispensable member of FNE.

822.     FN EXPRESS, INC, ("FNX"), a shell company of FN, and a Delaware company incorporated on August 15, 2019. FNX is a controlling and indispensable member of FNE.

### 2. FN SUBSIDIARIES, AFFILIATES, FN FOREIGN BRANCHES & SHELL COMPANIES

823.     FN Parent Company: Upon information and belief, FN's parent company is Fashion Nova Holdings, LLC, ("FNH"). FNH is a holding company that does not produce goods or services. FNH is a controlling and indispensable member of FNE.

824.     FN Subsidiaries: Upon information and belief, FN owns and controls more than fifty percent (50%) of the following companies. The following companies, collectively known as, FN Subsidiaries, are subsidiaries of FN and are all are members of FNE:

(a) 2801 EAST 46TH STREET, LLC, an FN subsidiary that is ordinarily in the business of managing FN's headquarters, located in Vernon, CA, and FN's distribution warehouses.

(b) <u>1360 EAST 17TH STREET, LLC</u>, an FN subsidiary that is ordinarily in the business of managing FN's garment manufacturing factories.

825.   <u>FN Affiliate Companies:</u> Upon information and belief, FN owns and controls less than fifty percent (50%) of the following companies. The following companies, collectively known as, FN Affiliate Companies, are affiliate companies of FN and are all are members of FNE:

(a) <u>SAM MARCEL COSMETICS, INC</u>, an affiliate company of FN, that is ordinarily in the business of manufacturing, marketing, and selling cosmetics in the United States and internationally, via retail and online e-commerce stores.

(b) <u>FN LOGISTICS, LLC</u>, an affiliate company of FN, that is ordinarily in the business of providing warehousing and inventory management services for FN, including receiving, storage, packing, and shipping.

826.   <u>FN Foreign Branches:</u> Upon information and belief, FN owns and controls several foreign companies, collectively known as, FN Foreign Branches. Some of the FN Foreign branches were incorporated prior to 2018 and were affiliates of FNE.

(a) <u>UFF LLC</u> is also registered in the United Kingdom, and its Value Added Tax (VAT) number is GB 375566164. UFF LLC's registered business address in the United Kingdom is:

> HM Revenue and Customs
> Ruby House
> 8 Ruby Place
> Aberdeen
> AB10 1ZP
> GB

(b) A screenshot of UFF LLC's United Kingdom registration is below:



COMPLAINT
- 205 -

1    (c) Fashionnova PTY LTD was registered in Australia on or about

2       October 23, 2020. The Australian Business Number ("ABN") is

3

4       645363819. The registered address is:

5            125 Cockatiel CCT

6

7            Green Valley NSW 2168

8    (d) A screenshot of Fashionnova PTY LTD's Australian registration is

9       below:

10

11

12

13   

14

15

16

17

18

19

20

21

22

23   (e) Fashionnova PTY LTD is also registered for the Australian

24

25      Securities and Investments Commission. A true and correct copy

26

27

28

COMPLAINT
- 206 -

of Fashionnova's application for registration as an Australian company is attached as Exhibit Y and incorporated by reference.

(f) Plaintiff is ignorant of the true names and capacities of all the FN Foreign Branches. The unknown FN Foreign Branches are fictitiously named, non-Defendant members of FNE.

(a) The true names and capacities of the fictitiously named FN Foreign Branches are known by Defendants Saghian, Meierhans, and Riordan and can be ascertained via discovery.

827. <u>FN Shell Companies:</u> Upon information and belief, the following companies are FN's shell companies. FN's shell companies do not have substantial assets or active operations. FN's shell companies are used to reduce FN's tax liability, access financing, store funds and to maintain anonymity.  The following companies, collectively known as, FN Shell Companies, are shell companies of FN, and are all are members of FNE:

(a) <u>UFF, LLC</u>, a shell company of FN that is a holding company that does not produce goods or services.

(b) <u>FN EXPRESS, INC</u>, a shell company of FN that is an investment company that does not produce goods or services.

828. <u>FN Doe Companies:</u> Plaintiff is unaware as to the true names and identities of all of FN's, subsidiaries, affiliate companies, foreign branches,

and shell companies. This information is known by Defendants FN, Saghian, Meierhans, Nixon Peabody, and Riordan and can be ascertained during discovery.

    (a) Stillwell sues FN Doe Defendant Companies by their fictitious names, defendant Does 1 through 10 ("Doe Defendants"),

### 3.    FNE RICO ACTORS: NAMED RICO DEFENDANTS

829.    Actors in the Fashion Nova enterprise consist of the following RICO Defendants: Saghian, Meierhans, Riordan, Nixon Peabody, Benaron, Markel, and Intrivo, hereafter ("FNE RICO Defendants"). The FNE RICO Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

830.    **Defendant Richard Saghian** has been employed by FNE as the CEO of Fashion Nova, LLC and its subsidiaries, affiliates, and foreign branches since 2007.

    (a) <u>Conduct and Participation in FNE's affairs:</u> Saghian knowingly devised and intended to devise and participate in multiple schemes and artifices to defraud vendors, investors, customers, and employees of FN and FNL.

    (b) <u>Bribes and Kickbacks:</u> Saghian received cash bonuses in exchange for his participation in FNE's racketeering activities.

831. **Defendant Erica Meierhans** has been employed by FNE as the general counsel and compliance officer of Fashion Nova, LLC and its subsidiaries, affiliates, and foreign branches since 2018.

    (a) <u>Conduct and Participation in FNE's affairs:</u> Meierhans knowingly devised and intended to devise and participate in multiple schemes and artifices to defraud vendors, investors, customers, and employees of FN and FNL.

    (b) <u>Bribes and Kickbacks:</u> Upon information and belief, On or about July 2021, Meierhans was promoted and given a bonus in exchange for her agreement to provide perjured testimony pertaining to the undocumented workers, workers compensation fraud, and OHN program, and for her participation in in FNE's racketeering activities.

832. **Defendant Staci Riordan** is a partner at Nixon Peabody LLP and works out of the Los Angeles, California office. Riordan associates with FNE as a vendor who ordinarily provides legal services to FNE. Riordan has been providing services to FNE since 2018.

    (a) <u>Conduct and Participation in FNE's affairs:</u> Riordan knowingly devised and intended to devise and participate in multiple schemes

and artifices to defraud vendors, investors, customers, and employees of FN and FNL.

(b) Bribes and Kickbacks: Riordan received cash bonuses in exchange for her participation in FNE's racketeering activities.

833. **Defendant Nixon Peabody LLP** is a law firm that associates with FNE as a vendor that ordinarily provides legal services to FNE. Nixon Peabody associates with FNE as a vendor who ordinarily provides legal services to FNE. Nixon Peabody has been providing services to FNE since 2018.

(a) Conduct and Participation in FNE's affairs: Nixon Peabody is the employer of at least six attorneys, including at least two partners, and many of other non-named, and "Doe" RICO actors, who directly and indirectly participated in the conduct of FNE's affairs through a pattern of racketeering activity, specifically:

1. Nixon Peabody advised FNE on tax and employment law matters, including aiding with FNE's tax evasion schemes;

2. Nixon Peabody also advised FNE on health law matters, including the Joint Venture and compliance with the Cal/OSHA ETS, as described herein.

(b) Bribes and Kickbacks: Nixon Peabody received cash bonuses in exchange for its participation in FNE's racketeering activities.

834.   **Defendant Reeve Benaron** is the CEO and a Co-Founder of Intrivo and president of Socialcom.com. Benaron associates with FNE as a vendor who ordinarily provides marketing services to FNE. Benaron has been providing services to FNE since 2018.

(a) Conduct and Participation in FNE's affairs: Benaron directly and indirectly participated in the conduct of FNE's affairs through a pattern of racketeering activity, specifically:

1. Benaron agreed to offer perjured testimony in the FNL Complaint;

2. Benaron agreed to assist FN, FNL, Intrivo and Nixon Peabody with reselling the expired CSA Tests.

(b) Bribes and Kickbacks: Benaron received cash bonuses in exchange for its participation in FNE's racketeering activities.

835.   **Defendant Daniel R. Markel** is the CEO of PBG, Pure Blue Health, and a Co-Founder of Intrivo. Markel associates with FNE as a vendor who ordinarily provides marketing and financial services to FNE. Markel has been providing services to FNE since 2018.

(a) <u>Conduct and Participation in FNE's affairs:</u> Markel directly and indirectly participated in the conduct of FNE's affairs through a pattern of racketeering activity, specifically:

    1. Markel agreed to offer perjured testimony in the FNL Complaint;

    2. Markel agreed to assist FN, FNL, Intrivo and Nixon Peabody with reselling the expired CSA Tests.

(b) <u>Bribes and Kickbacks:</u> Markel received cash bonuses in exchange for its participation in FNE's racketeering activities.

836. **<u>Defendant Intrivo Diagnostics, Inc</u>** is a diagnostics company that associates with FNE as a vendor that ordinarily provides marketing of COVID-19 tests. Intrivo has been providing services to FNE since 2021.

(a) <u>Conduct and Participation in FNE's affairs:</u> Intrivo is the employer of at least four attorneys, and many of other non-named, and "Doe" RICO actors, who directly and indirectly participated in the conduct of FNE's affairs through a pattern of racketeering activity, specifically:

    1. Intrivo employees concealed the disposition of the CSA Tests from Compliance Firm and Stillwell;

2. Intrivo employees agreed to offer perjured testimony in the FNL Complaint;

3. Intrivo employees agreed to assist FN, FNL, Intrivo and Nixon Peabody with reselling the expired CSA Tests.

(b) Bribes and Kickbacks: Intrivo received cash bonuses in exchange for its participation in FNE's racketeering activities.

837. **FNE Doe Defendant RICO Actors:** Plaintiff is unaware as to the true names and identities of the FNE Doe Defendant RICO Actors. This information is known by Defendants FN, Saghian, Meierhans, Nixon Peabody, and Riordan and can be ascertained during discovery. Stillwell sues FNE Doe Defendant RICO Actors by their fictitious names, defendant Does 1 through 10 ("Doe Defendants").

(a) Conduct and Participation in FNE's affairs: The Doe Defendants knowingly devised and intended to devise and participate in multiple schemes and artifices to defraud vendors, investors, customers, and employees of FN and FNL.

(b) Bribes and Kickbacks: The Doe Defendants received cash bonuses in exchange for her participation in FNE's racketeering activities.

### 4.    FNE RICO ACTORS: NON-NAMED DEFENDANTS

838.     Actors in the Fashion Nova enterprise consist of the following non-named Defendants:

839.     Socialcom.com, doing business as AudienceX, ("AudienceX"), marketed and sold the expired CSA Tests and received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

840.     Pure Blue Medical, Inc. marketed and sold the expired CSA Tests and received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

841.     Pure Blue Diagnostics, a division of Pure Blue Health, marketed and sold the expired CSA Tests and received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

842.     Pure Blue Health & Pure Blue Diagnostics assisted Markel, Benaron, Intrivo, and FNE with marketing and selling the expired CSA Tests. Pure Blue Health currently uses the expired CSA Tests at clinics, schools, and workplaces across the country.

843.     Brian Aaron, ("Aaron"), is attorney at Nixon Peabody who concealed FN and FNL's use of the CSA Tests, and concealed Intrivo's possession of the CSA Tests from Stillwell and Compliance Firm. Aaron also devised and participated in schemes to defraud Stillwell and Compliance Firm and agreed to offer perjured testimony in the FNL Complaint. Aaron received

kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

844.    Jill Gordon, ("Gordon"), is partner attorney at Nixon Peabody. Gordon concealed FN and FNL's use of the CSA Tests, and concealed Intrivo's possession of the CSA Tests from Stillwell and Compliance Firm. Gordon also devised and participated in schemes to defraud Stillwell and Compliance Firm and agreed to offer perjured testimony in the FNL Complaint. Gordon received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

845.    Parikah P. Hash, ("Hash") is an attorney at Nixon Peabody. Hash concealed FN and FNL's use of the CSA Tests, and concealed Intrivo's possession of the CSA Tests from Stillwell and Compliance Firm. Hash also devised and participated in schemes to defraud Stillwell and Compliance Firm and agreed to offer perjured testimony in the FNL Complaint. Hash received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

846.    Andrew Holmes, ("Holmes"), is Intrivo's General Counsel who concealed Intrivo's possession of the CSA Tests from Stillwell and Compliance Firm. Holmes also agreed to offer perjured testimony in the

FNL Complaint and received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

847.    Jack Sahagian, ("Sahagian") is an attorney at Intrivo who concealed Intrivo's possession of the CSA Tests from Stillwell and Compliance Firm. Sahagian also agreed to offer perjured testimony in the FNL Complaint, and received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

848.    Matt Held, ("Held") is an attorney at Intrivo who concealed Intrivo's possession of the CSA Tests from Stillwell and Compliance Firm. Held also agreed to offer perjured testimony in the FNL Complaint and received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

849.    Lori Ott, ("Ott") is the Fashion Nova's Director of Human Resources. Ott concealed positive COVID-19 test results and agreed to offer perjured testimony in the FNL Complaint. Ott also received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell. Upon information and belief, in July 2021 Ott was promoted in exchange for perjured testimony and participation in FNE's schemes.

850.    Kim Herrera, ("Herrera") is Fashion Nova's Human Resources' Senior Business Partner. Herrera concealed positive COVID-19 test results

and agreed to offer perjured testimony in the FNL Complaint. Herrera also received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell. Upon information and belief, in July 2021 Herrera was promoted in exchange for perjured testimony and participation in FNE's schemes.

851.    Heather Salazar, ("Salazar"), a former employee of Compliance Firm and current employee of FNE concealed positive COVID-19 test results and agreed to offer perjured testimony in the FNL Complaint. Herrara also received kickbacks and bribes for participating in FNE's schemes against Compliance Firm and Stillwell.

852.    Dr. Carol L. Brosgart, M.D., ("Brosgart") and Dr. Michael J. Harbour, M.D., ("Harbour") are Co-Founders of Intrivo and ratified Intrivo's unlawful conduct described herein. Upon information and belief, Brosgart and Harbour both accepted bribes and kickbacks from AudienceX, Benaron, Markel, Intrivo and FNE in connection to Intrivo's unlawful possession and sale of the expired CSA Tests.

853.    According to Intrivo's website, Brosgart and Harbour founded Intrivo because "they were frustrated by what they perceived as a piecemeal response to the pandemic, with poor communication between federal and local agencies."

854.     A screenshot of Intrivo's website describing Brosgart and Harbour's

vision for Intrivo is below:



We are the exclusive U.S. distributor of Access
Bio's COVID-19 PCR test, which was just
granted Emergency Authorization Use by the
FDA.

In a time of great uncertainty, when even some
of the world's most trusted health institutes
lacked a unified understanding of transmission
and containment principles of COVID-19, there
has never been a greater need for leadership
from the scientific community.

Infectious disease experts Dr. Carol Brosgart,
MD, and Dr. Michael Harbor, MD, recognized this
incredible need when they founded Intrivo
Diagnostics. As public health experts, they were
frustrated by what they perceived as a
piecemeal response to the pandemic, with poor
communication between federal and local
agencies. And as humanitarians, they felt a true
calling to use their resources to make a
difference.

Powered by decades of expertise in
epidemiology and public health, Intrivo searches
out diagnostic solutions for some of the world's
most pressing health challenges. From the very
beginning, they understood that the COVID-19

855. Brosgart also sits on Intrivo's Board of Directors, according to Mirum Pharmaceutical, Inc.'s Form 8-K that was filed with the SEC on June 9, 2021,

856. Brosgart also sits on Pure Blue Diagnostics' Board of Directors, according to Galmed Pharmaceutical Ltd.'s Form 20-F that was filed with the SEC on December 31, 2020.

857. <u>Joseph Paul, ("Paul")</u>, is a recent associate chief counsel for enforcement at the FDA, and currently serves as Intrivo's Chief Regulatory Counsel. Paul is also a Co-Founder of Intrivo. Upon information and belief, Paul assisted Intrivo, Benaron, Pure Blue Medical and Markel with lobbying the FDA in connection with COVID-19 testing. Markel is currently indicted on criminal charges stemming from an FDA investigation that Paul oversaw in 2017-2019. Upon information and belief, Paul accepted bribes from AudienceX, Benaron, Markel, Intrivo and FNE in connection to Intrivo's unlawful possession and sale of the expired CSA Tests.

### 5.    FNE RICO STRUCTURE

858. Members of FNE function as a continuing unit with an ascertainable structure.

(a) FNE is currently operated and controlled by FNH, Saghian and Meierhans.

1.  Saghian is the CEO of FNH, the FN Subsidiaries, the FN Foreign Branches, the FN Shell Companies, and the FN Doe Companies. Saghian has been operating and controlling FNE since its inception on or about, June 18, 2018, when FN Logistics, Inc. was formed.

2.  Meierhans is the General Counsel and Chief Compliance Officer of FNH, the FN Subsidiaries, and the FN Shell Companies. Meierhans has been operating and controlling FNE since on or about November 2018, when Meierhans began working at FN.

3.  FNH operates and controls a majority of the shares of the FN Subsidiaries, and FN Shell Companies. FNH owns and controls a minority of the shares of the FN Affiliate Companies. FNH operates and controls ascertainable shares of the FN Doe Companies. FNH's amount of ownership and control of the Doe Defendant Companies is unknown to Stillwell but can be ascertained via discovery.

859.   **Ordinary Business:** The overall activities and ordinary business of FNE includes manufacturing, marketing, and selling clothes and cosmetics, and shipping clothes and cosmetics worldwide.

860. **Conduct Pattern of Racketeering Activity**: The ordinary business of FNE is distinct from that of the conduct pattern of racketeering activity.

(a) Racketeering Activity of FN Parent Company: FN's parent company, FNH, is used for tax evasion, tax avoidance, and used by FNE to hide FN's assets and ownership of other companies.

(b) Racketeering Activity of FN Subsidiaries: The FN Subsidiaries are used for tax evasion, tax avoidance, and used by FNE to hide FN's assets and ownership of other companies.

(c) Racketeering Activity of FN Affiliate Companies: The FN Affiliate Companies are used for tax evasion, tax avoidance, and used by FNE to hide FN's assets and ownership of other companies

(d) Racketeering Activity of FN Shell Companies: The FN Shell Companies are used for tax evasion, tax avoidance, and used by FNE to hide FN's assets and ownership of other companies.

(e) Racketeering Activity of FN DOE Companies: The FN Shell Companies are used for tax evasion, tax avoidance, and used by FNE to hide FN's assets and ownership of other companies.

861. **Common Objectives and Purpose:** The objectives and common purpose of FNE is to maximize Fashion Nova, LLC's profits so that FNE

owners, investors, shareholders, and RICO Actors can profit through bribes and kickbacks from their participation in FNE's racketeering.

862. **Common Methods:** FNE achieved and continues to achieve its common objectives and common purpose to maximize FN's profits by creating schemes and artifices to defraud customers, creditors, vendors, employees, investors, and taxpayers by:

(a) Evading and avoiding payroll and sales taxes to retain maximum profits;

(b) Using undocumented workers to keep labor costs down;

(c) Worker's compensation fraud to decrease cost of insurance premiums;

(d) Using mail fraud and wire fraud to mislead, deceive, and defrauding customers, employees, vendors, creditors, and investors; specifically:

1. Charging customers for services, such as expedited shipping, when the service is known to be unavailable;

2. Charging customers for retail items that are known to be out-of-stock and refusing to refund customers' monies;

3. Non-payment of employee wages, despite employees providing proof of their earned wages;

4.  Non-payment of vendor invoices for services provided by vendors;

5.  Misrepresentation of financial records to investors, to solicit and raise capital and unregistered securities; and

6.  Committing stifling, unfair business practices against competitors.

863.  **Interstate Commerce:** The ordinary business and activities of FNE affect interstate and foreign commerce because wires and mails are used by FNE to market, sell, and ship merchandise. Raw materials to manufacture clothes sold by FNE are purchased from China and shipped to FNE's garment shops located in California.

864.  The racketeering activities of FNE affect interstate and foreign commerce because wires and mails are used by FNE to defraud and in furtherance of FNE's schemes, objectives, and common purpose.

865.  FN, FNH, 2801-LLC, 1360-LLC, SMC, FNL, UFF, and FNX, hereafter, ("Fashion Nova Enterprise") constitute an "enterprise" within the meaning of 18 U.S.C. §1961(4) because they are corporations and are associated in fact. Members of the Fashion Nova Enterprise, ("FNE"), are indispensable and function as a continuing unit for a common purpose of achieving the objectives of FNE.

866.    FNE is an enterprise engaged in activities of which affect interstate and foreign commerce, as defined by 18 U.S.C § 1961(4).

867.    FNE's use of deceit and fraudulent means, such as schemes and artifices wire fraud and mail fraud, are the enterprise's regular way of doing business, and capable of repetition.

868.    FNE has been in operation as a racketeering enterprise for over two years, since at least June 18, 2018, when FN Logistics, Inc. was formed to avoid and evade taxes. The enterprise has been restructured several times since its inception in 2018, with many RICO actors participating in schemes on and-on-and off basis over the course of more than two years.

869.    FNE was most recently restructured in December 2020 for fraudulent and deceptive reasons, including, but not limited to tax evasion and tax avoidance.

870.    FN is an entity separate and apart from the pattern of activity in which it engages

871.    FNL is an entity separate and apart from the pattern of activity in which it engages

872.    Nixon Peabody is an entity separate and apart from the pattern of activity in which it engages

873.   Intrivo is an entity separate and apart from the pattern of activity in which it engages

### 6.   FNE RELATED SCHEMES AND ARTIFICES

874.   **STATE UNEMPLOYMENT TAX ACT ("SUTA") DUMPING SCHEME**: In 2020, FNE created over sixteen (16) shell companies to obtain lower insurance premiums for worker compensation and unemployment.

875.   FNE registers new companies and reports a small payroll for at least one year, or until the minimum unemployment rate is achieved.

876.   FNE created the following sixteen (16) shell companies in the last eighteen (18) months to evade taxes and obtain lower insurance premiums:

| DATE | STATE | ENTITY NAME |
|------|-------|-------------|
| 08/15/2019 | Delaware | FN EXPRESS, INC |
| 01/02/2020 | California | FN EXPRESS, INC |
| 02/4/2020 | Delaware | FASHION NOVA F21 ACQUISITION LLC |
| 06/24/2020 | California | NOVA 21 LLC |
| 12/15/2020 | Delaware | FASHION NOVA HOLDINGS, LLC |
| 12/15/2020 | Delaware | FNL, INC. |
| 12/15/2020 | California | NOVA FASHION, INC |
| 12/17/2020 | Delaware | NOVA 1 OWNER LLC |
| 12/17/2020 | Delaware | NOVA 2 OWNER LLC |
| 12/30/2020 | Delaware | FN LOGISTICS, LLC |
| 12/31/2020 | California | FASHION NOVA, LLC |
| 03/12/2021 | California | NOVA 21, INC |

| 03/23/2021 | Delaware | NOVA 21 LLC |
| 04/13/2021 | California | FASHION NOVA HOLDINGS, LLC |
| 04/13/2021 | California | FN LOGISTICS, LLC |
| 04/23/2021 | California | FNL, INC. which will be doing business in California as FNL HOLDINGS, INC |

877.    SUTA (State Unemployment Tax Act) dumping, one of the biggest issues facing the Unemployment Insurance (UI) program, is a tax evasion scheme where shell companies are formed and creatively manipulated to obtain low UI tax rates. When a low rate is obtained, payroll from another entity with a high UI tax rate is shifted to the account with the lower rate. The entity with the higher rate is then "dumped." Such abusive schemes leave other employers making up for the unpaid tax. SUTA dumping is also referred to as state unemployment tax avoidance and tax rate manipulation.

878.    **X-MOD EVASION SCHEME**: Saghian and Meierhans devised schemes to misrepresent FN and FNL workers' compensation claims history by not reporting reportable injuries or by creating shell companies to give the impression of a non or low claims history to obtain workers' compensation coverage at a lower premium.

879.    **UFF, LLC AND THE CITY OF WHITTER 20-YEAR ECONOMIC DEVELOPMENT SCHEME**: In 2019, Fashion Nova created UFF, LLC ("UFF") as a shell company to evade taxes. Just two

months after incorporation, Saghian and Robert E. Cendejas ("Cendejas")

brokered a twenty-year, multimillion dollar tax agreement with the city of

Whitter, ("Whittier Agreement"). Under the Whittier Agreement, the city

pays UFF 50% of the expected $2,000,000.00 that UFF's *non-existent* call

center generates each year.

880.    Whittier then pays Cendejas 20% of the $1,000,000.00 million that

remains for the city. Under the agreement, UFF and the City of Whittier

estimated that the twenty-year agreement "will initially create five (5) to ten

(10) full times jobs in the City of Whittier."

881.    UFF, LLC is a shell company and does not have any employees and

does not provide any services. The Whittier Agreement was a fraudulent

scheme in furtherance of FNE's common purposes.

882.    According to Whittier's City Council Agenda Report, dated

December 10, 2019, "Per Mr. Cendejas, UFF is one of the fastest growing

fashion brands in the US. They were the #1 most-searched fashion brand on

Google in 2018. The company provides affordable clothing for men and

women, including dresses, jeans, swimsuits, active wear, shoes, and

accessories both in-store and online." This is the same description that

Saghian uses to describe Fashion Nova.

883.     A true and correct copy of the City of Whittier's City Council Agenda Report dated December 10, 2019, is attached as Exhibit Z and incorporated by reference.

884.     **CALIFORNIA COMPETES TAX CREDIT ("CCTC")**

**SCHEME:** In 2019 Saghian and Meierhans devised schemes to defraud the state of California out of $13,000,000.00 is tax credits under the CCTC tax program. At the request of Saghian and Meierhans, FNL provided false information and suborned perjury on its CCTC application and hearing.

885.     Under the five-year CCTC agreement, FNL received tax credits to hire 3,079 employees. Saghian cancelled FNL's qualification on April 22, 2021, after claiming tax credits in 2019 and 2020 and three years shy of its five-year CCTC commitment.

886.     A true and correct copy of FN Logistics, Inc Certificate of Surrender, filed by Saghian, is attached as Exhibit AA and incorporated by reference.

887.     FNL never intended to hire 3,079 employees and misrepresented temporary employees as full-time employees in order to avoid taxes, and in furtherance of FNE's purpose.

888.     FNL also paid employees less than $15.00 per hour, which is less than the hourly rate the CCTC proscribes.

889.     A true and correct copy of FNL's CCTC tax agreement is attached as

Exhibit BB and incorporated by reference.

890.     **FEDERAL TRADE COMMISSION ("FTC") NON-**

**COMPLIANCE SCHEME:** In 2019, FN settled at $9,000,000.00 case with

the Federal Trade Commission ("FTC") over defrauding its customers.

According to section VIII of the court order:

"VIII. COMPLIANCE REPORTING IT IS FURTHER ORDERED

that Defendant make timely submissions to the Commission:

A. One year after entry of this Court Order, Defendant must submit a

compliance report, sworn under penalty of perjury.

1. Defendant must: (a) identify the primary physical, postal, and email

address and telephone number, as designated points of contact, which

representatives of the Commission may use to communicate with

Defendant; (b) identify all of Defendant's businesses by all of their

names, telephone numbers, and physical, postal, email, and Internet

addresses; (c) describe the activities of each business, including the

goods and services offered, the means of advertising, marketing, and

sales, whether these businesses involve Mail, Internet or Telephone

Order Sales; (d) describe in detail whether and how Defendant is in

compliance with each Section of this Court Order; and (e) provide a

copy of each Order Acknowledgment obtained pursuant to this Court Order, unless previously submitted to the Commission.

B. For 10 years after entry of this Court Order, Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following: 1. Defendant must report any change in: (a) any designated point of contact; or (b) the structure of Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Court Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Court Order.

C. Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Defendant within 14 days of its filing.

D. Any submission to the Commission required by this Court Order to be sworn under penalty of perjury must be true and accurate and

comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  " and supplying the date, signatory's full name, title (if applicable), and signature.

891.　Saghian and Meierhans devised schemes to conceal FN's ownership of certain business domestically and internationally, and suborned perjured statements from FN executives that were submitted to the FTC pursuant to the court order.

892.　Saghian and Meierhans also concealed FN's ownership interest in QuadPay and Forever 21, and concealed FN's "merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices" pursuant to section VIII of the court order.

893.　Upon information and belief, Saghian and Meierhans concealed FN and Saghian's ownership in Forever 21 in the shell company, F21 Acquisition, LLC, a Delaware corporation.

894.　The FTC reporting requirements are "sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746." Saghian and Meierhans suborned perjury in their attempt to avoid FTC compliance, in furtherance of FNE's purpose.

895.     A true and correct copy of FN's FTC court order and permanent

injunction is attached as Exhibit CC and incorporated by refence.

## J.   FNE RICO DEFENDANTS CONTINUOUS PATTERN OF RACKETEERING ACTIVITY

896.     Pursuant to 18 U.S.C.§ 1962(c), "It shall be unlawful for

any person employed by or associated with any enterprise engaged in, or the

activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs

through a pattern of racketeering activity or collection of unlawful debt.

897.     Each of the FNE RICO Defendants are "persons" within the meaning

of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity

capable of holding a legal or beneficial interest in property."

898.     Each of the FNE RICO Defendants are "persons" within the meaning

of 18 U.S.C.§ 1962(c).

899.     18 U.S.C. § 1961(4), defines an enterprise as any individual,

partnership, corporation, association, or other legal entity, and any union or

group of individuals associated in fact although not a legal entity; FNE is an

"enterprise" within the meaning of 18 U.S.C. § 1961(4), whose activities

affect interstate and foreign commerce.

900.    18 U.S.C. § 1961(1), defines "racketeering activity" as (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code…"

901.    Wire Fraud in violation of 18 U.S.C. 1343 in an indictable act under title 18 of the United States Code and is considered "racketeering activity" pursuant to 18 U.S.C. § 1961(1)(B).

902.    Pursuant to 18 U.S.C. 1343, Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both"

903.    The FNE RICO Defendants agreed to and did conduct and participate in the conduct of the FNE and AudienceX enterprise's affairs through a

pattern of racketeering activity and for the unlawful purpose of using

internet and wire to intentionally defraud Compliance Firm and Stillwell of

money, in violation of 18 U.S.C. § 1343.

904.     The FNE RICO Defendants conducted and participated in the conduct

of the affairs of the FNE enterprise through a pattern of racketeering activity

in the following specific instances below:

## PREDICATE ACT: WIRE FRAUD IN VIOLATION OF 18 U.S.C. § 1343

905.     **SCHEME #1: TAX EVASION:** On or about June 2018 Saghian

voluntarily and intentionally devised a scheme to evade and state and federal

taxes. Saghian acted with the intent to defraud the State of California, the

United States of America, and its payroll processors. It was reasonably

foreseeable that interstate wire communications would be used. Interstate

wire communications were in fact used in furtherance of this scheme on the

following dates:

906.     On or about February 29, 2019, Saghian used, or caused interstate

wire communications to be used, to incorporate UFF, LLC, a shell company

in Delaware, to hide assets and evade taxes in furtherance of Scheme #1.

907.     On or about March 4, 2019, Saghian used or caused interstate wire

communications to be used, to register UFF, LLC in California as a foreign

limited liability company to hide assets and evade taxes in furtherance of Scheme #1.

908.     On or about September 23, 2019, Saghian used or caused interstate wire communications to be used, to submit a Form LLC-12, Statement of Information, for UFF, LLC to the California Secretary of State, in furtherance of Scheme #1.

909.     On or about January 5, 2021, Meierhans used interstate wire communications to inform Stillwell that FNL would not be paying any invoices that were related to oral contracts, including the reimbursement of FN and FNL's fourth quarter 2020 payroll taxes, that Compliance Firm paid on behalf of FNL, in in furtherance of Scheme #1.

910.     On or about February 18, 2021, Meierhans used interstate wire communications to submit a Form LLC-12NC, Statement of No Change for UFF, LLC to the California Secretary of State, in furtherance of Scheme #1.

911.     On or about April 13, 2021- Meierhans used interstate wire communications to register FN Logistics, LLC as a foreign limited liability company in California in furtherance of FNE's schemes as described herein. At the time this suit was filed, Meierhans intentionally has not file the Statement of Information – to shield true ownership of FNL and in furtherance of schemes to defraud Stillwell and Compliance Firm

912.    April 23, 2021 - Meierhans used interstate wire communications to register FNL, Inc., which will be doing business in California as FNL HOLDINGS, INC as a foreign limited liability company in California in furtherance of Scheme #1 and Scheme #2.

913.    **SCHEME #2: X-MOD EVASION**: On or about January 2019, Saghian and Meierhans voluntarily and intentionally devised a scheme to obtain lower worker compensation premiums by misrepresenting claims history, not reporting reportable injuries, creating shell companies to give the impression of a non or low claims history, and by misclassifying employees to obtain workers' compensation coverage at a lower premiums.

914.    Saghian and Meierhans acted with the intent to defraud its employees, insurer, CompWest, and the State of California and the United States of America and it was reasonably foreseeable that interstate wire communications would be used. Wire communications were in fact used in furtherance of this scheme on the following dates:

915.    On or about January 1, 2020, Meierhans used interstate wire communications to instruct Ott to avoid reporting certain workplace injuries, because the injuries were contributing to higher X-Mod rates, which caused insurance premiums to rise, in furtherance of Scheme #2.

916.     On or about September 2020, Saghian used interstate wire communications to instruct Meierhans to conceal the true number of positive COVID-19 cases outbreak to prevent employees from missing work due to fear of infection, prevent employees from filing unemployment and prevent employees from filing work compensation claims.

917.     On or about September 2020, Meierhans used interstate wire communications to instruct Ott to conceal the true number of positive COVID-19 cases listed in the COVID-19 Associates Letters, in furtherance of Scheme #2. Each COVID-19 Associate Letter was a separate act in furtherance of FNE's schemes.

918.     **SCHEME #3: FORCED LABOR TO INCREASE PROFIT IN VIOLATION OF 18 U.S. CODE § 1589:** On or about January 1, 2018, Saghian devised schemes to use undocumented workers in FN and FNL's warehouses in order to increase profit margins and in furtherance of FNE's schemes.

919.     On or about December 1, 2020 – Saghian used wires or internet to message an employee in Finance to withdraw $100,000.00 in $100 and $50 bills to be delivered to FNL's Santa Fe Springs warehouse, to pay employees in cash. FN paid employees in cash and did not report the wages to the IRS to evade payroll taxes, in furtherance of FNE's schemes.

a) On or about December 4, 2020, Ott send an email in connection to a 100,000 sweepstakes in furtherance of Scheme #3.

920.     **SCHEME #4: FRAUDULENTLY DISPUTE AND WITHHOLD $10M IN FN VENDOR PAYMENTS**: On or about December 1, 2019, Saghian, Meierhans and the Doe Defendants voluntarily and intentionally devised a scheme to fraudulently withhold over $10,000,000.00 in payments that were owed to FN vendors, in order to misrepresent FN's profit margins to investors. Saghian, Meierhans and the Doe Defendants acted with the intent to defraud FN vendors and contractors, and it was reasonably foreseeable that interstate wire communications would be used. Wire communications were in fact used in furtherance of this scheme on the following dates:

921.     On or about December 1, 2020, Saghian instructed Meierhans to dispute valid invoices to avoid or delay payments to vendors.

922.     On or about December 1, 2020, Saghian instructed FN finance employees to hold payments from FN's larger vendors, including UPS, FedEx, Randstad, OneLive, Logistics Co I that flaked and Adecco, and any invoices that exceeded $500,000.00.

923.     On or about December 1, 2020, Meierhans instructed FN employees to hold payments to Compliance Firm and Stillwell in furtherance of FNE's

schemes. Meierhans also instructed FN executives and supervisors to not approve any more invoices from Compliance Firm or Stillwell

924.     Each email and wire communication from Meierhans and Saghian described herein was in furtherance of FNE's schemes.

925.     Each email and wire communication from Riordan, Aaron, Nixon Peabody, Intrivo, Benaron, and Markel described herein was in furtherance of FNE's schemes.

926.     Each email and wire communication from a FNE RICO Defendant described herein was in furtherance of FNE's schemes.

927.     **SCHEME #5: CSA TESTS SCHEME:** On or about January 1, 2021, Saghian, Meierhans, FN, and FNL voluntarily and intentionally devised a scheme to use the CSA Tests with other vendors, then fraudulently dispute the invoice for the CSA Tests.

928.     Saghian, Meierhans, FN, and FNL acted with the intent to defraud Stillwell and Compliance Firm, and it was reasonably foreseeable that interstate wire communications would be used. Wire communications were in fact used in furtherance of this scheme on the following dates:

929.     On or about February 1, 2021, Saghian, Meierhans, Nixon Peabody, Riordan, and Aaron voluntarily and intentionally devised a scheme to misrepresent the legality of the CSA sale by falsely alleging that

930.     Saghian, Riordan, Meierhans, Nixon Peabody, Aaron, and the Doe Defendants acted with the intent to defraud Stillwell and Compliance Firm, and it was reasonably foreseeable that interstate wire communications would be used. Wire communications were in fact used in furtherance of this scheme, as described herein.

931.     Each email and wire communication from Meierhans and Saghian described herein was in furtherance of FNE's schemes.

932.     Each email and wire communication from Riordan, Aaron, Nixon Peabody, Intrivo, Benaron, and Markel described herein was in furtherance of FNE's schemes.

933.     Each email and wire communication from a FNE RICO Defendant described herein was in furtherance of FNE's schemes.

934.     **SCHEME #6 STOLEN GOODS** On or about March 1, 2021, the Defendants each voluntarily and intentionally devised a scheme to fraudulently convert Compliance Firm's medical supplies and PPE that were located at FN and FNL's Santa Fe Springs warehouse, as described herein.

935.     Benaron, Markel and Intrivo advertised the stolen CSA Tests over twenty (20) separate occasions via Twitter from Intrivo's Twitter account, @Intrivo, and from Pure Blue Health's Twitter account, @PureBlueHealth.

936.        Screenshots of some of the Twitter advertisements are below:



SCHEDULE AN APPOINTMENT

Locate a testing location near you and book online or by calling the location directly, or our national service number 844-TEST BLU. Bring your ID and insurance cared (if you have one) to the site and receive test.

#healthcare #health #insurance



2:59 PM · 4/25/21 · Twitter for iPhone



COVID-19 TESTS

We currently offer the Rapid Antigen Test and Antibody Tests. (PCR Tests coming soon.) All test kits are manufactured in the U.S. and EUA-approved.

#covid #testing #medicaldevices #research #purbluehealth



8:42 AM · 4/17/21 · Twitter for iPhone



Our professionals set up at your location to keep you Covid Free and OPEN FOR BUSINESS. Contact Pure Blue Health for more information!

#CovidTesting #covidtest #medical #testing #openforbusiness



10:49 AM · 4/28/21 · Twitter for iPhone

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16







17   937.    Each Defendant acted with the intent to defraud Stillwell and

18   Compliance Firm, and it was reasonably foreseeable that interstate wire

19   communications would be used. Wire communications were in fact used in

20   furtherance of this scheme as described herein.

22   938.    Each email and wire communication from Meierhans and Saghian

23   described herein was in furtherance of FNE's schemes.

24
25
26
27
28

939.     Each email and wire communication from Riordan, Aaron, Nixon Peabody, Intrivo, Benaron, and Markel described herein was in furtherance of FNE's schemes.

940.     Each email and wire communication from a FNE RICO Defendant described herein was in furtherance of FNE's schemes.

941.     **SCHEME #7 FNL COMPLAINT:** On or about March 2021, Saghian, Meierhans, and Riordan voluntarily and intentionally devised a scheme to defraud Stillwell and Compliance Firm of the intangible right of honest services of FN and FNL. Saghian, Meierhans, and Riordan acted with the intent to defraud Stillwell and Compliance Firm and it was reasonably foreseeable that interstate wire communications would be used. Wire communications were in fact used in furtherance of this scheme as described herein.

942.     Each email and wire communication from Meierhans and Saghian described herein was in furtherance of FNE's schemes.

943.     Each email and wire communication from Riordan, Aaron, Nixon Peabody, Intrivo, Benaron, and Markel described herein was in furtherance of FNE's schemes.

## PREDICATE ACT: TRANSPORTATION OF STOLEN GOODS IN

## VIOLATION OF 18 U.S.C. § 2314

944.    According to 18 U.S.C. § 2314,

"Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more…Shall be fined under this title or imprisoned not more than ten years, or both. If the offense involves a pre-retail medical product (as defined in section 670) the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under this section is greater.

"Money" means the legal tender of the United States or of any

foreign country, or any counterfeit thereof; 18 USC § 2311"

"Value" means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof. 18 USC § 2311"

945.   The FNE RICO Defendants violated 18 U.S.C. § 2314 by devising schemes, described herein, to defraud, obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000.

## PREDICATE ACT: THEFT OF MEDICAL PRODUCTS IN VIOLATION OF 18 U.S.C. § 670

946.   Pursuant to 18 U.S.C. § 670(a),

"Whoever, in, or using any means or facility of, interstate or foreign commerce—

1. embezzles, steals, or by fraud or deception obtains, or

knowingly and unlawfully takes, carries away, or conceals a pre-retail medical product;

2. knowingly and falsely makes, alters, forges, or counterfeits the labeling or documentation (including documentation relating to origination or shipping) of a pre-retail medical product;

3. knowingly possesses, transports, or traffics in a pre-retail medical product that was involved in a violation of paragraph (1) or (2);

4. with intent to defraud, buys, or otherwise obtains, a pre-retail medical product that has expired or been stolen;

5. with intent to defraud, sells, or distributes, a pre-retail medical product that is expired or stolen; or

6. attempts or conspires to violate any of paragraphs (1) through (5); shall be punished as provided in subsection (c) and subject to the other sanctions provided in this section.

**(b)Aggravated Offenses.—**An offense under this section is an aggravated offense if— (1)the defendant is employed by, or is an agent of, an organization in the supply chain for the pre-retail medical product;

**(d)Civil Penalties.**—Whoever violates subsection (a) is subject to a civil penalty in an amount not more than the greater of—

1. three times the economic loss attributable to the violation; or

2. $1,000,000.

**(e) Definitions.**—In this section—

(1) the term "pre-retail medical product" means a medical product that has not yet been made available for retail purchase by a consumer;

(2) the term "medical product" means a drug, biological product, device, medical food, or infant formula;

(6) the term "supply chain" includes manufacturer, wholesaler, repacker, own-labeled distributor, private-label distributor, jobber, broker, drug trader, transportation company, hospital, pharmacy, or security company

947.     The CSA Tests were pre-retail medical products and a medical product as defined by 18 U.S.C. § 670(e). The CSA Tests costs more than $5,000.00.

948.     Compliance Firm's medical supplies and PPE that was taken from FN and FNL's warehouse are medical products as defined by 18 U.S.C. § 670(e). The medical supplies costs more than $5,000.00.

949.     Access Bio, Inc., Intrivo, Benaron, Markel, Riordan, Aaron, and Nixon Peabody held Intrivo out to be part of the supply chain as defined by 18 U.S.C. § 670(e)(6).

950.     The FNE RICO Defendants violated 18 U.S.C. § 670 by devising schemes, described herein, to defraud, obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000.

**PREDICATE ACT: SALE OF STOLEN GOODS IN VIOLATION OF 18 U.S.C. § 2315**

951.     Pursuant to 18 U.S.C. 2315,

"Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan

any goods, wares, or merchandise, or securities, of the value of $500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken… Shall be fined under this title or imprisoned not more than ten years, or both. If the offense involves a pre-retail medical product (as defined in section 670) the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under this section is greater."

952.    The FNE RICO Defendants violated 18 U.S.C. § 2315 by devising schemes, described herein, to defraud, obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000.

## PREDICATE ACT: CONSPIRACY IN VIOLATION OF 18 U.S.C. § 1962(d)

953.    Pursuant to 18 U.S.C. § 1962(d), "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section"

954.    Each of the FNE RICO Defendants conspired to commit the aforementioned predicate acts, as described herein.

## PREDICATE ACT: AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2

955.    Pursuant to 18 U.S.C. § 2

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b)Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The term "United States", as used in this title in a territorial sense, includes all places and waters, continental or insular, subject to the

jurisdiction of the United States, except the Canal Zone. 18 U.S. Code § 5"

956.    Each of the FNE RICO Defendants' conduct described herein was a violation of 18 U.S.C. § 2.

## PREDICATE ACT: ACCESSORY AFTER THE FACT, 18 U.S.C. § 3

957.    Pursuant to 18 U.S.C. § 3, "Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."

958.    Each of the FNE RICO Defendants' conduct described herein was a violation of 18 U.S.C. § 3.

## PREDICATE ACT: 18 U.S.C. § 4 - MISPRISION OF FELONY

959.    Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

960.     Each of the FNE RICO Defendants' conduct described herein was a violation of 18 U.S.C. § 4.

### FNE'S RACKETEERING ACTIVITY REPETITIVE AND ONGOING

961.     The predicate acts set forth above are all indictable act under Title 18 of the United States Code and are considered "racketeering activity" pursuant to 18 U.S.C. § 1961(1)(B). These acts also constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

962.     The conduct of FNE is open and repetition is likely to continue because the racketeering activity is a normal way of doing business for FNE.

963.     Each FNE member knew of the others' activities, and each FNE member knew that the other entities were involved in fraud.

964.     Each FNE RICO Actor and each FNE RICO Defendant knew of the others' activities, and each FNE RICO Actor knew that the other entities were involved in fraud.

965.     The FNE RICO Defendants worked together in an indispensable and integrated manner to mutually engage in wrongful acts, in that: (1) the success of the FNL Complaint could not have occurred without all of them acting together because each of them performed a necessary part of the

transaction; (2) each predicate act involved coordination to conceal material facts.

966. Further information regarding the roles of the FNE RICO Defendants' is within the exclusive possession of the Defendants.

967. Each of the FNE members knew about the general nature of the enterprise and knew that the enterprise extended beyond their individual role.

968. Each of the FNE RICO Defendants knew about the general nature of the enterprise and knew that the enterprise extended beyond their individual role.

969. The nature and structure of FNE's schemes was known to each of the FNE RICO Defendants, as evidenced by their extensive communications described in detail herein.

970. The FNE RICO Defendants knew about the entirety of the enterprise because they hired the vendors used to support the schemes and conspiracies.

971. The FNE Enterprise functioned as a continuing unit because the formal and informal relationships that lasted for a long of period of time, at least from April 2018, until the date this lawsuit was filed on August 30, 2021.

972.     FNE also qualifies as a closed-ended enterprise because the predicate acts occurred over a period exceeding a year and a half, from April 2018, to the date suit was filed.

973.     The FNE Enterprise qualifies as an open-ended enterprise, in that it was actively continuing to commit predicate acts as of the date of the filing of this lawsuit, including actively enforcing a default judgment against Compliance Firm, that was obtained by the fraud and schemes described herein.

974.     FNE's past conduct by its nature poses a threat of repetition not only because the conduct has continued post-suit, but because the FNE members and FNE RICO Defendants' businesses have been structured around fraud and schemes, as described herein.

975.     Committing the predicate acts described herein has become a regular way of doing business for FNE and the FNE RICO Defendants and is thus repetition likely to recur.

976.     Each of the FNE RICO Defendants committed, conspired to commit, and agreed to the commission of at least two predicate acts.  Each FNE RICO Defendant had a specific intent to deceive or defraud.

977.     Each FNE RICO Defendant agreed to the commission of the aforementioned predicate acts and intended that they occur.

COMPLAINT
- 254 -

978.     The purpose of these each internet or wire transmissions described herein, was to obtain money from Stillwell or Compliance Firm, and the transmissions were made in furtherance of FNE's schemes to defraud.

979.     The services provided to FNE by the FNE RICO Defendant, in connection to Stillwell and Compliance Firm, went beyond ordinary business transactions because it was combined with other services which required knowledge of and direct participation in the fraud, conspiracies and schemes against Stillwell and Compliance Firm.

980.     Each FNE RICO Defendant had a specific intent to deceive or defraud. Each FNE RICO Defendant agreed to the commission of these predicate acts and intended that they occur.

981.     The place of origination of the transmissions is unknown, but the FNE members and FNE RICO Actors and FNE RICO Defendants are located in California, and their wire communications were transmitted to each other and unknown persons in the United States via United States wire.

982.     The purpose of these transmissions was to defraud Stillwell and Compliance Firm, and the transmissions were made in furtherance of FNE's overall purposes to scheme and to defraud.

983.     Plaintiff is unable to fully plead details of all of FNE's predicate

acts because the facts are largely within the possession of the Defendants, but the examples herein are representative and show that the predicate acts committed against Plaintiff were part of a long-running pattern which was ongoing as of the date of filing of this lawsuit and has continued post-suit, and is  thus likely to recur.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

FORCED LABOR, 18 U.S.C. § 1589(a)(2) and

CIVIL REMEDY, 18 U.S.C. § 1595

(*Against Defendants Saghian, Meierhans, FN, and FNL*)

984.    Stillwell restates and incorporates the allegations from the paragraphs 1-983 above, as if they were stated in full herein.

985.    Plaintiff brings this cause of action against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC (4) FN Logistics, LLC ("Count I  Defendants") for forced labor in violation of 18 U.S.C. § 1589(a)(2).

986.    18 U.S.C. § 1589(a)(2) provides that it is unlawful to knowingly provide or obtain the labor or services of a person by means of serious harm or threats of serious harm to that person or another person.

987.     The term "serious harm" is defined in 18 USC § 1589(c)(2) as

"any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."

988.     The Count I Defendants intentionally and knowingly recruited Stillwell for the purpose of obtaining forced labor or services from Stillwell under the Joint Venture, OHN Consultancy Agreement and COVID-19 Consultancy Agreements.

989.     The Count I Defendants obtained the labor or services of Stillwell by means of serious harm or threats of serious harm to Stillwell and Compliance Firm, as set described herein and set forth below.

990.     On or about August 27, 2020, Ott threatened to harm Stillwell's reputation and caused Stillwell psychological harm by misrepresenting Stillwell's traumatic sexual assault experience as "prostitution" after Stillwell made several complaints about sexual harassment, safety concerns, and discriminatory hiring practices. Ott agreed to allow Stillwell and Compliance Firm to continue providing FN and FNL services if

Stillwell could de-escalate litigation threats that were made by a Leased Employee who was discriminated against because of a physical disability. On or about August 28, 2020, Ott instructed Stillwell to review the training procedures and safety policies for the cherry pickers and ensure Cal/OSHA compliance. Ott refused to compensate Stillwell for her labor as punishment and retaliation for Stillwell's complaints to Cal/OSHA.

991.    Ott and Meierhans continued to spread rumors about Stillwell being a fraud, "snitch" an "overpriced prostitute," which Stillwell perceived as a mocking of the Turtleboy Article about Stillwell being a victim of rape and sex trafficking.

992.    On or about September 8, 2020, after Stillwell raised concerns about worker compensation fraud, Ott, FN's Director of Human Resources, threatened to disaffirm the Leasing Agreement and report Compliance Firm for not carrying Workers Compensation for the Leased Employees if Stillwell didn't "fix" things with the OHN program. Under the Leasing Agreement, FN agreed to cover the leased Compliance Firm employees under its Comp West worker compensation policy ending in 3123. Stillwell agreed to the OHN Consultancy Agreement due to fear that Ott and FN would refuse to honor the terms of the Leasing Agreement, under which FN agreed to indemnify Compliance Firm in employment lawsuits,

reimbursement for all payroll expenses and taxes, and NET 15 payment terms. Under the OHN Consultancy Agreement, Stillwell was to be paid $175.00

993.     On or about September 11, 2020, Ott, Meierhans and FN threatened to terminate all Compliance Firm agreements and sue Compliance Firm for breach of contract, negligence, and fraud if Stilwell reported the FN or the OHN for being FN's worker compensation schemes.  Ott then refused to approve any of Compliance Firm's invoices, because Stillwell refused to sign a non-disclosure agreement ("NDA") that contained an arbitration agreement that would've bound Stillwell and Compliance Firm. Ott's refusal to approve Compliance Firm invoices resulted in Compliance Firm going nearly 90 days without payment for services it provided FN and FNL. Eventually Ott was removed from the approval process of Compliance Firm's invoices.

994.     On or about October 5, 2020, Ott told Stillwell FN was interested in salvaging the relationship if Stillwell could help with creating a Reasonable Suspicion policy with training materials for the security team – Stillwell agreed.

995.     On or about October 7, 2020, Ott asked Stillwell to develop a Department of Transportation ("DOT") compliant drug screen program. On

October 20, 2020, Ott and Meierhans asked Stillwell to assist with "putting on a Flu clinic." Meierhans and Ott demanded both projects be completed by November 1, 2020.

996.     On or about December 28, 2020, Ott, Meierhans, FNL and FN threatened to leverage its social media clout to cause reputational harm to Stillwell and Compliance Firm if Stillwell continued to pursue legal claims against FN, as alleged herein.

997.     From November 1, 2020, to January 5, 2021, Stillwell was asked and provided the following services:

(a) Create a CPR/ First Aid / AED training program

(b) Create a Cal/OSHA compliant COVID-19 IIPP program

(c) Create a respiratory care plan

(d) Life Safety and Fire Safety training program

(e) Emergency Response policy

(f) Create an on-site COVDI-19 testing site

998.      Stillwell completed all projects and assignments the Count I Defendants asked of her out of fear of phycological, financial and reputational harm as threatened by the Count I Defendants.

999.      Stillwell spent two hundred and forty (240) hours providing the services described herein but was never compensated for her labor or

services.

1000.     In January 2021, FN refused to honor oral agreements unless Stillwell signed an NDA that contained an arbitration agreement, and an indemnity agreement.

1001.     Saghian, Meierhans, FN and FNL each knowingly recruited Stillwell for the purposes of obtaining forced labor or services from Stillwell by means of serious harm or threats of serious harm to Stilwell and Stillwell's company, Compliance Firm.

1002.     Saghian, Meierhans, FN and FNL each condoned, ratified, and encouraged the unlawful conduct described herein.

1003.     18 U.S.C. § 1594(a) provides that whoever attempts to violate 18 U.S.C. § 1589 shall be punishable in the same manner as a completed violation of that section.

1004.     Saghian, Meierhans, FN and FNL each knowingly attempted to obtain the labor or services of Stillwell by means of serious harm or threats of serious harm to Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(2).

1005.     18 U.S. Code § 1594(b) provides that whoever conspires with another to violate 18 U.S.C. § 1589 shall be punished in the same manner as a completed violation of such section.

1006.    Saghian, Meierhans, FN and FNL each knowingly conspired to obtain the labor or services of Stillwell by means of serious harm or threats of serious harm to Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(2).

1007.    18 U.S.C. § 1595(a) provides that

> "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."

1008.    Stillwell, an individual, is a victim of a violation of 18 U.S.C.1589(a)(2), 18 U.S. Code § 1594(a), and 18 U.S. Code § 1594(b), as described in 18 U.S.C § 1595(a).

1009.    Saghian, Meierhans, FN and FNL are the perpetrators that victimized and benefited from Stillwell's labor or services in violation of 18 U.S.C.1589(a)(2), 18 U.S. Code § 1594(a), and 18 U.S. Code § 1594(b).

1010.    Saghian, Meierhans, FN and FNL each knowingly benefitted, financially or received something of value from participation in ventures

and schemes, which each of them knew or should have known, were in violation of the United States Code, Title 18, Chapter 77, specifically 18 U.S.C. § 1589(a)(2).

1011.   The Count I Defendants' conduct as described herein was malicious and oppressive and done with a conscious disregard of Stillwell rights. The Count I Defendants' acts were designed to humiliate and oppress Stilwell; and they had that effect.

1012.   Cal. Civil Code. Section 236.1(f) provides that a prevailing plaintiff may also be awarded reasonable attorney's fees and litigation costs including, but not limited to, expert witness fees and expenses as part of the costs.

1013.   The Count I Defendants knowingly provided or obtained $42,000.00 worth of labor or services from Stillwell by means of serious harm or threats of serious harm to Stillwell and Compliance Firm.

1014.   Pursuant to Cal. Civil Code. Section 1431, the Count I Defendants are jointly liable for economic damages, and severally labile for non-economic damages. *See* Cal. Civil Code. Section 1431.2.

1015.   But for, and as a direct and proximate result of each of the Count I Defendants' conduct as set forth above, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has

experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

1016.    Defendants' actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

1017.    Because of the violations described herein and pursuant to 18 U.S.C. § 1595(a), the Count I Defendants are each jointly and severally liable to Plaintiff for the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**

<u>FORCED LABOR, 18 U.S.C. § 1589(a)(3) and</u>

<u>CIVIL REMEDY, 18 U.S. Code § 1595</u>

(*Against Defendants Saghian, Meierhans, FN, FNL, Riordan, and Nixon*

*Peabody*)

1018.    Stillwell restates and incorporates the allegations from the

COMPLAINT

- 264 -

paragraphs 1-1012 above, as if they were stated in full herein.

1019.     This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, (4) FN Logistics, (5) Riordan, and (6) Nixon Peabody (the "Count II Defendants").

1020.     18 U.S.C. § 1589(a)(3) provides that it is unlawful to knowingly provide or obtain the labor or services of a person by means of the abuse or threatened abuse of law or legal process.

1021.     The term "abuse or threatened abuse of law or legal process" is defined in 18 USC § 1589(c)(1) as:

> "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."

1022.     The Count II Defendants intentionally and knowingly recruited Stillwell for the purpose of obtaining forced labor or services from Stillwell by means of the abuse or threatened abuse of law or legal process.

1023.     The Count II Defendants obtained the labor or services of Stillwell by means of abuse or threatened abuse of law or legal process to Stillwell and Compliance Firm, as set described herein and set forth below.

1024.    On or about September 8, 2020, Ott, Meierhans, FNL and FN threatened to sue Compliance Firm for breach of contract, negligence, and fraud if Stillwell reported FN and FNL's unlawful conduct, as alleged herein.

1025.    On or about October 1, 2020, Ott, Meierhans, FNL and FN threatened to sue Stillwell for breach of fiduciary duties if Stillwell reported FN and FNL's unlawful conduct, as alleged herein.

1026.    On or about December 28, 2020, Ott, Meierhans, FNL and FN threatened to use fraudulent documents in court against Stillwell and Compliance Firm, if Stillwell continued to refuse to sign the NDA and indemnity agreements, as alleged herein.

1027.    On or about January 4, 2021, Dill, Ott, Meierhans, FNL and FN threatened to falsely accuse Stillwell of illegally conducting COVID-19 testing if Stillwell refused to perform COVID-19 testing on January 5, 2021, as alleged herein. From January 4, 2021, to January 5, 2021, Stillwell was forced to stay up for over twenty-four (24) hours to prepare for testing on January 5, 2021, as alleged herein. On January 5, 2021, Stillwell performed COVID-19 testing on twenty persons, including FN and FNL employees, and Saghian's relatives. Stillwell performed the testing out of fear of being falsely accused of a crime and fear of financial harm.

1028.  On or about January 25, 2021, Ott, Meierhans, FNL and FN threatened to sue Stillwell for pursuing an investigation of a death related to an undocumented worker's exposure to COVID-19 at FN's Santa Fe Springs warehouse, as alleged herein.

1029.  Stillwell completed all projects and assignments Saghian, Meierhans, FN, FNL asked of her, out of fear of the abuse or threatened abuse of law or legal process against Stillwell or Compliance Firm, as threatened by the Count II Defendants.

1030.  Stillwell spent one hundred (100) hours providing the services described herein but was never compensated for her labor or services.

1031.  On April 13, 2021, the Count II Defendants agreed, conspired, and did abuse the law or legal process by filing a frivolous lawsuit, <u>FN Logistics, LLC vs. The Compliance Firm LLC <i>d/b/a</i> Compliant Care Staffing; and Does 1 through, Case No. 2:21-cv-03312-GW-MAR</u> ("Frivolous Lawsuit") in a United States District Court. The Count II Defendants filed the Frivolous Lawsuit to harm and defraud Stillwell and Compliance Firm, and for purposes which the law was not designed. The Count II Defendants also filed the Frivolous Lawsuit to exert pressure on Stillwell to cause her to sign the NDA and indemnity agreement and to prevent Stillwell from pursuing or participating in investigations about FN

and FNL's unlawful conduct.

1032.    Saghian, Meierhans, FN and FNL each knowingly recruited Stillwell for the purposes of obtaining forced labor or services from Stillwell by means of the abuse or threatened abuse of law or legal process against Stilwell and Stillwell's company, Compliance Firm.

1033.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody each condoned, ratified, and encouraged the unlawful conduct described herein.

1034.    18 U.S.C. § 1594(a) provides that whoever attempts to violate 18 U.S.C. § 1589 shall be punishable in the same manner as a completed violation of that section.

1035.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody each knowingly attempted to obtain the labor or services of Stillwell by means of the abuse or threatened abuse of law or legal process against Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(3).

1036.    18 U.S. Code § 1594(b) provides that whoever conspires with another to violate 18 U.S.C. § 1589 shall be punished in the same manner as a completed violation of such section.

1037.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody each knowingly conspired to obtain the labor or services of Stillwell by means

of the abuse or threatened abuse of law or legal process against Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(3).

1038.    Stillwell, an individual, is a victim of a violation of 18 U.S.C.1589(a)(3), 18 U.S. Code § 1594(a), and 18 U.S. Code § 1594(b), as described in 18 U.S.C § 1595(a).

1039.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody are the perpetrators that victimized and benefited from Stillwell's labor or services in violation of 18 U.S.C.1589(a)(3), 18 U.S. Code § 1594(a), and 18 U.S. Code § 1594(b).

1040.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody each knowingly benefitted, financially or received something of value from participation in ventures and schemes, which each of them knew or should have known, were in violation of the United States Code, Title 18, Chapter 77, specifically 18 U.S.C. § 1589(a)(3).

1041.    The Count II Defendants knowingly provided or obtained $17,500.00 worth of labor or services from Stillwell by means of the abuse or threatened abuse of law or legal process against Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(3).

1042.    The Count II Defendants' conduct as described herein was malicious

and oppressive and done with a conscious disregard of Stillwell rights. The Count II Defendants' acts were designed to humiliate and oppress Stilwell; and they had that effect.

1043.    As a direct and proximate result of each of the Count II Defendants' conduct as set forth above, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

1044.    Defendants' actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

1045.    Because of the violations described herein and pursuant to 18 U.S.C. § 1595(a), the Count II Defendants are each jointly and severally liable to Plaintiff for the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

<u>FORCED LABOR, 18 U.S.C. § 1589(b) and</u>

<u>CIVIL REMEDY, 18 U.S. Code § 1595</u>

(*Against Defendants Saghian, Meierhans, FN, FNL, Riordan, and Nixon*

*Peabody*)

1046.    Stillwell restates and incorporates the allegations from the paragraphs 1-1012 and 1018-1040 above, as if they were stated in full herein.

1047.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, (4) FN Logistics, (5) Riordan, and (6) Nixon Peabody ("Count III Defendants").

1048.    18 U.S.C. § 1589(b) provides that it is unlawful to knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in 18 U.S.C. 1589(a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

1049.    Saghian, Meierhans, FN, and FNL engaged in the providing or obtaining of Stillwell's labor or services by means of serious harm or threats of serious harm to Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(2), and by means of the abuse or

threatened abuse of law or legal process against Stilwell and Stillwell's company, Compliance Firm, in violation of 18 U.S.C. § 1589(a)(3), as described herein.

1050.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody each knew or had reckless disregard of the fact that Saghian, Meierhans, FN, and FNL had engaged in the providing or obtaining of Stillwell's labor or services by any of the means described in 18 U.S.C. 1589(a).

1051.    Saghian, Meierhans, Riordan and Nixon Peabody each received bribes or kickbacks for their participation in the providing or obtaining of Stillwell's labor or services by any of the means described in 18 U.S.C. 1589(a). The actual amount each Count III Defendant received is known by the Count III Defendants and can be ascertained during discovery.

1052.    Saghian, Meierhans, FN, FNL, Riordan and Nixon Peabody each knowingly benefitted, financially or received something of value from participation in ventures and schemes, which each of them knew or should have known, were in violation of the United States Code, Title 18, Chapter 77, specifically 18 U.S.C. § 1589(a)(2), 18 U.S.C. § 1589(a)(3), 18 U.S.C. § 1594(a), and 18 U.S.C. § 1594(b)

1053.    FN and FNL each shared and received $59,500.00 of labor and services for their participation in the providing or obtaining of Stillwell's

labor or services by any of the means described in 18 U.S.C. 1589(a).

1054.    The Count III Defendants' conduct as described herein was malicious and oppressive and done with a conscious disregard of Stillwell rights. The Count III Defendants' acts were designed to humiliate and oppress Stilwell; and they had that effect.

1055.    As a direct and proximate result of each of the Count III Defendants' conduct as set forth above, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

1056.    Defendants' actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

1057.    Because of the violations described herein and pursuant to 18 U.S.C. § 1595(a), the Count III Defendants are each jointly and severally liable to Plaintiff for the damages Plaintiff has sustained, including the disgorgement

COMPLAINT
- 273 -

of $59,5000, which is the benefit of Stillwell's labor or services that were unlawfully obtained, plus the cost of this suit, including reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### CALIFORNIA TRAFFICKING VICTIMS' PROTECTION ACT

### Ca. Civil Code Section 52.5

(*Against Defendants Saghian, Meierhans, FN, and FNL*)

1058.   Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 - 1040 and 1046 -1053 above, as if they were stated in full herein.

1059.   This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, and (4) FN Logistics, (the "Count IV Defendants").

1060.   Cal. Civil Code. Section 236.1(a) states "a person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking."

1061.   Cal. Civil Code. Section 236.1. (h) For purposes of this chapter, the following definitions apply:

"Coercion" includes a scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in

COMPLAINT
- 274 -

serious harm to or physical restraint against any person; the abuse or threatened abuse of the legal process; debt bondage; or providing and facilitating the possession of a controlled substance to a person with the intent to impair the person's judgment.

"Deprivation or violation of the personal liberty of another" includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.

"Duress" includes a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed; a direct or implied threat to destroy, conceal, remove, confiscate, or possess an actual or purported passport or immigration document of the victim; or knowingly destroying, concealing, removing, confiscating, or possessing an actual or purported passport or immigration document of the victim.

"Forced labor or services" means labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person.

"Serious harm" includes any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor, services, or commercial sexual acts in order to avoid incurring that harm."

1062.   Saghian, Meierhans, FN and FNL knowingly recruited Stillwell to work on the OHN and COVID-19 lab for the purpose of obtaining forced labor or services from Stillwell. The Count IV Defendants deprived or violated the personal liberty of Stillwell with the intent to obtain forced labor or services from Stillwell.

1063.   Saghian, Meierhans, FN and FNL deprived or violated the personal liberty of Stillwell with the intent to obtain forced labor or services by devising multiple schemes to coerce Stillwell to provide forced labor or services. The Count IV Defendants obtained forced labor or services from Stillwell through fraud, duress, and coercion, as described herein, and as

alleged in Causes of Action One, Two and Three, all in violation of Cal. Civil Code. Section 236.1.

1064.    The Count IV Defendants deprived or violated the personal liberty of Stillwell by a substantial and sustained restriction of Stillwell's liberty, which was accomplished through fear, fraud, deceit, coercion, duress, and threat of unlawful injury to Stillwell and Compliance Firm.

1065.    The Count IV Defendants threatened Stillwell with serious harm, psychological, financial, or reputational harm. Under the circumstances described herein, Stillwell received and apprehended all threats alleged herein and reasonably believed that it was likely that the Count IV Defendants would carry it out the threats.

1066.    The Count IV Defendants intended and did carry out their threats of reputational harm, financial harm, and threat of unlawful injury, as described herein.

1067.    Each of the Count IV Defendants is a person who deprived or violated the personal liberty of Stillwell with the intent to obtain forced labor or services and is guilty of human trafficking as defined in Cal. Civil Code. Section 236.1(a).

1068.    Cal. Civil Code. Section 52.5 states:

"(a) A victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action for actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief. A prevailing plaintiff may also be awarded attorney's fees and costs.

In addition to the remedies specified in this section, in an action under subdivision (a), the plaintiff may be awarded up to three times his or her actual damages or ten thousand dollars ($10,000), whichever is greater. In addition, punitive damages may be awarded upon proof of the defendant's malice, oppression, fraud, or duress in committing the act of human trafficking".

1069.    Stillwell is victim of human trafficking, as defined in Section 236.1 of the California Penal Code.

1070.    The Count IV Defendants' conduct as described herein was malicious and oppressive and done with a conscious disregard of Stillwell rights. The Count IV Defendants' acts were designed to humiliate and oppress Stilwell; and they had that effect.

1071.    As a direct and proximate result of each of the Count IV Defendants' conduct as set forth above, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced

and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

1072.    Because of the violations described herein and pursuant to Cal. Civil Code. Section 52.5, the Count IV Defendants are each jointly and severally liable to Plaintiff for the actual damages and compensatory damages in the amount of $112,812.50 that Stillwell has sustained as a result of Count IV Defendants conduct in violation of Cal. Civil Code. Section 236.1(a).

1073.    The Count IV Defendants conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Each of the Count IV Defendants' acts were designed to humiliate and oppress Stillwell; and they had that effect. Each of the Count IV Defendants condoned, ratified, and encouraged the unlawful conduct. Thus, Stillwell is entitled to exemplary and punitive damages against each of the Count IV Defendants pursuant to Cal. Civil Code. Section 3294.

## FIFTH CAUSE OF ACTION

### PROMISSORY FRAUD: INTENTIONAL MISREPRESENTATION

*(Against Defendants Meierhans, FN, and FNL)*

1074.    Stillwell restates and incorporates the allegations from the

paragraphs 1 - 983 above, as if they were stated in full herein.

1075.     This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Fashion Nova, LLC and (3) FN Logistics, LLC (the "Count V Defendants").

1076.     Represented that they would pay Stillwell $175.00 per hour under the OHN Consultancy Agreement and under the COVID-19 Consultancy Agreement.

1077.     The Count V Defendants made these representations to convince Stillwell to provide services and to bind Compliance Firm to the Joint Venture and Leasing Agreements.

1078.     Stillwell had reasonable grounds for believing that FNL and FNL would honor the OHN Consultancy Agreement, COVID-19 Consultancy Agreement, Joint Venture and Leasing Agreements.

1079.     Stillwell reasonably relied on the Count V Defendants' representation and agreed to perform under the OHN Consultancy Agreement and COVID-19 Consultancy Agreement.

1080.     Stillwell reasonably relied on the Count V Defendants' representation and agreed to enter the Joint Venture and Leasing Agreements on behalf of Compliance Firm.

1081.     Stillwell would not have entered into the OHN Consultancy

Agreement, COVID-19 Consultancy Agreement, Joint Venture and Leasing Agreements if it was known that the Count V Defendants' representations were false.

1082.    As a result of the Count V Defendants' misrepresentations, Stillwell performed according to the OHN Consultancy Agreement, COVID-19 Consultancy Agreement and was not compensated for her services.

1083.    Also, as a result of the Count V Defendants' misrepresentations, Compliance Firm performed according to the Joint Venture and Leasing Agreements and was left in possession of COVID-19 testing supplies and materials that it could not use.

1084.    Stillwell suffered damages in the amount of $112,812.50, as a result of her reliance on the Count V Defendants' misrepresentations equal to the amount money for the services she provided to FN and FNL.

1085.    When the Count V Defendants made their representations to Plaintiff in September 2020 promising Plaintiff to honor and perform pursuant to the OHN and COVID-19 Consultancy Agreements, the Count V Defendants knew that their representations were untrue.

1086.    As a direct and proximate result of the Count V Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay,

and benefits, plus consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional

1087.    As a further direct and proximate result of the Count V Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered and continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

1088.    Plaintiff is further entitled to prejudgment interest in an amount to be shown at trial.

## SIXTH CAUSE OF ACTION

### PROMISSORY FRAUD: NEGLIGENT MISREPRESENTATION

*(Against Defendants Meierhans, FN, and FNL)*

1089.    Stillwell restates and incorporates the allegations from the paragraphs 1- 983 and 1076- 1083, above, as if they were stated in full herein.

1090.    This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Fashion Nova, LLC and (3) FN Logistics, LLC (the "Count VI Defendants").

1091.    Represented that they would pay Stillwell $175.00 per hour under

the OHN Consultancy Agreement and under the COVID-19 Consultancy Agreement.

1092.   The Count VI  Defendants made these representations to convince Stillwell to provide services and to bind Compliance Firm to the Joint Venture and Leasing Agreements.

1093.   Stillwell had reasonable grounds for believing that FNL and FNL would honor the OHN Consultancy Agreement, COVID-19 Consultancy Agreement, Joint Venture and Leasing Agreements.

1094.   Stillwell reasonably relied on the Count VI Defendants' representation and agreed to perform under the OHN Consultancy Agreement and COVID-19 Consultancy Agreement.

1095.   Stillwell reasonably relied on the Count VI Defendants' representation and agreed to enter the Joint Venture and Leasing Agreements on behalf of Compliance Firm.

1096.   Stillwell would not have entered into the OHN Consultancy Agreement, COVID-19 Consultancy Agreement, Joint Venture and Leasing Agreements if it was known that the Count VI Defendants' representations were false.

1097.   As a result of the Count VI Defendants' misrepresentations, Stillwell performed according to the OHN Consultancy Agreement and the,

COVID-19 Consultancy Agreement and was not compensated for her services.

1098.    Also, as a result of the Count VI Defendants' misrepresentations, Compliance Firm performed according to the Joint Venture and Leasing Agreements and was left in possession of COVID-19 testing supplies and materials that it could not use.

1099.    Stillwell suffered monetary damages as a result of her reliance on the Count VI Defendants' misrepresentations equal to the amount money for the services she provided to FN and FNL.

1100.    When the Count VI Defendants made their representations to Plaintiff promising Plaintiff that they would each perform pursuant to the OHN and COVID-19 Consultancy Agreements, the Count VI Defendants knew that their representations were untrue.

1101.    As a direct and proximate result of the Count VI Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay, and benefits, plus consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional.

1102.    As a further direct and proximate result of the Count VI Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered and

continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

1103.    Plaintiff is further entitled to prejudgment interest in an amount to be shown at trial.

## SEVENTH CAUSE OF ACTION

<u>BREACH OF ORAL CONTRACT – OHN CONSULTANCY AGREEMENT</u>

*(Against Defendants FN and FNL)*

1104.    Stillwell restates and incorporates the allegations from the paragraphs 1-983 and 1091 -1100 above, as if they were stated in full herein.

1105.    This cause of action is against Defendants: (1) Fashion Nova, LLC and (2) FN Logistics, LLC (the "Count VII Defendants").

1106.    Stillwell was recruited and obtained by FN and FNL to provide consultancy services and to develop FN and FNL's Occupational Health and Safety Program per the OHN Consultancy Agreement.

1107.    The OHN Consultancy Agreement was a valid and enforceable contract between FN, FNL and Stillwell.

1108.    FN and FNL refused to reduce the oral agreement to writing.

1109.    Stillwell completed performance pursuant the terms of the OHN Consultancy Agreement.

1110.    Each of the Count VII Defendants breached the terms of the contract by nonpayment of the labor or services Stillwell provided under the OHN Consultancy Agreement, which resulted in damages to Stillwell.

*1111*.    Cal. Civil Code. Section 3300 states that damages should consist of "the amount which will compensate the [plaintiff] for all the detriment proximately caused" by the defendant's breach, or the amount that, "in the ordinary course of things, would be likely to result therefrom."

1112.    Each of the Count VII Defendants' failure to perform its obligations under the OHN Consultancy Agreement caused damages to Stillwell in an amount of $64,250.00 for the costs of labor and services that Stillwell provided to FN and FNL under the OHN Consultancy Agreement.

1113.    The OHN Consultancy Agreement was a valid and enforceable twelve (12) month agreement that would have ended on September 30, 2021.

1114.    At the time of the Count VII Defendants' breach on January 6, 2021, there were eight (8) months left of the OHN Consultancy Agreement.

1115.    Each of the Count VII Defendants' failure to perform its obligations under the OHN Consultancy Agreement caused damages to Stillwell in an

amount of $28,000.00, which is the amount which that will compensate Stillwell for all the detriment proximately caused by the Count VII Defendant's breach, or also the amount that in the ordinary course of things, would be likely to result therefrom.

1116.    As a direct and proximate result of the Count VII Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay, and benefits, plus consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

1117.    Plaintiff is further entitled to prejudgment interest in an amount to be shown at trial.

1118.    The Count VII Defendants are jointly and severally liable.

## EIGHTH CAUSE OF ACTION

## BREACH OF ORAL CONTRACT – COVID-19 CONSULTANCY AGREEMENT

*(Against Defendants FN and FNL)*

1119.    Stillwell restates and incorporates the allegations from the paragraphs 1-983, and 1091 -1100 above, as if they were stated in full herein.

1120.    This cause of action is against Defendants: (1) Fashion Nova, LLC and (2) FN Logistics, LLC (the "Count VIII Defendants").

1121.    Stillwell was recruited and obtained by FN and FNL to provide consultancy services and to develop FN and FNL's onsite COVID-19 testing lab per the COVID-19 Consultancy Agreement.

1122.    The COVID-19 Consultancy Agreement was a valid and enforceable contract between FN, FNL and Stillwell.

1123.    FN and FNL refused to reduce the oral agreement to writing.

1124.    Stillwell completed performance per the terms of the COVID-19 Consultancy Agreement.

1125.    The Count VIII Defendants breached the terms of the contract by nonpayment of the labor or services Stillwell provided under the COVID-19 Consultancy Agreement, which resulted in damages to Stillwell.

1126.    The Count VIII Defendants' failure to perform its obligations under the COVID-19 Consultancy Agreement caused damages to Stillwell in an amount of $48,562.50 for the costs of labor and services that Stillwell provided to FN and FNL.

1127.    The COVID-19 Consultancy Agreement was a valid and enforceable twelve (12) month agreement that would have ended on November 20, 2021.

1128.    At the time of the Count VII Defendants' breach on January 6, 2021, there were ten (10) months left of the COVID-19 Consultancy Agreement.

1129.    Each of the Count VII Defendants' failure to perform its obligations under the COVID-19 Consultancy Agreement caused damages to Stillwell in an amount of $140,000.00, which is the amount which that will compensate Stillwell for all the detriment proximately caused by the Count VII Defendant's breach, or also the amount that in the ordinary course of things, would be likely to result therefrom.

1130.    As a direct and proximate result of the Count VIII Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay, and benefits, plus consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

1131.    Plaintiff is further entitled to prejudgment interest in an amount to be shown at trial.

1132.    The Count VIII Defendants are jointly and severally liable.

## NINTH CAUSE OF ACTION

BREACH OF FIDUCIARY DUTY

(*Against Defendants Saghian, Meierhans, FN, FNL, Riordan, and Nixon Peabody*)

1133.    Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, and 1091 -1100 above, as if they were stated in full herein.

1134.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, and (6) Nixon Peabody, (the "Count IX Defendants").

1135.    A fiduciary relationship existed between Stillwell and each of the Count IX Defendants.

1136.    Stillwell reasonably relied upon Meierhans, Riordan, and Nixon Peabody to provide legal consulting and services in connection with the Joint Venture and Covid-19 testing at FN and FNL's warehouses.

1137.    Stillwell reasonably relied upon each of the Count IX Defendants' integrity to give honest advice and recommendations so that Compliance Firm, the Joint Venture, and Stillwell could provide Covid-19 testing to FN and FNL's roughly 10,000 warehouse employees.

1138.    Each of the Count IX Defendants knowingly undertook the

responsibility to act on behalf of and for the benefit of Compliance Firm, the Joint Venture, and Stillwell in providing Covid-19 testing services.

1139.    Each of the Count IX Defendants owed fiduciary duties to Compliance Firm, the Joint Venture, and Stillwell in connection with the provision of Covid-19 testing services.

1140.    Each of the Count IX Defendants acted in its own financial self-interest in devising and participating in multiple schemes to deceive and defraud Compliance Firm and Stillwell, in connection with the provision of Covid-19 testing services, as described in detail herein.

1141.    Each of the Count IX Defendants stood to gain financially from the quid pro quo, bribes, and kickbacks each received in connection to the participation in multiple schemes to deceive and defraud Compliance Firm and Stillwell, as described in detail herein.

1142.    Each of the Count IX Defendants' failure to place Compliance Firm and Stillwell's interest ahead of its own was a breach of the fiduciary duties that each Count IX Defendant owed to Stillwell.

1143.    Meierhans, Riordan, and Nixon Peabody also breached their fiduciary duties by falsely alleging to third parties, including a federal court, that Compliance Firm could not lawfully administer, warehouse, store, sell, broker, distribute, or provide logistics services for the CSA

Tests.

1144.     Each of the Count IX Defendants' misconduct, including self-dealing or personal interest conflicts described herein was a breach of their fiduciary duties to Stillwell.

1145.     Each of the Count IX Defendants' breach of fiduciary duty was contrary to the interests of Plaintiff; and each of the Count IX Defendants' misconduct, including self-dealing or personal interest conflicts described herein directly causes damages to Plaintiff.

1146.     Each of the Count IX Defendants acted with malice and intended to harm Stillwell.

1147.     Stillwell suffered harm as a proximate result of these breaches, including damages equal to:

i)   the amount of money Stillwell spent creating the Covid-19 testing lab and for consultancy services,

b)   payment of services that Stillwell provided FN and FNL in good faith per their oral agreements; and

c)   the costs of investigations pursuant to oral agreements between Stillwell and FN, and Stillwell and FNL

1148.     Stillwell suffered harm as a result of these fiduciary breaches, including damages equal to the amount of $280,812.50 that Stillwell

incurred for creating the Covid-19 testing lab, and for services Stillwell provided under the Joint Venture.

## TENTH CAUSE OF ACTION

### CIVIL RICO 18 U.S.C. § §1962(c), 1964(c)

### Predicate Act: Honest Services Fraud, 18 U.S.C. § 1346

*(Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, and Doe Defendants 1-10, inclusive)*

1149.    Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, 1091 -1100, and 1133-1148 above, as if they were stated in full herein.

1150.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, and (7) Doe Defendants 1-10, inclusive (the "Count X Defendants").

1151.    Each of the Count X Defendants is a FNE RICO Defendant as described herein.

1152.    At all relevant times, each of the Count X Defendants were "person[s]" pursuant to 18 U.S.C. §§ 1961(3) and 1962(d).

1153.    At all relevant times, the Fashion Nova Enterprise, ("FNE") constitutes an "Enterprise" within the meaning of 18 U.S.C.  §§ 1961(4)

and 1962(c). At all relevant times, FNE was engaged in, and/or its activities affected, interstate commerce and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c).

1154. At all times relevant hereto, the Count X Defendants and FNE RICO Defendants each held a position in or were otherwise affiliated with FNE as well as participated in the operation, management, and directed the affairs of FNE.

1155. FNE, as alleged herein, was not limited to FNE RICO Defendants' predicate acts and has activities extending beyond the FNE RICO Defendants' racketeering activity. FNE and its member corporations exists separate and apart from the pattern of racketeering activity. The FNE RICO Defendants have had and do have legitimate business plans outside the pattern of racketeering activity related to FNE.

1156. The Count X Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1346 as described above, in violation of 18 U.S.C. § 1962(c).

1157. FNE's racketeering activity commenced at least as early as January of 2018 and remains ongoing.

1158. The purpose of FNE's schemes against Stillwell and Compliance

Firm was to defraud Stillwell of money, property, and benefits of monetary value by using wire and mail frauds, devising multiple schemes to deceive, trick and defraud Stillwell and Compliance Firm.

1159.    Each Count X Defendant committed at least two predicate acts in furtherance of the conspiracies and schemes against Stillwell and Compliance Firm. These predicate act in furtherance of the conspiracies and schemes against Stillwell and Compliance Firm include, but are not limited to, the acts set forth in paragraphs 812 -1012, 1018-1040, and 1046 -1053 above.

1160.    The Count X Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of RICO Defendants was necessary to allow the commission of this pattern of racketeering violation of 18 U.S.C. § 1346, in violation of 18 U.S.C. § 1962(c).

1161.    Each Count X Defendant knew about and agreed to facilitate the scheme to defraud Stillwell and Compliance Firm of their money, property, and other business property and business interests, including state and federal benefits of monetary value by fraudulently depriving Stillwell Compliance Firm of honest services, such as state and federal tax

refunds that are owed to Stillwell and Compliance Firm.

1162.    It was part of the conspiracy that Count X Defendants would commit a pattern of racketeering activity in the conduct of the affairs of FNE, including the acts of racketeering set forth in paragraphs 812 - 1012, 1018-1040, and 1046 -1053 above.

1163.    As a direct and proximate result of the Count X Defendants' conduct, the acts of racketeering activity of FNE, the predicate acts completed in furtherance of the schemes and artifices, and violations of 18 U.S.C. § 1962(c), Stillwll has been injured in her money and business property, in an amount of $9,315,242.75.

1164.    Pursuant to 18 U.S.C. § 1964(c), Stillwell is entitled to recover treble damages plus costs and attorneys' fees from Defendants as well as any other relief authorized by statute.

## ELEVENTH CAUSE OF ACTION

### CIVIL RICO 18 U.S.C. § §1962(c), 1964(c)

### Predicate Act: NATIONAL STOLEN PROPERTY 18 U.S.C. § 2314

*(Against Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive)*

1165.    Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, 1091 -1100, and

1133-1148 above, as if they were stated in full herein.

1166.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, (7) Reeve Benaron, (8) Daniel R. Markel, and (9) Doe Defendants 1-10, inclusive (the "Count XI Defendants").

1167.    Each of the Count XI Defendants is a FNE RICO Defendant as described herein.

1168.    At all relevant times, each of the Count XI Defendants were "person[s]" pursuant to 18 U.S.C. §§ 1961(3) and 1962(d).

1169.    At all relevant times, the Fashion Nova Enterprise, ("FNE") constitutes an "Enterprise" within the meaning of 18 U.S.C.  §§ 1961(4) and 1962(c). At all relevant times, FNE was engaged in, and/or its activities affected, interstate commerce and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c).

1170.    At all times relevant hereto, the Count XI Defendants and FNE RICO Defendants each held a position in or were otherwise affiliated with FNE as well as participated in the operation, management, and directed  the affairs of FNE.

1171.    FNE, as alleged herein, was not limited to FNE RICO Defendants'

predicate acts and has activities extending beyond the FNE RICO Defendants' racketeering activity. FNE and its member corporations exists separate and apart from the pattern of racketeering activity. The FNE RICO Defendants have had and do have legitimate business plans outside the pattern of racketeering activity related to FNE.

1172.    The Count XI Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 2314 as described above, in violation of 18 U.S.C. § 1962(c).

1173.    FNE's racketeering activity commenced at least as early as January of 2018 and remains ongoing.

1174.    The purpose of FNE's schemes against Stillwell and Compliance Firm was to defraud Stillwell of money, property, and benefits of monetary value by using wire and mail frauds, devising multiple schemes to deceive, trick and defraud Stillwell and Compliance Firm.

1175.    Each Count XI Defendant committed at least two predicate acts in furtherance of the conspiracies and schemes against Stillwell and Compliance Firm. These predicate act in furtherance of the conspiracies and schemes against Stillwell and Compliance Firm include, but are not limited to, the acts set forth in paragraphs 812 -1012, 1018-1040, and

COMPLAINT

1046 -1053  above.

1176.     The Count XI  Defendants  knew  that  they  were  engaged  in  a conspiracy  to  commit  the  predicate  acts,  and  they  knew  that  the predicate  acts  were  part  of  such  racketeering  activity,  and  the participation  and  agreement  of  each  of  RICO  Defendants  was necessary  to  allow  the  commission  of  this  pattern  of  racketeering violation of   18 U.S.C. § 2314, in violation of  18 U.S.C. § 1962(c).

1177.     Each  Count XI Defendant  knew  about  and  agreed  to  facilitate the  scheme  to  defraud Stillwell and Compliance Firm  of  their  money, property,  and  other  business property and business interests, including state  and  federal  benefits  of  monetary  value by  fraudulently  depriving Stillwell Compliance Firm of  honest services, such as state and federal tax refunds that are owed to Stillwell and Compliance Firm.

1178.     It  was  part  of  the  conspiracy  that Count XI Defendants  would commit  a  pattern  of  racketeering  activity  in  the  conduct  of  the  affairs of FNE,  including  the  acts  of  racketeering  set forth in paragraphs  812 - 1012, 1018-1040, and 1046 -1053  above.

1179.     As  a  direct  and  proximate  result  of  the Count XI Defendants' conduct,  the  acts  of racketeering  activity  of FNE,  the  predicate  acts completed  in  furtherance  of  the  schemes and artifices,  and  violations  of

18 U.S.C. § 1962(c), Stillwell has been injured in her money and business property, in an amount to be determined at trial.

1180.    Pursuant to 18 U.S.C. § 1964(c), Stillwell is entitled to recover treble damages plus costs and attorneys' fees from Defendants as well as any other relief authorized by statute.

### TWELFTH CAUSE OF ACTION

### CIVIL RICO 18 U.S.C. § §1962(c), 1964(c)

### Predicate Act: Wire Fraud 18 U.S.C. § 1343

*(Against Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive)*

1181.    Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, 1091 -1100, and 1133-1148 above, as if they were stated in full herein.

1182.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, (7) Reeve Benaron, (8) Daniel R. Markel, and (9) Doe Defendants 1-10, inclusive (the "Count XII Defendants").

1183.    Each of the Count XII Defendants is a FNE RICO Defendant as described herein.

1184.   At all relevant times, each of the Count XII Defendants were "person[s]" pursuant to 18 U.S.C. §§ 1961(3) and 1962(d).

1185.   At all relevant times, the Fashion Nova Enterprise, ("FNE") constitutes an "Enterprise" within the meaning of 18 U.S.C.  §§ 1961(4) and 1962(c). At all relevant times, FNE was engaged in, and/or its activities affected, interstate commerce and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c).

1186.   At all times relevant hereto, the Count XII Defendants and FNE RICO Defendants each held a position in or were otherwise affiliated with FNE as well as participated in the operation, management, and directed  the affairs of FNE.

1187.   FNE, as alleged herein, was not limited to FNE RICO Defendants' predicate acts and has activities extending beyond the FNE RICO Defendants' racketeering activity. FNE and its member corporations exists separate and apart from the pattern of racketeering activity. The FNE RICO Defendants have had and do have legitimate business plans outside the pattern of racketeering activity related to FNE.

1188.   The Count XII Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with  others  to  violate  18  U.S.C. § 1343 as described above, in violation

of 18 U.S.C. § 1962(c).

1189. FNE's racketeering activity commenced at least as early as January of 2018 and remains ongoing.

1190. The purpose of FNE's schemes against Stillwell and Compliance Firm was to defraud Stillwell of money, property, and benefits of monetary value by using wire and mail frauds, devising multiple schemes to deceive, trick and defraud Stillwell and Compliance Firm.

1191. Each Count XII Defendant committed at least two predicate acts in furtherance of the conspiracies and schemes against Stillwell and Compliance Firm. These predicate act in furtherance of the conspiracies and schemes against Stillwell and Compliance Firm include, but are not limited to, the acts set forth in paragraphs 812 -1012, 1018-1040, and 1046 -1053 above.

1192. The Count XII Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of RICO Defendants was necessary to allow the commission of this pattern of racketeering violation of 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1962(c).

1193. Each Count XII Defendant knew about and agreed to facilitate

the scheme to defraud Stillwell and Compliance Firm of their money, property, and other business property and business interests, including state and federal benefits of monetary value by fraudulently depriving Stillwell Compliance Firm of honest services, such as state and federal tax refunds that are owed to Stillwell and Compliance Firm.

1194.    It was part of the conspiracy that Count XII Defendants would commit a pattern of racketeering activity in the conduct of the affairs of FNE, including the acts of racketeering set forth in paragraphs 812 - 1012, 1018-1040, and 1046 -1053 above.

1195.    As a direct and proximate result of the Count XII Defendants' conduct, the acts of racketeering activity of FNE, the predicate acts completed in furtherance of the schemes and artifices, and violations of 18 U.S.C. § 1962(c), Stillwell has been injured in her money and business property, in an amount to be determined at trial.

1196.    Pursuant to 18 U.S.C. § 1964(c), Stillwell is entitled to recover treble damages plus costs and attorneys' fees from Defendants as well as any other relief authorized by statute.

## THIRTEENTH CAUSE OF ACTION

### PROFESSIONAL NEGLIGENCE

*(Against Defendants Meierhans, Riordan, and Nixon Peabody)*

1197.     Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, 1091 -1100, 1133-1162, 1167-1178, and 1183-1194 above, as if they were stated in full herein.

1198.     This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Staci J. Riordan, and (3) Nixon Peabody (the "Count XIII Defendants").

1199.     Nixon Peabody is a law firm that provides legal services.

1200.     Meierhans and Riordan are licensed attorneys who provide legal services.

1201.     The Count XIII Defendants provided legal services to Stillwell.

1202.     The Count XIII Defendants had a duty to use the skill, prudence, and diligence that other members of the legal profession commonly possess and exercise.

1203.     The Count XIII Defendants had a duty to disclose Intrivo, FN and FNL's use of the CSA Tests to Stillwell.

1204.     The Count XIII Defendants had a duty to disclose that Intrivo was not authorized to purchase, possess, store, warehouse, distribute or administer the CSA Tests.

1205.     The Count XIII Defendants had a duty to disclose that FN and FNL contracted with Rapid Now to administer onsite COVID-19 testing at FN

and FNL's warehouse facilities.

1206.    Each of the Count XIII Defendants breached their duties to use the skill, prudence, and diligence that other members of the legal profession.

1207.    Each of the Count XIII Defendants' failure to properly advise and consult Stillwell, in connection to the Joint Venture and COVID-19 testing, caused Stillwell to spend money defending the FNL Complaint, lost revenues and profits from cancelled client contracts, as described herein.

1208.    Each of the Count XIII Defendants' failure to properly advise and consult Stillwell, in connection to the Joint Venture and COVID-19 testing, caused Stillwell to incur charges in an amount to be determined at trial.

1209.    There is a proximate causal connection between each of the Count XIII Defendants' negligent conduct. Stillwell's actual losses and damages, in the amount to be determined at trial, are a direct and proximate result of each of the Count XIII Defendants' professional's negligence.

1210.    Defendants' actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

# FOURTEENTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

*(Against Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive)*

1211.   Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, 1091 -1100, 1133-1162, 1167-1178, 1183-1194, and 1199-1209 above, as if they were stated in full herein.

1212.   This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, (7) Reeve Benaron, (8) Daniel R. Markel, and (9) Doe Defendants 1-10, inclusive (the "Count XIV Defendants").

1213.   An economic relationship existed between Stillwell and FN that was likely to benefit the Plaintiff, and each of the Count XIV Defendants had knowledge of this relationship.

1214.   Each of the Count XIV Defendants intended to disrupt the economic relationship between Stillwell and FN or had knowledge that disruption was likely because of their conduct.

1215.    Independent wrongful conduct by each of the Count XIV Defendants disrupted the economic relationship between Stillwell and FN.

1216.    An economic relationship existed between Stillwell and FNL that was likely to benefit the Plaintiff, and each of the Count XIV Defendants had knowledge of this relationship.

1217.    Each of the Count XIV Defendants intended to disrupt the economic relationship between Stillwell and FNL or had knowledge that disruption was likely because of their conduct.

1218.    Independent wrongful conduct by each of the Count XIV Defendants disrupted the economic relationship between Stillwell and FNL.

1219.    An economic relationship existed between Compliance Firm and FN that was likely to benefit Stillwell, and each of the Count XIV Defendants had knowledge of this relationship.

1220.    Each of the Count XIV Defendants intended to disrupt the economic relationship between Compliance Firm and FN or had knowledge that disruption was likely because of their conduct.

1221.    Independent wrongful conduct by each of the Count XIV Defendants disrupted the economic relationship between Compliance Firm and FN.

1222.    An economic relationship existed between Compliance Firm and FNL that was likely to benefit Stillwell, and each of the Count XIV

COMPLAINT

Defendants had knowledge of this relationship.

1223.    Each of the Count XIV Defendants intended to disrupt the economic relationship between Compliance Firm and FNL or had knowledge that disruption was likely because of their conduct.

1224.    Independent wrongful conduct by each of the Count XIV Defendants disrupted the economic relationship between Compliance Firm and FNL.

1225.    Each of the Count XIV Defendants conduct alleged herein caused harm to Stillwell, and causal connections exists between the Count XIV Defendants' wrongful acts alleged herein and the harms caused to Stillwell.

1226.    There is a direct and a proximate causal connection between each of the Count XIV Defendants' conduct.

1227.    The Count XIV Defendants acted with malice and intended to harm Stillwell.

1228.    Stillwell's actual losses and damages, in the amount to be determined at trial, are a direct and proximate result of each of the Count XIV Defendants' conduct alleged herein, and the Count XIV Defendants' negligent interference with the economic relationships alleged herein.

1229.    Defendants' actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to

punish Defendants and deter Defendants and others from engaging in similar future conduct.

## FIFTEENTH CAUSE OF ACTION

<u>NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE</u>

*(Against Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive)*

1230.    Stillwell restates and incorporates the allegations from the paragraphs 1-1012, 1018 -1040, 1046-1053, 1058-1069, 1091 -1100, 1133-1162, 1167-1178, 1183-1194, 1199-1209, and 1213- 1228 above, as if they were stated in full herein.

1231.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, (7) Reeve Benaron, (8) Daniel R. Markel, and (9) Doe Defendants 1-10, inclusive (the "Count XV Defendants").

1232.    Economic relationships existed between Stillwell and FN that was likely to benefit the Plaintiff, and each of the Count XV Defendants had knowledge of these relationships.

1233.    Each of the Count XV Defendants intended to disrupt the economic

relationships between Stillwell and FN or had knowledge that disruption was likely because of their conduct.

1234.   Each of the Count XV Defendants, knew or should have known, that by failing to act with reasonable care they would disrupt the economic relationships between Stillwell and FN.

1235.   Independent wrongful conduct by each of the Count XV Defendants disrupted the economic relationships between Stillwell and FN.

1236.   Each of the Count XV Defendants conduct alleged herein was independently wrongful apart from each of the interferences of the economic relationships between Stillwell and FN.

1237.   Economic relationships existed between Stillwell and FNL that was likely to benefit the Plaintiff, and each of the Count XV Defendants had knowledge of these relationships.

1238.   Each of the Count XV Defendants intended to disrupt the economic relationships between Stillwell and FNL or had knowledge that disruption was likely because of their conduct.

1239.   Each of the Count XV Defendants, knew or should have known, that by failing to act with reasonable care they would disrupt the economic relationships between Stillwell and FNL.

1240.   Independent wrongful conduct by each of the Count XV Defendants

disrupted the economic relationships between Stillwell and FNL.

1241.   Each of the Count XV Defendants conduct alleged herein was independently wrongful apart from each of the interferences of the economic relationships between Stillwell and FNL.

1242.   Economic relationships existed between Compliance Firm and FN that was likely to benefit Stillwell, and each of the Count XV Defendants had knowledge of these relationships.

1243.   Each of the Count XV Defendants intended to disrupt the economic relationships between Compliance Firm and FN or had knowledge that disruption was likely because of their conduct.

1244.   Each of the Count XV Defendants, knew or should have known, that by failing to act with reasonable care they would disrupt the economic relationships between Compliance Firm and FN.

1245.   Independent wrongful conduct by each of the Count XV Defendants disrupted the economic relationships between Compliance Firm and FN.

1246.   Each of the Count XV Defendants conduct alleged herein was independently wrongful apart from each of the interferences of the economic relationships between Compliance Firm and FN.

1247.   Economic relationships existed between Compliance Firm and FNL that was likely to benefit Stillwell, and each of the Count XV Defendants

had knowledge of these relationships.

1248.    Each of the Count XV Defendants intended to disrupt the economic relationships between Compliance Firm and FNL or had knowledge that disruption was likely because of their conduct.

1249.    Each of the Count XV Defendants, knew or should have known, that by failing to act with reasonable care they would disrupt the economic relationships between Compliance Firm and FNL.

1250.    Independent wrongful conduct by each of the Count XV Defendants disrupted the economic relationships between Compliance Firm and FNL.

1251.    Each of the Count XV Defendants conduct alleged herein was independently wrongful apart from each of the interferences of the economic relationships between Compliance Firm and FNL.

1252.    Each of the Count XV Defendants conduct alleged herein caused harm to Stillwell, and causal connections exists between the Count XV Defendants' wrongful acts alleged herein and the harms caused to Stillwell.

1253.    There are direct and a proximate causal connections between each of the Count XV Defendants' conduct and the harms caused to Stillwell.

1254.    The Count XV Defendants acted with malice and intended to harm Stillwell.

1255.    Stillwell's actual losses and damages, in an amount to be determined

at trial, are a direct and proximate result of each of the Count XV Defendants' conduct alleged herein, and the Count XV Defendants' negligent interference with the economic relationships alleged herein.

1256.    Defendants' actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

## SIXTEENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(*Against Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive*)

1257.    Stillwell restates and incorporates the allegations from the paragraphs 1-1256 above, as if they were stated in full herein.

1258.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, (7) Reeve Benaron, (8) Daniel R. Markel, and (9) Doe Defendants 1-10, inclusive (the "Count XVI Defendants").

1259.    The extreme and outrageous conduct by the Count XVI Defendants

against Stillwell, alleged herein, was done with the intention of causing, or reckless disregard of the probability of causing, Stillwell emotional distress.

1260.    Stillwell suffered, and continues to suffer, severe and extreme emotional distress as an actual and proximate causation of the Count XVI Defendants' outrageous conduct.

1261.    But for, and as a direct and proximate result of each of the Count XVI Defendants' conduct as alleged herein, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial

1262.    The Count XVI Defendants actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from the Count XVI Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SEVENTEENTH CAUSE OF ACTION

<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

(*Against Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody,*

*Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive*)

1263.    Stillwell restates and incorporates the allegations from the paragraphs 1-1260 above, as if they were stated in full herein.

1264.    This cause of action is against Defendants: (1) Richard D. Saghian, (2) Erica A. Meierhans, (3) Fashion Nova, LLC, (4) FN Logistics, LLC, (5) Staci J. Riordan, (6) Nixon Peabody, (7) Reeve Benaron, (8) Daniel R. Markel, and (9) Doe Defendants 1-10, inclusive (the "Count XVII Defendants").

1265.    The Count XVII Defendants owed Stillwell a duty of care and each of the Count XVII Defendants breached that duty of care.

1266.    Stillwell suffered and continues to suffer damages as a proximate result of each of the Count XVII Defendants' breach of care, as described herein.

1267.    But for, and as a direct and proximate result of each of the Count XVII Defendants' conduct as alleged herein, Stillwell's emotional well-being has substantially suffered and will continue to suffer; Stillwell has experienced and continues to experience severe emotional distress, in an

COMPLAINT
- 315 -

amount to be proven at trial. Stillwell alleges that she has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial

1268.     The Count XVII Defendants actions were fraudulent, malicious, and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from the Count XVII Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

## EIGHTEENTH CAUSE OF ACTION

## REQUEST FOR DECLARATORY RELIEF: CALIFORNIA PHARMACY LAW, AS APPLIED TO COMPLIANCE FIRM

*(Against Defendants Meierhans, FN, FNL, Riordan, and Nixon Peabody)*

1269.     Stillwell restates and incorporates the allegations from the paragraphs 1-1268 above, as if they were stated in full herein.

1270.     This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Fashion Nova, LLC, (3) FN Logistics, LLC, (4) Staci J. Riordan, and (5) Nixon Peabody (the "Count XVIII Defendants").

1271.     Stillwell is an interested party under the Joint Venture, Leasing Agreement, OHN Agreement and Recruiting Agreement.

1272.    Pursuant to Cal Civ. Code Section 1060, Stillwell desires a declaration of FN, FNL, Intrivo, Nixon Peabody, Compliance Firm and Stillwell's rights or duties with respect to California's Pharmacy Law, as applied to Compliance Firm in its connection to COVID-19 testing at FN and FNL's warehouses.

1273.    An actual controversy involving justiciable questions relating to FN, FNL, Intrivo, Nixon Peabody, Compliance Firm Compliance Firm and Stillwell's rights or obligations exists and are described herein and set forth in the FNL Complaint.

1274.    An actual controversy involving a determination of whether Compliance Firm was required to have a California Board of Pharmacy license to possess, warehouse, store, sell, broker, distribute or provide logistics services for the CareStart COVID-19 Antigen Tests exists between Stillwell and FNL, and Compliance Firm and FNL.

1275.    A determination of this controversy by this Court is a proper subject of declaratory relief.

# NINETEENTH CAUSE OF ACTION

## REQUEST FOR DECLARATORY RELIEF: CALIFORNIA PHARMACY LAW, AS APPLIED TO INTRIVO DIAGNOSTICS, INC.

*(Against Defendants Intrivo, Benaron, Markel, FN, FNL, Riordan, and Nixon Peabody)*

1276.   Stillwell restates and incorporates the allegations from the paragraphs 1-1275 above, as if they were stated in full herein.

1277.   This cause of action is against Defendants: (1) Intrivo Diagnostics, Inc., (2) Reeve Benaron, (3) Daniel R. Markel, (4) Fashion Nova, LLC, (5) FN Logistics, LLC, (6) Staci J. Riordan, and (7) Nixon Peabody, (the "Count XIX Defendants").

1278.   Pursuant to Cal Civ. Code Section 1060, Stillwell desires a declaration of FN, FNL, Intrivo, Nixon Peabody, Compliance Firm and Stillwell's rights or duties with respect to California's Pharmacy Law, as applied to Intrivo and its connection to CSA Tests it collected from t FN and FNL's Santa Fe Springs warehouse in March 2021.

1279.   An actual controversy involving justiciable questions relating to FN, FNL, Intrivo, Nixon Peabody, Compliance Firm Compliance Firm and Stillwell's rights or obligations exists and are described herein and also set forth in the FNL Complaint.

1280.    An actual controversy involving a determination of whether Intrivo was required to have a California Board of Pharmacy license to possess, warehouse, store, sell, broker, distribute or provide logistics services for the CareStart COVID-19 Antigen Tests.

1281.    A determination of this controversy by this Court is a proper subject of declaratory relief.

## TWENTIETH CAUSE OF ACTION

<u>REQUEST FOR DECLARATORY RELIEF: STILLWELL'S STATE OF RESIDENCY AND DOMICILE</u>

(*Against Defendants Meierhans, FN, FNL, Riordan, and Nixon Peabody*)

1282.    Stillwell restates and incorporates the allegations from the paragraphs 1-1281 above, as if they were stated in full herein.

1283.    This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Fashion Nova, LLC, (3) FN Logistics LLC, (4) Staci J. Riordan, and (5) Nixon Peabody (the "Count XX Defendants").

1284.    Pursuant to Cal Civ. Code Section 1060, 28 U.S.C. § 2201, Stillwell desires a declaration of Meierhans, FN, FNL, Riordan, Nixon Peabody, Compliance Firm and Stillwell's rights or duties with respect to Stillwell's domicile and state of residency, as applied to a determination of diversity jurisdiction under 28 U.S.C. § 1332.

1285.   An actual controversy involving justiciable questions relating to Meierhans, FN, FNL, Riordan, Nixon Peabody, Compliance Firm and Stillwell's rights or obligations exists and are described herein and also set forth in the FNL Complaint.

1286.   An actual controversy involving a determination of whether Stillwell was a resident of Nevada or California for the determination of diversity jurisdiction in the FNL Complaint.

1287.   A determination of this controversy by this Court is a proper subject of declaratory relief.

### TWENTY- FIRST CAUSE OF ACTION

REQUEST FOR DECLARATORY JUDGEMENT: SUBJECT MATTER JURISDICTION LACKING IN *FNL VS COMPLIANCE FIRM*

(*Against Defendants Meierhans, FNL, Riordan, and Nixon Peabody*)

1288.   Stillwell restates and incorporates the allegations from the paragraphs 1-1287 above, as if they were stated in full herein.

1289.   This cause of action is against Defendants: (1) Erica A. Meierhans, (2) FN Logistics, LLC, (3) Staci J. Riordan, and (4) Nixon Peabody (the "Count XXI Defendants").

1290.   Pursuant to Cal Civ. Code Section 1060, and 28 U.S.C. § 2201 Stillwell desires a declaration of Meierhans, FN, FNL, Riordan, Nixon

Peabody, Compliance Firm and Stillwell's rights or duties with respect to subject matter jurisdiction of the United States District Court of CENTRAL DISTRICT OF CALIFORNIA in FN LOGISTICS, LLC v. THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and DOES 1 though 10, Case No. 2:21-cv-03312-GW-MAR, ("FNL Complaint").

1291.    An actual controversy involving justiciable questions relating to Meierhans, FN, FNL, Riordan, Nixon Peabody, Compliance Firm and Stillwell's rights or obligations exists and are described herein and also set forth in the FNL Complaint.

1292.    An actual controversy involving a determination of the United States District Court of CENTRAL DISTRICT OF CALIFORNIA's lack of subject matter jurisdiction in the FNL Compliant exists.

1293.    A determination of this controversy by this Court is a proper subject of declaratory relief.

**TWENTY- SECOND CAUSE OF ACTION**

REQUEST FOR DECLARATORY JUDGEMENT: PREP ACT IMMUNITY

APPLICABLE TO STILLWELL AND COMPLIANCE FIRM

(*Against Defendants Meierhans, FN, FNL, Riordan, and Nixon Peabody*)

1294.    Stillwell restates and incorporates the allegations from the

COMPLAINT

- 321 -

paragraphs 1-1293 above, as if they were stated in full herein.

1295.    This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Fashion Nova, LLC, (3) FN Logistics, LLC, (4) Staci J. Riordan, and (5) Nixon Peabody, (the "Count XXII Defendants").

1296.    Pursuant to 28 U.S.C. § 2201, Stillwell desires a declaration of Meierhans, FN, FNL, Riordan, Nixon Peabody, Compliance Firm and Stillwell's rights or duties with respect to Compliance Firm and Stillwell's immunity under the PREP Act in connection to to COVID-19 testing at FN and FNL's warehouses.

1297.    An actual controversy involving justiciable questions relating to Meierhans, FN, FNL, Riordan, Nixon Peabody, Compliance Firm and Stillwell's rights or obligations exists and are described herein and also set forth in the FNL Complaint.

1298.    An actual controversy involving a determination of whether Stillwell and Compliance Firm's conduct in connection to COVID-19 testing at FN and FNL's warehouses is covered activity under the PREP Act.

1299.    A determination of this controversy by this Court is a proper subject of declaratory relief.

## TWENTY-THIRD CAUSE OF ACTION

## REQUEST FOR DECLARATORY JUDGMENT: ATTORNEY

## MISCONDUCT

(*Against Defendants Meierhans, Riordan, Nixon Peabody, and Intrivo*)

1300.    Stillwell restates and incorporates the allegations from the paragraphs 1-1299 above, as if they were stated in full herein.

1301.    This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Staci J. Riordan, (3) Nixon Peabody, and (4) Intrivo, (the "Count XXIII Defendants").

1302.    The following are California licensed attorneys who are also admitted to the Bar of the Central District of California: Erica A. Meierhans (Bar No. 240377), Staci J. Riordan (Bar No. 232659), Aaron M. Brian (Bar No. 213191), Harsh P. Parikh (Bar No. 281402), Andrew B. Holmes (Bar No. 185401), hereafter inclusive ("Dishonest Attorneys")

1303.    The misconduct of the Dishonest Attorneys described herein is sanctionable under FRCP Rule 11, L.R. 5.2-1, and L.R. 83-3.

1304.    Pursuant to Cal Civ. Code Section 1060, Stillwell desires a declaration of Meierhans, FN, FNL, Riordan, Nixon Peabody, Intrivo Compliance Firm and Stillwell's rights or duties with respect to the sanctionable misconduct of the Dishonest Attorneys.

1305.   An actual controversy involving justiciable questions relating to Meierhans, FN, FNL, Riordan, Nixon Peabody, Intrivo, Compliance Firm and Stillwell's rights or obligations exists and are described herein and also set forth in the FNL Complaint.

1306.   An actual controversy involving a determination of whether the Dishonest Attorneys' misconduct alleged herein is sanctionable under FRCP Rule 11, L.R. 5.2-1, and L.R. 83-3.

1307.   A determination of this controversy by this Court is a proper subject of declaratory relief.

### TWENTY- FOURTH CAUSE OF ACTION

<u>REQUEST FOR DECLARATORY RELIEF: ATTORNEY MISCONDUCT</u>

(*Against Defendants Meierhans, Riordan, Nixon Peabody, and Intrivo*)

1308.   Stillwell restates and incorporates the allegations from the paragraphs 1-1307 above, as if they were stated in full herein.

1309.   This cause of action is against Defendants: (1) Erica A. Meierhans, (2) Staci J. Riordan, (3) Nixon Peabody, and (4) Intrivo (the "Count XXIV Defendants").

1310.   The following are California licensed attorneys who are also admitted to the Bar of the Central District of California: Erica A. Meierhans (Bar No. 240377), Staci J. Riordan (Bar No. 232659), Aaron M.  Brian (Bar

No. 213191), Harsh P. Parikh (Bar No. 281402), Andrew B. Holmes (Bar No. 185401), hereafter inclusive ("Dishonest Attorneys")

1311.    The misconduct of the Dishonest Attorneys described herein is sanctionable under FRCP Rule 11, L.R. 5.2-1, and L.R. 83-3.

1312.    Pursuant to 28 U.S.C. § 2201, Stillwell desires a declaration of Meierhans, FN, FNL, Riordan, Nixon Peabody, Intrivo Compliance Firm and Stillwell's rights or duties with respect to the sanctionable misconduct of the Dishonest Attorneys.

1313.    An actual controversy involving justiciable questions relating to Meierhans, FN, FNL, Riordan, Nixon Peabody, Intrivo, Compliance Firm and Stillwell's rights or obligations exists and are described herein and also set forth in the FNL Complaint.

1314.    An actual controversy involving a determination of whether the Dishonest Attorneys' misconduct alleged herein is sanctionable under FRCP Rule 11, L.R. 5.2-1, and L.R. 83-3.

1315.    A determination of this controversy by this Court is a proper subject of declaratory relief.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    <u>AS TO THE FIRST CAUSE OF ACTION</u>, **Forced Labor, 18 U.S.C. § 1589(a)(2) and Civil Remedy, 18 U.S.C. § 1595**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans, FN and FNL*, and monetary damages in the amount of $42,000.00 for labor or services obtained by Stillwell Labor in violation of 18 U.S.C. § 1589(a)(2). Stillwell also prays for a judgment for Plaintiff on her claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count I Defendants' conduct, along with punitive damages;

2.    <u>AS TO THE SECOND CAUSE OF ACTION</u>, **Forced Labor, 18 U.S.C. § 1589(a)(3) and Civil Remedy, 18 U.S.C. § 1595**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans, FN, FNL, Riordan, and Nixon Peabody* and monetary damages in the amount of $17,500.00 for labor or services obtained by Stillwell Labor in violation of 18 U.S.C. § 1589(a)(3). Stillwell also prays for a judgment for Plaintiff on her claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count II Defendants' conduct, along with punitive damages;

3.    <u>AS TO THE THIRD CAUSE OF ACTION</u>, **Forced Labor, 18 U.S.C. § 1589(b) and Civil Remedy, 18 U.S.C. § 1595**, Stillwell prays for

judgment on her claims against *Defendants Saghian, Meierhans, FN, FNL, Riordan, and Nixon Peabody* and monetary damages in the amount of $59,000.00 for labor or services obtained by Stillwell Labor in violation of 18 U.S.C. § 1589(a) and 18 U.S.C § 1589(b). Stillwell also prays for a judgment for Plaintiff on her claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count II Defendants' conduct, along with punitive damages;

4.　AS TO THE FOURTH CAUSE OF ACTION, **California Trafficking Victims' Protection Act, Ca. Civil Code Section 52.5**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans, FN, and FNL* and monetary damages in the amount of $338,437.50 for labor or services obtained by Stillwell in violation of Cal. Civil Code. Section 236.1(a). Stillwell also prays for a judgment for Plaintiff on her claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by each of the Count IV Defendants' conduct, along with exemplary or punitive damages. Plaintiff prays for an awarded up to three times her actual damages pursuant to Cal. Civil Code. Section 52.5(b);

5.　AS TO THE FIFTH CAUSE OF ACTION, **Promissory Fraud: Intentional Misrepresentation**, Stillwell prays for judgment on her claims against *Defendants Meierhans, FN, and FNL* and monetary damages in the

amount of $112,812.50 for Stillwell's services that were provided to FN and FNL pursuant to the OHN Consultancy Agreement and COVID-19 Consultancy Agreement;

6. AS TO THE SIXTH CAUSE OF ACTION, **Promissory Fraud: Negligent Misrepresentation**, Stillwell prays for judgment on her claims against *Defendants Meierhans, FN, and FNL* and special damages including but not limited to loss of wages, including front and back pay, and benefits, plus consequential damages in an amount to be proven at time of trial;

7. AS TO THE SEVENTH CAUSE OF ACTION, **Breach of Oral Contract – OHN Consultancy Agreement**, Stillwell prays for judgment on her claims against *Defendants FN, and FNL* and monetary damages in the amount of $92,250.00 for costs of labor and services that Stillwell provided to FN and FNL under the OHN Consultancy Agreement, and the amount which will compensate Stillwell for all the detriment proximately caused by the defendant's breach, or the amount that, in the ordinary course of things, would be likely to result therefrom;

8. AS TO THE EIGHTH CAUSE OF ACTION, **Breach of Oral Contract – COVID-19 Consultancy Agreement**, Stillwell prays for judgment on her claims against *Defendants FN, and FNL* and monetary damages in the amount of $188,562.50 for costs of labor and services that

Stillwell provided to FN and FNL under the COVID-19 Consultancy Agreement, and the amount which will compensate Stillwell for all the detriment proximately caused by the defendant's breach, or the amount that, in the ordinary course of things, would be likely to result therefrom;

9.    AS TO THE NINTH CAUSE OF ACTION, **Breach of Fiduciary Duty**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans, FN, FNL, Riordan, and Nixon Peabody* and monetary damages in the amount of $280,812.50 that Stillwell incurred for creating the Covid-19 testing lab, and for services Stillwell provided under the Joint Venture.

10.    AS TO THE TENTH CAUSE OF ACTION, **CIVIL RICO, 18 U.S.C. § 1962(c), Predicate Act: HONEST SERVICES FRAUD, 18 U.S.C. § 1346**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, and Doe Defendants 1-10, inclusive,* and monetary damages in the amount of $27,945,728.20, which is equal to three times the amount of damages Stillwell has sustained because of the Count X Defendants' actions, plus a civil penalty for each violation of 18 U.S.C. § 1964;

11.    AS TO THE ELEVENTH CAUSE OF ACTION, **CIVIL RICO 18 U.S.C. § 1962(c), Predicate Act: NATIONAL STOLEN PROPERTY 18 U.S.C. § 2314**, Stillwell prays for judgment on her claims against *Defendants*

*Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo and Doe Defendants 1-10, inclusive,* and monetary damages in an amount equal to three times the amount of damages Stillwell has sustained because of the Count XI Defendants' actions, plus a civil penalty for each violation of 18 U.S.C. § 1964;

12.   <u>AS TO THE TWELFTH CAUSE OF ACTION</u>, **CIVIL RICO 18 U.S.C. § 1962(c), Predicate Act: WIRE FRAUD 18 U.S.C. § 1343**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo and Doe Defendants 1-10, inclusive,* and monetary damages in an amount equal to three times the amount of damages Stillwell has sustained because of the Count XII Defendants' actions, plus a civil penalty for each violation of 18 U.S.C. § 1964;

13.   <u>AS TO THE THIRTEENTH CAUSE OF ACTION</u>, **Professional Negligence**, Stillwell prays for judgment on her claims against *Defendants Meierhans, Riordan, and Nixon Peabody* and monetary damages in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count XIII Defendants' conduct, along with punitive damages;

14.     AS TO THE FOURTEENTH CAUSE OF ACTION, **Intentional Interference with Prospective Economic Advantage,** Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive, Peabody* and monetary damages in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count XIV Defendants' conduct, along with punitive damages;

15.     AS TO THE FIFTEENTH CAUSE OF ACTION, **Negligent Interference with Prospective Economic Advantage,** Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo, and Doe Defendants 1-10, inclusive* and *Peabody* and monetary damages in an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count XV Defendants' conduct, along with punitive damages;

16.     AS TO THE SIXTEENTH CAUSE OF ACTION, **Intentional Infliction of Emotional Distress**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo and Doe Defendants 1-10, inclusive,* and an amount to be proven at trial, for economic, monetary, consequential, compensatory, or

statutory damages caused by the Count XVI Defendants' conduct, along with punite damages;

17.   AS TO THE SEVENTEENTH CAUSE OF ACTION, **Negligent Infliction of Emotional Distress**, Stillwell prays for judgment on her claims against *Defendants Saghian, Meierhans FN, FNL, Riordan, Nixon Peabody, Benaron, Markel, Intrivo and Doe Defendants 1-10, inclusive,* and an amount to be proven at trial, for economic, monetary, consequential, compensatory, or statutory damages caused by the Count XVI Defendants' conduct, along with punite damages;

18.   AS TO THE EIGHTEENTH CAUSE OF ACTION, **Request for Declaratory Relief: California Pharmacy Law**, as Applied to Compliance Firm**, Stillwell prays for judgment on her claims against *Defendants Meierhans, FN, FNL, Riordan, Nixon Peabody* and an order declaring that Compliance Firm was *not* required to have a California Board of Pharmacy license to possess, warehouse, store, sell, broker, distribute or provide logistics services for the CareStart COVID-19 Antigen Tests;

19.   AS TO THE NINETEENTH CAUSE OF ACTION, **Request for Declaratory Relief: California Pharmacy Law, as Applied to Intrivo Diagnostics, Inc.**, Stillwell prays for judgment on her claims against *Defendants Intrivo, Benaron, Markel, FN, FNL, Riordan, Nixon Peabody* and

an order declaring that Intrivo is required to have a California Board of

Pharmacy license to possess, warehouse, store, sell, broker, distribute or

provide logistics services for the CareStart COVID-19 Antigen Tests. The

CareStart COVID-19 Antigen Tests are "dangerous devices" that are regulated

by California's Pharmacy Law;

20.    <u>AS TO THE TWENTIETH CAUSE OF ACTION</u>, **Request for**

**Declaratory Relief: Stillwell's State of Residency and Domicile**, Stillwell

prays for judgment on her claims against *Defendants Meierhans, FN, FNL,*

*Riordan, Nixon Peabody* and an order declaring that Brittany A. Stillwell was a

resident and has remained a resident of the State of California since January 1,

2020. Brittany A. Stillwell was domiciled and has remained domiciled in the

State of California since January 1, 2020.

21.    <u>AS TO THE TWENTY-FIRST CAUSE OF ACTION</u>, **Request for**

**Declaratory Judgment: Subject Matter Jurisdiction Lacking in *FNL vs***

***Compliance Firm***, Stillwell prays for judgment on her claims against

*Defendants Meierhans, FNL, Riordan, Nixon Peabody* and an order declaring

that the United States District Court of CENTRAL DISTRICT OF

CALIFORNIA lacked subject matter jurisdiction in FN LOGISTICS, LLC v.

THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and

DOES 1 though 10, Case No. 2:21-cv-03312-GW-MAR.

22.     AS TO THE TWENTY-SECOND CAUSE OF ACTION, **Request for Declaratory Judgment: PREP Act Immunity Applicable to Stillwell and Compliance Firm**, Stillwell prays for judgment on her claims against *Defendants Meierhans, FN, FNL, Riordan, Nixon Peabody* and an order declaring that Prep Act Immunity applies to Stillwell and Compliance Firm, in connection to the COVID-19 services provided to Fashion Nova, LLC and FN Logistics, LLC.

23.     AS TO THE TWENTY-THIRD CAUSE OF ACTION, **Request for Declaratory Judgment: Attorney Misconduct**, Stillwell prays for judgment on her claims against *Defendants Meierhans, FN, FNL, Riordan, Nixon Peabody and Intrivo,* and an order declaring that the misconduct of attorneys Erica A. Meierhans (Bar No. 240377), Staci J. Riordan (Bar No. 232659), Aaron M.  Brian (Bar No. 213191), Harsh P. Parikh (Bar No. 281402), Andrew B. Holmes (Bar No. 185401), is sanctionable under FRCP Rule 11, L.R. 5.2-1, and L.R. 83-3;

24.     AS TO THE TWENTY-FOURTH CAUSE OF ACTION, **Request for Declaratory Relief: Attorney Misconduct**, Stillwell prays for judgment on her claims against *Defendants Meierhans, FN, FNL, Riordan, Nixon Peabody and Intrivo*, and an order declaring that the misconduct of attorneys Erica A. Meierhans (Bar No. 240377), Staci J. Riordan (Bar No. 232659), Aaron M.

Brian (Bar No. 213191), Harsh P. Parikh (Bar No. 281402), Andrew B. Holmes (Bar No. 185401), is sanctionable under FRCP Rule 11, L.R. 5.2-1, and L.R. 83-3.2;

25.     An order striking FN Logistics' Application for Default Judgment against The Compliance Firm LLC, docket #12, in FN LOGISTICS, LLC v. THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and DOES 1 though 10, Case No. 2:21-cv-03312-GW-MAR, pursuant to F.R.Civ.P 12(f).

26.     Report the following attorneys the Sate of California State Bar's Office of Chief Trial Counsel pursuant to L.R. 83 -3.2:

        a. Erica A. Meierhans (Bar No. 240377),

        b. Staci J. Riordan (Bar No. 232659),

        c. Aaron M.  Brian (Bar No. 213191),

        d. Harsh P. Parikh (Bar No. 281402), and

        e. Andrew B. Holmes (Bar No. 185401);

27.     Refer this civil matter to the California Attorney General for further investigation in connection to the allegations alleged herein;

28.     Actual and compensatory damages in a sum according to proof at time of trial;

29.  Consequential and incidental damages in a sum according to proof at time of trial;

30.  General damages, including damages for mental and emotional distress, in a sum according to proof at time of trial;

31.  Payment of Plaintiff's costs and reasonable attorneys, to the full extent authorized by statute, or law, with interest;

32.  Prejudgment interest at the legal prevailing rate;

33.  For punitive and exemplary damages in a sum according to proof at trial;

34.  For costs of suit herein incurred; and

35.  For any such other and further relief as the court deems proper.

Dated: August 31, 2021

Brittany Stillwell, *Plaintiff*
Appearing in *Pro Per*

COMPLAINT
- 336 -

# EXHIBIT A

FNL Associates,

As of today, 11/05/20, we have been notified of two (2) confirmed COVID19 positive case since last week's associate notification letter, posted on 10/29/20.

We cannot identify the associates who tested positive because of privacy laws. However, we have gathered the names of those associates whom the impacted associates were in close contact with and have required those associates to quarantine with pay for 14 days (FNL associates only). Staffing associates please refer to your respective agency for notification and quarantine policy.

1. The individual last worked on 10/28/20, day shift, department picking.
2. The individual last worked on 10/29/20, day shift, department picking.

The health and well-being of our associates is paramount. Out of an abundance of caution, we have continued to exceeded CDC guidelines by deep cleaning and sterilizing the entire facility. The following safety measures have been executed:

1. Deep cleaning and sterilization occurred following the last day worked of each associate.
2. Our third-party cleaning company cleaned and sterilized the entire facility on 10/31/20, and 11/02/20.
3. The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency so that we may track any potential outbreaks within our company. All such personal information will be maintained confidentially.

The weekly associate notification letter will be posted in the main break room, and on safety boards. A physical copy of the letter is available to you by requesting a copy from FNL HR, an agency representative, or any operations manager.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

Sincerely,

Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

**12588 Florence Ave., Santa Fe Springs, California 90670**

FNL Asociados,

A partir de hoy, 05/11/20, hemos sido notificados de dos (2) casos positivos confirmado de COVID19 desde la carta de notificación de asociado de la semana pasada, publicada el 29/10/20.

No podemos identificar los asociados que dieron positivo debido a las leyes de privacidad. Sin embargo, hemos reunido los nombres de aquellos asociados con quienes los asociados afectados estuvieron en contacto cercano y hemos requerido que esos asociados estén en cuarentena con pago durante 14 días. (FNL asociados solamente). Asociados de agencia, por favor refiérase a su agencia respetuosa para la política de cuarentena.

1. El individuo trabajo por ultima vez el 28/10/20 en el turno del día en el departamento de picking.
2. El individuo trabajo por ultima vez el 29/10/20 en el turno del día en el departamento de picking.

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, excedimos las pautas de los CDC al no solo limpiar las áreas en las que trabajaban las personas impactadas, sino que también se cerró todo el centro de distribución para esterilizar de pared a pared. Se ejecutaron las siguientes medidas de seguridad:

1. Limpieza profunda ocurrió después del ultimo día trabajado de cada asociado.
2. Nuestra empresa de limpieza externa limpió y esterilizó todas las instalaciones el 31/10/20 y 02/11/20.
3. La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan el centro de distribución.

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o su agencia respectiva para que podamos rastrear cualquier brote potencial dentro de nuestra empresa. Toda esa información personal se mantendrá confidencialmente.

La carta de notificación semanal para asociados se publicará en la sala de descanso principal y en los paneles de seguridad. Puede obtener una copia física de la carta solicitando una copia de FNL HR, un representante de la agencia o cualquier gerente de operaciones.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

Sinceramente,


Felix Felder, Director Senior de Operaciones

Lori Ott, Directora Senior de Recursos Humanos

**12588 Florence Ave., Santa Fe Springs, California 90670**

FNL Associates,

As of today, 11/12/20, we have been notified of one (1) confirmed COVID19 positive case since last week's associate notification letter, posted on 11/05/20.

We cannot identify the associates who tested positive because of privacy laws. However, we have gathered the names of those associates whom the impacted associates were in close contact with and have required those associates to quarantine with pay for 14 days (FNL associates only). Staffing associates please refer to your respective agency for notification and quarantine policy.

1. The individual last worked on 10/25/20, 2nd shift, department picking.

The health and well-being of our associates is paramount. Out of an abundance of caution, we have continued to exceeded CDC guidelines by deep cleaning and sterilizing the entire facility. The following safety measures have been executed:

1. Deep cleaning and sterilization occurred following the last day worked of each associate.
2. Our third-party cleaning company cleaned and sterilized the entire facility on 10/27/20, 10/31/20, and 11/02/20.
3. The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency so that we may track any potential outbreaks within our company. All such personal information will be maintained confidentially.

The weekly associate notification letter will be posted in the main break room, and on safety boards. A physical copy of the letter is available to you by requesting a copy from FNL HR, an agency representative, or any operations manager.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

Sincerely,

Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

**12588 Florence Ave., Santa Fe Springs, California 90670**

FNL Asociados,

A partir de hoy, 12/11/20, hemos sido notificados de un (1) caso positivo confirmado de COVID19 desde la carta de notificación de asociado de la semana pasada, publicada el 05/11/20.

No podemos identificar los asociados que dieron positivo debido a las leyes de privacidad. Sin embargo, hemos reunido los nombres de aquellos asociados con quienes los asociados afectados estuvieron en contacto cercano y hemos requerido que esos asociados estén en cuarentena con pago durante 14 días. (FNL asociados solamente). Asociados de agencia, por favor refiérase a su agencia respetuosa para la política de cuarentena.

1. El individuo trabajo por ultima vez el 25/10/20 en el segundo turno en el departamento de picking.

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, excedimos las pautas de los CDC al no solo limpiar las áreas en las que trabajaban las personas impactadas, sino que también se cerró todo el centro de distribución para esterilizar de pared a pared. Se ejecutaron las siguientes medidas de seguridad:

1. Limpieza profunda ocurrió después del ultimo día trabajado de cada asociado.
2. Nuestra empresa de limpieza externa limpió y esterilizó todas las instalaciones el 27/10/20, 31/10/20 y 02/11/20.
3. La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan el centro de distribución.

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o su agencia respectiva para que podamos rastrear cualquier brote potencial dentro de nuestra empresa. Toda esa información personal se mantendrá confidencialmente.

La carta de notificación semanal para asociados se publicará en la sala de descanso principal y en los paneles de seguridad.  Puede obtener una copia física de la carta solicitando una copia de FNL HR, un representante de la agencia o cualquier gerente de operaciones.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

Sinceramente,


Felix Felder, Director Senior de Operaciones


Lori Ott, Directora Senior de Recursos Humanos


**12588 Florence Ave., Santa Fe Springs, California 90670**

FNL Associates,

As of today, 11/19/20, we have been notified of four (4) confirmed COVID19 positive case since last week's associate notification letter, posted on 11/12/20.

We cannot identify the associates who tested positive because of privacy laws. However, we have gathered the names of those associates whom the impacted associates were in close contact with and have required those associates to quarantine with pay for 14 days (FNL associates only). Staffing associates please refer to your respective agency for notification and quarantine policy.

1. The individual last worked on 11/07/20, 1st shift, department packing.
2. The individual last worked on 11/13/20 on 1st shift, department packing.
3. The individual last worked on 11/11/20 on 2nd shift, department safety.
4. The individual last worked on 11/15/20 on 2nd shift, department packing.

The health and well-being of our associates is paramount. Out of an abundance of caution, we have continued to exceeded CDC guidelines by deep cleaning and sterilizing the entire facility. The following safety measures have been executed:

1. Deep cleaning and sterilization occurred following the last day worked of each associate.
2. Our third-party cleaning company cleaned and sterilized the entire facility on 11/07/20, 11/10/20, and 11/17/20.
3. The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency so that we may track any potential outbreaks within our company. All such personal information will be maintained confidentially.

The weekly associate notification letter will be posted in the main break room, and on safety boards. A physical copy of the letter is available to you by requesting a copy from FNL HR, an agency representative, or any operations manager.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

Sincerely,

Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

**12588 Florence Ave., Santa Fe Springs, California 90670**



FNL Asociados,

A partir de hoy, 19/11/20, hemos sido notificados de cuatro (4) caso positivo confirmado de COVID19 desde la carta de notificación de asociado de la semana pasada, publicada el 12/11/20.

No podemos identificar los asociados que dieron positivo debido a las leyes de privacidad. Sin embargo, hemos reunido los nombres de aquellos asociados con quienes los asociados afectados estuvieron en contacto cercano y hemos requerido que esos asociados estén en cuarentena con pago durante 14 días. (FNL asociados solamente). Asociados de agencia, por favor refiérase a su agencia respetuosa para la política de cuarentena.

1. El individuo trabajo por ultima vez el 07/11/20 en el 1er turno, en el departamento de packing.
2. El individuo trabajo por ultima vez el 13/11/20 en el 1er turno, en el departamento de packing.
3. El individuo trabajo por ultima vez el 11/11/20 en el 2ndo turno, en el departamento de safety.
4. El individuo trabajo por ultima vez el 15/11/20 en el 2ndo turno, en el departamento de packing.

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, excedimos las pautas de los CDC al no solo limpiar las áreas en las que trabajaban las personas impactadas, sino que también se cerró todo el centro de distribución para esterilizar de pared a pared. Se ejecutaron las siguientes medidas de seguridad:

1. Limpieza profunda ocurrió después del ultimo día trabajado de cada asociado.
2. Nuestra empresa de limpieza externa limpió y esterilizó todas las instalaciones el 07/11/20, 10/11/20, 14/11/20 y 17/11/20.
3. La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan el centro de distribución.

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o su agencia respectiva para que podamos rastrear cualquier brote potencial dentro de nuestra empresa. Toda esa información personal se mantendrá confidencialmente.

La carta de notificación semanal para asociados se publicará en la sala de descanso principal y en los paneles de seguridad. Puede obtener una copia física de la carta solicitando una copia de FNL HR, un representante de la agencia o cualquier gerente de operaciones.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

Sinceramente,


Felix Felder, Director Senior de Operaciones


Lori Ott, Directora Senior de Recursos Humanos


**12588 Florence Ave., Santa Fe Springs, California 90670**



FNL Associates,

As of 11/26/20, we have been notified of sixteen confirmed COVID19 positive case since last week's associate notification letter, posted on 11/19/20. We cannot identify the associates who tested positive because of privacy laws. However, we have gathered the names of those associates whom the impacted associates were in close contact with and have required those associates to quarantine with pay, as outlined by LA County Health Department Order (FNL associates only). Staffing associates please refer to your respective agency for notification and quarantine policy.

This list includes last day in the facility, not testing or notification dates.
1. The individual last worked on 11/12/20 1st shift in packing
2. The individual last worked on 11/15/20 2nd shift in a support department.
3. The individual last worked on 11/16/20 1st shift in picking.
4. The individual last worked on 11/16/20 1st. in packing.
5. The individual last worked on 11/17/20 2nd shift in replenishment.
6. The individual last worked on 11/17/20 2nd shift in picking.
7. The individual last worked on 11/18/20 1st shift in packing.
8. The individual last worked on 11/18/20 2nd shift in packing.
9. The individual last worked on 11/18/20 2nd shift in packing.
10. The individual last worked on 11/19/20 2nd shift in receiving.
11. The individual last worked on 11/19/20 1st shift in inventory.
12. The individual last worked on 11/20/20 1st shift in packing.
13. The individual last worked on 11/20/20 1st shift in picking.
14. The individual last worked on 11/20/20 1st shift in inventory.
15. The individual last worked on 11/20/20 1st shift on the safety team.
16. The individual last worked on 11/24/20 in a support department.

The health and well-being of our associates is paramount. Out of an abundance of caution, we have continued to exceeded CDC guidelines by deep cleaning and sterilizing the entire facility. The following safety measures have been executed:

1. Deep cleaning and sterilization occurred following the last day worked of each associate.
2. Our third-party cleaning company cleaned and sterilized the entire facility on 11/14/20, 11/17/20, 11/19, 11/22/20 and 11/25.
3. The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency so that we may track any potential outbreaks within our company. All such personal information will be maintained confidentially.

The weekly associate notification letter will be posted in the main break room, and on safety boards. A physical copy of the letter is available to you by requesting a copy from FNL HR, an agency representative, or any operations manager.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

**12588 Florence Ave., Santa Fe Springs, California 90670**



Sincerely,


Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

FNL Asociados,

A partir de hoy, 26/11/20, hemos sido notificados de dieciséis casos positivos confirmados de COVID19 desde la carta de notificación de asociado de la semana pasada, publicada el 19/11/20.

Esta lista incluye el ultima día que trabajaron en el edificio, no incluye fechas de exámenes o notificaciones:

1. El individuo trabajo por ultima vez el 12/11/20 en el 1er turno, en el departamento de packing.
2. El individuo trabajo por ultima vez el 15/11/20 en el 2ndo turno, en el departamento de apoyo.
3. El individuo trabajo por ultima vez el 16/11/20 en el 1er turno, en el departamento de picking.
4. El individuo trabajo por ultima vez el 16/11/20 en el 1er turno, en el departamento de packing.
5. El individuo trabajo por ultima vez el 17/11/20 en el 2ndo turno, en el departamento de replenishment.
6. El individuo trabajo por ultima vez el 17/11/20 en el 2ndo turno, en el departamento de picking.
7. El individuo trabajo por ultima vez el 18/11/20 en el 1er turno, en el departamento de packing.
8. El individuo trabajo por ultima vez el 18/11/20 en el 2ndo turno, en el departamento de packing.
9. El individuo trabajo por ultima vez el 18/11/20 en el 2ndo turno, en el departamento de packing.
10. El individuo trabajo por ultima vez el 19/11/20 en el 2ndo turno, en el departamento de receiving.
11. El individuo trabajo por ultima vez el 19/11/20 en el 1er turno, en el departamento de inventario.
12. El individuo trabajo por ultima vez el 20/11/20 en el 1er turno, en el departamento de packing.
13. El individuo trabajo por ultima vez el 20/11/20 en el 1er turno, en el departamento de picking.
14. El individuo trabajo por ultima vez el 20/11/20 en el 1er turno, en el departamento de inventario.
15. El individuo trabajo por ultima vez el 20/11/20 en el 1er turno, en el departamento de safety.
16. El individuo trabajo por ultima vez el 24/11/20 en el departamento de apoyo.

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, excedimos las pautas de los CDC al no solo limpiar las áreas en las que trabajaban las personas impactadas, sino que también se cerró todo el centro de distribución para esterilizar de pared a pared. Se ejecutaron las siguientes medidas de seguridad:

1. Limpieza profunda ocurrió después del ultimo día trabajado de cada asociado.
2. Nuestra empresa de limpieza externa limpió y esterilizó todas las instalaciones el 14/11/20, 17/11/20, 19/11/20, 22/11/20, 25/11/20.
3. La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan el centro de distribución.

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o su agencia respectiva para que podamos rastrear cualquier brote potencial dentro de nuestra empresa. Toda esa información personal se mantendrá confidencialmente.

La carta de notificación semanal para asociados se publicará en la sala de descanso principal y en los paneles de seguridad.  Puede obtener una copia física de la carta solicitando una copia de FNL HR, un representante de la agencia o cualquier gerente de operaciones.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

**12588 Florence Ave., Santa Fe Springs, California 90670**

Sinceramente,


Felix Felder, Director Senior de Operaciones

Lori Ott, Directora Senior de Recursos Humanos

# EXHIBIT B

**Compliant Care Staffing**
1055 W 7th Street, 33rd Floor
Los Angeles, CA 90017
+1 7472712100
billing@thecompliancefirm.com
www.thecompliancefirm.com


Compliant Care
Staffing

# INVOICE

**BILL TO**

FN Logistics, Inc.
12588 Florence Avenue
Santa Fe Springs, CA 90670
USA

| | |
|---|---|
| **INVOICE #** | 1033 |
| **DATE** | 11/24/2020 |
| **DUE DATE** | 11/24/2020 |
| **TERMS** | Due on receipt |

| WEEK END DATE | EMPLOYEE | DESCRIPTION | LABOR TYPE | HRS | RATE | TOTAL |
|---|---|---|---|---|---|---|
| 11/24/2020 | **CareStart Antigen Test** | | | 12,800 | 28.00 | 358,400.00T |

| | |
|---|---|
| SUBTOTAL | 358,400.00 |
| TAX | 34,048.00 |
| TOTAL | 392,448.00 |
| PAYMENT | 392,448.00 |
| BALANCE DUE | **$0.00** |

**NONREFUNDABLE** 12,800 COVID antigen tests to be used at CCS at FNL Lab; FNL/FashionNova declines 3PL storage and indemnifies CCS for FNL/s care. Terms and conditions according to EUA Purchase agreement and COVID Testing Service Agreement

PAID

THE COMPLIANCE FIRM
Healthcare. Business. Consultants.


Compliant Care
Staffing

## EMERGENCY USE PURCHASE AGREEMENT

The Emergency Use Test Purchase Agreement ("Agreement") is entered into by and between The Compliance Firm, LLC *dba* Compliant Care Staffing, LLC, a Nevada company ("Company") and the purchasers, FN Logistics, Inc, a Delaware Company and Fashion Nova, Inc., a California Company ("Purchaser") and is effective as the date set forth next to the Purchaser's signature.

The purchaser agrees that the tests purchased by Purchaser from the Company ("Tests") are for emergency use test purposes only and have not been approved, cleared or licensed for sale or use in the U.S. by the U.S. Food and Drug Administration ("FDA"). The tests are provided by Company to Purchaser pursuant to the <u>Policy for Diagnostic Tests for Coronavirus Disease-2019 during the Public Health Emergency</u> issued on the  web on March 16, 2020 by U.S. Food and Drug Administration (" FDA") which may be found here <u>https:// www .fda.gov/media/ 135659/download</u> (collectively the "Policy"). All uses of the  tests by the Purchaser shall be consistent with the Policy.

The Purchaser shall comply with the Policy guidance including, but not limited to, validation, FDA notification, reporting results, Emergency User Authorization (" EUA "), clinical testing and distribution. Collection and interpretation of the Tests shall only be performed by medical professionals. The Tests shall not be made available, sold, distributed or marketed, directly or indirectly, to the general public.

THE TESTS SHALL BE ADMINISTERED BY COMPANY TO CONDUCT EMPLOYER SPONSORED TESTING IN PURCHASER'S ONSITE LABORATORY.

All tests will be provided with labeling which states **"The test has not been reviewed by the FDA and results from antibody testing should not be used as the sole basis to diagnose or exclude SARS-Co-V-2 infection or to inform infection status".** The Purchaser shall not alter, modify, remove or deface the labelling on the Tests.

Due to the nature of these tests, once these tests are shipped, they will **NOT BE REFUNDABLE OR EXCHANGEABLE** for any reason.

The Purchaser agrees to indemnify, defend and hold harmless Company and its officers, directors, employees, agents, representatives, successors and assigns from any and all claims, demands, losses, liabilities, judgements, awards and costs (including attorney's fees) arising out of or relating to the breach of this Agreement by the Purchaser or any person affiliated with the Purchaser.

**Company:**        The Compliance Firm, LLC

**Signature/Title:**                                                   Dir. of Business Development

**Purchaser:**      Fashion Nova, Inc. & FN Logistics, Inc.

**Signature/Title:**

**Date:**

# EXHIBIT C

FNL Associates,

As of 12/3/20, we have been notified of nineteen confirmed COVID19 positive case since last week's associate notification letter, posted on 11/27/20. We cannot identify the associates who tested positive because of privacy laws. However, we have gathered the names of those associates whom the impacted associates were in close contact with and have required those associates to quarantine with pay, as outlined by LA County Health Department Order (FNL associates only). Staffing associates please refer to your respective agency for notification and quarantine policy.

This list includes last day in the facility, not testing or notification dates.

1.  1st shift picking department, last worked 11/16.
2.  2nd shift packing department, last worked 11/17.
3.  1st shift replenishment department, last worked 11/18.
4.  2nd shift picking department, last worked 11/20.
5.  1st shift packing department, last  worked on 11/20.
6.  2nd shift support department, last worked 11/21.
7.  2nd shift packing department, last  worked 11/22.
8.  1st shift picking department, last worked 11/23.
9.  2nd shift support department, last  worked 11/23.
10.  1st shift picking department, last day worked 11/24.
11.  1st shift replenishment department, last worked 11/25
12.  1st shift inventory department, last  worked 11/25
13.  1st shift packing department, last  worked on 11/25.
14.  2nd shift packing department, last worked 11/25.
15.  2nd shift packing department, last  worked 11/25.
16.  1st shift picking department, last  worked 11/25.
17.  2nd shift replenishment department, last worked 11/25
18.  2nd shift packing department, last worked 11/26.
19.  2nd shift support department, last worked 11/28.

The health and well-being of our associates is paramount. Out of an abundance of caution, we have continued to exceeded CDC guidelines by deep cleaning and sterilizing the entire facility. The following safety measures have been executed:

1.  Deep cleaning and sterilization occurred following the last day worked of each associate.
2.  Our third-party cleaning company cleaned and sterilized the entire facility on 11/14, 11/18, 11/21 11/25 and 12/03.
3.  The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency so that we may track any potential outbreaks within

our company. All such personal information will be maintained confidentially.

The weekly associate notification letter will be posted in the main break room, and on safety boards. A physical copy of the letter is available to you by requesting a copy from FNL HR, an agency representative, or any operations manager.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

Sincerely,

Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

**12588 Florence Ave., Santa Fe Springs, California 90670**

FNL Asociados,

A partir de hoy, 03/12/20, hemos sido notificados de diecinueve casos positivos confirmados de COVID19 desde la carta de notificación de asociado de la semana pasada, publicada el 27/11/20.  No podemos identificar los asociados que salieron positivos por leyes de privacidad.  Sin embargo, hemos colectado nombres de los asociados con los que los afectados estaban en estrecho contacto y les hemos exigido que se pongan en cuarentena con paga, como se describe en la Orden del Departamento de Salud del Condado de Los Ángeles (solo asociados FNL).  Asociados de agencia, consulte a su agencia respectiva para conocer la política de notificación y cuarentena.

Esta lista incluye el ultima día que trabajaron en el edificio, no incluye fechas de exámenes o notificaciones:

1.  1er turno departamento de picking, ultimo día trabajado 11/16.
2.  2ndo turno departamento de packing, ultimo día trabajado 11/17.
3.  1er turno departamento de replenishment, ultimo día trabajado 11/18.
4.  2ndo turno departamento de picking, ultimo día trabajado 11/20.
5.  1er turno departamento de packing, ultimo día trabajado 11/20.
6.  2ndo turno departamento de apoyo, ultimo día trabajado 11/21.
7.  2ndo turno departamento de packing, ultimo día trabajado 11/22.
8.  1er turno departamento de picking, ultimo día trabajado 11/23.
9.  2ndo turno departamento de apoyo, ultimo día trabajado 11/23.
10. 1er turno departamento de picking, ultimo día trabajado 11/24.
11. 1er turno departamento de replenishment, ultimo día trabajado 11/25.
12. 1er turno departamento de inventario, ultimo día trabajado 11/25.
13. 1er turno departamento de packing, ultimo día trabajado 11/25.
14. 2ndo turno departamento de packing, ultimo día trabajado 11/25.
15. 2ndo turno departamento de packing, ultimo día trabajado 11/25.
16. 1er turno departamento de picking, ultimo día trabajado 11/25.
17. 2ndo turno departamento de replenishment, ultimo día trabajado 11/25.
18. 2ndo turno departamento de packing, ultimo día trabajado 11/26.
19. 2ndo turno departamento de apoyo, ultimo día trabajado 11/28.

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, excedimos las pautas de los CDC al no solo limpiar las áreas en las que trabajaban las personas impactadas, sino que también se cerró todo el centro de distribución para esterilizar de pared a pared. Se ejecutaron las siguientes medidas de seguridad:

1.  Limpieza profunda ocurrió después del ultimo día trabajado de cada asociado.
2.  Nuestra empresa de limpieza externa limpió y esterilizó todas las instalaciones el 14/11, 18/11, 21/11, 25/11 and 03/12.
3.  La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan el centro de distribución.

**12588 Florence Ave., Santa Fe Springs, California 90670**

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o su agencia respectiva para que podamos rastrear cualquier brote potencial dentro de nuestra empresa. Toda esa información personal se mantendrá confidencialmente.

La carta de notificación semanal para asociados se publicará en la sala de descanso principal y en los paneles de seguridad.  Puede obtener una copia física de la carta solicitando una copia de FNL HR, un representante de la agencia o cualquier gerente de operaciones.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

Sinceramente,

Felix Felder, Director Senior de Operaciones

Lori Ott, Directora Senior de Recursos Humanos

**12588 Florence Ave., Santa Fe Springs, California 90670**

# EXHIBIT D

FNL Associates,

As of 12/9/2020, FNL received notification of twenty-eight confirmed COVID19 positive cases since last week's associate notification letter, posted on 12/03/20. As required by law, FNL cannot identify Covid19 positive due to privacy concerns. However, HR gathered the names of all associates whom the impacted associates were in close contact with, and required them to quarantine as outlined by federal, state and local orders.

| Shift | Departemnt | Last Day Worked | Shift | Department | Last Day Worked |
|-------|-----------|-----------------|-------|-----------|-----------------|
| 1st | Packing | Monday, November 30, 2020 | 2nd | Packing | Monday, November 30, 2020 |
| 1st | Packing | Saturday, November 28, 2020 | 2nd | Packing | Wednesday, November 25, 2020 |
| 1st | Replenishment | Saturday, November 28, 2020 | 2nd | Picking | Wednesday, November 25, 2020 |
| 1st | Shipping | Saturday, November 28, 2020 | 2nd | Picking | Wednesday, November 25, 2020 |
| 1st | Picking | Tuesday, December 1, 2020 | 2nd | Picking | Friday, November 27, 2020 |
| 1st | Picking | Wednesday, December 2, 2020 | 2nd | Picking | Saturday, November 28, 2020 |
| 1st | Packing | Wednesday, December 2, 2020 | 2nd | Packing | Saturday, November 28, 2020 |
| 1st | Picking | Thursday, December 3, 2020 | 2nd | Picking | Sunday, November 29, 2020 |
| 1st | Packing | Thursday, December 3, 2020 | 2nd | Receiving | Tuesday, December 1, 2020 |
| 1st | Inventory | Friday, December 4, 2020 | 2nd | WCS | Tuesday, December 1, 2020 |
| 1st | Packing | Sunday, December 6, 2020 | 2nd | Picking | Thursday, December 3, 2020 |
| 1st | Packing | Monday, December 7, 2020 | 2nd | Picking | Thursday, December 3, 2020 |
| 1st | Packing | Tuesday, December 8, 2020 | 2nd | Picking | Thursday, December 3, 2020 |
| 1st | Packing | Wednesday, December 9, 2020 | 2nd | Packing | Wednesday, December 9, 2020 |

The health and well-being of our associates is paramount. Out of an abundance of caution, FNL continues to exceed the CDC guideline to deep clean and disinfect select areas exposed to Covid19 by deep cleaning and sterilizing the entire facility at minimum multiple times per week. The following safety measures were executed:

1. Eco-bear, our third-party cleaning company cleaned and sterilized the entire facility on 12/04, 12/10
2. The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency immediately. Federal, state and local laws require FNL to track and report potential outbreaks within the company. All such personal information is confidential.

Check the main break room and safety boards for the weekly associate letter posting.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

Sincerely,

Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

**12588 Florence Ave., Santa Fe Springs, California 90670**



FNL Asociados,

A partir del 09/12/20, FNL recibió notificación de veintiocho casos positivos confirmados de COVID19 desde la carta de notificación asociada de la semana pasada, publicada el 03/12/20.  Como lo requiere la ley, FNL no puede identificar COVID19 positivo debido a preocupaciones de privacidad.  Sin embargo, Recursos Humanos, recopilo los nombres de todos los asociados con los que los asociados afectados estaban en estrecho contacto y les exigió que los pusieran en cuarentena según lo estipulado por las ordenes federales, estatales y locales.

| Turno | Departamento | Ultimo dia Trabajado | Turno | Departamento | Ultimo dia Trabajado |
|-------|--------------|----------------------|-------|--------------|----------------------|
| 1er | Packing | Lunes, 30 Noviembre 2020 | 2ndo | Packing | Lunes, 30 Noviembre 2020 |
| 1er | Packing | Sabado, 28 Noviembre 2020 | 2ndo | Packing | Miercoles, 25 Noviembre 2020 |
| 1er | Replenishment | Sabado, 28 Noviembre 2020 | 2ndo | Picking | Miercoles, 25 Noviembre 2020 |
| 1er | Shipping | Sabado, 28 Noviembre 2020 | 2ndo | Picking | Miercoles, 25 Noviembre 2020 |
| 1er | Picking | Martes, 1 Diciembre 2020 | 2ndo | Picking | Viernes, 27 Noviembre 2020 |
| 1er | Picking | Miercoles, 2 Diciembre 2020 | 2ndo | Picking | Sabado, 28 Noviembre 2020 |
| 1er | Packing | Miercoles, 2 Diciembre 2020 | 2ndo | Packing | Sabado, 28 Noviembre 2020 |
| 1er | Picking | Jueves, 3 Diciembre 2020 | 2ndo | Picking | Domingo, 29 Noviembre 2020 |
| 1er | Packing | Jueves, 3 Diciembre 2020 | 2ndo | Receiving | Martes, 1 Diciembre 2020 |
| 1er | Inventario | Viernes, 4 Diciembre 2020 | 2ndo | WCS | Martes, 1 Diciembre 2020 |
| 1er | Packing | Domingo, 6 de Diciembre 2020 | 2ndo | Picking | Jueves, 3 de Diciembre 2020 |
| 1er | Packing | Lunes, 7 de Diciembre 2020 | 2ndo | Picking | Jueves, 3 de Diciembre 2020 |
| 1er | Packing | Martes, 8 de Diciembre 2020 | 2ndo | Picking | Jueves, 3 de Diciembre 2020 |
| 1er | Packing | Miercoles, 9 de Diciembre 2020 | 2ndo | Packing | Miercoles, 9 de Diciembre 2020 |

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, FNL sigue superando las pautas de los CDC de limpiar y desinfectar en profundidad determinadas áreas expuestas a COVID19 mediante una limpieza profunda y esterilización de todo el centro de distribución al menos varias veces por semana. Se ejecutaron las siguientes medidas de seguridad:

1. Eco-Bear, nuestra empresa de limpieza externa, limpio y esterilizo toda la instalación el 04/12, 10/12
2. La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan las instalaciones.

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 o a su agencia respectiva lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o a su agencia respectiva de inmediato.  Las leyes federales, estatales y locales requieren que FNL rastree e informe los posibles brotes dentro de la empresa.  Toda esa información personal es confidencial.

Consulte la sala de descanso principal y los tableros de seguridad para ver la publicación semanal de cartas de asociados.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

Sinceramente,


Felix Felder, Director Senior de Operaciones

Lori Ott, Directora Senior de Recursos Humanos


**12588 Florence Ave., Santa Fe Springs, California 90670**

# EXHIBIT E

**FN LOGISTICS**

FNL Associates,

As of 12/17/2020, FNL received notification of thirty-eight confirmed COVID19 positive cases since last week's associate notification letter, posted on 12/10/20. As required by law, FNL cannot identify Covid19 positive due to privacy concerns. However, HR gathered the names of all associates whom the impacted associates were in close contact with, and required them to quarantine as outlined by federal, state and local orders.

| Shift | Department | Last Day Worked | Shift | Department | Last Day Worked |
|-------|------------|-----------------|-------|------------|-----------------|
| 1st | Receiving | 11/27/2020 | 1st | Inventory | 12/8/2020 |
| 1st | Packing | 11/30/2020 | 2nd | Packing | 12/8/2020 |
| 1st | Receiving | 12/1/2020 | 2nd | Facilities | 12/8/2020 |
| 2nd | Inventory | 12/3/2020 | 2nd | Packing | 12/8/2020 |
| 1st | Packing | 12/4/2020 | 2nd | Picking | 12/8/2020 |
| Office | Office | 12/4/2020 | 1st | Packing | 12/9/2020 |
| 1st | Returns | 12/4/2020 | 1st | Packing | 12/9/2020 |
| 1st | Receiving | 12/4/2020 | 2nd | Picking | 12/9/2020 |
| 1st | Packing | 12/5/2020 | 1st | Packing | 12/10/2020 |
| 1st | Safety | 12/5/2020 | 2nd | Packing | 12/10/2020 |
| 1st | Picking | 12/5/2020 | 1st | Packer | 12/10/2020 |
| 1st | Packing | 12/6/2020 | 1st | Packing | 12/11/2020 |
| 1st | Packing | 12/6/2020 | 1st | Packing | 12/11/2020 |
| 1st | Receiving | 12/7/2020 | 1st | Replenishment | 12/11/2020 |
| 2nd | Picking | 12/7/2020 | 1st | Picking | 12/11/2020 |
| 1st | Picking | 12/7/2020 | 2nd | Picking | 12/11/2020 |
| 1st | Packing | 12/7/2020 | 1st | Receiving | 12/13/2020 |
| Office | Support Group | 12/7/2020 | 1st | Packing | 12/13/2020 |
| 1st | Picking | 12/7/2020 | 1st | Packing | 12/14/2020 |

The health and well-being of our associates is paramount. Out of an abundance of caution, FNL continues to exceed the CDC guideline to deep clean and disinfect select areas exposed to Covid19 by deep cleaning and sterilizing the entire facility at minimum multiple times per week. The following safety measures were executed:

1. Eco-bear, our third-party cleaning company cleaned and sterilized the entire facility on 12/04, 12/10, 12/13, 12/16
2. The cleaning company uses only CDC recommended cleaning solutions and disinfectants each time they clean and disinfect the facility.

If you develop flu or other symptoms including dry cough and fever, please contact your medical provider, and do not come to work. Notify FNL HR at (323) 807-5874 or your respective agency as soon as possible. If you, or someone in your household, exhibits COVID-19 related symptoms, please notify FNL HR or your respective agency immediately. Federal, state and local laws require FNL to track and report potential outbreaks within the company. All such personal information is confidential.

Check the main break room and safety boards for the weekly associate letter posting.

Should you have any questions or concerns, please contact FNL's HR (323) 807-5874.

Sincerely,

Felix Felder
Senior Director of Operations

Lori Ott
Senior Director of Human Resources

**12588 Florence Ave., Santa Fe Springs, California 90670**



FNL Asociados,

A partir del 17/12/20, FNL recibió notificación de treinta y ocho casos positivos confirmados de COVID19 desde la carta de notificación asociada de la semana pasada, publicada el 10/12/20.  Como lo requiere la ley, FNL no puede identificar COVID19 positivo debido a preocupaciones de privacidad.  Sin embargo, Recursos Humanos, recopiló los nombres de todos los asociados con los que los asociados afectados estaban en estrecho contacto y les exigió que los pusieran en cuarentena según lo estipulado por las ordenes federales, estatales y locales.

| Turno | Departamento | Ultimo Dia Trabajado | Turno | Departamento | Ultimo Dia Trabajado |
|-------|--------------|----------------------|-------|--------------|----------------------|
| 1er | Receiving | 27/11/2020 | 1er | Inventario | 8/12/2020 |
| 1er | Packing | 30/11/2020 | 2ndo | Packing | 8/12/2020 |
| 1er | Receiving | 1/12/2020 | 2ndo | Facilities | 8/12/2020 |
| 2ndo | Inventario | 3/12/2020 | 2ndo | Packing | 8/12/2020 |
| 1er | Packing | 4/12/2020 | 2ndo | Picking | 8/12/2020 |
| Oficina | Office | 4/12/2020 | 1er | Packing | 9/12/2020 |
| 1er | Returns | 4/12/2020 | 1er | Packing | 9/12/2020 |
| 1er | Receiving | 4/12/2020 | 2ndo | Picking | 9/12/2020 |
| 1er | Packing | 5/12/2020 | 1er | Packing | 10/12/2020 |
| 1er | Safety | 5/12/2020 | 2ndo | Packing | 10/12/2020 |
| 1er | Picking | 5/12/2020 | 1er | Packer | 10/12/2020 |
| 1er | Packing | 6/12/2020 | 1er | Packing | 11/12/2020 |
| 1er | Packing | 6/12/2020 | 1er | Packing | 11/12/2020 |
| 1er | Receiving | 7/12/2020 | 1er | Replenishment | 11/12/2020 |
| 2ndo | Picking | 7/12/2020 | 1er | Picking | 11/12/2020 |
| 1er | Picking | 7/12/2020 | 2ndo | Picking | 11/12/2020 |
| 1er | Packing | 7/12/2020 | 1er | Receiving | 13/12/2020 |
| Oficina | Support Group | 7/12/2020 | 1er | Packing | 13/12/2020 |
| 1er | Picking | 7/12/2020 | 1er | Packing | 14/12/2020 |

La salud y el bienestar de nuestros asociados son primordiales. Por precaución, FNL sigue superando las pautas de los CDC de limpiar y desinfectar en profundidad determinadas áreas expuestas a COVID19 mediante una limpieza profunda y esterilización de todo el centro de distribución al menos varias veces por semana. Se ejecutaron las siguientes medidas de seguridad:

1. Eco-Bear, nuestra empresa de limpieza externa, limpio y esterilizo toda la instalación el 04/12, 10/12, 13/12, 16/12
2. La empresa de limpieza utiliza solo las soluciones de limpieza y desinfectantes recomendados por los CDC cada vez que limpian y desinfectan las instalaciones.

Si desarrolla gripe u otros síntomas, como tos seca y fiebre, comuníquese con su proveedor médico y no vaya a trabajar. Notifique a FNL HR al (323) 807-5874 o a su agencia respectiva lo antes posible. Si usted o alguien en su hogar presenta síntomas relacionados con COVID-19, notifique a FNL HR o a su agencia respectiva de inmediato.  Las leyes federales, estatales y locales requieren que FNL rastree e informe los posibles brotes dentro de la empresa.  Toda esa información personal es confidencial. Consulte la sala de descanso principal y los tableros de seguridad para ver la publicación semanal de cartas de asociados.

Si tiene alguna pregunta o inquietud, comuníquese con HR de FNL (323) 807-5874.

Sinceramente,


Felix Felder, Director Senior de Operaciones

Lori Ott, Directora Senior de Recursos Humanos


**12588 Florence Ave., Santa Fe Springs, California 90670**

# EXHIBIT F

# Fashion Nova, Inc.

Consolidated Financial Statements as of and for the
Years Ended December 31, 2019 and 2018, and
Independent Auditors' Report

# Deloitte.

**Deloitte & Touche LLP**
555 West 5th Street
Suite 2700
Los Angeles, CA 90013-1010
USA

Tel: +1 213 688 0800
Fax: +1 213 688 0100
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

The Board of Directors
Fashion Nova, Inc.
Vernon, California

We have audited the accompanying consolidated financial statements of Fashion Nova, Inc. and its subsidiaries (the "Company"), which comprise the consolidated balance sheets as of December 31, 2019 and 2018, and the related consolidated statements of income and comprehensive income, shareholders' equity, and cash flows for the years then ended and the related notes to the consolidated financial statements.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Fashion Nova, Inc. and its subsidiaries as of December 31, 2019 and 2018, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matter**

As discussed in Note 7 to the financial statements, the Company has extensive transactions and relationships with related parties. Accordingly, the accompanying financial statements may not necessarily be indicative of the conditions that would have existed or the results of operations that would have been achieved if the Company had not operated without such affiliations. Our opinion is not modified with respect to this matter.

Deloitte & Touche LLP

May 8, 2020

- 2 -

# FASHION NOVA, INC.

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2019 AND 2018**
**(In thousands, except share data)**

| | 2019 | 2018 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 68,714 | $ 28,382 |
| Short-term investments—available-for-sale securities | | 2,958 |
| Note receivable from Affiliate | | 3,053 |
| Merchandise inventories | 170,736 | 175,611 |
| Prepaid expenses and other current assets | 6,632 | 2,621 |
| Total current assets | 246,082 | 212,625 |
| PROPERTY AND EQUIPMENT—Net | 3,307 | 2,941 |
| INTANGIBLES—Net | 13,151 | 2,558 |
| SECURITY DEPOSITS | 823 | 845 |
| TOTAL ASSETS | $263,363 | $218,969 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Accounts payable | $ 81,719 | $ 66,220 |
| Due to affiliates—net | 26,920 | 38,644 |
| Accrued expenses and other current liabilities | 37,491 | 14,224 |
| Gift card liability | 25,668 | 20,598 |
| Sales returns reserve | 6,192 | 692 |
| Deferred revenue | 8,946 | 5,661 |
| Total current liabilities | 186,936 | 146,039 |
| COMMITMENTS AND CONTINGENCIES (Note 8) | | |
| SHAREHOLDERS' EQUITY: | | |
| Common stock, $0.025 and $0.025 par value, respectively—authorized, 10,000,000 and 10,000,000 shares, respectively; issued and outstanding, 4,000,000 and 4,000,000 shares, as of December 31, 2019 and 2018, respectively | 100 | 100 |
| Additional paid-in capital | 14,690 | 14,690 |
| Retained earnings | 61,637 | 58,140 |
| Total shareholders' equity | 76,427 | 72,930 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $263,363 | $218,969 |

See accompanying notes to consolidated financial statements.

# FASHION NOVA, INC.

**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018**
**(In thousands)**

|  | 2019 | 2018 |
|---|---|---|
| NET SALES | $1,294,650 | $900,337 |
| COST OF SALES | 955,947 | 619,124 |
| GROSS PROFIT | 338,703 | 281,213 |
| SELLING, GENERAL, AND ADMINISTRATIVE EXPENSES | 217,602 | 174,479 |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 121,101 | 106,734 |
| PROVISION FOR INCOME TAXES | 1,850 | 1,715 |
| NET INCOME AND COMPREHENSIVE INCOME | $ 119,251 | $105,019 |

See accompanying notes to consolidated financial statements.

# FASHION NOVA, INC.

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018**
**(In thousands, except share data)**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Total Shareholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| BALANCE—January 1, 2018 | 4,000,000 | $100 | $ 9,690 | $ 28,769 | $ 38,559 |
| Cash contributions from shareholders (Note 6) | | | 5,000 | | 5,000 |
| Distributions to shareholders (Note 6) | | | | (75,648) | (75,648) |
| Net income | | | | 105,019 | 105,019 |
| BALANCE—December 31, 2018 | 4,000,000 | 100 | 14,690 | 58,140 | 72,930 |
| Distributions to shareholders (Note 6) | | | | (115,754) | (115,754) |
| Net income | | | | 119,251 | 119,251 |
| BALANCE—December 31, 2019 | 4,000,000 | $100 | $14,690 | $ 61,637 | $ 76,427 |

See accompanying notes to consolidated financial statements.

- 5 -

# FASHION NOVA, INC.

## CONSOLIDATED STATEMENTS OF CASH FLOWS
## FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018
### (In thousands)

|  | 2019 | 2018 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |  |
| Net income | $ 119,251 | $ 105,019 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |
| Depreciation and amortization | 2,379 | 2,191 |
| Loss on disposal of assets | (13) |  |
| Changes in assets and liabilities: |  |  |
| Due to/from Affiliate | (11,671) | 38,591 |
| Merchandise inventories | 4,875 | (91,596) |
| Prepaid expenses and other current assets | (4,011) | (1,450) |
| Security deposits | 22 | (155) |
| Accounts payable and accrued liabilities | 38,766 | 31,274 |
| Gift card liability | 5,070 | 4,952 |
| Sales returns reserve | 5,500 | 233 |
| Deferred revenue | 3,285 | (11,474) |
| Net cash provided by operating activities | 163,453 | 77,585 |
| CASH FLOWS FROM INVESTING ACTIVITIES: |  |  |
| Purchase of property and equipment | (13,325) | (1,773) |
| Proceeds from sale of investments | 2,958 |  |
| Purchase of investments |  | (2,958) |
| Net cash used in investing activities | (10,367) | (4,731) |
| CASH FLOWS FROM FINANCING ACTIVITIES: |  |  |
| Issuance of promissory notes |  | (11,500) |
| Proceeds from repayment of promissory notes | 3,000 | 8,500 |
| Cash contributions from shareholders |  | 5,000 |
| Distributions to shareholders | (115,754) | (75,648) |
| Net cash used in financing activities | (112,754) | (73,648) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 40,332 | (794) |
| CASH AND CASH EQUIVALENTS—Beginning of year | 28,382 | 29,176 |
| CASH AND CASH EQUIVALENTS—End of year | $ 68,714 | $ 28,382 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION—Cash paid for taxes | $ 4,257 | $ 2,210 |

See accompanying notes to consolidated financial statements.

**FASHION NOVA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018**
**(In thousands, except share data)**

1. **DESCRIPTION OF BUSINESS**

   Fashion Nova, Inc. (the "Company") was incorporated in California in March 2006. The Company markets trendy and affordable women's and men's apparel to customers worldwide. Approximately 99% of the Company's revenues are generated via online e-commerce retail, and the balance of the Company's revenues are generated from six brick and mortar retail locations. The Company is a subchapter S corporation, and all income and expenses are passed through to the Company's majority shareholder for federal income tax purposes.

2. **SIGNIFICANT ACCOUNTING POLICIES**

   **Basis of Presentation**—The consolidated financial statements have been prepared by the Company in accordance with accounting principles generally accepted in the United States of America (US GAAP).

   **Consolidation**—The accompanying consolidated financial statements include the accounts of the Company and its various subsidiaries. All intercompany accounts and transactions have been eliminated in consolidation. The Company elected not to apply the Variable Interest Entity ("VIE") guidance to its affiliated entity, FN Logistics, Inc. (the "Affiliate") and therefore, it was not subject to consolidation according to the requirements of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 810, Consolidation.

   **Use of Estimates**—The preparation of consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. These estimates are based on information available as of the date of the consolidated financial statements; therefore, actual results could differ materially from management's estimates using different assumptions or under different conditions.

   **Cash and Cash Equivalents**—The Company considers all highly liquid investments with a maturity of three months or less from the date of purchase to be cash equivalents. As of December 31, 2019 and 2018, cash and cash equivalents consist of cash deposited with banks, credit card transactions in transit, and cash on hand. The recorded carrying amount of cash equivalents approximates their fair value. The Company maintains its cash in bank accounts, which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts. The Company mitigates its risk by placing funds with high-quality financial institutions, and consequently, the Company believes it is not exposed to any significant risk on its cash balance. Book overdraft balances represent outstanding checks in excess of bank balances and are reported as a component of operating cash flows in the accompanying statements of cash flows. Book overdrafts for the years ended December 31, 2019 and 2018, were $0 and $1,815, respectively.

**Merchandise Inventories**—Merchandise inventories are composed of finished goods obtained from third-party suppliers. Merchandise inventories are valued at the lower of average cost or net realizable value. The Company determines cost on an average cost method. If the Company identifies excess, obsolete, or unsalable items, its merchandise inventories are written down to their net realizable value in the period in which the impairment is first identified.

**Property and Equipment**—Property and equipment are stated at cost, less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Leasehold improvements | Shorter of estimated useful life (approximately seven years) or lease term |
| Vehicles | Three to five years |
| Computers and equipment | Three to five years |
| Furniture and fixtures | Five years |

Property and equipment are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of assets may not be recoverable.

Expenditures for repairs and maintenance are charged to expense as incurred. Gain or loss on the disposal of property and equipment is the difference between the net sales proceeds and the carrying value of the relevant assets and is reflected in the accompanying consolidated statements of income and comprehensive income as an operating expense.

**Capitalized Software for Internal Use**—Software is related to packaged software purchased and add-ons to the packaged software included in intangibles—net in the accompanying balance sheets. Software is amortized over three to five years using the straight-line method. Amortization expense for the years ended December 31, 2019 and 2018, was $1,367 and $1,103, respectively. During the years ended December 31, 2019 and 2018, the Company capitalized software costs of $1,283 and $786, respectively, and placed such assets in service during 2019. Costs incurred related to ongoing maintenance, training, and post-implementation activities are expensed as incurred in selling, general, and administrative expenses in the accompanying statements of income and comprehensive income.

**Intangible Assets**—The Company acquired several trademarks in 2018 and domain names in 2019, which are indefinite-lived intangible assets, included in intangibles—net in the accompanying balance sheets. Indefinite-lived intangible assets are evaluated for impairment at least annually by comparing the fair value to their carrying amount and recording an impairment charge for the excess of the carrying value over fair value.

**Long-Lived Assets**—The Company evaluates the recoverability of property and equipment and other assets, including identifiable intangible assets with definite lives, whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets held and used is measured by comparing the carrying amount of an asset or an asset group to estimate undiscounted future net cash flows expected to be generated by the asset or asset group. If the carrying amount of an asset exceeds these estimated future cash flows, an impairment charge is recognized as the amount by which the carrying amount of the assets exceeds the fair value of the asset or asset group, based on discounted cash flows. Assets to be disposed of are reported at the lower of their carrying amount or fair value, less cost to sell. There have been no impairment losses recorded for the years ended December 31, 2019 and 2018.

- 8 -

**Leases**—The Company evaluates and classifies lease agreements at inception as operating leases or capital leases. Certain leases for the Company's store locations provide for contingent payments based on future sales volumes at the lease location, which are not measurable at the inception of the lease. The Company accrues for these contingent rents on a monthly basis based on actual store sales. The Company recognizes rent expense on a straight-line basis over the lease term beginning from possession date through lease termination date. The difference between the cash paid and the amount recognized as rent expense on a straight-line basis is included in deferred rent in the accompanying consolidated balance sheets.

**Deferred Revenue**—Deferred revenue is composed of revenue associated with paid customer orders for which the product has not yet been delivered to the customer.

**Revenue Recognition**—Effective January 1, 2019, the Company adopted the Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. Revenue is recognized when the Company satisfies its performance obligations through the transfer of control of promised goods to its customers, in an amount that reflects the consideration it expects to be entitled to receive in exchange for those goods. The Company adopted the standard using the modified retrospective adoption method. The adoption of the standard did not result in any change in the timing or amount of revenue recognized by the Company during the current year.

Retail store sales are recognized upon purchase of merchandise by the customers. Transfer of control takes place at the point at which the customer receives and pays for the merchandise at the register. E-commerce sales are recorded when control transfers to the customer which generally occurs upon delivery of the product. Shipping and handling revenues are included in total net sales. Shipping costs incurred by the Company are included in cost of sales. E-commerce sales are also reduced by an estimate of returns and chargebacks. Payment from customer is due upon placing the order online or purchasing the product in store. As of December 31, 2019, there were no contracts with a significant financing component with any customer.

Revenue is recorded net of estimated allowance for product returns and actual sales returns and deductions for promotions are included as a reduction of net sales in the accompanying consolidated statements of income and comprehensive income. The Company generally allows for customer returns within 30 days of purchase. Provisions for returns are provided for in the same period the related sales are recorded, which are estimated based on projected sales returns using the Company's historical experience and are presented on a gross basis in the Company's consolidated balance sheets. The impact of applying ASU No. 2014-09, which was effective as of January 1, 2019, would have resulted in an increase of $868 to the Company's sales return reserves and merchandise inventories as of December 31, 2018 due to the gross presentation of the Company's provisions for sales returns. The comparative information has not been restated and continues to be reported under the accounting standards in effect for those periods. The reserve for sales returns totaled $6,192 and $692 as of December 31, 2019 and 2018, respectively.

Sales tax, when applicable, that is collected in connection with revenue transactions is withheld and remitted to the respective taxing authorities. As such, these taxes are excluded from revenue.

The Company maintains a liability for unredeemed gift cards and recognizes revenues from the sale of gift cards as they are subsequently redeemed for merchandise. This liability was $25,668 and $20,598 at December 31, 2019 and 2018, respectively. Gift cards issued to e-commerce customers are escheatable if not redeemed; accordingly, the Company does not recognize breakage.

**Cost of Sales**—Cost of sales consists of cost of merchandise; freight and outbound shipping expenses; warehousing costs, including outsourced logistics and warehousing operations, warehouse depreciation expense, labor, overhead, and supplies; and costs related for shrinkage, damages, and replacements.

**Shipping and Handling Charges and Costs**—The Company includes shipping and handling fees billed to customers in net sales and related costs in cost of sales in the accompanying consolidated statements of income and comprehensive income.

**Selling, General, and Administrative Expenses**—Selling, general, and administrative expenses consist of employee compensation, outside services, advertising and marketing, occupancy costs, order processing fees, depreciation and amortization for the corporate office and retail stores, and other general expenses.

**Marketing Expenses**—Marketing expenses primarily represent the cost associated with the Company's social media activities and online marketing, which are included in selling, general, and administrative expenses in the accompanying consolidated statements of income and comprehensive income. Total marketing expenses were $88,588 and $50,213 for 2019 and 2018, respectively.

**Income Taxes**—The Company is taxed as an S corporation under the Internal Revenue Code of the United States of America. As an S corporation, the shareholder is taxed on the shareholder's respective share of corporation business gain or loss, and therefore, the benefits or losses or the liability for any taxes due from income was the responsibility of the Company's majority shareholder, and not the Company. The Company is subject to the California privilege tax at 1.5% of pretax income.

**Recent Accounting Pronouncements**—In March 2020, the FASB issued ASU No. 2020-03, *Codification Improvements to Financial Instruments*. The amendments in ASU No. 2020-03 clarify or improve the codification of various topics. ASU No. 2020-03 is effective on different dates for the various topics ranging between fiscal years beginning after December 15, 2019, through 2023. The Company is currently evaluating the requirements of ASU No. 2020-03 and has not yet determined the effect on its consolidated financial statements and the related disclosures.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments (a consensus of the Emerging Issues Task Force)*. ASU No. 2016-15 clarifies how certain cash receipts and payments should be presented in the statement of cash flows. ASU No. 2016-15 is effective for fiscal years beginning after December 15, 2018. The Company adopted ASU No. 2016-15 for fiscal year 2019. The adoption of ASU No. 2016-15 did not have a material impact on its consolidated financial statements or the related disclosures.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. ASU No. 2016-02 requires lessees to recognize a lease liability and a right-of-use asset in the balance sheet and aligns many of the underlying principles of the new lessor model with those in ASC Topic 606, *Revenue from Contracts with Customers*. In July 2018, the FASB

- 10 -

issued ASU No. 2018-10, *Codification Improvements to Topic 842, Leases,* and ASU No. 2018-11, *Leases (Topic 842): Targeted Improvements.* ASU No. 2018-10 affects narrow aspects of the guidance issued in the amendments in ASU No. 2016-02. ASU No. 2018-11 provides an additional (and optional) transition method to adopt the new leases standard. ASU No. 2018-11 also provides lessors with a practical expedient, by class of underlying asset, to not separate nonlease components from the associated lease component if certain conditions are met. In December 2018, the FASB issued ASU No. 2018-20, *Leases (Topic 842): Narrow-Scope Improvements for Lessors.* ASU No. 2018-20 provides additional guidance to lessors regarding sales taxes and other similar taxes collected from lessees, certain lessor costs, and recognition of variable payments for contracts with lease and nonlease components. In March 2019, the FASB issued ASU No. 2019-01, *Leases (Topic 842): Codification Improvements.* ASU No. 2019-01 provides additional guidance in determining the fair value of underlying assets by lessors that are not manufacturers or dealers, the presentation in the statement of cash flows—sales type and direct financing leases, and transition disclosures related to Topic 250, accounting changes and error corrections. In November 2019, the FASB issued ASU No. 2019-10, *Financial Instruments—Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates.* ASU No. 2019-10 extends the effective date of ASU Nos. 2016-02, 2018-10, 2018-11, 2018-20, and 2019-01 (collectively, the Topic 842 ASUs) from fiscal years beginning after December 15, 2019, to fiscal years beginning after December 15, 2020. Early adoption is permitted. The Company is currently evaluating the requirements of the Topic 842 ASUs and has not yet determined the effect on its consolidated financial statements or the related disclosures. Based on the assessment to date, the adoption of the Topic 842 ASUs is expected to result in a significant increase in lease-related assets and liabilities in the consolidated balance sheets. The ultimate impact of adopting the new standard will depend on the lease portfolio and related commitments as of the adoption date. See Note 9 for the current lease commitments for future periods.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820)—Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement.* The amendment improves the effectiveness of fair value measurement disclosures and modifies the disclosure requirements on fair value measurements in Topic 820, *Fair Value Measurement,* based on the concepts in FASB Concepts Statement, Conceptual Framework for Financial Reporting—Chapter 8: Notes to Financial Statements, including the consideration of costs and benefits, and is effective for financial statements issued for fiscal years beginning after December 15, 2019. The Company is currently evaluating the impact of adopting this guidance on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract.* The amendment aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license) and is effective for financial statements issued for fiscal years beginning after December 15, 2020, with early adoption permitted. The Company is currently evaluating the impact of adopting this guidance on its consolidated financial statements.

3.  **FINANCIAL STATEMENT COMPONENTS**

**Property and Equipment—Net**—Property and equipment consisted of the following at December 31, 2019 and 2018:

|  | 2019 | 2018 |
|---|---|---|
| Construction in progress | $    554 | $    145 |
| Leasehold improvements | 2,338 | 1,990 |
| Furniture and fixtures | 1,301 | 1,078 |
| Vehicles | 65 | 31 |
| Equipment | 1,578 | 1,221 |
|  | 5,836 | 4,465 |
| Less accumulated depreciation and amortization | (2,529) | (1,524) |
|  | $ 3,307 | $ 2,941 |

Depreciation expense for the years ended December 31, 2019 and 2018, was approximately $1,012 and $1,087, respectively, and was recorded in cost of sales and selling, general, and administrative expenses in the accompanying consolidated statement of income and comprehensive income. Loss on disposal of fixed assets was $14 and $0, respectively, which was included in selling, general, and administrative expenses.

**Intangibles—Net**—Intangibles consisted of the following at December 31, 2019 and 2018:

| | 2019 | | | |
|---|---|---|---|---|
| | Gross | Accumulated Amortization | Net | Economic Life |
| Domain name license | $11,184 | $    - | $11,184 | Indefinite |
| Software | 4,860 | (2,954) | 1,906 | 3 |
| Trademarks | 61 | | 61 | Indefinite |
| Total intangible assets | $16,105 | $(2,954) | $13,151 | |

| | 2018 | | | |
|---|---|---|---|---|
| | Gross | Accumulated Amortization | Net | Economic Life |
| Domain name license | $    506 | $    (36) | $    470 | 15 |
| Software | 3,578 | (1,551) | 2,027 | 3 |
| Trademarks | 61 | | 61 | Indefinite |
| Total intangible assets | $ 4,145 | $(1,587) | $ 2,558 | |

Amortization expense for the years ended December 31, 2019 and 2018, was approximately $1,367 and $1,103, respectively, and was recorded in selling, general, and administrative expenses in the accompanying consolidated statement of income and comprehensive income.

**Accrued Expenses**—Accrued expenses consisted of the following at December 31, 2019 and 2018:

|  | 2019 | 2018 |
|---|---|---|
| Deferred rent | $    318 | $    162 |
| Credit card payable | 1,931 | 237 |
| Accrual for loss contingencies | 11,308 | 1,967 |
| Taxes and duty payable | 14,669 | 2,547 |
| Accrued payroll | 1,185 | 755 |
| Other miscellaneous accruals | 8,080 | 8,556 |
|  | $37,491 | $14,224 |

## 4.  FAIR VALUE MEASUREMENTS

ASC 820, *Fair Value Measurements*, defines fair value, establishes a framework for measuring fair value under US GAAP, and enhances disclosures about fair value measurements. It clarifies that fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or liability. As a basis for considering such assumptions, ASC 820 establishes a three-tier value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

*Level 1*—Observable inputs, such as quoted prices in active markets

*Level 2*—Inputs other than the quoted prices in active markets that are observable either directly or indirectly

*Level 3*—Unobservable inputs in which there is little or no market data, which requires the Company to develop its own assumptions

This hierarchy requires the Company to use observable market data, when available, and to minimize the use of unobservable inputs when determining fair value.

Assets and liabilities recorded at fair value on a recurring basis as of December 31, 2019 and 2018, are included in the table below:

| **Recurring Fair Value Measurements** | 2019 Level 1 | 2018 Level 1 |
|---|---|---|
| Assets—short-term investments | $ - | $2,958 |
| Total | $ - | $2,958 |

- 13 -

The Company does not have any Level 2 and Level 3 assets or liabilities that are valued at fair value on a recurring basis at December 31, 2019 and 2018.

The Company's financial instruments include cash and cash equivalents, investments in fixed income and equity securities, accounts payable, and accrued expenses for which the carrying amounts approximate fair value due to their short-term maturity. The fair values of amounts due to/from affiliates are not determinable due to the related-party nature of the balances.

## 5. INCOME TAXES

The Company is an S corporation under the Internal Revenue Code of the United States, and is not subject to federal income tax. The Company is subject to state income tax under California law. The provision for income taxes for the years ended December 31, 2019 and 2018, was $1,850 and $1,715, respectively. The Company's state income tax returns are generally open to audit under the various statutes of limitations for fiscal years 2015 to 2018.

ASC 740, *Income Taxes*, requires that a position taken or expected to be taken in a tax return be recognized in the financial statements when it is more likely than not that the position would be sustained upon examination by tax authorities. A recognized tax position is measured at the largest amount of payable or benefit that is expected to be realized upon ultimate settlement with the tax authority. As of December 31, 2019 and 2018, the Company had $4,662 and $2,500, respectively, of unrecognized state tax payable which relates to uncertain tax positions taken on the Company's state tax return for the year ended December 31, 2019, related to the state tax liabilities. The Company recognizes interest and penalties related to unrecognized tax benefits or payable within selling, general, and administrative expenses in the accompanying consolidated statement of income and comprehensive income.

## 6. SHAREHOLDERS' EQUITY

As of December 31, 2019, the Company had 10,000,000 authorized shares of common stock, of which 2,000,000 voting shares and 2,000,000 nonvoting shares were issued and outstanding at $0.025 per share.

During the years ended December 31, 2019 and 2018, the Company received $0 and $5,000, respectively, of cash contributions from and made $115,754 and $75,648, respectively, of cash distributions to the shareholders. No other cash contributions or distributions were made during the years.

## 7. RELATED-PARTY TRANSACTIONS

The Company leases its corporate office and warehouse space from the majority shareholder at rates ranging between $70 and $77 per month over the term of the lease. The lease terminates in January 2022. Total rent and related property tax that the majority shareholder was entitled to receive from the Company during the years ended December 31, 2019 and 2018, were $867 and $840, respectively.

Certain retail store leases are personally guaranteed by the majority shareholder.

- 14 -

A substantial portion of the Company's operations is conducted with or in conjunction with the Affiliate. The Affiliate provides logistics and inventory management services to the Company to support both its ecommerce and retail operations. The Company performs certain management activities for the Affiliate and bills the Affiliate for costs arising from these activities resulting in amounts due from the Affiliate. Transactions with the Affiliate for the year ended December 31, 2019, are summarized as follows:

| | FY2019 | FY2018 |
|---|---|---|
| Amounts included in the accompanying balance sheet: | | |
| Due from Affiliate | $    - | $16,553 |
| Due to Affiliate | 26,920 | 55,197 |
| Notes receivable from Affiliate | | 3,053 |
| | | |
| Amounts included in the accompanying consolidated statements of income—warehousing and distribution expenses included in costs of sales | $270,028 | $90,341 |

On July 11, 2018, the Company issued an unsecured promissory note to the Affiliate. This first promissory note in the amount of $3,000 matured on July 10, 2019, and generated interest at a rate of 2.38% per annum. All principal and accrued interest outstanding under this note were due upon maturity. The promissory note and all accrued interest were repaid in full in 2019, and the Company recognized interest income of $40 during the year ended December 31, 2019.

On July 20, 2018, the Company issued an unsecured promissory note to the Affiliate. This second promissory note in the amount of $8,500 matured on July 10, 2019, and generated interest at a rate of 2.38% per annum. All principal and accrued interest outstanding under this note were due upon maturity. The promissory note and all accrued interest were repaid in full during the year ended December 31, 2018.

As of December 31, 2018, the Company was a guarantor of the Affiliate's term loan ("Note") with MUFG Union Bank, N.A. The Note matures in February 2024, bears interest at a rate of 4.39%, and was secured by the assets of the Company and its Affiliate. Certain covenants on the Note were tied to the financial performance of the Company and its Affiliate. Upon the occurrence of an event of default, at the option of the Bank, and to the extent permitted by law, interest will be payable on the outstanding principal under the Note at a per annum rate equal to 5% in excess of the applicable interest rate at the time of the event. As of December 31, 2019, the Affiliate had an outstanding balance of $29,167 on the Note.

In May 2019, the securitization of the Company's assets on the Note was removed. As of December 31, 2019, the Note remained guaranteed by the Affiliate's shareholder, the Company, and the Affiliate's President.

As described above, the Company has extensive transactions and relationships with related parties. The consolidated financial statements may not necessarily be indicative of the conditions that would have existed or the results of operations that would have been achieved if the Company had not operated without such affiliations.

## 8.   COMMITMENTS AND CONTINGENCIES

**Operating Leases**—The Company has lease agreements for each of its six retail store locations. These leases expire at various dates from 2020 to 2023. The store leases require payment of a specified minimum rent and common area maintenance expense, plus a contingent rent based on a percentage of the store's net sales in excess of a specified threshold. In fiscal years 2019 and 2018, contingent rent expense was $206 and $331, respectively.

In March 2018, the Company entered into a long-term lease for a distribution center facility located in Santa Fe Springs, California. The lease commenced in June 2018 and on November 1, 2018, the Company assigned the lease to its Affiliate. Total minimum rent paid by the Company was $828 during the year ended December 31, 2018.

The Company recognizes rent expense on a straight-line basis and has recorded the difference between the straight-line rent and the amount paid as deferred rent liability. Rent expense is included both in cost of sales and selling, general, and administrative expenses in the accompanying statements of income and comprehensive income. Deferred rent liability is included in accrued expenses in the accompanying consolidated balance sheets.

The Company's commitments for minimum payments under noncancelable leases are as follows:

| | Leases Executed as of December 31, 2019 | |
| Fiscal Year Ending December 31 | Third Party | Related Party |
| --- | --- | --- |
| 2020 | $ 2,174 | $  889 |
| 2021 | 2,079 | 919 |
| 2022 | 2,076 | 35 |
| 2023 | 1,866 | |
| 2024 | 1,756 | |
| Thereafter | 224 | |
| Total payments | $10,175 | $1,843 |

In January 2020, the Company assigned its lease for the receiving warehouse in Vernon, California, to its Affiliate along with the remainder of the Company's commitments on the lease. Average annual minimum lease commitment assumed by the Affiliate was $1,657 from 2020 to 2024 and $224 in 2025, and is included in the Company's commitments for minimum payments under noncancelable lease.

Rent expense, including base rent, common area maintenance, and contingent rent for the years ended December 31, 2019 and 2018, was $4,165 and $4,573, respectively.

**Legal Proceedings**—In February 2018, the Federal Trade Commission's (FTC) Western Region began an investigation into the Company's compliance with the Mail Internet Telephone Order Merchandise Rule. In November 2019, the Company and the FTC entered

into preliminary settlement negotiations, which are currently pending for internal review at the FTC. In July 2019, a separate office of the FTC, the Division of Advertising Practices in Washington D.C., sent the Company an administrative subpoena seeking information on the Company's compliance with the FTC's Endorsement and Testimonial Guidelines. The Company is in the process of settling both FTC matters contemporaneously and has accrued $9,300 as of December 31, 2019, with respect to both of these matters.

The Company is also subject to various other claims and legal proceedings that arise in the ordinary course of its business activities. In the opinion of the Company, although the outcome of any legal proceedings cannot be predicted with certainty, the ultimate liability of the Company, if any, in connection with this and other legal proceedings will not have a material and adverse effect on the Company's consolidated financial statements.

## 9. EMPLOYEE BENEFIT PLAN

The Company sponsors a defined contribution employee retirement plan, the Fashion Nova, Inc. 401(k) Plan & Trust (the "Plan"), which was established in 2018 for the benefit of eligible employees. Participants are allowed to contribute to the Plan up to 90% of their compensation, as defined in the Plan, subject to certain limitations. The Company provides a matching contribution of 100% for each dollar a participant contributes, up to 3% of each participant's compensation, plus 50% for each dollar a participant contributes for the next 2% of the participant's compensation. The Company's contributions for the years ended December 31, 2019 and 2018, totaled $250 and $134, respectively, and is included in selling, general, and administrative expenses in the consolidated statements of income and comprehensive income.

## 10. SUBSEQUENT EVENTS

Management has evaluated events occurring after December 31, 2019, and through May 8, 2020, the date the consolidated financial statements were available for issuance, for items that may require adjustments to, or disclosure in, the consolidated financial statements.

On March 11, 2020, the World Health Organization declared a novel strain of coronavirus disease ("COVID-19") a pandemic. The disease was first reported in Wuhan, China, in December 2019. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread, and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. However, if the pandemic continues to evolve into a severe worldwide health crisis, the disease could have a material adverse effect on the Company's business, results of operations, financial condition, and cash flows.

* * * * * *

# EXHIBIT G

# FN Logistics, Inc.

Financial Statements as of and for the
Year Ended December 31, 2019, and
Independent Accountants' Review Report

# Deloitte.

**Deloitte & Touche LLP**
555 West 5th Street
Suite 2700
Los Angeles, CA 90013-1010
USA

Tel: +1 213 688 0800
Fax: +1 213 688 0100
www.deloitte.com

## INDEPENDENT ACCOUNTANTS' REVIEW REPORT

To the Board of
Directors
FN Logistics, Inc.
Vernon, California

We have reviewed the accompanying financial statements of FN Logistics, Inc. (the "Company"), which comprise the balance sheet as of December 31, 2019, and the related statements of income and comprehensive income, shareholder's equity, and cash flows for the year ended December 31, 2019, and the related notes to the financial statements. A review includes primarily applying analytical procedures to management's financial data and making inquiries of the Company's management. A review is substantially less in scope than an audit, the objective of which is the expression of an opinion regarding the financial statements as a whole. Accordingly, we do not express such an opinion.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement whether due to fraud or error.

### Accountants' Responsibility

Our responsibility is to conduct the review engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the American Institute of Certified Public Accountants. Those standards require us to perform procedures to obtain limited assurance as a basis for reporting whether we are aware of any material modifications that should be made to the financial statements for them to be in accordance with accounting principles generally accepted in the United States of America. We believe that the results of our procedures provide a reasonable basis for our conclusion.

### Accountants' Conclusion

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America.

### Emphasis of Matter

As discussed in Note 7 to the financial statements, the Company has extensive transactions and relationships with related parties. Accordingly, the accompanying financial statements may not necessarily be indicative of the conditions that would have existed or the results of operations that would have been achieved if the Company had not operated without such affiliations.

*Deloitte & Touche LLP*

May 8, 2020

# FN LOGISTICS, INC.

**BALANCE SHEET**
**AS OF DECEMBER 31, 2019**
**(In thousands, except share data)**

**ASSETS**

CURRENT ASSETS:
| | |
|---|---:|
| Cash | $ 16,783 |
| Due from Affiliate | 26,920 |
| Prepaid expenses and other current assets | 2,321 |
| Total current assets | 46,024 |

LONG-TERM ASSETS:
| | |
|---|---:|
| Property and equipment—net | 37,946 |
| Intangible assets—net | 875 |
| Security deposits | 7 |
| Total long-term assets | 38,828 |
| TOTAL ASSETS | $ 84,852 |

**LIABILITIES AND SHAREHOLDER'S EQUITY**

CURRENT LIABILITIES:
| | |
|---|---:|
| Accounts payable | $ 25,994 |
| Accrued expense | 11,544 |
| Current portion of long-term debt | 7,000 |
| Income tax payable | 1,736 |
| Total current liabilities | 46,274 |

LONG-TERM LIABILITIES:
| | |
|---|---:|
| Deferred rent | 3,461 |
| Long-term debt | 22,166 |
| Other long-term liabilities | 604 |
| Total long-term liabilities | 26,231 |

COMMITMENTS AND CONTINGENCIES (NOTE 10)

SHAREHOLDER'S EQUITY:
| | |
|---|---:|
| Common stock, $0.0001 par value—3,000 shares authorized; 1,000 shares issued and outstanding | |
| Additional paid-in capital | 1,000 |
| Retained earnings | 11,347 |
| Total shareholder's equity | 12,347 |
| TOTAL LIABILITIES AND SHAREHOLDER'S EQUITY | $ 84,852 |

See accompanying independent accountants' review report and notes to financial statements

**FN LOGISTICS, INC.**

**STATEMENT OF INCOME AND COMPREHENSIVE INCOME
FOR THE YEAR ENDED DECEMBER 31, 2019
(In thousands)**

| | |
|---|---:|
| REVENUE | $ 270,028 |
| COSTS AND EXPENSES | |
| Purchased transportation and related services | 177,988 |
| Personnel expenses | 60,039 |
| Rent and utilities expenses | 6,156 |
| Other selling, general, and administrative expenses | 13,937 |
| Total costs and expenses | $ 258,120 |
| OPERATING INCOME | 11,908 |
| INTEREST AND OTHER EXPENSES—Net | 1,790 |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 10,118 |
| INCOME TAX EXPENSE | 1,938 |
| NET INCOME AND COMPREHENSIVE INCOME | $    8,180 |

See accompanying independent accountants' review report and notes to financial statements

**FN LOGISTICS, INC.**

**STATEMENT OF SHAREHOLDER'S EQUITY**
**FOR THE YEAR ENDED DECEMBER 31, 2019**
**(In thousands, except share data)**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Total Shareholder's Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| BALANCE—January 1, 2019 | 1,000 | $ – | $1,000 | $ 3,236 | $ 4,236 |
| Distribution to shareholder (Note 6) | | | | (69) | (69) |
| Net income | | | | 8,180 | 8,180 |
| BALANCE—December 31, 2019 | 1,000 | $ – | $1,000 | $11,347 | $12,347 |

See accompanying independent accountants' review report and notes to financial statements

# FN LOGISTICS, INC.

## STATEMENT OF CASH FLOWS
## FOR THE YEAR ENDED DECEMBER 31, 2019
### (In thousands)

| | |
|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Net income | $ 8,180 |
| Adjustments to reconcile net income to net cash used in operating activities: | |
| Depreciation and amortization | 4,248 |
| Change in fair market value of interest rate swap | 387 |
| Deferred income taxes | (722) |
| Changes in assets and liabilities: | |
| Due from Affiliates | 11,724 |
| Prepaid expenses and other current assets | (1,443) |
| Accounts payable and accrued expenses | 15,329 |
| Net cash provided by operating activities | 37,703 |
| | |
| CASH FLOWS FROM INVESTING ACTIVITY—Purchase of property and equipment and other assets | (15,320) |
| Net cash used in investing activity | (15,320) |
| | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | |
| Payments under long-term loan | (5,851) |
| Payments under Affiliate loan | (3,000) |
| Payments under capital lease | (30) |
| Distributions to shareholders | (69) |
| Net cash used in financing activities | (8,950) |
| | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 13,433 |
| CASH AND CASH EQUIVALENTS—Beginning of year | 3,350 |
| CASH AND CASH EQUIVALENTS—End of year | $ 16,783 |
| | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION— | |
| Cash paid for interest | $ 1,500 |
| Cash paid for taxes | $ 1,550 |
| | |
| SUPPLEMENTAL DISCLOSURE OF NON-CASH FINANCING ACTIVITIES— | |
| Capital lease obligations for the purchase of property and equipment | $ 604 |

See accompanying independent accountants' review report and notes to financial statements

**FN LOGISTICS, INC.**

**NOTES TO FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEAR ENDED DECEMBER 31, 2019**
**(In thousands, except share data)**
**(See independent accountants' review report)**

1. **DESCRIPTION OF BUSINESS**

   FN Logistics, Inc. (the "Company") was incorporated in the state of Delaware on June 18, 2018, as a subchapter C corporation. The Company subsequently elected to be taxed for US federal income tax purposes as an S Corporation effective June 1, 2019. Pursuant to this election, all income and expenses are passed through to the Company's shareholder for federal income tax purposes. The Company provides warehouse and inventory management services, including receiving, storage, packing, and shipping.

2. **SIGNIFICANT ACCOUNTING POLICIES**

   **Basis of Presentation**—The financial statements have been prepared by the Company in accordance with accounting principles generally accepted in the United States of America (US GAAP).

   **Use of Estimates**—The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. These estimates are based on information available as of the date of the financial statements; therefore, actual results could differ materially from management's estimates using different assumptions or under different conditions.

   **Cash**—As of December 31, 2019, cash consisted of cash deposited with banks, and cash on hand. The recorded carrying amount of cash equivalents approximates their fair value. The Company maintains its cash in bank accounts, which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts. The Company mitigates its risk by placing funds with high-quality financial institutions, and consequently, the Company believes it is not exposed to any significant risk on its cash balance. Book overdraft balances represent outstanding checks in excess of bank balances and are reported as a component of operating cash flows in the accompanying statement of cash flows. The Company did not have any book overdrafts for the year ended December 31, 2019.

   **Property and Equipment**—Property and equipment are stated at cost, less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the following estimated useful lives:

   | | |
   |---|---|
   | Leasehold improvements | Shorter of estimated useful life or lease term |
   | Vehicles | Three years |
   | Computer hardware and equipment | Three years |
   | Furniture | Five years |
   | Fixtures and machinery | Ten years |

Property and equipment are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

Expenditures for repairs and maintenance are charged to expense as incurred. Gain or loss on the disposal of property and equipment is the difference between the net sales proceeds and the carrying value of the relevant assets and is included in other selling, general, and administrative expenses in the accompanying statement of income and comprehensive income. During the year ended December 31, 2019, the Company did not dispose of any assets.

**Capitalized Software for Internal Use**—Software is related to packaged software purchases and add-ons to the packaged software and is included in intangibles—net in the accompanying balance sheet. Software is amortized over three years using the straight-line method. During the year ended December 31, 2019, the Company capitalized software costs of $594. Accumulated amortization as of December 31, 2019, was $303. Costs incurred related to ongoing maintenance, training, and postimplementation activities are expensed as incurred in other selling, general, and administrative expenses in the accompanying statement of income and comprehensive income.

**Impairment of Long-Lived Assets**—The Company evaluates the recoverability of property and equipment and other assets, including identifiable intangible assets with definite lives, whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets held and used is measured by comparing the carrying amount of an asset or an asset group to estimate undiscounted future net cash flows expected to be generated by the asset or asset group. If the carrying amount of an asset exceeds these estimated future cash flows, an impairment charge is recognized as the amount by which the carrying amount of the assets exceeds the fair value of the asset or asset group, based on discounted cash flows. Assets to be disposed of are reported at the lower of their carrying amount or fair value, less cost to sell. There has been no impairment loss recorded for the year ended December 31, 2019.

**Leases**—The Company evaluates and classifies lease agreements at inception as operating leases or capital leases. The Company recognizes rent expense on a straight-line basis over the lease term beginning from possession date through lease termination date. The difference between the cash paid and the amount recognized as rent expense on a straight-line basis is included in deferred rent in the accompanying balance sheet.

**Due from Affiliate**—One hundred percent of the due from affiliate balance is due from Fashion Nova Inc. (the "Affiliate") as a result of providing logistics services to it.

**Revenue Recognition**—Effective January 1, 2019, the Company adopted Financial Accounting Standards Board (FASB) Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, using the modified retrospective method. The Company's performance obligations are satisfied over time as customers receive and consume the benefits of the Company's services. The contracts contain a single performance obligation as the distinct services provided remain substantially the same over time and possess the same pattern of transfer. The transaction price is based on the consideration specified in the contract with the customer and contains fixed and variable consideration. In general, the fixed consideration component of a contract represents reimbursement for facility costs incurred to satisfy the performance obligation and is recognized on a straight-line basis over the term of the contract at an 11% markup. The variable consideration component is composed of cost reimbursement plus an 11%

markup determined based on the costs incurred, while per-unit pricing is determined based on an 11% markup on units provided and time and materials pricing is determined based on an 11% markup on the hours of services provided. The variable consideration component is recognized over time based on the level of activity. Customers are billed based on terms specified in the revenue contract and are paid according to approved payment terms. The Company's contracts do not contain financing components nor is sales tax collected in connection with the provision of the Company's services. The Company adopted the standard using the modified retrospective adoption method. The adoption of the standard did not result in any change in the timing or amount of revenue recognized by the Company during the current year.

The Affiliate was the only source of revenue for the Company during year ended December 31, 2019.

**Other Selling, General, and Administrative Expenses**—Other selling, general, and administrative expenses consist of equipment rental, repairs and maintenance, depreciation and amortization for the distribution center, and other general expenses.

**Income Taxes**—From inception to May 31, 2019, the Company was subject to federal, state, and local income taxes as a C corporation. Effective June 1, 2019, the Company became subject to taxation as an S corporation under the Internal Revenue Code of the United States of America. This resulted in a decrease in deferred tax liability of $722. As an S corporation, the shareholder is taxed on its respective share of the corporation's business gain or loss, and therefore, the benefits or losses or the liability for any taxes due from income is the responsibility of the Company's shareholder, and not the Company. The Company is subject to the California privilege tax at 1.5% of pretax income. As a C corporation, deferred tax assets and liabilities are computed based on the temporary differences between the financial statements and income tax bases of assets and liabilities that will result in taxable or deductible amounts in future years. Such deferred tax asset and liability computations are based on enacted tax laws and rates applicable to periods in which the differences are expected to affect taxable income. Deferred tax assets are required to be reduced by a valuation allowance to the extent that, based on the weight of available evidence, it is more likely than not that the deferred tax assets will not be realized.

The Company recognizes a tax benefit to the extent of management's best estimate of the impact of tax positions based on the technical merits of the tax position, provided it is more likely than not that the tax position will be sustained upon examination, including resolution of any related appeals or litigation processes. This involves the identification of potential uncertain tax positions, the evaluation of tax laws, and an assessment of whether a liability for uncertain tax positions is necessary.

The Company recognizes interest and penalties, if applicable, which could be assessed related to uncertain tax positions within the provision for income taxes. No interest or penalties related to uncertain tax positions were recognized in the financial statements for the year ended December 31, 2019.

**Recent Accounting Pronouncements**—In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. ASU No. 2016-02 requires lessees to recognize a lease liability and a right-of-use asset on the balance sheet and aligns many of the underlying principles of the new lessor model with those in ASC Topic 606, *Revenue from Contracts with Customers*. In July 2018, the FASB issued ASU No. 2018-10, *Codification Improvements to Topic 842, Leases* and ASU No. 2018-11, *Leases (Topic 842): Targeted*

*Improvements.* ASU No. 2018-10 affects narrow aspects of the guidance issued in the amendments in ASU No. 2016-02. ASU No. 2018-11 provides an additional (and optional) transition method to adopt the new leases standard. ASU No. 2018-11 also provides lessors with a practical expedient, by class of underlying asset, to not separate nonlease components from the associated lease component if certain conditions are met. In December 2018, the FASB issued ASU No. 2018-20, *Leases (Topic 842): Narrow-Scope Improvements for Lessors.* ASU No. 2018-20 provides additional guidance to lessors regarding sales taxes and other similar taxes collected from lessees, certain lessor costs, and recognition of variable payments for contracts with lease and nonlease components. In March 2019, the FASB issued ASU No. 2019-01, *Leases (Topic 842): Codification Improvements.* ASU No. 2019-01 provides additional guidance in determining the fair value of underlying assets by lessors that are not manufacturers or dealers, the presentation on the statement of cash flows—sales type and direct financing leases, and transition disclosures related to Topic 250, *Accounting Changes and Error Corrections.* In November 2019, the FASB issued ASU No. 2019-10, *Financial Instruments—Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates.* ASU No. 2019-10 extends the effective date of ASU Nos. 2016-02, 2018-10, 2018-11, 2018-20, and 2019-01 (collectively, the Topic 842 ASUs) from fiscal years beginning after December 15, 2019, to fiscal years beginning after December 15, 2020. Early adoption is permitted. The Company is currently evaluating the requirements of the Topic 842 ASUs and has not yet determined the effect on its financial statements or the related disclosures. Based on the assessment to date, the adoption of the Topic 842 ASUs is expected to result in a significant increase in lease-related assets and liabilities on the balance sheet. The ultimate impact of adopting the new standard will depend on the lease portfolio and related commitments as of the adoption date. See Note 10 for the current lease commitments for future periods.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments (a consensus of the Emerging Issues Task Force).* ASU No. 2016-15 clarifies how certain cash receipts and payments should be presented in the statement of cash flows. ASU No. 2016-15 is effective for fiscal years beginning after December 15, 2018. The Company adopted ASU No. 2016-15 for fiscal year 2019. The adoption of ASU No. 2016-15 did not have a material impact on its financial statements or the related disclosures.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820)—Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement. The amendment improves the effectiveness of fair value measurement disclosures and modifies the disclosure requirements on fair value measurements in Topic 820, Fair Value Measurement, based on the concepts in FASB Concepts Statement, Conceptual Framework for Financial Reporting—Chapter 8: Notes to Financial Statements, including the consideration of costs and benefits, and is effective for financial statements issued for fiscal years beginning after December 15, 2019. The Company is currently evaluating the impact of adopting this guidance on its financial statements.

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting.* The amendments in ASU No. 2020-04 apply to contracts or other transactions that reference LIBOR (London Inter-Bank Offered Rate) or another reference rate expected to be discontinued as a result of reference rate reform. ASU No. 2020-04 is effective as of March 12, 2020, through December 31, 2022. The Company is currently evaluating the requirements of ASU No. 2020-04 and has not yet determined the effect on its financial statements and the related disclosures.

There are no other new accounting pronouncements issued or effective for which the adoption thereof will have a material impact on the Company's financial statements.

3.  **FINANCIAL STATEMENT COMPONENTS**

**Property and Equipment—Net**—Property and equipment consisted of the following at December 31, 2019 (in thousands):

| | |
|---|---:|
| Construction in progress | $   779 |
| Leasehold improvements | 498 |
| Furniture | 267 |
| Fixtures and machinery | 38,477 |
| Computer hardware | 1,758 |
| Warehouse equipment | 286 |
| Vehicles | 69 |
| Capital lease assets | 634 |
| Total property and equipment | 42,768 |
| Less: accumulated depreciation | (4,822) |
| Property and equipment—net | $37,946 |

Depreciation for the year ended December 31, 2019, was approximately $3,915, and is included in other selling, general, and administrative expenses in the accompanying statement of income and comprehensive income.

**Intangible Assets—Net**—Intangible assets consisted of approximately $1,178 of software costs capitalized as of December 31, 2019. Amortization expense for the year ended December 31, 2019, was approximately $333.

**Accrued Expenses**—Accrued expenses consisted of the following at December 31, 2019 (in thousands).

| Description | |
|---|---:|
| Agency labor and shipping accrual | $ 9,742 |
| Interest rate swap liability | 883 |
| Other miscellaneous accrual | 919 |
| Total | $11,544 |

4.  **FAIR VALUE MEASUREMENTS**

Accounting Standards Codification (ASC) 820, *Fair Value Measurements*, defines fair value, establishes a framework for measuring fair value under US GAAP, and enhances disclosures about fair value measurements. It clarifies that fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. As such, fair value is a market-based measurement that should be determined based on assumptions that market

- 10 -

participants would use in pricing an asset or liability. As a basis for considering such assumptions, ASC 820 establishes a three-tier value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

*Level 1*—Observable inputs, such as quoted prices in active markets

*Level 2*—Inputs other than the quoted prices in active markets that are observable either directly or indirectly

*Level 3*—Unobservable inputs in which there is little or no market data, which requires the Company to develop its own assumptions

This hierarchy requires the Company to use observable market data, when available, and to minimize the use of unobservable inputs when determining fair value.

The Company's financial instruments include cash and cash equivalents, accounts payable, and accrued expenses for which the carrying amounts approximate fair value due to their short-term maturity. The fair values of amounts due to/from affiliates are not determinable due to the related-party nature of the balances. The Company early adopted the provisions of FASB ASU No. 2016-01, which removed the requirement for the Company to disclose the fair value of certain financial instruments, such as note payables.

| Recurring Fair Value Measurements | Level 2 (In thousands) |
|---|---|
| Liabilities—interest rate swap | $ 883 |

The fair value of the interest rate swap agreements described in Note 9 is the estimated amount that the Company would have to pay or receive to terminate the interest rate swap agreements, taking into account the remaining terms of the interest rate swap agreements, the current interest rate environment, and the current creditworthiness of the swap counterparty, which represent Level 2 measurements within the fair value hierarchy.

The Company does not have any Level 3 assets or liabilities that are valued at fair value on a recurring basis at December 31, 2019.

5. **INCOME TAXES**

As an S corporation, the Company is subject to state income tax under California law.

The provision for income taxes for the year ended December 31, 2019, was $1,938. The Company did not have any uncertain tax positions at December 31, 2019. The Company has identified its federal and California State returns as major tax jurisdictions.

6. **SHAREHOLDER'S EQUITY**

As of June 18, 2018, the Company had 3,000 authorized shares of common stock, par value $0.0001 per share, of which 1,000 shares were issued and outstanding. On June 18, 2018, 1,000 shares were issued for $1 million.

During the year ended December 31, 2019, the Company made $69 of cash distributions to the shareholder. No cash contributions were made during the year ended December 31, 2019.

## 7.  RELATED-PARTY TRANSACTIONS

For year ended December 31, 2019, 100% of the Company's revenues are generated by providing fulfilment and inventory management-related services to the Affiliate, to support its ecommerce and retail operations. As of December 31, 2019, $26,920 was due from the Affiliate. As of December 31, 2019, the Affiliate was also a guarantor of the Company's term loan with the third-party bank.

On July 11, 2018, the Company entered into an unsecured promissory note with the Company's Affiliate. This promissory note in the amount of $3,000 matured on July 10, 2019, and generated interest at a rate of 2.38% per annum. All principal and accrued interest outstanding under this note were due upon maturity. The promissory note and all accrued interest were repaid in full in 2019, and the Company recognized interest and other expenses on the promissory note due to Affiliate of $40 during the year ended December 31, 2019.

As described above, the Company has extensive transactions and relationships with related parties. The financial statements may not necessarily be indicative of the conditions that would have existed or the results of operations that would have been achieved if the Company had not operated without such affiliations.

## 8.  DEBT

On August 20, 2018, the Company entered into a $35,000 term loan ("Note") with MUFG Union Bank, N.A. which matures in February 2024. The Note was secured by the assets of the Company and its Affiliate and certain covenants on the note were tied to the financial performance of the Company and its Affiliate. Principal is to be paid in 60 consecutive monthly installments, with the first payment due in March 2019 and last payment in February 2024. Interest payments commenced on August 31, 2018. Interest rate is LIBOR plus 1.4% per annum. The variable interest rate for the year ended December 31, 2019, was 3.20%. The Company entered into an interest rate swap agreement to lock the interest rate to a fixed rate of 4.39% (see Note 9).

Interest expense on the Note, which is included as a component of interest and other expenses in the accompanying statement of income and comprehensive income, amounted to $1,220 for the year ended December 31, 2019.

In May 2019, the securitization of the Affiliate's assets on the Note was removed. As of December 31, 2019, the Note remained guaranteed by the Company's shareholder, its Affiliate, and its President.

Future maturities of long-term debt based on contractual obligations as of December 31, 2019, are as follows (amounts in thousands):

| Year | Principal Payments |
|------|-------------------:|
| 2020 | $ 7,000 |
| 2021 | 7,000 |
| 2022 | 7,000 |
| 2023 | 7,000 |
| 2024 | 1,166 |
| Thereafter | |
| Total | $29,166 |

The Company was in compliance with the financial covenants at December 31, 2019.

## 9.  DERIVATIVE FINANCIAL INSTRUMENTS

The Company entered into an interest rate swap agreement in order to manage fluctuations in the variability of the interest rate on its Note. On August 31, 2018, the Company entered into an interest rate swap agreement (the "Agreement") in order to manage fluctuations in the variability of the interest rate on its Note (see Note 8), with a notional amount of $30,000, which expires in February 2024. The Agreement provides for a fixed-interest cost of 4.39% per annum.

The Agreement is a separate financial instrument that has a fair value at any moment in time that is measured based on current market interest rates, the amount, terms, and valuation models. The Company is required to reflect the fair value of this Agreement in its financial statements.

The Company did not adopt hedge accounting, and as such, the change in the fair value of the interest rate swap for the year ended December 31, 2019 of $387 is included as a component of interest and other expenses in the accompanying statement of income and comprehensive income.

## 10.  COMMITMENT AND CONTINGENCIES

**Operating Leases**—The Company recognizes rent expense on a straight-line basis, and has recorded the difference between the straight-line rent and the amount paid as deferred rent liability. Deferred rent liability is included in deferred rent—long term in the accompanying balance sheet.

The Company's commitments for minimum payments under noncancelable leases are as follows:

| Fiscal Year Ending December 31 | Leases Executed as of December 31, 2019 Third Party |
|---|---|
| 2020 | $ 4,102 |
| 2021 | 4,225 |
| 2022 | 4,351 |
| 2023 | 4,482 |
| 2024 | 4,616 |
| Thereafter | 29,826 |
| Total payments | $ 51,602 |

In January 2020, the Affiliate assigned its lease for the receiving warehouse in Vernon, California to the Company, along with the remainder of the Affiliate's commitments on the lease. Average annual minimum lease commitment assumed by the Company was $1,657 from 2020 to 2024 and $224 in 2025, and is excluded from the Company's commitments for minimum payments under noncancelable lease.

Rent expense for the year ended December 31, 2019, was $4,461.

**Legal Proceedings**—The Company is subject to various claims and legal proceedings that arise in the ordinary course of its business activities. In the opinion of the Company, although the outcome of any legal proceedings cannot be predicted with certainty, the ultimate liability of the Company, if any, in connection with this and other legal proceedings will not have a material effect on the Company's financial statements.

## 11. SUBSEQUENT EVENTS

Management has evaluated events occurring after December 31, 2019, and through May 8, 2020, the date the financial statements were available for issuance, for items that may require adjustments to, or disclosure in, the financial statements.

On March 11, 2020, the World Health Organization declared a novel strain of coronavirus disease ("COVID-19") a pandemic. The disease was first reported in Wuhan, China in December 2019. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread, and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. However, if the pandemic continues to evolve into a severe worldwide health crisis, the disease could have a material adverse effect on the Company's business, results of operations, financial condition, and cash flows.

\* \* \* \* \* \*

- 14 -

# EXHIBIT H

**THE COMPLIANCE FIRM**
Healthcare. Business. Consultants.

**Compliant Care Staffing**

Britt Stillwell <britt@compliantcarestaffing.com>

# COVID testing @ FN status update / task delegation & point of contacts

2 messages

**Brittany Stillwell** <britt.stillwell@compliantcarestaffing.com>        Wed, Dec 9, 2020 at 6:46 PM
To: Ian Dill <ian.dill@fashionnova.com>
Cc: Rosie Partida <Rosie.partida@fashionnova.com>, Ernesto Hernandez <ernesto.hernandez@fashionnova.com>, Ismael Ramirez <ismael.ramirez@fashionnova.com>, Eduardo Saturnino <eduardo.s@fashionnova.com>, Lori Ott <lori.ott@fashionnova.com>, Erica Meierhans <erica.meierhans@fashionnova.com>, Felix Felder <felix.felder@fashionnova.com>, James Esquer <james.esquer@fashionnova.com>, Kwamane Liddell <Kwamane@mlezihealth.com>

Hi Team,

I wanted to provide a high level overview of the COVID testing process in hopes of being able to delegate tasks so that we can stay on track to begin testing on 12/27/2020. The project will take the collaboration of Safety, HR, legal, IT and facilities to pull off.  After reading the update below, my hope is that task delegation will become more clear. Once FN delegates tasks, I can assign a point of contact to streamline communication between the TCF/CCS consultants and FN.

**OVERVIEW**
Onsite testing can be divided into two parts: collection and testing. Below is a high level overview of collection – (collection is client dependent and based largely on FN's preferences and policies / testing SOP's are the responsibility of the lab director and lab supervisor)

**Collection:**
    1.  Employees need to be consented, assigned a unique medical record number (MRN) and given required testing disclosures
        a.  one master consent is ok, consent revocation pursuant to CA informed consent laws
            i.  consider how non-FN employees will be included in this process, their respective employers would need to obtain releases so that FN can release employee info to the Lab
        b.  the MRN is protected health information (PHI)
            i.  anyone involved with the MRN process, whether printing labels or using documents containing the MRN should be trained on HIPAA for business associates
                1.  For more info on HIPAA Business Associates visit: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html
            ii.  MRN  definition
                1.  MRN is a healthcare organization-specific identifier given to each patient. This number is used to retrieve everything in the patient's record (medical history, past encounters, medication list) and it is also used to map things like incoming lab results to a patient.
    2.  Each time an EE gets tested they'll need to identify themselves to the observer with their Name and DOB (two patient identifiers are required)
    3.  At time of collection each EE will need:
        a.  1(one) nasal swab
        b.  1(one) specimen collection bag
        c.  3(three) patient labels (with barcodes) printed: these will be applied to the specimen

(by EE); the testing cassette (lab tech) and a third for result interpretation (lab director)

      i.   The patient labels should include:

   1.  MRN (numeric) and scannable barcode
   2.  EE name
   3.  EE DOB
4.  After EE swab their noses, they will need to deposit the labeled specimen and two remaining patient labels in a receptacle of some sort so that the lab technician can collect and eventually test the specimen.
5.  Contactless collection is preferred and requires less PPE
6.  Collection should NOT exceed 2minutes per employee.
7.  CDC guidance for testing multiple people in succession
    a.  https://www.cdc.gov/coronavirus/2019-ncov/hcp/broad-based-testing.html

## Testing Structure @Ismael Ramirez
1.  Must have negative pressure
2.  Water source needed
3.  Biohazard trash can needed (can ICS be sub-contracted out for biohazard collection?)
4.  Secure internet access needed
5.  Electricity needed
6.  Table for testing (at least 6 ft wide)
7.  Testing structure will need:
    a.   a window for observation
    b.   An access for lab tech to give EE labels and swab / EE to return specimen through this same access or receptacle (this all depends on FN's testing procedures – these need to be clarified and confirmed before the lab structure can be built)
       i.   There will need to be an internal partition to separate the "collection" activities from the "testing" activities because the testing must be in negative pressure

## Technology @Eduardo Saturnino
1.  Barcode and scanning system needed
2.  MRN - The required LA County demographic info will need to be captured and then associated with a MRN. (Please click HERE to see the date LA COVID Lab Submitter template – all of this information will be needed from each person being tested. This info can all be collected during consent process)
3.  Each time an EE gets tested, their MRN barcode should be scanned (time & date of collection is needed for reporting)
    a.  All demographic data associated with MRN should auto-populate in the template (this would prevent manual entry)

### Security
1. COVID kits are high theft and need to be securely stored where access is limited and monitored.

### CONSIDERATIONS (these should be evaluated and responses shared with me so that the Lab's SOP's are consistent with FN)

    1.  Will testing be provided for FN/ FNL employees or for all employees and vendors?
    2.  Has FN reached out to staffing partners about testing? Each employer may have existing processes in place.
    3.  Has FN obtained consent from vendors to share their employee

information with the lab?

4. Will each employer obtain consents from their employees?

5. Who should results be reported to? Each employer should be informed of their employees' results, especially positives, since ER's need to report positives to work comp carriers. Will the lab give results to FN and FN disseminate to vendors and staffing partners? EE would need to sign release for results to be released.

6. How will FN address refusals? If an EE refuses to be tested, how will FN report refusals to the department of health?

7. How will FN capture vendors who enter the DC? If these vendors need to be tested, how will FN communicate this to the vendor and to the lab?

8. When an EE fails to show up for testing, how will FN like to be informed? Will there be someone internally tracking this?

9. ETA for the physical lab? Should we plan on using tents in the interim?

10. FN currently has no medical director and the IIPP doesn't include medical surveillance or a program that a medical director could oversee. Although the testing is required – COVID testing still requires a physician order (CA has now allowed pharmacists to write these orders)

11. Once FN gets a medical director, the standing order for testing will need to include vendors and contractors and anyone who'd require testing.

## TENTATIVE TIMELINE AND LAB INFO

The lab is wholly owned by The Compliance Firm (CCS' parent company) but has been created and located at SFS for the sole purpose of providing rapid onsite COVID testing to FN Logistics, FashionNova and its vendors

The name of the lab (that will appear on the CLIA certificate): CCS at FNL
Lab Address: 12588 Florence Ave, Santa Fe Springs, CA 90670
Lab Director: Dr. Joanna Xie, MD (resume attached)
Lab Supervisor/ Lead Scientist: Dr. Matt Cruzen, PhD (resume attached)

Tentative Timeline (not all inclusive):
12/12/2020 - have at least one lab built - Dr. Cruzen is designing the lab(s) and will travel onsite as needed to assist facilities with construction)

12/12/2020 - FN to decide on a uniform badge system or process so that tech engineers can build out the EMR platform (electronic medical record)

12/19/2020 - deadline for FN to have a medical director (I will continue to search my network for directors who charge <$1,500/mo.)

12/20/2020 - begin consenting employees and vendors, assigning medical record numbers (MRN), badges, and educating EE and vendors on testing process. We'll do "dry runs" on Sunday - Saturday of this week - this will allow EE to get familiar and comfortable with the new testing process and allow ops to make adjustments if needed

12/27/2020 - At 12:01am CCS at FNL will be open for testing. FN can confirm the exact time to being testing

I've attached a copy of the LA county template for reporting - hopefully this will aid in determining if current systems in place could be used for communicating test results from the Lab to FN.

Kind Regards,

Britt Stillwell | *Dir. of Business Development*



**Compliant Care Staffing**

1055 West 7th Street, 33rd Floor
Los Angeles, CA  90017
ph. 213-282-9905 / 702-781-1908 (direct)
fax. 213-513-5102

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**3 attachments**

 **LAC_COVID19ImportLabSubmittersTemplate.xlsx**
22K

 **Dr. Joanna Xie MD - resume.pdf**
123K

 **_Dr Matt Cruzen PhD Resume.pdf**
164K

---

**Rosie Partida** <rosie.partida@fashionnova.com>    Wed, Dec 9, 2020 at 6:47 PM
To: Brittany Stillwell <britt.stillwell@compliantcarestaffing.com>
Cc: Ian Dill <ian.dill@fashionnova.com>, Ernesto Hernandez <ernesto.hernandez@fashionnova.com>, Ismael Ramirez <ismael.ramirez@fashionnova.com>, Eduardo Saturnino <eduardo.s@fashionnova.com>, Lori Ott <lori.ott@fashionnova.com>, Erica Meierhans <erica.meierhans@fashionnova.com>, Felix Felder <felix.felder@fashionnova.com>, James Esquer <james.esquer@fashionnova.com>, Kwamane Liddell <Kwamane@mlezihealth.com>

Thans, Britt for providing the protocol

Rosie Partida | Sr Manager - Risk Management & Safety

**FASHIONNOVA**

p: 714.519.1934
a: 2801 E 46th St, Vernon, CA 90058
e: rosie.partida@fashionnova.com

[Quoted text hidden]

# EXHIBIT I



**VIA E-MAIL**

January 6, 2021

       Re:     Notice of Termination of Recruitment Agreement and Staffing Agreement

Ms. Stillwell:

     Pursuant to Section E of the Recruitment Agreement by and between FN Logistics, Inc. ("FN Logistics") and The Compliance Firm dba Compliant Care Staffing executed August 14, 2020, and the Section D(1) of the Recruitment Agreement by and between FN Logistics and The Compliance Firm dba Compliant Care Staffing executed June 16, 2020, Fashion Nova hereby provides notice of its intent to terminate the MSA and SOW. Therefore, the Recruitment Agreement and the Staffing Agreement shall terminate effective January 5, 2021.

     Should you have any questions regarding the foregoing, please do not hesitate to contact me at erica.meierhans@fashionnova.com.

                     Sincerely,

                     *Erica Meierhans*

                     Erica Meierhans
                     General Counsel

**12588 Florence Ave., Santa Fe Springs, California 90670**

# EXHIBIT J

**AGREEMENT FOR RAPID TESTING SERVICES AND FASHION NOVA:**

A. RapidNow, a division of Esteem Dermatology Inc., a California Corporation with its head office at 29020 Agoura Rd a6, Agoura Hills, CA 91301("RapidNow"); and

B. the person, firm or corporate body together with any subsidiary or associated or connected company or person to whom RapidNow provides services, as may be (but is not necessarily) better particularised in the signature section of this agreement ("**CLIENT**").

**AGREEMENT: CLIENT'S request that RapidNow provides on-site rapid testing for a minimum amount of 300 employees, vendors or visitors of Fashion Nova distribution center and headquarters seven days per week for a six month contract**. Distribution Center hours will be 1:30pm overnight till 4:30am. Contract will begin on January 7, 2021.

RapidNow will ramp up techs according to the following schedule:
January 7-10: (1) Rapid Tech from 8am-5pm
January 11-12: (3) Rapid Techs from 5am-4:30pm
January 13: We can be at full capacity with 8-12 Rapid Techs 1:30pm overnight till 4:00am

From January 13th we will provide 4-8 Rapid Techs at the distribution center 7 days per week between the hours of 1:30pm till 4:30am the following day. The number of Rapid Techs will be adjust between 4-8 people on shifts dependent on rush times. These rush times will be approximately from 1:30pm-3:30pm and 1:00am-3:30am. On Mondays, we will also provide 3 additional Rapid Techs at the Fashion Nova headquarters from 5:00am-4:30pm.

RapidNow will provide all personal protective equipment for our trained Rapid Techs to be able to safely administer the rapid antigen tests. Fashion Nova will supply 13,000 rapid antigen tests. Under RapidNow medical direction we will be the ordering practitioner and Fashion Nova will be required to directly purchase the tests. RapidNow will provide a link for Fashion Nova associates to electronically fill out the RapidNow testing consent form. The rapid antigen tests are administered by the Rapid Techs with an anterior nasal swab. The results process in 15-30 minutes. The distribution center employees will receive their results 1-3 hours after being tested. The tests results are sent via our HIPAA compliant electronic record system and employees will be sent their results to the email address that they provide. If there is no email provided by the Fashion Nova employee, the results will be sent to HQcovid@fashionnova.com.

Positive results will be sent directly to HQcovid@fashionnova.com.

Signature of this agreement shall constitute CLIENT'S acceptance of the terms and conditions of this agreement.

**FEES AND EXPENSES:** CLIENT agrees to pay $60 per test administered. There is a minimum number of 300 tests per day at the $60 rate.

In addition to any fees, CLIENT agrees to pay all reasonable CLIENT pre-approved expenses incurred

1

by RapidNow related to the performance of its services under this agreement.

**PAYMENT TERMS**: CLIENT agrees to pay a down payment of 40% of the minimum amount of tests required to be administered within a two week time period starting on January 7. The final total amount of tests will be due upon receipt every two weeks.

If the client wants to put a limit to the number of tests performed onsite per day, RapidNow must be notified 24 hours in advance via email at britt@rapidnowtesting.com.

Interest of 10% per month will be charged on unpaid fees more than 30 days past due. CLIENT agrees to reimburse RapidNow for all reasonable costs of collection, including attorney fees.

*Payment by Wire Transfer:* Please remit the total USD invoice total amount by bank transfer as follows:
Bank: Bank of America
ABA: 121000358
Account Number:XXXXXX984
Account Name: Esteem Dermatology Medical Group, Inc.

## ACCOUNTING/BILLING INFORMATION:

Name:_____

Title:

_____

Address:

_____ City:

_____ State: _____ Zip: _____

Telephone: ( ) _____

Email: _____

**PRIMARY CONTACT INFORMATION:**

2

Contact Name for Testing Logistics Requirements:

_____ Title:

_____

Telephone: ( ) _____

Email: _____

**CONFIDENTIALITY OF SERVICES:** All service agreements made by RapidNow are made on a confidential basis and CLIENT shall hold RapidNow harmless from any liability resulting from CLIENT'S unauthorized disclosure or misuse of information regarding any services and/or contract pricing.

**DISCLAIMER:** RapidNow does not guarantee the accuracy of test results. Our rapid antigen test is FDA-authorized or authorized by the FDA's Emergency Authorized Use (EAU) protocol to diagnose current infection with SARS-Cov-2, the virus that causes COVID-19. Antigen tests work by detecting the presence of a structure on the outside of a virus' cell. Other diagnostic tests, known as PCR tests, look for the virus' genetic material. PCR tests require specialized equipment and can take days to get results. Our antigen tests return results in about 15 minutes.
Antibody tests are not the same as antigen tests. Antibody tests are used to tell you if you may have been infected with COVID-19 in the past. They are not typically indicated for diagnosis of a current infection. They test the blood for the presence of antibodies, molecules created by the body to fight off infection.

A positive antigen test result means that the test detected the COVID-19 virus. Positive results from antigen tests are highly accurate. Based on FDA-approved research, a positive test result indicates of a near-100 percent chance of COVID-19 infection. Antigen tests have a very low rate of false positives. A negative result means the test did not detect the virus at the time the test was taken. Antigen tests have a low rate of false negatives. According to CDC reporting, a negative test result indicates there is between an 84% and 97.6% chance that the person is not infected with COVID-19 (when compared to a PCR test). No test for COVID-19 is perfect. The best way to reduce the risk of COVID-19 infection is to avoid confined spaces, crowds, and close contact, and to follow CDC guidelines for COVID-19 infection prevention.

**LIMITATION OF LIABILITY:** The total liability of RapidNow, CLIENT and their affiliates, and their respective officers, directors, employees and agents, relating to or arising from this Agreement shall be limited to the amount paid or payable pursuant to this Agreement as specified in the Order Form. In no event shall either party be liable for any indirect, special, incidental, punitive or consequential damages, regardless of the form of action, even if a party has been advised of the possibility of such damages.

**INDEPENDENT CONTRACTOR:** The services provided by RapidNow under agreement are provided as an independent contractor. Nothing in this agreement shall be construed as creating the relationship of principal and agent, joint venturers, or employer and employee, between RapidNow and CLIENT.

**ASSIGNMENT:** This agreement and all of its provisions are binding on and inure to the benefit of

3

RapidNow and CLIENT and their respective successors and permitted assigns, but neither this agreement nor any of the rights, interests, or obligations hereunder may be assigned by either party without the prior written consent of the other.

**GOVERNING LAW & JURISDICTION:** This agreement will be governed by and enforced in accordance with the laws of the state of California. The parties agree that state and federal courts within the state of California shall have the exclusive jurisdiction over any litigation brought or arising out of this agreement. CLIENT and RapidNow irrevocably and unconditionally agree that they will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the courts of the State of California sitting in Los Angeles County, and of the United States District Court of the Southern District of California.

**COST OF ENFORCING AGREEMENT:** In the event RapidNow institutes litigation to enforce its rights under this agreement and is the prevailing party in such litigation, RapidNow shall be entitled to costs of suit and reasonable attorney fees incurred by it in connection with such litigation.

**TERMINATION AND SURVIVAL:** This agreement may be terminated by either party upon 60 days' written notice to the other party. However, CLIENT shall remain liable to RapidNow for all fees and expenses due under this agreement prior to termination. All other provisions of this agreement that by their terms extend beyond the termination of this agreement shall survive such termination and remain in full force and effect.

<u>Term</u>. Unless terminated earlier pursuant to the terms of the Agreement, the term of this agreement shall commence on the Effective Date and shall continue for a period of six months (the "Initial Term"). Thereafter, unless either party notifies the other in writing not later than thirty (30) days prior to the end of the Initial Term or any Renewal Term, as defined below, of its intent to terminate this agreement, this statement of work shall automatically continue in effect thereafter for consecutive periods of six months each (a "Renewal Term") at the end of the Initial Term and/or any Renewal Term hereunder.

<u>Termination</u>.  In the event of a material breach of this agreement, the non-breaching party may terminate this agreement by giving sixty (60) days prior written notice to the breaching party; provided that, except for breach of Client's payment obligations, this agreement shall not terminate if the breaching party has cured the breach prior to the expiration of such sixty (60) day period or has used its best efforts to cure such breach within such sixty (60) day period and can demonstrate to the reasonable satisfaction of the other party that based on such efforts such breach will be promptly cured after the expiration of such sixty (60) day period.

4

**The Company:**

**RapidNow/Esteem Dermatology Inc.**

**By: Dr. David Drimmer**

**Title: Medical Director and Co-Founder**

**Signature:**_____

**Date:** _____


**By: Brittany Brown**

**Title: Co-Founder and COO**

**Signature:** _____

**Date:** _____


**The Client:**

**Fashion Nova**

**By:** _____

**Title:** _____

**Signature:** _____

**Date:** _____

5

# EXHIBIT K

# PARKER · STANBURY LLP

**ATTORNEYS AT LAW**
444 SOUTH FLOWER STREET
NINETEENTH FLOOR
LOS ANGELES, CA 90071-2901
TELEPHONE (213) 622-5124
FAX (213) 622-4858
E-MAIL: LA@PARKSTAN.COM

DOUGLASS H. MORI
JOHN D. BARRETT, JR. *
J. LUIS GARCIA †
DAVID E. COWAN
GEORGE A. HUNLOCK
MATTHEW W. DAVIS
REYNALDO C. SANTOS
B. PETER LEE
MARCUS BASTIDA

ROSEMARIE MERRILL
DAVID C. LANE
DANA C. GIOVINE
MATHEW L. MAY
ALEX L. SHIA
JEFF H. GREEN
GLENN M. HABAS
GEORGANN CARMAN
RICARDO A. MERCADO

J. MARTIN LATHROP
JAMES L. WOLFSEN
GEORGE C. GONZALEZ
KELLY A. SHERIDAN
HANS W. CHEN
ERIK PRIEDKALNS
AARON G. FREEMAN
GREGORY T. FONG
JOSEPH R. SERPICO

ROCCO A. PAPALIA
MELANIE M. BUTLER
TAMARA C. HARRIS
CLAUDIA M. PALENCIA
SARA Y. SHOWKATIAN
KRISTOFFER M. GARRISON
SUZANNE K. GOLDEN
IAN G. STERLING
MICHAEL COMPTON

* ASSOCIATE IN AMERICAN BOARD OF TRIAL ADVOCATES
† MEMBER OF AMERICAN BOARD OF TRIAL ADVOCATES
HARRY D. PARKER (1891-1976)
RAYMOND G. STANBURY (1904-1966)

February 26, 2021

## VIA U.S. MAIL AND E-MAIL

FN Logistics, Inc.
Attn: Erica Meierhans, Esq.
2801 E. 46th Street
Vernon, CA  90058

erica.meierhans@fashionnova.com

Dear Ms. Meierhans:          Re:   Original Creditor:   Compliant Care Staffing
                                    Total Amount Due: $114,321.37
                                    Our File No.:        CA-R94-72G

This letter involves collection of a debt. Any and all information gathered shall be used for collection purposes.

Please be advised that our office has consulted with Compliant Care Staffing regarding your outstanding debt in the amount of $114,321.37.

Specifically, Compliant Care Staffing has informed our office that this debt represents your balance due from staffing services rendered, as supported by the enclosed document. Compliant Care Staffing has further informed our office that as of the date of this correspondence, you have failed and/or refused to remit any payment for this past-due debt.

Accordingly, demand is hereby made that you promptly remit full payment in the amount of $114,321.37.

Unless you dispute the validity of this debt or any portion thereof within thirty (30) days after receiving this notice, we will assume the debt to be valid. If you notify Parker · Stanbury LLP that the debt or any part of it is disputed, we will obtain and mail you a copy of a writing or verification evidencing the debt. Please be further advised that if your obligation remains in default, without a dispute, further legal action may be taken against you that could result in a judgment, which may include attorney fees and other litigation costs.

Please notify the undersigned if you so dispute this debt. Otherwise, please forward certified funds in the full amount of $114,321.37 directly to Compliant Care Staffing, in order to avoid further legal action.

February 26, 2021
Page 2

California state law requires that we make the following disclosure to you:

> The state *Rosenthal Fair Debt Collection Practices Act* and the federal *Fair Debt Collection Practices Act* require that, except under unusual circumstances, collectors may not contact you before 8:00 a.m. or after 9:00 p.m.  They may not harass you by using threats of violence or arrest or by using obscene language.  Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work.  For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt.  Collectors may contact another person to confirm your location or enforce a judgment.  For more information about debt collection activities, you may contact the Federal Trade Commission at (877) FTC-HELP or www.ftc.gov.

Thank you for your anticipated cooperation and professional courtesy.  Should you have any questions or require additional information, you may respond to the undersigned via e-mail at LA@PARKSTAN.com.

Very truly yours,

PARKER · STANBURY LLP

By
ALEX L. SHIA

ALS:sml

cc:    Compliant Care Staffing – *via e-mail*

Enclosure

February 26, 2021
Page 3

# Compliant Care Staffing

### A/R Aging Detail

As of February 17, 2021

| DATE | TRANSACTION TYPE | NUM | CUSTOMER | DUE DATE | AMOUNT | OPEN BALANCE |
|------|------------------|-----|----------|----------|--------|--------------|
| 31 - 60 days past due | | | | | | |
| 12/14/2020 | Invoice | 1038 | FN Logistics, Inc. | 12/29/2020 | 95,236.78 | 55,179.20 |
| 12/21/2020 | Invoice | 1039 | FN Logistics, Inc. | 01/05/2021 | 20,732.17 | 2,316.04 |
| 12/28/2020 | Invoice | 1040 | FN Logistics, Inc. | 01/12/2021 | 11,262.38 | 11,262.38 |
| Total for 31 - 60 days past due | | | | | $127,231.33 | $68,757.62 |
| 1 - 30 days past due | | | | | | |
| 01/04/2021 | Invoice | 1043 | FN Logistics, Inc. | 01/19/2021 | 29,170.50 | 29,170.50 |
| 01/11/2021 | Invoice | 1045 | FN Logistics, Inc. | 01/26/2021 | 3,800.43 | 3,800.43 |
| 01/18/2021 | Invoice | 1049 | FN Logistics, Inc. | 02/02/2021 | 123.96 | 123.96 |
| 01/18/2021 | Invoice | 1048 | FN Logistics, Inc. | 02/02/2021 | 12,468.86 | 12,468.86 |
| Total for 1 - 30 days past due | | | | | $45,563.75 | $45,563.75 |
| TOTAL | | | | | $172,795.08 | $114,321.37 |

# EXHIBIT L



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Staci J. Riordan**
*Partner*
sriordan@nixonpeabody.com

Nixon Peabody LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
213-629-6000

February 26, 2021

**VIA EMAIL** (Britt@thecompliancefirm.com)

The Compliance Firm d/b/a Complaint Care Staffing
1055 West 7th Street, 33rd Floor
Los Angeles, CA 90017
Attn: Britt Stillwell, Director of Business Development

Re:     **Compliant Care Staffing and FN Logistics, Inc.**

Dear Ms. Stillwell:

We are aware that The Compliance Firm d/b/a Complaint Care Staffing ("CCS") was recently engaged by FN Logistics, Inc. ("FNL") to perform on-site rapid Covid testing ("CCS Testing").[1] CCS Testing was to begin after Christmas 2020, but was delayed so that CCS Testing was only performed on January 4 and January 5, 2021.  The parties terminated their relationship on January 6, 2021.

We have been advised that there was no written agreement or scope of work in connection with the CCS Testing.  We also understand that the invoicing for the CCS Testing is not yet completed, and some submitted invoices are being revised.

From the invoices and emails we have reviewed to date, it appears as if CCS attempted to expand its business from on-site nursing services to the start-up and operation of an employee health clinic and laboratory housed at the FNL warehouse.  What should have been a turn-key service whereby a licensed nurse came on premises and provided point-of-care COVID-19 testing, became a business opportunity for CCS to develop a CLIA-certified laboratory from the ground-up, while passing all of the start-up costs to FNL. Either CCS had a misunderstanding of what was necessary for on-site COVID-19 testing or intentionally used its relationship with FNL to develop a new line of business – either way, the work that was performed was unnecessary, and an inefficient way to conduct employee testing, and CCS is now trying to pass on its costs and take advantage of FNL's reliance on CCS' purported expertise.

As the lab owner and director, as well as the employer of all clinical staff, CCS had, and still has, an obligation to adhere to the proper standards of care, not to mention the law.  As clinical professionals and those knowledgeable of the health care industry, especially when compared to FNL, which is merely a company that packages and ships clothing, it was CCS' obligation to

---

[1] We are aware that CCS and FNL had an agreement relating to staffing services.  That agreement is not in dispute.

The Compliance Firm d/b/a Complaint Care Staffing
February 23, 2021
P a g e | **2**

provide the CCS Testing in an efficient and compliant manner, and to provide a solution to employee testing that was rational for a non-clinical business. It should be no surprise that FNL relied on CCS and its stated expertise to do so.

While it appears that CCS was taking advantage of FNL's clinical inexperience to the detriment of FNL, nonetheless, FNL prefers an amicable resolution. To that end, FNL asked us to review, reconcile and approve all amounts billed in connection with the CCS Testing. FNL hereby puts CCS on notice that all invoices submitted, whether paid or not, in connection with, at minimum, the CCS Testing, are being disputed and will be re-reviewed to determine whether the charges are appropriate.

We would prefer to work collaboratively to resolve this situation. While we are gathering materials from FNL, it would expedite resolution if you could send us:

- all the invoices relating to this matter, whether paid or not;
- amounts CCS contends is owed, if any;
- a listing of all payments received from January 1, 2020 to date from FNL, whether in connection with the CCS Testing or otherwise;
- an inventory of any supplies purchased on behalf of FNL, and if not used, where such items are currently located; and
- a list of all the people CCS secured to perform services in connection with this matter, and a description of such services and hours worked for FNL.

In addition, FNL learned that CCS left approximately 13,000 CareStart COVID-19 Antigen tests at FNL's warehouse, which is considered a "dangerous device" under the law, and which is CCS's responsibility as a licensed California laboratory. Given these are the property and legal responsibility of CCS, please contact me at your earliest convenience to arrange for your taking possession and picking them up.

Please be advised that nothing in this letter is a waiver of any of FNL's rights, nor a complete statement of the facts or FNL's position, all of which are expressly reserved.

We look forward to working with you to resolve this matter.

Very truly yours,

Staci Jennifer Riordan, Esq.
**Nixon Peabody LLP**

cc:     Jill Gordon, Esq.

# EXHIBIT M



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Staci J. Riordan**
*Partner*
sriordan@nixonpeabody.com

Nixon Peabody LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
213-629-6000

March 12, 2021

**VIA EMAIL** (Britt@thecompliancefirm.com)

The Compliance Firm d/b/a Compliant Care Staffing
1055 West 7th Street, 33rd Floor
Los Angeles, CA 90017
Attn: Britt Stillwell, Director of Business Development

Re:     **Compliant Care Staffing and FN Logistics, Inc.**

Dear Ms. Stillwell:

We received confirmation late last week that Parker Stanbury LLP *is not* representing The Compliance Firm d/b/a Complaint Care Staffing ("CCS") in this matter.  Please notify me if CCS retains other counsel; until then, I will send all communications directly to your attention.

This letter concerns only the CareStart Antigen Tests ("CSA Tests") that CCS agreed to administer at FN Logistics, Inc. ("FNL") for FNL personnel. CCS improperly left the CCA Tests behind at FNL's facility in Santa Fe Springs when the parties' relationship was terminated.  As you may be aware, the CSA Tests are considered "dangerous devices" – pursuant to California Business & Professions Code § 4022 – which can only be handled, stored, warehoused, distributed or shipped by authorized parties, pursuant to California pharmacy law. FNL is not permitted to store, hold or administer the CSA Tests.

CCS was retained as the expert healthcare consultant to administer COVID-19 testing services for FNL personnel in accordance with California and federal laws.  CCS recommended and then obtained the CSA Tests from the manufacturer under authority of its CLIA Certificate of Waiver (CLIA No. 05D2210239).  When the parties' relationship was terminated, and it became clear that CCS would not be administering the CSA Tests at FNL, CCS was required to take custody and possession of these devices.  To date, FNL has requested that CCS pick up the remaining CSA Tests on multiple occasions.  Your response has been to threaten contacting the police and health department and then demanding "signed waivers and releases" in exchange.  Your responses have not been helpful, and they are not well-taken.  CCS obtained the CSA Tests from the manufacturer, and is required by law to maintain possession of those tests.

This is a further request that CCS immediately, and unconditionally, retrieve the remaining CSA Tests and all other items related to the administration of the CSA Tests from the FNL facility.  Staff at the FNL warehouse, located at 12588 Florence Avenue, in Santa Fe Springs, will be available to allow access.  Please contact Ian Dill (ian.dill@fashionnova.com) at FNL to schedule

The Compliance Firm d/b/a Compliant Care Staffing
March 12, 2021
P a g e | **2**

a time to pick up the CSA Tests.  We expect the CSA Tests to be picked up no later than 5:00 PM on March 15, 2021.

Very truly yours,

Staci Jennifer Riordan, Esq.
**Nixon Peabody LLP**

cc:     Jill Gordon, Esq.

# EXHIBIT N


THE COMPLIANT
Healthcare. Business. Consultants.
Compliant Care
Staffing

Britt Stillwell <britt@thecompliancefirm.com>

---

# URGENT: Please provide proof of ownership for CareStart Antigen Tests

---

**Brian, Aaron** <abrian@nixonpeabody.com>                                    Mon, Mar 22, 2021 at 8:50 PM
To: Britt Stillwell <britt@thecompliancefirm.com>, "Riordan, Staci Jennifer" <sriordan@nixonpeabody.com>
Cc: "Gutierrez, Heidi" <hgutierrez@nixonpeabody.com>, "Dannah.bosi@thecompliancefirm.com"
<Dannah.bosi@thecompliancefirm.com>, "Gordon, Jill" <jgordon@nixonpeabody.com>

Dear Ms. Stillwell,

We notified the California Pharmacy Board and Access Bio, the manufacturer of the CareStart Antigen Tests, that a significant number of unused test kits remain at the FNL warehouse.  The Pharmacy Board recommended that we contact waste disposal to pick up the test kits, since CCS has refused to do so.  Access Bio however has agreed to pick up the test kits as a courtesy to FNL.

Despite its previous refusal, we take this opportunity to give CCS a final chance to retrieve its unused test kits no later than March 24, 2021.  If CCS elects to pick up the tests, please notify me by 5:00 PM tomorrow, March 23, 2021, and please provide me with the date and time CCS will be at the FNL warehouse to pick them up.  If I do not hear from you, or if CCS elects not to pick up the tests by March 24, 2021, FNL will have no choice but to allow Access Bio to collect them.

Aaron



**Aaron Brian**
Counsel
abrian@nixonpeabody.com
T 213-629-6033 | C 310-498-9975 | F 855-515-9456
Nixon Peabody LLP | 300 South Grand Avenue, Suite 4100 | Los Angeles, CA 90071-3151
nixonpeabody.com | @NixonPeabodyLLP

**Please consider the environment before printing this email.**

This email message and any attachments are confidential and may be protected by the attorney/client or other applicable privileges. The information is intended to be conveyed only to the designated recipient(s) of the message. If you are not an intended recipient, please notify the sender immediately and delete the message from your email system. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful. Thank you.

---

**From:** Britt Stillwell <britt@thecompliancefirm.com>
**Sent:** Tuesday, March 16, 2021 12:00 PM

**To:** Brian, Aaron <abrian@nixonpeabody.com>; Riordan, Staci Jennifer <sriordan@nixonpeabody.com>
**Cc:** Gutierrez, Hector <hgutierrez@nixonpeabody.com>; ba.van-bosi@lalegalhealthfirm.com; Gordon, Jill <jgordon@nixonpeabody.com>
**Subject:** URGENT: Please provide proof of ownership for CareStart Antigen Tests

[EXTERNAL E-MAIL]

[Quoted text hidden]

# EXHIBIT O

**Compliant Care Staffing**
1055 W 7th Street, 33rd Floor
Los Angeles, CA  90017
+1 7472712100
billing@thecompliancefirm.com
www.thecompliancefirm.com



# INVOICE

**BILL TO**

FN Logistics, Inc.
12588 Florence Avenue
Santa Fe Springs, CA  90670
USA

**INVOICE #**  1043
**DATE**  01/04/2021
**DUE DATE**  01/19/2021
**TERMS**  Net 15

**PMT METHOD**
Cash

| WEEK END DATE | EMPLOYEE | DESCRIPTION | LABOR TYPE | HRS | RATE | TOTAL |
|---|---|---|---|---|---|---|
| 01/01/2021 | **FN COVID lab supervisors (PhD and PharmD)** | FN COVID lab supervisors (PhD and PharmD (billed monthly) | | 540 | 50.00 | 27,000.00 |
| 01/02/2021 | **Dr. Xie - lab director** | Lab director monthly retainer | | 1 | 1,500.00 | 1,500.00 |
| 01/02/2021 | **Dr. Rene Hinton – medical director** | medical director monthly retainer | | 1 | 1,500.00 | 1,500.00 |
| 01/02/2021 | **Virtual Nurse Observers** | Virtual Nurse Observers for COVID testing | | 540 | 41.50 | 22,410.00 |
| 01/02/2021 | **Steve Connor** | Employee Health Specialist | | 20 | 55.00 | 1,100.00 |
| 01/02/2021 | **Britt Stillwell** | consultancy - discounted rate | | 11.50 | 175.00 | 2,012.50 |
| 01/02/2021 | **FN COVID lab technicians (LVN)** | FN COVID lab technicians (LVNs) | | 160 | 50.00 | 8,000.00 |

COVID lab fees weekending 01/02/2020

LINES 1-4 services billed monthly - invoice attached

LINE 4: Discounted consultant rate (Britt Stillwell) rate discounted from $300/hr to $175/hr

LINE 7 - 20 LVN techs hired and trained 8hrs  for FN COVID lab but unable to work the new 3pm - 3am schedule that was changed with less than 24hours notice on 12/29/2020.

DEPOSIT APPLIED: $34,352.00 deposit from Invoice 1029 applied. Deposit

| | | |
|---|---|---|
| TOTAL | | 63,522.50 |
| DEPOSIT | | 34,352.00 |
| BALANCE DUE | | **$29,170.50** |

# EXHIBIT P



April 12, 2021

Sang Joon Han
Associate Principal Scientist / R&D Division
Access Bio, Inc.
65 Clyde Road Suite A
Somerset, NJ 08873

| | |
|---|---|
| Device: | *CareStart* COVID-19 Antigen |
| EUA Number: | EUA202625 |
| Company: | Access Bio, Inc. |
| Indication: | Qualitative detection of the nucleocapsid protein antigen from SARS-CoV-2 in nasopharyngeal or anterior nasal swab specimens directly collected from individuals suspected of COVID-19 by their healthcare provider within five days of symptom onset, or from individuals without symptoms or other epidemiological reasons to suspect COVID-19 when tested twice over two or three days with at least 24 hours and no more than 48 hours between tests. |
| | Emergency use of this test is limited to authorized laboratories. |
| Authorized Laboratories: | Laboratories certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), 42 U.S.C. §263a, that meet the requirements to perform high, moderate or waived complexity tests. This test is authorized for use at the Point of Care (POC), i.e., in patient care settings operating under a CLIA Certificate of Waiver, Certificate of Compliance, or Certificate of Accreditation. |

Dear Sang Joon Han:

On October 8, 2020, based on your[1] request the Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) for emergency use of your *CareStart* COVID-19 Antigen test for the qualitative detection of the nucleocapsid protein antigen from SARS-CoV-2 in nasopharyngeal swab specimens directly collected, or collected in BD universal transport media, from individuals suspected of COVID-19 by their healthcare provider within five days of symptom onset, pursuant to Section 564 of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. §360bbb-3).[2] Based on your request, the October 8, 2020, letter was revised

---

[1] For ease of reference, this letter will use the term "you" and related terms to refer to Access Bio, Inc.
[2] In this case testing was limited to laboratories certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), 42 U.S.C. §263a, that met the requirements to perform high, moderate or waived complexity tests.

Page 2 – Sang Joon Han, Access Bio, Inc.

and reissued by FDA on February 1, 2021.[3]  FDA subsequently granted updates to the CareStart COVID-19 Antigen test at your request on March 15, 2021.[4]

On April 1, 2021, you requested to amend your EUA. Based on that request, and having concluded that revising the February 1, 2021, EUA is appropriate to protect the public health or safety under section 564(g)(2)(C) of the Act (21 U.S.C. § 360bbb-3(g)(2)(C)), FDA is reissuing the February 1, 2021, letter in its entirety with revisions incorporated.[5]  Pursuant to section 564 of the Act and the Scope of Authorization (Section II) and Conditions of Authorization (Section IV) of this reissued letter, your product[6] is now authorized for use consistent with the indication described above.

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Act, the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes COVID-19. Pursuant to Section 564 of the Act, and on the basis of such determination, the Secretary of HHS then declared that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of the virus that causes COVID-19 subject to the terms of any authorization issued under Section 564(a) of the Act.[7]

FDA considered the totality of scientific information available in authorizing the emergency use of your product for the indication above.  A summary of the performance information FDA relied upon is contained in the Instructions for Use (identified below).

---

This test was authorized for use at the Point of Care (POC), i.e., in patient care settings operating under a CLIA Certificate of Waiver, Certificate of Compliance, or Certificate of Accreditation.

[3] The revisions to the October 8, 2020, letter and authorized labeling included: (1) updating the intended use to include use in direct anterior nasal swab specimens and remove use with nasopharyngeal swabs collected in BD universal transport media, (2) updating the intended use and limitations section to include language around performance of the test with respect to newly emerging strain variants of SARS-CoV-2, (3) updating the clinical performance with data from a new clinical study performed to fulfill Conditon of Authorization P. in the October 8, 2020, letter, (4) adding the authorized distributor brand name *KarmaCare* COVID-19 Antigen and associated labeling, and (5) updating the healthcare provider and patient fact sheets accordingly.

[4] On March 15, 2021, your request was granted to update the shelf-life expiration date of the CareStart COVID-19 Antigen test to nine months at 1–30°C based on the results of your real-time stability study.

[5] The revisions to the February 1, 2021, letter and authorized labeling include: (1) revisions to the intended use and authorized labeling documents, including the Fact Sheet for Healthcare Providers and Fact Sheet for Patients to reflect current information known about serial testing as outlined in the March 16, 2021, FDA "Supplemental Template for Developers of Molecular and Antigen Diagnostic COVID-19 Tests for Screening with Serial Testing" (https://www.fda.gov/media/146695/download), which includes testing of individuals without symptoms or other epidemiological reasons to suspect COVID-19, (2) remove from the intended use language around performance of the test with respect to newly emerging strain variants of SARS-CoV-2 to be consistent with more recent authorizations, (3) removal of the authorized distributor brand name *KarmaCare* COVID-19 Antigen and associated labeling, and (4) updates to the Conditions of Authorization to require a post-authorization clinical study to support the serial testing claim.

[6] For ease of reference, this letter will use the term "your product" to refer to the *CareStart* COVID-19 Antigen used for the indication identified above.

[7] U.S. Department of Health and Human Services, *Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*. 85 FR 7316 (February 7, 2020).

Page 3 – Sang Joon Han, Access Bio, Inc.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of your product, described in the Scope of Authorization of this letter (Section II), subject to the terms of this authorization.

## I. Criteria for Issuance of Authorization

I have concluded that the emergency use of your product meets the criteria for issuance of an authorization under Section 564(c) of the Act, because I have concluded that:

1.  The SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2.  Based on the totality of scientific evidence available to FDA, it is reasonable to believe that your product may be effective in diagnosing COVID-19 and that the known and potential benefits of your product when used for such a use, outweigh the known and potential risks of your product; and

3.  There is no adequate, approved, and available alternative to the emergency use of your product.[8]

## II. Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited to the indication above.

### Authorized Product Details

Your product is a visually read a lateral flow immunochromatographic assay for the qualitatiave detection of the nucleocapsid protein antigen from SARS-CoV-2 in nasopharyngeal or anterior nasal swab specimens directly collected from individuals suspected of COVID-19 by their healthcare provider within five days of symptom onset, or from individuals without symptoms or other epidemiological reasons to suspect COVID-19 when tested twice over two or three days with at least 24 hours and no more than 48 hours between tests. The SARS-CoV-2 viral antigen is generally detectable in nasopharyngeal or anterior nasal swab specimens during the acute phase of infection. Positive results indicate the presence of viral antigens, but the clinical correlation with patient history and other diagnostic information is necessary to determine infection status. Positive results do not rule out a bacterial infection or co-infection with other viruses.

Negative results should be treated as presumptive, and do not rule out SARS-CoV-2 infection and should not be used as the sole basis for treatment or patient management decisions, including infection control decisions. Negative results should be considered in the context of a patient's recent exposures, history, and the presence of clinical signs and symptoms consistent with COVID-19, and confirmed with a molecular assay, if necessary, for patient management. For serial testing programs, additional confirmatory testing with a molecular test for negative results may be necessary, if there is a high likelihood of SARS-CoV-2 infection, such as in an individual

---

[8] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

Page 4 – Sang Joon Han, Access Bio, Inc.

with a close contact with COVID-19 or with suspected exposure to COVID-19 or in communities with high prevalence of infection. Additional confirmatory testing with a molecular test for positive results may also be necessary, if there is a low likelihood of SARS-CoV-2 infection, such as in individuals without known exposures to SARS-CoV-2 or residing in communities with low prevalence of infection.

Testing is limited to laboratories certified under CLIA that meet the requirements to perform moderate, high or waived complexity tests. This test is authorized for use at the POC, i.e., in patient care settings operating under a CLIA Certificate of Waiver, Certificate of Compliance, or Certificate of Accreditation.

To use your product, the patient sample (the direct swab) is transferred to the extraction vial, during which time the virus particles in the sample are disrupted, exposing internal viral nucleoproteins. Extracted swab sample is then added to the sample well of the test device to initiate the test. When the swab sample migrates in the test strip, SARS-CoV-2 viral antigens bind to anti-SARS-CoV-2 nucleocapsid protein antibodies conjugated to indicator and capture particles in the test strip forming an immune complex. The immune complex is then captured by the test line on the nitrocellulose membrane as it migrates through the strip. Test results are interpreted at 10 minutes.

The *CareStart* COVID-19 Antigen test includes the following materials or other authorized materials:  Test devices, Extraction vials and caps, Nasal (or Nasopharyngeal) swabs, Positive control swab, Negative control swab, Package insert, and Quick Reference Instructions (QRI).

Your product requires various types of quality control, including the Internal Quality Control and the External Control materials, or other authorized control materials (as may be requested under Condition K. below), that are processed in the same way as the patient samples. All controls listed below must generate expected results in order for a test to be considered valid, as outlined in the Instructions for Use:

- Positive Control Swab:  Recombinant SARS-CoV-2 nucleocapsid protein antigen is dried on the foam-tipped head

- Negative Control Swab:  Blank Universal Viral Transport media (BD UVT)  is dried on the foam-tipped head

Your product also requires the use of additional authorized materials and authorized ancillary reagents that are not included with your product and are described in the Instructions for Use.

The labeling labeling entitled "*CareStart* COVID-19 Antigen Package Insert (Instructions for Use)" and the "Quick Reference Instructions for *CareStart* COVID-19 Antigen" (available at https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/vitro-diagnostics-euas), and the following fact sheets pertaining to the emergency use, which are required to be made available as set forth in the Conditions of Authorization (Section IV), are collectively referred to as "authorized labeling":

- Fact Sheet for Healthcare Providers:  Access Bio, Inc.- *CareStart* COVID-19 Antigen

Page 5 – Sang Joon Han, Access Bio, Inc.

- Fact Sheet for Patients:  Access Bio, Inc.- *CareStart* COVID-19 Antigen

The above described product, when accompanied by the authorized labeling as set forth in the Conditions of Authorization (Section IV), is authorized to be distributed to and used by authorized laboratories under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of your product, when used consistent with the Scope of Authorization of this letter (Section II), outweigh the known and potential risks of your product.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that your product may be effective in diagnosing COVID-19, when used consistent with the Scope of Authorization of this letter (Section II), pursuant to Section 564(c)(2)(A) of the Act.

FDA has reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, and concludes that your product (as described in the Scope of Authorization of this letter (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of your product under this EUA must be consistent with, and may not exceed, the terms of this letter, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section IV).  Subject to the terms of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) of the Act described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1) of the Act, your product is authorized for the indication above.

## III. Waiver of Certain Requirements

I am waiving the following requirements for your product during the duration of this EUA:

- Current good manufacturing practice requirements, including the quality system requirements under 21 CFR Part 820 with respect to the design, manufacture, packaging, labeling, storage, and distribution of your product, but excluding Subpart H (Acceptance Activities, 21 CFR 820.80 and 21 CFR 820.86), Subpart I (Nonconforming Product, 21 CFR 820.90), and Subpart O (Statistical Techniques, 21 CFR 820.250).

## IV. Conditions of Authorization

Pursuant to Section 564(e) of the Act, I am establishing the following conditions on this authorization:

## Access Bio, Inc. (You) and Authorized Distributor(s)[9]

---

[9] "Authorized Distributor(s)" are identified by you, Access Bio, Inc., in your EUA submission as an entity allowed

Page 6 – Sang Joon Han, Access Bio, Inc.

A. Your product must comply with the following labeling requirements under FDA regulations:  the intended use statement (21 CFR 809.10(a)(2), (b)(2)); adequate directions for use (21 U.S.C. 352(f)), (21 CFR 809.10(b)(5), (7), and (8)); appropriate limitations on the use of the device including information required under 21 CFR 809.10(a)(4); and any available information regarding performance of the device, including requirements under 21 CFR 809.10(b)(12).

B. You and authorized distributor(s) must make your product available with the authorized labeling to authorized laboratories.

C. You and authorized distributor(s) must make available on your website(s) the authorized labeling.

D. You and authorized distributor(s) must include a physical copy of the authorized "Quick Reference Instructions for *CareStart* COVID-19 Antigen" and "*CareStart* COVID-19 Antigen Package Insert (Instructions for Use)" with each shipped kit of your product to authorized laboratories.

E. You and authorized distributor(s) must inform authorized laboratories and relevant public health authorities of this EUA, including the terms and conditions herein, and any updates made to your product, authorized labeling and authorized Fact Sheets.

F. Through a process of inventory control, you and authorized distributor(s) must maintain records of the authorized laboratories to which they distribute the test and number of tests they distribute.

G. You and authorized distributor(s) must collect information on the performance of your product. You will report to FDA any suspected occurrence of false positive or false negative results and significant deviations from the established performance characteristics of the product of which you become aware.

H. You and authorized distributor(s) are authorized to make available additional information relating to the emergency use of your product that is consistent with, and does not exceed, the terms of this letter of authorization.

**Access Bio, Inc. (You)**

I. You must notify FDA of any authorized distributor(s) of your product, including the name, address, and phone number of any authorized distributor(s).

J. You must provide authorized distributor(s) with a copy of this EUA and communicate to authorized distributor(s) any subsequent amendments that might be made to this EUA and its authorized accompanying materials (e.g., Fact Sheets).

to distribute your product.

Page 7 – Sang Joon Han, Access Bio, Inc.

K. You may request changes to this EUA for your product, including to the Scope of Authorization (Section II in this letter) or to the authorized labeling, including requests to make available additional authorized labeling specific to an authorized distributor. Such additional labeling may use another name for the product but otherwise must be consistent with the authorized labeling, and not exceed the terms of authorization of this letter. Any request for changes to this EUA should be submitted to the Division of Microbiology (DMD)/Office of Health Technology 7 (OHT7)-Office of In Vitro Diagnostics and Radiological Health (OIR)/Office of Product Evaluation and Quality (OPEQ)/Center for Devices and Radiological Health (CDRH) and require appropriate authorization from FDA prior to implementation.

L. You must comply with the following requirements under FDA regulations: Subpart H (Acceptance Activities, 21 CFR 820.80 and 21 CFR 820.86), Subpart I (Nonconforming Product, 21 CFR 820.90), and Subpart O (Statistical Techniques, 21 CFR 820.250).

M. You must have lot release procedures and the lot release procedures, including the study design and statistical power, must ensure that the tests released for distribution have the clinical and analytical performance claimed in the authorized labeling.

N. If requested by FDA, you must submit lot release procedures to FDA, including sampling protocols, testing protocols, and acceptance criteria, that you use to release lots of your product for distribution in the U.S. If such lot release procedures are requested by FDA, you must provide it within 48 hours of the request.

O. You must evaluate the analytical limit of detection and assess traceability[10] of your product with any FDA-recommended reference material(s). After submission to and concurrence with the data by FDA, you will update your labeling to reflect the additional testing. Such labeling updates will be made in consultation with, and require concurrence of, DMD/OHT7-OIR/OPEQ/CDRH.

P. You must evaluate the clinical performance of your product to support the serial screening claim in an FDA agreed upon post authorization clinical evaluation study within 6 months of the date of this letter (unless otherwise agreed to with DMD/OHT7-OIR/OPEQ/CDRH). After submission to and concurrence with the data by FDA, you must update the authorized labeling to reflect the additional testing. Such labeling updates will be made in consultation with, and require concurrence of, DMD/OHT7-OIR/OPEQ/CDRH.

Q. You must have a process in place to track adverse events, including any occurrence of false results with your product, and report to FDA pursuant to 21 CFR Part 803.

**Authorized Laboratories**

R. Authorized laboratories using your product must include with test result reports, all authorized Fact Sheets. Under exigent circumstances, other appropriate methods for

---

[10] Traceability refers to tracing analytical sensitivity/reactivity back to an FDA-recommended reference material.

Page 8 – Sang Joon Han, Access Bio, Inc.

disseminating these Fact Sheets may be used, which may include mass media.

S.  Authorized laboratories using your product must use your product as outlined in the authorized labeling.  Deviations from the authorized procedures, including the authorized instruments, authorized extraction methods, authorized clinical specimen types, authorized control materials, authorized other ancillary reagents and authorized materials required to use your product are not permitted.

T.  Authorized laboratories that receive your product must notify the relevant public health authorities of their intent to run your product prior to initiating testing.

U.  Authorized laboratories using your product must have a process in place for reporting test results to healthcare providers and relevant public health authorities, as appropriate.

V.  Authorized laboratories must collect information on the performance of your product and report to DMD/OHT7-OIR/OPEQ/CDRH (via email: CDRH-EUA-Reporting@fda.hhs.gov) and you (Technical Support at +1-888-898-1270 or TShelp@accessbio.net) any suspected occurrence of false positive or false negative results and significant deviations from the established performance characteristics of your product of which they become aware.

W.  All operators using your product must be appropriately trained in performing and interpreting the results of your product, use appropriate personal protective equipment when handling this kit, and use your product in accordance with the authorized labeling.

**Access Bio, Inc. (You), Authorized Distributor(s) and Authorized Laboratories**

X.  You, authorized distributors, and authorized laboratories using your product must ensure that any records associated with this EUA are maintained until otherwise notified by FDA.  Such records will be made available to FDA for inspection upon request.

**Conditions Related to Printed Materials, Advertising and Promotion**

Y.  All descriptive printed matter, advertising, and promotional materials relating to the use of your product shall be consistent with the authorized labeling, as well as the terms set forth in this EUA and meet the requirements set forth in section 502(a), (q)(1), and (r) of the Act and FDA implementing regulations.

Z.  No descriptive printed matter, advertising, or promotional materials relating to the use of your product may represent or suggest that this test is safe or effective for the detection of SARS-CoV-2.

AA.  All descriptive printed matter, advertising, and promotional materials relating to the use of your product shall clearly and conspicuously state that:

- This product has not been FDA cleared or approved, but has been authorized by FDA under an EUA for use by authorized laboratories;

Page 9 – Sang Joon Han, Access Bio, Inc.

- This product has been authorized only for the detection of proteins from SARS-CoV-2, not for any other viruses or pathogens; and

- The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19 under Section 564(b)(1) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3(b)(1), unless the declaration is terminated or authorization is revoked sooner.

The emergency use of your product as described in this letter of authorization must comply with the conditions and all other terms of this authorization.

**V. Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19 is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

_____

RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Enclosure

# EXHIBIT Q



65 Clyde Road, Suite A, Somerset, NJ 08873 U.S.A.
Tel: +1-732-873-4040 ‖ Fax: +1-732-873-4043 ‖ Email: info@accessbio.net

# Letter of Notification

Date: April 19, 2021

Dear Authorized Distributors and Laboratories Distributing and Using *CareStart™* COVID-19 Antigen.

This letter is to inform you of the amendment to the Emergency Use Authorization (EUA202625) of the *CareStart*™ COVID-19 Antigen test. As of April 12, 2021, the authorization scope was expanded, as follows (expanded use is underlined).

"*CareStart*™ COVID-19 Antigen test is a visually-read lateral flow immunochromatographic assay for the qualitative detection of the nucleocapsid protein antigen from SARS-CoV-2 in nasopharyngeal or anterior nasal swab specimens directly collected from individuals suspected of COVID-19 by their healthcare provider within five days of symptom onset, <u>or from individuals without symptoms or other epidemiological reasons to suspect COVID-19 when tested twice over two or three days with at least 24 hours and no more than 48 hours between tests</u>." For documentation purposes, please find the attached file 'Letter of Authorization,' or follow the link https://www.fda.gov/media/142916/download.

According to the expanded intended use, Access Bio, Inc. will be distributing the re-authorized labeling, including Instructions for Use (IFU), Quick Reference Instructions (QRI), and Fact Sheets for Healthcare Providers and Patients. For further action, kindly make the re-authorized labeling available on your website using the links; IFU/QRI (https://www.fda.gov/media/142919/download), Fact sheet for patients (https://www.fda.gov/media/142918/download) and Fact sheet for healthcare providers (https://www.fda.gov/media/142917/download).

The revised labeling reflecting the new intended use will be applied to products manufactured by Access Bio Inc. after April 12, 2021. If you have product batches in inventory listed in **Attachment A**, the re-authorized labeling is not applicable, and you should not use the products for POC serial screening purposes. While there were no changes to the product itself, it is important from the compliance point of view that the labeling matches the intended use.

Please contact Access Bio, Inc. immediately prior to distribution or use if you have any questions or concerns.

Name: Seungjae Baek

Job Title: Head of Quality Management

Signature:



65 Clyde Road, Suite A, Somerset, NJ 08873 U.S.A.
Tel: +1-732-873-4040 ‖ Fax: +1-732-873-4043 ‖ Email: info@accessbio.net

# Attachment A

**NOTE:** The following product batches in the table below should not be used for POC serial
screening purposes.

| Batch Number | | | |
|---|---|---|---|
| CH20J06 | CH20M01 | CH21A01 | CH21B01 |
| CH20J07 | CH20M02 | CH21A02 | CH21B01-1 |
| CH20K01 | CH20M03 | CH21A03 | CH21B02 |
| CH20K02 | CH20M04 | CH21A04 | CH21B03 |
| CH20K03 | CH20M05 | CH21A05 | CH21B04 |
| CH20K04 | CH20M06 | CH21A06 | CH21B05 |
| CH20L01 | CH20M07 | CH21A07 | CH21B06 |
| CH20L02 | CH20M08 | CH21A08 | CH21B07 |
| CH20L03 | CH20M09 | CH21A09 | CH21B08 |
| CH20L04 | CH20M10 | CH21A10 | CH21B09 |
| CH20L05 | CH20M10-1 | CH21A10-1 | CH21B10 |
| CH20L06 | CH20M12 | CH21A11 | CH21B11 |
| CH20L07 | CH20M13 | CH21A12 | CH21B12 |
| CH20L08 | CH20M14 | CH21A13 | CH21B13 |
| CH20L09 | CH20M15 | CH21A14 | CH21B14 |
| CH20K04 | CH20M16 | CH21A15 | CH21B15 |
| CH20L01 | CH20M17 | CH21A16 | CH21B16 |
| CH20L02 | CH20M18 | CH21A17 | CH21B17 |
| CH20L03 | CH20M19 | CH21A18 | CH21B18 |
| CH20L04 | CH20M20 | CH21A19 | CH21B19 |
| | CH20M21 | CH21A20 | CH21B20 |
| | CH20M22 | CH21A21 | CH21B21 |
| | CH20M23 | CH21A21-1 | CH21B22 |
| | | CH21A22 | CH21B23-1 |
| | | CH21A23 | CH21B31-1 |
| | | CH21A24 | |
| | | CH21A25 | |
| | | CH21A26 | |
| | | CH21A27 | |
| | | CH21A28 | |
| | | CH21A29 | |
| | | CH21A30 | |

# EXHIBIT R



65 Clyde Road, Suite A, Somerset, NJ 08873 U.S.A.
Tel: +1-732-873-4040 ‖ Fax: +1-732-873-4043 ‖ Email: info@accessbio.net

## Title: *CareStart*<sup>TM</sup> COVID-19 ANTIGEN TEST SHELF-LIFE EXTENSION NOTIFICATION

Date: July 19, 2021

To Whom It May Concern,

This letter is to inform you regarding the extension of the shelf-life expiration date of the Access Bio, Inc. *CareStart*<sup>TM</sup> COVID-19 ANTIGEN test. As a part of the EUA requirement, the US Food and Drug Administration (FDA) requested Access Bio, Inc. to indicate shelf life of the product based on the real-time stability data.

To comply with the requirement, Access Bio, Inc. submitted the real-time stability data on July 15th, 2021, and the FDA granted **twelve (12) months of shelf-life at 1–30°C for the *CareStart*<sup>TM</sup> COVID-19 ANTIGEN test as of July 16th, 2021.**

**Attachment A** lists the lot numbers of *CareStart*<sup>TM</sup> COVID-19 ANTIGEN products labeled with six (6). These products' shelf-life will now be extended to twelve (12) months.

Name: Seungjae Baek

Job Title: Sr. Managing Director, Quality Management

Signature:



65 Clyde Road, Suite A, Somerset, NJ 08873 U.S.A.
Tel: +1-732-873-4040 ‖ Fax: +1-732-873-4043 ‖ Email: info@accessbio.net

**Attachment A**

List of Lot Numbers printed with 6 months shelf life and new extended shelf life

| Lot Numbers | Printed Shelf Life (6 Months) | Extended Shelf Life (12 Months) |
|---|---|---|
| CH20J06, CH20J07 | FEB 2021 | AUG 2021 |
| CH20K01, CH20K02, CH20K03, CH20K04 | MAR 2021 | SEP 2021 |
| CH20L01, CH20L02, CH20L03, CH20L04, CH20L05, CH20L06, CH20L07, CH20L08, CH20L09 | APR 2021 | OCT 2021 |
| CH20M01, CH20M02, CH20M03, CH20M04, CH20M05, CH20M06, CH20M07, CH20M08, CH20M09, CH20M10, CH20M10-1, CH20M12, CH20M13, CH20M14, CH20M15, CH20M16, CH20M17, CH20M18, CH20M19, CH20M20, CH20M21, CH20M22, CH20M23 | MAY 2021 | NOV 2021 |
| CH21A01, CH21A02, CH21A03, CH21A04, CH21A05, CH21A06, CH21A07, CH21A08, CH21A09, CH21A10, CH21A11, CH21A12, CH21A13, CH21A14, CH21A15, CH21A16, CH21A17, CH21A18, CH21A19, CH21A20, CH21A21, CH21A21-1, CH21A22, CH21A23, CH21A24, CH21A25, CH21A26, CH21A27, CH21A28 CH21A29, CH21A30 | JUN 2021 | DEC 2021 |
| CH21B01, CH21B02, CH21B03, CH21B04, CH21B05, CH21B06, CH21B07, CH21B08, CH21B09, CH21B10, CH21B11, CH21B12, CH21B13, CH21B14, CH21B15, CH21B16, CH21B17, CH21B18, CH21B19, CH21B20, CH21B21, CH21B22, CH21B23, CH21B24 | JUL 2021 | JAN 2022 |

# EXHIBIT S

Staci Jennifer Riordan (Bar No. 232659)
 sriordan@nixonpeabody.com
Aaron M. Brian (Bar No. 213191)
 abrian@nixonpeabody.com
Harsh P. Parikh (Bar No. 281402)
 hparikh@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (213) 629-6001

Attorneys for Plaintiff
FN LOGISTICS, LLC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FN LOGISTICS, LLC<br><br>　　　Plaintiff,<br><br>　　vs.<br><br>THE COMPLIANCE FIRM LLC d/b/a/ COMPLIANT CARE STAFFING; and DOES 1 through 10,<br><br>　　　Defendants. | Case No. 2:21-cv-3312<br><br>**COMPLAINT AGAINST THE COMPLIANCE FIRM FOR (1) RESCISSION, (2) CONVERSION, (3) DECLARATORY RELIEF, (4) BREACH OF FIDUCIARY DUTY, (5) VIOLATION OF UNFAIR COMPETITION LAW; (6) INTENTIONAL MISREPRESENTATION; (7) NEGLIGENT MISREPRESENTATION; (8) PROFESSIONAL NEGLIGENCE; (9) BREACH OF CONTRACT; AND (10) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**Jury Trial Requested** |

Plaintiff FN LOGISTICS, LLC., alleges as follows:

**INTRODUCTION**

1.　　This lawsuit is being filed because The Compliance Firm LLC, d/b/a Compliant Care Staffing (the "Compliance Firm"), charged FN Logistics, LLC ("FNL") over $600,000 to provide Covid-19 testing services that resulted in just 40

　　　　　　　　　　　　　　　　　　　　　　　COMPLAINT

1    individuals being tested and now refuses to take any responsibility for its

2    misrepresentations and gross mismanagement.

3        2.    FNL is not a healthcare services provider.  It operates a warehouse in

4    Santa Fe Springs, California from which it distributes clothing sold by the retail

5    company Fashion Nova.

6        3.    Compliance Firm, however, represents itself to be an expert healthcare

7    consulting company that specializes in mHealth, health informatics, medical

8    engineering, and the laboratory and life sciences.  Compliance Firm advertises that,

9    among other healthcare services, it staffs medical providers at Covid-19 testing

10   clinics, and provides clients with affordable and efficient onsite Covid-19 testing.

11       4.    In November 2020, and in response to the ongoing public health

12   emergency and Covid-19 pandemic, FNL sought to offer Covid-19 testing services

13   for its warehouse employees to safeguard the health and wellbeing of all personnel

14   working at the warehouse.  Compliance Firm convinced FNL that it was legally

15   authorized and qualified to offer these testing services.  As it turned out, Compliance

16   Firm was not only unqualified and unauthorized to provide Covid-19 testing at FNL's

17   facility, as requested, Compliance Firm instead used this situation as a business

18   opportunity to charge FNL for a variety of expenses and services that were

19   unnecessary and contrary to the parties' understanding.

20       5.    Instead of providing FNL with a turnkey solution to help respond

21   quickly to the public health emergency, or arranging to contract with another

22   authorized test kit distributor or logistics provider that could immediately offer

23   Covid-19 testing services to FNL's employees, Compliance Firm went through the

24   expensive, cumbersome, and unreasonably time-consuming process of "building" a

25   Covid-19 testing infrastructure from scratch that would enable Compliance Firm to

26   be a CLIA-certified laboratory and acquire the testing kits from manufacturers.

27   Compliance Firm passed the entire cost of this unnecessary process off to FNL, even

28

1   though Compliance Firm planned to be the owner and sole operator of the testing lab
2   and services.

3       6.    Compliance Firm also misled FNL into paying $398,893.96, which the
4   Compliance Firm used to purchase thousands of *Carestart* COVID-19 Antigen
5   devices ("CSA Tests") from the manufacturer, and then arranged for delivery to FNL
6   premises.  Compliance Firm knew, but did not tell FNL, that neither party was
7   authorized to lawfully possess, warehouse, store, sell, broker, distribute, or provide
8   logistics services for the CSA Tests which are regulated by California pharmacy law
9   as a "dangerous device" because they cannot be used or administered without a
10  prescription.

11      7.    After many weeks of mismanagement and delays, and *just* two days of
12  inefficient and incredibly expensive testing services – which included a verbal
13  termination from Compliance Firm's manager that was "taken back" –  FNL was
14  forced to terminate the parties' relationship on January 6, 2021.

15      8.    Still, over the next two plus months, and despite numerous requests,
16  Compliance Firm refused to arrange to pick up unused CSA Tests that remained on
17  FNL's premises.  FNL was forced to contact that State Pharmacy Board and the
18  manufacturer of the CSA Tests to determine what should be done.  Ultimately, FNL
19  returned the CSA Tests to the manufacturer so they could be used prior to their
20  expiration date of April 2021.

21      9.    Compliance Firm represented itself as an expert in setting up and
22  running Covid-19 testing services to help FNL respond to the pandemic.  Compliance
23  Firm proved itself to be competent only in finding ways to charge FNL for
24  unnecessary work and services.  Compliance Firm misled FNL about its
25  qualifications, the cost of testing services, and the time needed to initiate testing
26  services for FNL's employees.  At no point did Compliance Firm – the self-
27  proclaimed expert healthcare consultant – advise FNL that a turn-key Covid-19
28  testing option could be obtained from any number of qualified sources.  Compliance

1  Firm instead used its alleged expertise to mislead FNL into funding Compliance
2  Firm's creation of an entirely new testing infrastructure, from the ground up.

3      10.    Compliance Firm should be required to return all moneys to FNL –
4  including the money that Compliance Firm said was necessary to purchase the
5  antigen test kits which FNL was not authorized to possess, warehouse, store, sell,
6  broker, distribute, or administer.

7  **PARTIES**

8      11.    Plaintiff FNL is a Delaware limited liability company with its
9  headquarters located in Vernon, California.  FNL converted from a corporation to a
10 limited liability company in December 2020.

11     12.    Defendant The Compliance Firm, d/b/a Compliant Care Staffing, is a
12 Nevada limited liability company with headquarters in Los Angeles, California.

13 **JURISDICTION AND VENUE**

14     13.    FNL's headquarters are in Vernon, California, and its relevant
15 warehouse is located at 12588 Florence Avenue, Santa Fe Springs, California.

16     14.    Compliance Firm is located at 1055 West 7th Street, Los Angeles,
17 California.

18     15.    Upon information and belief, the only member of Compliance Firm is
19 Brittany Stillwell, an individual who resides in Nevada.

20     16.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because
21 all parties are citizens of different states.

22     17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a
23 substantial part the events giving rise to the claims occurred in Los Angeles County,
24 which is in this judicial district.

25 **FACTS**

26     18.    In June 2020, the parties entered into a Staffing Agreement under which
27 Compliance Firm staffed Occupational Health Nurses to provide services at FNL's

28

COMPLAINT

1    warehouse.  FNL paid Compliance Firm directly for the work the Occupational
2    Health Nurses performed at FNL's facility.

3         19.    In August 2020, the parties entered into a Recruiting Agreement under
4    which Compliance Firm was to present candidates to FNL for possible employment.

5         20.    In August 2020, the parties also agreed to expand the scope of the
6    Staffing Agreement, and Compliance Firm began to staff various workers for FNL's
7    facility, including, but not limited to Yard Goat Drivers, Cherry Pickers and
8    Maintenance Tech workers.  FNL paid Compliance Firm directly for the hours the
9    staffed individuals worked at FNL's facility.

10        21.    In mid to late November 2020, FNL discussed with Compliance Firm
11   its desire to have its employees able to elect to be tested for Covid-19 on its premises.

12        22.    On November 23, 2020, FNL requested Compliance Firm's assistance
13   in obtaining "mail in covid19 diagnostic testing" which FNL thought could be
14   administered by George Villareal, the Occupational Health Nurse that Compliance
15   Firm staffed to work at FNL's facility.

16        23.    Compliance Firm replied immediately that it could obtain mail in Covid
17   tests.  Compliance Firm also suggested other types of Covid-19 tests, and provided
18   general price estimates.

19        24.    Over the next 24 hours, Compliance Firm continued to provide FNL
20   with detailed information about the various Covid-19 testing solutions that it could
21   provide as well as information about the steps necessary to set up a test administration
22   site at FNL's facility.

23        25.    On November 24, 2020, at 12:05 PM, Compliance Firm recommended
24   "CareStart nasal swab" as the best option.  Compliance Firm noted that the "kits are
25   $30/each, but [Compliance Firm was] only being charged $28.00." Compliance Firm
26   cautioned FNL that in order to get the tests by December 4, it would have to place
27   the order by 2:00 PM on November 25, 2020 (the next day).

28

26. On November 24, 2020, Compliance Firm issued an invoice to FNL for 12,800 CSA Tests. The invoice was dated November 24, 2020 and included a Due Date of November 24, 2020. The charged amount included $5,886.72 for "Late fee", which was applied (or was to be applied) on November 25, 2020 (the next day). With tax, and this Late fee, the total charge was $398,893.96.

27. The CSA Tests are *in vitro* diagnostic test kits that received Emergency Use Authorization (EUA) on October 8, 2020 from the Food and Drug Administration (FDA). The EUA only allows the test to be administered by a CLIA-approved laboratory; the packaging for the devices indicates that it is "Rx Use only." *See CareStart COVID-19 MDx RT-PCR - Instructions for Use (fda.gov)*.

28. The CSA Tests are considered "dangerous devices" and are also regulated by California pharmacy law. *See* Cal. Health & Saf. Code §§ 4022, 4160-4169.1. Compliance Firm did not, and does not, have the necessary approvals from the California Board of Pharmacy to handle the CSA Tests that it purchased from the manufacturer, charged to FNL, stored at FNL's facility, and then refused to pick up.

29. On November 25, 2020, Compliance Firm advised FNL that it already had a lab director, which was required, and that Compliance Firm was "finalizing the agreement for the medical director", which was also required. In the same communication, Compliance Firm included a table of its action items and associated due dates that would have the Covid-19 testing site operational by December 11, 2020.

30. In the same November 25, 2020 communication, Compliance Firm asked if FNL had a secure location where Compliance Firm could store some of the hundreds of thousands of tests it was procuring for its "North American clients." Compliance Firm also asked if FNL was interested in "lending its supply chain to distribute tests" and said this "could be mutually beneficial for both parties financially[.]"

31.     Compliance Firm agreed to provide Covid-19 testing services at FNL's facility.  The parties did not reduce their oral discussions, or their email exchanges, into a written, signed written agreement.

32.     On December 9, 2020, Compliance Firm sent FNL a detailed, four-page email, which purported to "provide a high level overview of the COVID testing process in hopes of being able to delegate tasks so that we can stay on track to begin testing on 12/27/2020."

33.     Compliance Firm stated in the December 9, 2020 email that the "lab is wholly owned by The Compliance Firm (CCS's parent company) but has been created and located at [FNL's warehouse] for the sole purpose of providing rapid onsite COVID testing to FN Logistics, FNL and its vendors[.]"

34.     In this December 9, 2020 email, Compliance Firm also notified FNL that the Lab Director would be Dr. Joanna Xie, MD, and the Lab Supervisor/Lead Scientist would be Dr. Matt Cruzen, PhD.  Compliance Firm attached resumes for both doctors to the email.

35.     On December 21, 2020, Compliance Firm sent an email to FNL notifying it, among other things, that a Dr. Hinton, MD, had agreed to serve as medical director.

36.     Finally, after numerous delays and scheduling adjustments by Compliance Firm, the onsite testing facility lab began operation on January 4, 2021. However, after just two days of testing, January 4 and January 5, it was clear that Compliance Firm could not effectively or efficiently operate the testing site.  Among other things, Compliance Firm's manager and responsible representative failed to arrive at the testing location, then terminated the relationship before she "took [] back" the termination.  This erratic behavior and inefficient testing, among other things, forced FNL to terminate the relationship and scramble to locate an alternative consultant that could provide an efficient and effective means of testing FNL's employees.

37.   FNL is not in the business of providing medical care or laboratory services, and has no experience or authorization to do so.  FNL is responsible for the distribution of clothing sold by Fashion Nova.  At all relevant times, FNL reasonably relied upon Compliance Firm's professed expertise in providing healthcare consulting and services, including onsite testing for Covid-19.

38.   Compliance Firm reinforced FNL's reasonable reliance by, among other things, identifying the purported licensure requirements and medical staffing requirements; procuring the CLIA licensure necessary to open a testing laboratory; recommending and procuring the CSA Tests; providing summaries of action items and steps necessary to having an operational testing site; and locating and retaining the lab director, lab supervisor, medical director, and other purportedly necessary personnel.

39.   At no time did Compliance Firm rely upon FNL for any expertise related to the creation of operation of the Covid-19 testing facility.  Nor would any such reliance be reasonable.  Compliance Firm was the purported healthcare consulting and staffing expert, who charged FNL tens of thousands of dollars for consulting services.

40.   It was Compliance Firm's recommendation that it build a testing lab from scratch at FNL's warehouse instead of contracting with an established, licensed and operational Covid-19 testing company.  This was an expensive, time-consuming, and wholly unnecessary process, and without notifying FNL in advance, Compliance Firm attempted to pass the entire cost of this process on to FNL.  Ultimately, Compliance Firm charged FNL $213,773.62 for this unnecessary process.  This included charges for consultants, monitors, directors, supervisors, and virtual observers.  Compliance Firm even charged FNL $1600 for iPads that would, ostensibly, be used by virtual observers.  In partial satisfaction of these charges, and without agreement or approval, Compliance Firm unilaterally withdrew $63,951.57 from deposit funds that FNL had previously placed with Compliance Firm to pay for

1  agreed-upon services; Plaintiff also paid $40,047.58 on December 29, 2020 to satisfy
2  another invoice connected to the Covid-19 testing.

3     41.   Despite  Compliance  Firm's  time-consuming  and  expensive
4  expenditures for creating a testing lab, and unbeknownst to FNL, Compliance Firm
5  did not have the California pharmacy licensure necessary to possess, warehouse,
6  store, sell, broker, distribute, or provide logistics services for, the CSA Tests.

7     42.   Compliance Firm did procure a waiver under the Clinical Laboratory
8  Improvement Amendments of 1988 (CLIA), which was required to administer
9  Covid-19 testing, and which also gave the manufacturer of CSA Tests the impression
10  Compliance Firm could purchase, store or distribute the test kits.  But Compliance
11  Firm was not authorized under California law to possess, warehouse, store, sell,
12  broker, distribute, or provide logistics services for these devices.

13     43.   Compliance Firm also concealed from FNL – an entity that has no
14  experience providing medical services and has no licenses or authority to do so – that
15  it was illegal for Compliance Firm to sell Covid-19 test kits directly to FNL, which
16  is not an authorized laboratory under the EUA. It was likewise illegal for FNL to
17  possess, store, warehouse or distribute the Covid-19 tests that Compliance Firm
18  arranged to purchase and transport to the FNL facility.

19     44.   Compliance Firm also misled FNL about the costs that would be
20  charged to FNL for creating the testing infrastructure – which Compliance Firm
21  would own by itself – and for providing its laboratory services.

22     45.   Based on invoices sent after FNL terminated the agreement, Compliance
23  Firm had charged FNL $213,773.62 just to "set up" the lab (i.e., before it
24  administered even a single test at FNL's facility), in addition to the $398,893.96
25  Compliance Firm charged FNL for purchasing the CSA Tests (which FNL is not
26  permitted under California law to even possess, let alone administer).

27  ///

28  ///

**CAUSES OF ACTION**

**First Cause of Action**

**Rescission – Unilateral Mistake - Sale of Covid-19 Testing Kits**

46.   FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

47.   On November 24, 2020, Compliance Firm purported to sell 12,800 CSA Tests to FNL, for the total cost of $398,893.96.

48.   The CSA Tests are considered "dangerous devices" under California law.

49.   It is unlawful in California to possess, warehouse, store, sell, broker, distribute, or provide logistics services for, "dangerous devices" such as the CSA Tests without a license from the California State Board of Pharmacy ("Board").

50.   Compliance Firm does not have a license or approval from the Board.

51.   FNL does not have a license or approval from the Board.

52.   FNL did not know that a license from the Board was required to possess, warehouse, store, sell, broker, distribute, or provide logistics services for, the CSA Tests.

53.   Compliance Firm knew or should have known that a license from the Board was required to possess, warehouse, store, sell, broker, distribute, or provide logistics services for, the CSA Tests.

54.   The parties' agreement or Compliance Firm to the CSA Tests to FNL was unlawful.

55.   FNL would not have entered into the agreement to purchase the CSA Tests from Compliance Firm had it known the contract was unlawful.

56.   The parties' agreement for Compliance Firm to sell CSA Tests to FNL should be rescinded – and all money FNL paid to Compliance Firm for the CSA Tests should be returned to FNL – pursuant to California Civil Code section 1689(b)(1).

**Second Cause of Action**

**Rescission – Unlawful Contract - Sale of Covid-19 Testing Kits**

57.     FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

58.     The parties' agreement to make the CSA Tests available to FNL was unlawful because the parties did not have the requisite approvals to from the Board.

59.     The parties are not equally at fault for entering into the unlawful contract as Compliance Firm was the self-proclaimed expert healthcare consultant that arranged for acquisition of the CSA Tests from the manufacturer.

60.     The parties' agreement for Compliance Firm to sell CSA Tests to FNL should be rescinded – and all money FNL paid to Compliance Firm for the CSA Tests should be returned to FNL – pursuant to California Civil Code section 1689(b)(5) and (b)(6).

**Third Cause of Action**

**Rescission – Consideration Failed – Creating Covid-19 Testing Lab**

61.     FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

62.     In response to FNL's request for on-site Covid-19 testing services, Compliance Firm recommended that it build a Covid-19 testing lab infrastructure from scratch instead of contracting with an established and licensed testing company that could begin testing almost immediately.

63.     Compliance Firm would own this brand new testing lab, which FNL was not qualified or authorized to operated.   FNL did not agree to pay the costs of Compliance Firm creating its brand new Covid-19 testing lab.

64.     Compliance Firm charged FNL $213,773.62, at least, for building the lab from scratch.   FNL, however, is not authorized to administer, possess, store, warehouse, or distribute Covid-19 testing kits.

65.     The lab that Compliance Firm charged FNL for is of no use – and has no value – to FNL.  The consideration has completely failed.

66.     The parties' agreement for Compliance Firm to provide on-site Covid-19 testing services should be rescinded – and all money Compliance Firm took for creating the testing lab infrastructure should be returned to FNL – pursuant to California Civil Code section 1689(b)(2).

### Fourth Cause of Action

### Conversion – Sale of Covid-19 Testing Kits

67.     FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

68.     Compliance Firm misled FNL into spending $398,893.96 on the CSA Tests, which FNL cannot lawfully administer, warehouse, store, sell, broker or distribute.

69.     FNL suffered harm as a result of being wrongly convinced by Compliance Firm to purchase the CSA Tests.

70.     The specific, identifiable sum of $398,893,96 was wrongly taken from FNL.  Compliance Firm continues to be in possession of this money.  The money should be returned.

### Fifth Cause of Action

### Conversion – Costs of Creating of Covid-19 Testing Lab

71.     FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

72.     Compliance Firm misled FNL into subsidizing Compliance Firm's efforts to build a new Covid-19 testing lab infrastructure from scratch which Compliance Firm would own for itself, and which FNL would not be qualified or authorized to operate.

73.     Compliance Firm wrongfully withdrew $63,951.57 from deposit funds that FNL had previously paid to Compliance Firm to pay for certain of the costs

1   Compliance Firm incurred to build its Covid-19 testing lab infrastructure. Plaintiff
2   also paid Defendant $40,057.58 for it what was misleadingly told were necessary
3   charges to provide Covid-19 tests to Plaintiff's workers.

4       74.    FNL did not agree to pay Compliance Firm for the cost of building its
5   brand new Covid-19 testing lab and FNL suffered harm as a result of Compliance
6   Firm wrongfully attempting to have FNL subsidize for those costs.

7       75.    The specific, identifiable sum of $104,009.15 was wrongly taken from
8   FNL. Compliance Firm continues to be in possession of this money. The money
9   should be returned.

10                          **Sixth Cause of Action**

11   **Request for Declaratory Relief – Costs of Creating Covid-19 Testing Lab**

12       76.    FNL restates and incorporates the allegations from the above paragraphs
13   as if they were stated in full herein.

14       77.    FNL did not agree to subsidize Compliance Firm's cost of building its
15   brand new Covid-19 testing site, which Compliance Firm would own and which FNL
16   was not qualified or authorized to operate.

17       78.    Compliance Firm has issued invoices to FNL totaling $213,773.62 for
18   costs associated with building its brand new Covid-19 testing lab.

19       79.    FNL disputes that it has any obligation to reimburse Compliance Firm
20   for those costs.

21       80.    FNL seeks a declaration that Compliance Firm is not entitled to seek
22   reimbursement from FNL for any costs associated with building Compliance Firms'
23   brand new Covid-19 testing lab.

24                          **Seventh Cause of Action**

25                          **Breach of Fiduciary Duty**

26       81.    FNL restates and incorporates the allegations from the above paragraphs
27   as if they were stated in full herein.

28

---

COMPLAINT

82. Compliance Firm had provided healthcare staffing solutions to FNL previously and was aware that FNL had no healthcare experience or expertise.

83. FNL reasonably relied upon Compliance Firm to provide expert healthcare consulting and services in connection with the Covid-19 testing lab.

84. FNL reasonably relied upon Compliance Firm's integrity to give honest advice and recommendations so that FNL could provide Covid-19 testing to its roughly 10,000 warehouse employees.

85. Compliance Firm knowingly undertook the responsibility to act on behalf of and for the benefit of FNL in providing Covid-19 testing services.

86. Compliance Firm owed fiduciary duties to FNL in connection with the provision of Covid-19 testing services.

87. Compliance Firm acted in its own financial self-interest in building a Covid-19 testing lab, from scratch and which it would own outright, instead of recommending or even offering to FNL the option of contracting with a previously established, fully licensed, Covid-19 testing company that could provide services almost immediately to FNL and without need for any secondary consulting work by Compliance Firm.

88. Compliance Firm stood to gain financially from the creation of a Covid-19 testing lab from scratch, including but not limited to the consulting services that Compliance Firm charged FNL in connection with that process.

89. Compliance Firm's failure to place FNL's interest ahead of its own was a breach of the fiduciary duties it owed to FNL.

90. Compliance Firm also breached its fiduciary duty to advise FNL that neither Compliance Firm or FNL could lawfully administer, warehouse, store, sell, broker, distribute, or provide logistics services for, the CSA Tests.

91. FNL suffered harm as a result of these breaches, including damages equal to the amount of money Compliance Firm charged for creating the Covid-19 testing lab and for the CSA Tests.

**Eighth Cause of Action**

**Violation of the Unfair Competition Law – Business & Professions Code §**
**17200**

92.   FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

93.   Compliance Firm violated California's Pharmacy Law, Business & Professions Code section 4600 *et seq.* when, among other things, it purchased the CSA Tests for resale to FNL.

94.   Compliance Firm fraudulently represented to FNL that FNL could purchase, possess and store the CSA Tests.

95.   Compliance Firm took advantage of FNL's lack of knowledge and expertise to sell FNL CSA Tests that FNL could not lawfully possess, store or administer.

96.   Compliance Firm also took advantage of FNL's lack of knowledge and expertise to mislead FNL about setting up the Covid-19 testing lab, which Compliance Firm unreasonably built from scratch and then attempted to have FNL pay the entire cost of building this lab which Compliance Firm would own and which FNL was not qualified or authorized to operate.

97.   Compliance Firm's unlawful, fraudulent and unfair business acts and practices caused damage to FNL equal to the amount of money that FNL spent on the CSA Tests and the brand-new Covid-19 testing lab, which was fully owned by Compliance Firm.

**Ninth Cause of Action**

**Intentional Misrepresentation**

98.   FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

99.   Compliance Firm represented to FNL that FNL could purchase, store and possess the CSA Tests.  Compliance Firm even suggested that FNL could store

tests for other clients of Compliance Firm and possibly get in the business of shipping tests for Compliance Firm.

100. Compliance Firm made these representations to convince FNL to buy 12,800 CSA Tests from Compliance Firm for a total of $398,893.96.

101. Compliance Firm knew that FNL was not authorized to purchase, store or possess the CSA Tests.

102. FNL reasonably relied on Compliance Firm's representation and agreed to buy the CSA Tests from Compliance Firm.

103. FNL would not have agreed to buy the CSA Tests if it has known it was not authorized to purchase, store or possess them.

104. As a result of Compliance Firm's misrepresentation, FNL purchased and was left in possession of CSA Tests that it could not use.

105. FNL suffered damages as a result of its reliance on Compliance Firm's misrepresentation equal to the amount money it paid Compliance Firm for the CSA Tests.

### Tenth Cause of Action

### Negligent Misrepresentation

106. FNL restates and incorporates the allegations from paragraphs 1-91, above, as if they were stated in full herein.

107. Compliance Firm represented to FNL that FNL could purchase, store and possess the CSA Tests.

108. Compliance Firm made this representation to convince FNL to buy 12,800 CSA Tests from Compliance Firm for a total of $398,893.96.

109. Compliance Firm had no reasonable grounds for believing that FNL could purchase, store or possess the CSA Tests.

110. FNL reasonably relied on Compliance Firm's representation and agreed to buy the CSA Tests from Compliance Firm.

111.    FNL would not have agreed to buy the CSA Tests if it has known it was not authorized to purchase, store or possess them.

112.    As a result of Compliance Firm's misrepresentation, FNL purchased and was left in possession of CSA Tests that it could not use.

113.    FNL suffered damages as a result of its reliance on Compliance Firm's misrepresentation equal to the amount money it paid Compliance Firm for the CSA Tests.

### Eleventh Cause of Action

### Professional Negligence

114.    FNL restates and incorporates the allegations from the paragraphs 1-96 and 106-113, above, as if they were stated in full herein.

115.    Compliance Firm is a healthcare services consultant and provider that claims to have expertise staffing medical providers at Covid-19 testing sites and providing affordable and efficient onsite Covid-19 testing.

116.    FNL retained Compliance Firm as its healthcare consultant for purposes of providing on-site Covid-19 testing at its warehouse facility.

117.    Compliance Firm had a duty to use the skill, prudence and diligence that other members of its profession commonly possess and exercise.

118.    Compliance Firm had a duty to advise FNL that FNL was not authorized to purchase, possess, store, warehouse, distribute or administer the CSA Tests.

119.    Compliance Firm had a duty to advise FNL that FNL could contract with established and licensed Covid-19 testing companies that could begin to administer on site tests at FNL's warehouse facility almost immediately.

120.    Compliance Firm had a duty to advise FNL it was not necessary, or prudent, to pay for Compliance Firm to create a Covid-19 testing lab from scratch, especially as FNL would not be licensed to operate the lab.

121. Compliance Firm's failure to properly advise and consult FNL caused FNL to spend $398,893.96 on CSA Tests that it is not authorized to possess, store or distribute, let alone administer to its employees.

122. Compliance Firm's failure to properly advise and consult FNL caused FNL to incur charges of $213,773.62, at least, for Compliance Firm to create a Covid-19 testing lab from scratch.

**Twelfth Cause of Action**

**Breach of Oral Contract**

123. FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

124. Compliance Firm was hired to provide on-site Covid-19 testing.

125. Instead, Compliance Firm unlawfully sold FNL 12,800 Covid-19 testing kits and attempted to have FNL subsidize Compliance Firm's creation of a brand new Covid-19 testing lab, which Compliance Firm would own and FNL was not qualified or authorized to operate.

126. Ultimately, Compliance Firm was unable to effectively or efficiently do the only thing FNL hired it for – to administer on-site Covid-19 tests.

127. Compliance Firm's failure to perform its obligations under the parties' agreement caused damages to FNL of $502,903.11, which is the total amount that FNL paid to Compliance Firm for the CSA Tests and for Compliance Firm's creation of its own testing lab.

**Thirteenth Cause of Action**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

128. FNL restates and incorporates the allegations from the above paragraphs as if they were stated in full herein.

129. The parties had a contract under which Compliance Firm would provide Covid-19 testing kits and on-site Covid-19 testing services at FNL's warehouse facility.

130.    FNL has performed all of the significant things that are required by the parties' contract, or such performance is excused.

131.    All conditions required for Compliance Firm's performance have occurred or have been excused.

132.    Compliance Firm's conduct prevented FNL from receiving the benefits under the contract in that FNL paid $398,893.96 for CSA Tests that it is not authorized to possess, store or distribute, let alone administer to its employees, and FNL has incurred charges of $213,773.62 for a Covid-19 testing lab that it cannot use or access and which is fully and completely owned by Compliance Firm.

133.    Compliance Firm did not act fairly or in good faith.

134.    FNL suffered damages equal to the amount of money it has paid to Compliance Firm, and or been charged by Compliance Firm, for services that were not provided or were of no value to FNL.

## **REQUEST FOR JURY TRIAL**

135.    FNL requests a jury trial on all causes of action for which it has the right to jury.

## **PRAYER FOR RELIEF**

WHEREFORE, FNL's pray for judgment as follows:

1.      As to the First and Second Cause of Action - Rescission, FNL prays for judgment against Compliance Firm for rescission of the sale of the CSA Tests and monetary damages of $398,893.96;

2.      As to the Third Cause of Action – Rescission, FNL prays for judgment against Compliance Firm for rescission of the agreement for Compliance Firm to provide a Covid-19 testing lab and monetary damages of $104,009.15;

3.      As to the Fourth Cause of Action – Conversion, FNL prays for judgment against the Compliance Firm for monetary damages in the amount of $398,893.96;

4.      As to the Fifth Cause of Action – Conversion, FNL prays for judgment against Compliance Firm for monetary damages in the amount of $104,009.15;

5.     As to the Sixth Cause of Action – Declaratory Relief, FNL prays for an order declaring that Compliance Firm is not entitled to seek reimbursement from FNL for any costs associated with Compliance Firm building its brand new Covid-19 testing lab;

6.     As to the Seventh Cause of Action – Breach of Fiduciary Duty, FNL prays for judgment against the Compliance Firm for monetary damages in the amount of $502,903.11;

7.     As to the Eighth Cause of Action – Violation of UCL, FNL prays for judgment against Compliance Firm for monetary damages in the amount of $502,903.11;

8.     As to the Ninth Cause of Action – Intentional Misrepresentation, FNL prays for judgment against the Compliance Firm for money damages in the amount of $398,893.96;

9.     As to the Tenth Cause of Action – Negligent Misrepresentation, FNL prays for judgment against the Compliance Firm for money damages in the amount of $398,893.96;

10.    As to the Eleventh Cause of Action – Professional Negligence, FNL prays for judgment against Compliance Firm for monetary damages in the amount of $502,903.11;

11.    As to the Twelfth Cause of Action – Breach of Contract, FNL prays for judgment against Compliance Firm for monetary damages in the amount of $502,903.11;

12.    As to the Thirteenth Cause of Action – Breach of Implied Covenant of Good Faith and Fair Dealing, FNL prays for judgment against Compliance Firm for monetary damages in the amount of $502,903.11;

13.    For an award of attorneys' fees;

14.    For prejudgment interest;

///

COMPLAINT

15. For an award of exemplary and punitive damages in an amount to be proven at trial;

16. For costs of suit; and

17. For such other relief as the Court may deem proper and just.

Dated: April 16, 2021                          NIXON PEABODY LLP


                                               By: */s/Staci Jennifer Riordan*
                                                   Staci Jennifer Riordan
                                                   Aaron M. Brian
                                                   Harsh P. Parikh
                                                   Attorneys for Plaintiff

# EXHIBIT T

Staci Jennifer Riordan (Bar No. 232659)
  sriordan@nixonpeabody.com
Aaron M. Brian (Bar No. 213191)
  abrian@nixonpeabody.com
Harsh P. Parikh (Bar No. 281402)
  hparikh@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (213) 629-6001

Attorneys for Plaintiff
FN LOGISTICS, LLC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FN LOGISTICS, LLC | Case No. 2:21-cv-03312-GW-MAR |
| Plaintiff, | **PLAINTIFF FN LOGISTICS, LLC'S REQUEST FOR ENTRY OF DEFAULT AGAINST THE COMPLIANCE FIRM LLC; DECLARATION OF STACI JENNIFER RIORDAN IN SUPPORT THEREOF** |
| vs. | |
| THE COMPLIANCE FIRM LLC d/b/a/ COMPLIANT CARE STAFFING; and DOES 1 through 10, | |
| Defendants. | |

ATTENTION CLERK OF THE ABOVE-ENTITLED COURT:

Plaintiff FN LOGISTICS, LLC ("Plaintiff") hereby requests that the Clerk of the above-entitled Court enter default in this matter against Defendant THE COMPLIANCE FIRM LLC d/b/a/ COMPLIANT CARE STAFFING; ("Defendant"), on the grounds that said Defendant has failed to appear or otherwise respond to the Complaint filed in this action within the time prescribed by the Federal Rules of Civil Procedure.

Plaintiff served the operative Complaint and Summons on Defendant on April 19, 2021 as evidence by the Proof of Service filed with the United States District Court, Central District, on April 22, 2021 (Dkt. No. 9). To date, no

1    response to the operative Complaint has been filed by Defendant and the time for

2    filing this response has now expired.

3        The above-stated facts are set forth in the accompanying Declaration of Staci

4    Jennifer Riordan which is filed concurrently herewith.

5

6

7    Dated: June 14, 2021                    NIXON PEABODY LLP

8

9                                            By: /s/ Staci Jennifer Riordan
                                                 Staci Jennifer Riordan
10                                               Aaron M. Brian
                                                 Harsh P. Parikh
11                                               Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR ENTRY OF DEFAULT

DECLARATION OF STACI JENNIFER RIORDAN

I, Staci Jennifer Riordan, hereby declare as follows:

1. I am partner at Nixon Peabody LLP, attorneys of record for Plaintiff FN LOGISTICS, LLC. I am licensed to practice law in Federal and State court in California. I have personal knowledge of the following facts, and if called as a witness, could and would competently testify thereto under oath.

2. Plaintiff FN LOGISTICS, LLC has filed an action entitled *Fashion Nova, LLC v. The Compliance Firm, LLC, et al.;* Case No. 2:21-cv-03312-GW-MAR.

3. Defendant THE COMPLIANCE FIRM LLC d/b/a/ COMPLIANT CARE STAFFING is and was a named Defendant in the above-stated action.

4. My firm caused to have the operative Complaint and Summons in the above-named action served on The Compliance Firm on April 19, 2021, as evidenced by the Proof of Service filed with the United States District Court, Central District, on April 22, 2021 (Dkt. No. 9).

5. The Compliance Firm has failed to file or serve a response to the operative Complaint and the time for filing a response to the Complaint has now expired.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of June, 2021, at Los Angeles, California.

*/s/ Staci Jennifer Riordan*
Staci Jennifer Riordan

4819-9269-4766.1

- 3 -                                          REQUEST FOR ENTRY OF DEFAULT

# EXHIBIT U



Brittany Stillwell
1055 W 7th St. PH 33
Los Angeles, CA 90017
Tel: 702-781-1908

August 12, 2021

**RE: FN LOGISTICS, LLC v. THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and
DOES 1 though 10; Case No. 2:21-cv-03312-GW-MAR**

To whom it may concern:

Northwest Registered Agent, Inc. is the listed registered agent for THE COMPLIANCE FIRM LLC in the
State of California.

On August 4, 2021, Northwest Registered Agent, Inc. received Service of Process document in the matter
of FN LOGISTICS, LLC v. THE COMPLIANCE FIRM LLC, d/b/a COMPLIANT CARE STAFFING; and
DOES 1 though 10, Case No. 2:21-cv-03312-GW-MAR. The Service of Process document was received
via standard mail and a copy of the same has been included with this letter.

On August 9, 2021, the document was reviewed, approved, and then immediately uploaded to our client's
account. This Service of Process is the only document regarding this matter which we have received on
behalf of our client since the Summons in a Civil Action received on April 19, 2021.

The Service of Process document is dated July 14, 2021, and was mailed to Northwest Registered Agent,
Inc. at 1267 Willis Street, Ste. 200, Redding, CA 96001. However, that address is no longer associated with
Northwest Registered Agent, Inc.

On or about May 18, 2021, Northwest Registered Agent, Inc. filed a Statement of Information and 1505
Certificate, with the California Secretary of State, to update our address from the aforementioned Redding
address to the correct address at 2108 N St., Ste. N, Sacramento, CA 95816.

As such, the Service of Process was initially sent to the incorrect address before being forwarded to our
current address, causing a delay in receipt.

Sincerely/Regards,

Tom Glover

Tom Glover, Assistant Secretary
Northwest Registered Agent Inc.

TG/bh
Encl: Service of Process Document
cc: client; file

1   Staci Jennifer Riordan (Bar No. 232659)
      sriordan@nixonpeabody.com
2   Aaron M. Brian (Bar No. 213191)
      abrian@nixonpeabody.com
3   Harsh P. Parikh (Bar No. 281402)
      hparikh@nixonpeabody.com
4   NIXON PEABODY LLP
    300 South Grand Avenue, Suite 4100
5   Los Angeles, CA 90071
    Tel: (213) 629-6000
6   Fax: (213) 629-6001

7   Attorneys for Plaintiff
    FN LOGISTICS, LLC.
8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12   FN LOGISTICS, LLC                 Case No. 2:21-cv-03312-GW-MAR

13          Plaintiff,                 **APPLICATION FOR DEFAULT
                                       JUDGMENT BY CLERK**
14   vs.

15   THE COMPLIANCE FIRM LLC
     d/b/a/ COMPLIANT CARE
16   STAFFING; and DOES 1 through 10,

17          Defendants.

18

19

20       TO THE CLERK OF THE ABOVE-CAPTIONED COURT:

21       Pursuant to Rule 55(b)(1) of the Federal Rules of Civil Procedure, Plaintiff FN

22   LOGISTICS, LLC ("Plaintiff"), hereby requests a default judgment against

23   Defendant THE COMPLIANCE FIRM LLC d/b/a/ COMPLIANT CARE

24   STAFFING ("Defendant").

25       1.   A request for entry of the clerk's default for failure to respond or appear

26   was filed herein (Dkt. No. 10), and entered by the clerk (Dkt. No. 11), on June 14,

27   2021.

28

2.     The Declarations of Staci Jennifer Riordan and Brittania Allison, filed herewith, establish proof that Plaintiff is owed (a) a sum certain due (or a sum that can be made certain by computation); (b) pursuant to a contract or statutory claim; (c) that defendant is not in military service and is neither a minor nor an incompetent person; and (d) that costs are properly awardable by the clerk.

3.     The amount that Plaintiff is owed is **$363,260.35.**

The above-stated facts are set forth in the accompanying Declarations of Staci Jennifer Riordan and Brittania Allison, which are filed concurrently herewith.

Dated: July 14, 2021                    NIXON PEABODY LLP


                                        By: */s/ Staci Jennifer Riordan*
                                             Staci Jennifer Riordan
                                             Aaron M. Brian
                                             Harsh P. Parikh
                                             Attorneys for Plaintiff

APPLICATION FOR DEFAULT JUDGMENT
CASE NO. 2:21-CV-03312-GW-MAR

## DECLARATION OF BRITTANIA ALLISON

I, Brittania Allison, hereby declare as follows:

1.      I am the Accounts Payable Manager at FN Logistics, LLC ("FNL"). I have personal knowledge of the following facts, and if called as a witness, could and would competently testify thereto under oath.

2.      As part of my regular duties and responsibilities at FNL, I have personal knowledge of and familiarity with the invoices that Compliant Care Staffing ("CCS") issued to FNL, and the amounts that FNL paid to CCS.

3.      Attached as **Exhibit A** is a true and correct copy of Invoice No. 1033, from CCS, dated November 24, 2020, in the amount of $398,893.96. This invoice was for the purchase of 12,800 CareStart Antigen testing kits ("Testing Kits"). FNL paid the full amount of this invoice to CCS on November 25, 2020. The per unit amount that FNL paid for the Testing Kits was **$31.16**.

4.      Attached as **Exhibit B** is a true and correct copy of a receipt dated March 26, 2021, confirming that Intrivo Diagnostics picked up 8,320 unused Testing Kits from FNL.

5.      As set forth in the Complaint, FNL was not authorized to possess or store the Testing Kits, which are "dangerous devices" under California pharmacy law and cannot be used or administered without a prescription. FNL received no refund of the money it paid for the unused Testing Kits.

6.      The total cost to FNL for the 8,320 unused Testing Kits that it had to return was **$259,251.20**.

7.      CCS also charged FNL for services related to building a new Covid Testing Lab, which was unnecessary and which FNL could not operate. In total, FNL paid CCS **$104,009.15** for services related to building the new Covid Testing Lab.

8.      Attached as **Exhibit C** are true and correct copies of invoices 1038, 1040, 1043 and 1045, which confirm that FNL paid CCS a total of **$104,009.15** for services related to building a new Covid Testing Lab. Each of the amounts that FNL

APPLICATION FOR DEFAULT JUDGMENT
CASE NO. 2:21-CV-03312-GW-MAR

1  paid, or which CCS withdrew from pre-paid deposits, are highlighted in the attached
2  exhibit.

3     9.     FNL paid CCS a total of **$363,260.35** for CareStart Antigen Testing Kits
4  it had to return, and for building a new Covid Testing Lab that FNL was unable to
5  use.

6     10.    Based on the aforementioned calculations (**$104,009.15 + $259,251.20**),
7  CCS owes FNL the total sum certain of **$363,260.35**.

8     I declare under penalty of perjury of the laws of the United States of America
9  that the foregoing is true and correct.

10    Executed this _14_ th day of July 2021, at _Vernon_____, California.

13                                    Brittania Allison

**DECLARATION OF STACI JENNIFER RIORDAN**

I, Staci Jennifer Riordan, hereby declare as follows:

1.      I am partner at Nixon Peabody LLP, attorneys of record for Plaintiff FN LOGISTICS, LLC. I am licensed to practice law in Federal and State court in California. I have personal knowledge of the following facts, and if called as a witness, could and would competently testify thereto under oath.

2.      Defendant The Compliance Firm LLC, d/b/a Compliant Care Staffing, is a Nevada limited liability company.

3.      Defendant has not appeared in this action and has not responded to the complaint (Dkt. No. 1) within the time permitted by law.

4.      Defendant is not a minor, incompetent person, or a person in military service or otherwise exempted from default judgment under the Servicemembers Civil Relief Act (50 U.S.C. App. § 521).

5.      The clerk's default was entered herein on June 14, 2021 (Dkt. No. 11).

6.      Plaintiff's damages are based upon a contract between the parties, as set forth in the First, Second, Third, Twelfth and Thirteenth Causes of Action.

7.      As a result of the default entered on June 14, 2021, Plaintiff is entitled judgment against Defendant for the sum certain amount of **363,260.35**, which is the amount of money that Plaintiff paid Defendant for services and equipment that could not be used because neither party had the proper licensure necessary to store Covid testing kits and operate a Covid testing lab.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of July, 2021, at Los Angeles, California.

*/s/ Staci Jennifer Riordan*
Staci Jennifer Riordan

# EXHIBIT A

**Compliant Care Staffing**
1055 W 7th Street, 33rd Floor
Los Angeles, CA 90017
+1 7472712100
billing@thecompliancefirm.com
www.thecompliancefirm.com

 Compliant Care
Staffing

# INVOICE

**BILL TO**

FN Logistics, Inc.
12588 Florence Avenue
Santa Fe Springs, CA 90670
USA

| | |
|---|---|
| **INVOICE #** | 1033 |
| **DATE** | 11 24 2020 |
| **DUE DATE** | 11 24 2020 |
| **TERMS** | Due on receipt |

| WEEK END DATE | EMPLOYEE | DESCRIPTION | LABOR TYPE | HRS | RATE | TOTAL |
|---|---|---|---|---|---|---|
| 11 24 2020 | CareStart Antigen Test | | | 12,800 | 28.00 | 358,400.00T |
| | Late fee | 1.5% - Applied on Nov 25, 2020 | | | | 5,886.72T |

12,800 COVID antigen tests

For Wire Transfers:
Bank: JP Morgan Chase
Account Name: The Compliance Firm
Address: 1055 W 7th St, 33rd FL, Los Angeles, CA 90017
Account number: REDACTED
Routing number: REDACTED

| | |
|---|---|
| SUBTOTAL | 364,286.72 |
| TAX | 34,607.24 |
| TOTAL | 398,893.96 |
| BALANCE DUE | **$398,893.96** |

# EXHIBIT B

## RECEIPT FOR CARESTART COVID-19 ANTIGEN TEST KITS

On March 26, 2021, Reeve Benaron of Intrivo Diagnostics, picked up 8,320 unused CareStart COVID-19

Antigen Testing Kits manufactured by Access Bio, Inc. from the Fashion Nova Logistics warehouse

located at 12588 Florence Avenue, Santa Fe Springs, California.  The CareStart test kits are contained in

13 unopened cartons; each carton contains 32 boxes and each box contains 20 tests.  The exterior of

each carton bears a sticker with the following information:

- Item Name: Covid-19 CH Ag RDT Multi Kit20 1-30C
- ABI Item Code: GCHP20E501
- ABI Lot No: CH20L03
- ABI Job No: 20K24

Date: 3/26/21

Reeve Benaron
Intrivo Diagnostics

Date: 3/26/2021

James Esquer
FashionNova Logistics

# EXHIBIT C

Compliant Care Staffing
1055 W 7th Street, 33rd Floor
Los Angeles, CA 90017
+1 7472712100
billing@thecompliancefirm.com
www.thecompliancefirm.com

 Compliant Care
Staffing

# INVOICE

**BILL TO**

FN Logistics, Inc.
12588 Florence Avenue
Santa Fe Springs, CA 90670
USA

INVOICE # 1038
DATE 12 14 2020
DUE DATE 12 29 2020
TERMS Net 15

| WEEK END DATE | EMPLOYEE | DESCRIPTION | LABOR TYPE | HRS | RATE | TOTAL |
|---|---|---|---|---|---|---|
| 07 31 2020 | Britt Stillwell | consultancy (complimentary) | | 10 | 0.00 | 0.00 |
| 08 31 2020 | Britt Stillwell | consultancy (complimentary) | | 10 | 0.00 | 0.00 |
| 10 13 2020 | Safety Audit by Gold Safety | Safety audit completed by David Gold from Gold Health & Safety Consulting | | 1 | 851.91 | 851.91 |
| 10 28 2020 | 5 panel OralTox drug test | oral drug tests | | 50 | 7.50 | 375.00T |
| 10 31 2020 | Britt Stillwell | consultancy (complimentary) | | 10 | 0.00 | 0.00 |
| 11 09 2020 | WorkCare | Implementation Fee | | 1 | 1,500.00 | 1,500.00 |
| 11 11 2020 | WorkCare - CMD | Consulting Medical Director Services | | 1 | 500.00 | 500.00 |
| 11 14 2020 | Dr. Phillip Cotter | Lab consultant - CLIA application for CCS @ FN; LFS lab registration fees | | 1 | 967.74 | 967.74 |
| 11 21 2020 | FN COVID lab supervisors (PhD and PharmD) | FN COVID lab supervisors (Dr. Cruzen, PhD and Dr. Scott, PharmD - billed monthly Prorated) | | 126 | 50.00 | 6,300.00 |
| 11 21 2020 | Dr. Xie - lab director | Lab director | | 1 | 375.00 | 375.00 |